VINEET BHATIA *(PHV Forthcoming)*
vbhatia@susmangodfrey.com
SHAWN RAYMOND *(PHV Forthcoming)*
sraymond@susmangodfrey.com
ROBERT SAFI *(PHV Forthcoming)*
rsafi@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiff CDK Global, LLC, a*
*Delaware limited liability company*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CDK GLOBAL, LLC, a Delaware limited liability company, | Case No.  25-1394 |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| TEKION CORP., a Delaware corporation, and INDESIGN DATA, LLC, a Florida limited liability company, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# INTRODUCTION

1.　　This case is about cybersecurity hacking and unauthorized computer access. Defendants Tekion Corp. ("Tekion") and InDesign Data, LLC ("InDesign") are engaged in a sophisticated, coordinated, and illicit campaign to surreptitiously penetrate protected electronic data management systems created by Plaintiff CDK Global, LLC ("CDK"), and in so doing access confidential material that includes proprietary formulas, calculations, and other intellectual property that is used to serve CDK's customers.

2.　　CDK is the leading automotive retail software provider. Its solutions help dealers and auto manufacturers ("OEMs") run their businesses more efficiently, drive improved profitability, and create frictionless purchase and ownership experiences for consumers. With more than 40 years of experience, CDK serves nearly 15,000 automotive and truck dealers in North America.

3.　　CDK's Dealer Management System ("DMS") is a suite of powerful software tools that equip dealers with the solutions they need in one fully integrated platform. CDK has built countless "business rules" into the DMS to cover nearly every business scenario that dealers face. The DMS's proprietary logic and intelligence streamline and automate processes across the dealership while delivering data-driven insights that light the path to increased profits. The DMS also serves as a hub that connects CDK's dealer–customers to the broader automotive retail ecosystem and facilitates their transactions with consumers, OEMs, credit bureaus, and other third parties. As such, the DMS houses vast amounts of CDK's intellectual property, sensitive consumer information, and confidential third-party data.

4.　　Tekion is a relatively new entrant to the automotive software industry that claims to offer superior solutions. CDK welcomes ***legitimate*** competition—rivalry on the merits—as a force to propel continuous innovation that ensures CDK's offerings remain best in class, and customers receive best in class service. But Tekion is not just trying to compete with CDK on the merits and instead has sought to gain market share through unlawful practices that damage competition and harm customers.

1

5.      CDK recently discovered that Tekion has been converting new dealer–customers by enticing them to breach their contracts with CDK by helping Tekion attempt to circumvent CDK's robust set of DMS access controls and secretly enter the DMS, thereby gaining access to CDK's intellectual property, sensitive consumer information, and confidential third-party data that resides on the DMS. Tekion then attempts to indiscriminately scrape and exfiltrate data from the DMS so that dealers can walk away from their contracts with CDK without honoring their payment obligations. Tekion has enlisted InDesign as a co-conspirator in this surreptitious cybersecurity hacking campaign that violates federal and state laws, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, the Digital Millenium Copyright Act, 17 U.S.C. § 1201 *et seq.*, the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, the Defend Trade Secrets Act, 18 U.S.C § 1836 *et seq.*, the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

6.      CDK confronted Tekion with this discovery in December 2024. Rather than deny its illegal conduct, Tekion filed a meritless action now pending in this Court as Case No. 3:24-cv-08879, *Tekion Corp. v. CDK Global, LLC*, citing the need for fair and lawful competition in the automotive retail software space.

7.      Defendants' conduct demonstrates that Tekion is right about one—and only one—thing: this Court must intervene to restore a fair and legal playing field among CDK and its competitor Tekion. CDK therefore brings this action to remediate and eradicate Defendants' unlawful methods of competing with CDK, to protect CDK's proprietary information, and to ensure the security and integrity of the DMS upon which thousands of CDK users and millions of consumers depend.

## PARTIES

8.      Plaintiff CDK Global, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business and corporate headquarters located at 11809 Domain Drive, Suite 200, Austin, Texas 78758.

9.      Defendant Tekion Corp. is a corporation organized under the laws of the State of Delaware with its principal place of business located at 5934 Gibraltar Dr, Pleasanton, California 94588.

10.     Defendant InDesign Data, LLC is a limited liability company organized under the laws of the State of Florida with its principal place of business located at 175 SW 7th Street, Unit 2010 Miami, Florida 33130.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under several federal statutes, as alleged herein.

12.     The Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1400 as this action arises under the Digital Millenium Copyright Act, which is an Act of Congress relating to copyrights.

13.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state law claims are so related to CDK's federal law claims that they form part of the same case or controversy.

14.     This Court has personal jurisdiction over Tekion because Tekion maintains its principal place of business in Alameda County, California, and is thus a resident of this judicial district; maintains minimum contacts with the United States, this judicial district, and this State; and intentionally avails itself of the laws of this State by conducting a substantial amount of business in California.

15.     This Court has personal jurisdiction over InDesign because InDesign purposefully directed itself at the State of California when it committed intentional acts expressly aimed at the forum state that caused harm that InDesign knew was likely to be suffered in the forum state. Defendant InDesign intentionally obtained California dealership credentials to CDK's DMS without authorization; fraudulently represented itself to CDK's network as an employee of California dealerships with authority to access CDK's network; connected to CDK's network via

3

California dealerships' local networks; using those connections, executed at least tens of thousands of automated, high-frequency queries on CDK's network; and scraped and downloaded massive amounts of data through those same California networks, all while inducing California dealerships to breach their contracts with CDK. InDesign's purposeful actions to inject itself into California makes this Court's exercise of jurisdiction consistent with fair play and substantial justice because Defendant targeted California dealerships and worked with Defendant Tekion to commit unlawful access and scraping of the DMS in California. Thus, InDesign has had sufficient contact with California in connection with the subject matter of this action to render the Court's exercise of jurisdiction over InDesign proper and necessary. California has an interest in adjudicating the dispute, and it is most judicially efficient to resolve the claims against Defendant InDesign in the same jurisdiction as Defendant Tekion because Defendants conspired and worked together to infiltrate CDK's DMS.

16.     This Court's exercise of personal jurisdiction over InDesign is also consistent with Cal. Code Civ. Proc. § 410.10, which permits exercise of jurisdiction that, as here, does not conflict with the California and United States constitutions where InDesign has purposefully directed its actions toward California and a substantial part of the unlawful actions giving rise to CDK's claims occurred in, and were targeted to, California, as alleged in the preceding paragraph and further alleged below.

17.     Under Cal. Penal Code § 502(j), "a person who causes by any means, the access of a computer, computer system, or computer network in one jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Thus, because InDesign accessed CDK's network from and through Dealership networks located in California, it is deemed to have accessed CDK's network in California, the location of the local node of access Defendants infiltrated.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Defendant Tekion resides in this district and, as an entity that is subject to this Court's personal

jurisdiction with respect to this action, InDesign is deemed to be a resident of this district. *See* 28 U.S.C. § 1391(c)(2).

19.     ***Divisional Assignment.*** Under N.D. Cal. Civil L.R. 3-2, because a substantial part of the alleged events or omissions occurred at or were directed from Defendant Tekion's headquarters in Alameda County, this action should be assigned to the San Francisco Division or the Oakland Division. This action is related to Case No. 3:24-cv-8879, *Tekion Corporation v. CDK Global, LLC*, which has been assigned to the San Francisco Division (Hon. Jacqueline Scott Corley).

## FACTUAL ALLEGATIONS

### CDK's Business and Services

20.     CDK has a 40+ year track record of providing integrated information technology to the automotive and truck retail industry.

21.     CDK serves customers in nearly 15,000 automotive and truck retail locations in North America.

22.     CDK's enterprise software and technology solutions include an automotive dealer management system and related products and services ("DMS"), which provide CDK's automotive dealership customers (the "Dealerships") proprietary software tools and database elements to manage and automate core aspects of their business.

23.     CDK has made significant investments to build out and support its network of products and service offerings. Over the last three years alone, CDK has invested hundreds of millions of dollars in research, development, and deployment of new and enhanced product solutions and IT infrastructure to serve its Dealerships.

### CDK's DMS

24.     Central to CDK's automotive data ecosystem is its DMS, which provides the infrastructure and intellectual property necessary for the ecosystem to function.

25.     CDK's DMS and related product platforms integrate multiple functions for the Dealerships, including consumer buying, targeted advertising and marketing, automotive sale and

lease transactions, financing, and insurance. The DMS and related product platforms also manage the Dealerships' parts supply, service, and maintenance of vehicles.

26.     Among other functions, the DMS and related product platforms and services enable Dealerships to perform critical aspects of their business, including:

> a.     Inventory management (including management of vehicles, parts, and accessories);
>
> b.     Sales and finance (including the initial customer contact, credit checks, insurance verification, and delivery);
>
> c.     Customer relationship management (including monitoring, maintaining, and personalizing customer information and interactions, improving the customer experience, and increasing customer loyalty);
>
> d.     Service and parts operations (including scheduling service appointments, monitoring technician productivity, and ensuring on-time parts availability);
>
> e.     Accounting and reporting (including tracking performance in real-time, managing payroll services, generating monthly mandatory reporting, tracking trends, and more);
>
> f.     Compliance (maintaining accurate records for all manner of compliance, audits, and financial reporting requirements in a highly regulated industry); and
>
> g.     Integration and data access (enabling integration within the Dealership and Dealership group, and with third parties from suppliers to auto manufacturers).

27.     As CDK's contracts with Dealerships and third parties make clear, the DMS is the sole and exclusive property of CDK.

28.     CDK grants dealerships who purchase its DMS services a personal, non-transferable, license to use CDK's DMS in accordance with the terms and conditions of their agreement with CDK. Neither Tekion nor InDesign have such a license.

29. The DMS operates as a central element of a larger automotive data "ecosystem" inhabited by Dealerships and other industry participants, including: (1) original equipment manufacturers ("OEMs") like General Motors, Ford, Toyota, Subaru, Porsche, and Jaguar; (2) third-party software vendors that offer applications and solutions to Dealerships and OEMs; and (3) CDK itself.

30. The automotive data ecosystem that CDK supports is massive, with millions of transactions every day, supporting billions of dollars in commerce each year.

### The DMS Houses CDK's Intellectual Property,

### Sensitive Consumer Data, and Confidential Third-Party Information

31. CDK's DMS incorporates valuable pieces of intellectual property, including patented technologies and proprietary software elements and programs created by CDK.

32. CDK's terminal program that runs on Dealership computers is an original and independent work created and licensed by CDK. It consists of original and distinct elements including its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

33. The Dealerships, through their access to the DMS, have access to highly sensitive, commercially valuable data belonging to consumers (*e.g.*, the car-buying public), OEMs, other third parties, and CDK itself.

34. The DMS stores voluminous amounts of financial and accounting information and highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personally identifiable information, intellectual property, and other third-party data.

35. CDK's trade secrets and other proprietary information are embedded within the DMS, and include CDK-owned forms, algorithms, calculations, business rules, structured tables, software code, tools, market data, and data compilations contained within the DMS. Collectively, these all are among the "CDK Trade Secrets."

36.      CDK considers the CDK Trade Secrets to be confidential and proprietary, and CDK derives significant value from the CDK Trade Secrets not being known to the public or the automotive industry.

### CDK's Security Measures

37.      In light of the importance of data security and protecting against the risk of data misuse, and in order to safeguard CDK Trade Secrets, CDK has continued to maintain and increase the number of security measures and system protections in place to protect all of this data and ensure that Dealerships have a stable, secure, and multi-functional system to use in the efficient operation of their businesses.

38.      The DMS consists of software and hardware components residing at both the Dealership ("Dealership network") and at CDK's data centers ("CDK network").

39.      Whenever possible, CDK keeps its applications behind firewalls and demands access only through private networks. It is only when compelling business reasons exist that CDK exposes its applications to the Internet.

40.      When CDK allows access to its applications and corresponding proprietary information therein over the internet, network security is paramount. CDK's security measures, including hardware and software controls, are integral to keep the connections private. Noncompliance or subversion of security measures erodes the privacy of these connections. This risks exposure of CDK's confidential, proprietary information to the public, including CDK's direct competitors, hackers, and other malicious individuals.

41.      CDK uses state-of-the-art technology to secure the connections between the local Dealership networks and the CDK network, including through the deployment of specialized hardware installed at Dealership sites.

42.      The hardware component of the local Dealership networks creates a "virtual private network" ("VPN") or, in some cases, a "Leased-Line Multiprotocol Label Switching network" ("MPLS") between the Dealership and the CDK Network. For most Dealerships, a CDK associate or contractor visits each Dealership to install and configure the Dealership's VPN and associated

networking equipment. In all cases, the Dealership ultimately connects to the DMS through a secure VPN or MPLS.

43.    By design, the CDK network only accepts electronic communications from devices (i.e., computer workstations) tied to internet protocol ("IP") addresses on the corresponding local Dealership network that have been authorized by CDK to access the CDK network and, in turn, the DMS.

44.    The VPN or MPLS between the local Dealership network and CDK's network creates a fully encrypted pathway that provides secure network connectivity and data transfer between the local Dealership network and the DMS.

45.    CDK also encrypts communications made through the DMS with third parties—such as lenders, insurance providers, and credit bureaus.

46.    The VPN/MPLS is owned on both ends by CDK. The VPN/MPLS tunnel that terminates in the CDK Network data center is controlled by CDK.

47.    Dealership employees who are authorized to access the DMS are required to use password-protected login credentials that are unique to each authorized user. The typical user only has access to the parts of the DMS necessary to perform their job functions, in accordance with the MSA and Product Guide. Depending on their job function, the average dealership employee would have access to DMS functions for customer service, sales, and/or accounting, but they would not have administrator-level privileges to access all DMS functions, create new DMS users, or access CDK's proprietary formulas, code, and similar confidential CDK data. CDK requires Dealerships to designate a limited group of employees, qualified in information management and technology, to receive administrator-level access privileges.

48.    To further protect against unauthorized access of the DMS, after entering their password-protected login credentials, Dealership employees are required to complete multi-factor authentication to confirm their identity.

49.    When logging on, each Dealership employee must certify that she is a Dealership employee authorized to access the DMS. CDK limits access within each Dealership to individuals on a need-to-know basis.

50.    As an additional safeguard, the Dealerships are contractually prohibited from giving unauthorized third parties access to the DMS and the CDK Trade Secrets, including login credentials meant for use solely by Dealership employees. CDK also prohibits the Dealerships from using third-party software outside of sanctioned integration methods.

### The CDK–Dealership Master Services Agreements

51.    Dealerships typically enter into a Master Services Agreement ("MSA") with CDK, which specifies the scope of services, products and intellectual property that CDK is agreeing to provide. CDK's standard MSA is attached as **Exhibit 1**.

52.    In CDK's standard MSA, the Dealership acknowledges that CDK owns the "Products and Services," including the databases that are part of the Products and Services, and related materials, and all copyrights, patents, trade secrets and other intellectual and proprietary rights therein and thereto. Ex. 1 (MSA) § 4(a).

53.    In CDK's standard MSA, a Dealership expressly agrees, among other things, that it only will use CDK's software for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any Products or Services, or any portion thereof, to any third party. *Id.* § 4(b).

54.    In CDK's standard MSA, the Dealership acknowledges that all CDK Products and Services are licensed only to the Dealership, and only for the term of the MSA. *Id*. § 4(a).

55.    In order to protect against unauthorized access to the sensitive and proprietary data maintained in the DMS, CDK's standard MSA expressly prohibits the Dealership from supplying login credentials to third parties or otherwise granting third parties' access to the DMS. *Id.* § 4(d).

56.    Dealerships also are prohibited from causing or permitting any third-party software to access the DMS, except as otherwise permitted by the MSA. CDK prominently puts this prohibition in all-caps in its standard MSA with Dealerships. *Id.* § 4(b).

57.     Nowhere does CDK's standard MSA permit access to the DMS by Tekion, InDesign, or any other third party without CDK's consent.

58.     CDK's standard MSA further provides that the Dealership will treat as confidential and will not disclose or otherwise make available any of the Products or Services (including, without limitation, screen displays or user documentation) or any proprietary data, information, or documentation related thereto, in any form, to any person other than employees of the Dealership. *Id.* § 4(d).

59.     CDK's standard MSA incorporates by reference and expressly includes CDK's Product Guide. Ex. 1 §§ 1(a), 1(c), 4(b). The Product Guide enumerates additional terms and provisions that supplement the MSA.

60.     Among other relevant provisions, the Product Guide:

    a.     requires Dealerships "to use the Software only at the sites indicated on the Schedules in conjunction with the Products and Services,"

    b.     prohibits Dealerships from allowing "access by any third party to the Services and Software" due to "the proprietary nature of the Services and Software,"

    c.     requires Dealerships to obtain CDK's approval to use any third-party software in conjunction with CDK's DMS and specifies a process to obtain such approval, and

    d.     prohibits Dealerships from connecting third-party devices to CDK's network without CDK's approval.

61.     Defendants are aware of the above contractual provisions that are included in CDK's MSAs with Dealerships.

### *CDK Transfers Customer Data to Tekion and Other DMS Competitors*

62.     When a Dealership, upon the expiration or termination of the MSA, ends its relationship with CDK and seeks to move to a different DMS provider, CDK will assist in

transferring the Dealership's data to the new provider under the terms of the MSA, provided the Dealership is not in default of its contractual obligations to CDK.

63.     Since April 2020, CDK has completed dozens of data conversions for Dealerships leaving CDK for Tekion and has likewise received from Tekion dozens of data conversions for customers joining CDK. CDK has a dedicated team to perform conversions, and CDK engineers work directly with their Tekion counterparts to export customer data in the exact form Tekion needs for each conversion project.

***CDK Warns Tekion to Abide by the Law***

64.     In April 2024, CDK learned that Tekion had entered an engagement to provide "Automative Retail Cloud" services at four locations for one of CDK's Dealerships before the end of the year.

65.     This Dealership had recently elected to renew the term of service under its MSA with CDK through April of 2025.

66.     As a result, CDK was concerned that Tekion would gain access to the Dealership's computer systems on which licensed CDK software is accessed, stored and used.

67.     Because of this concern, CDK wrote Tekion on April 2, 2024, advising of CDK's rights and the Dealership's obligations under the MSA. Specifically, CDK notified Tekion that neither the Dealership nor Tekion were allowed to:

        a.    "utilize the Products and Services to cause or facilitate a conversion to another vendor" while the MSA remains in effect;

        b.    "cause or permit any third-party software to access the Products or Services" except as specifically authorized by the MSA;

        c.    "copy" (other than for back-up purposes) or "recompile, decompile, disassemble, reverse engineer, or make or distribute any other form of, or any derivative work from, any of the Products and Services;" or

        d.    "otherwise make available any of the Products and Services (including, without limitation, screen displays or user documentation)…to any person

other than affiliates, employees, agents, contractors and consultants of [Dealership] with a need-to-know."

68.     In the April 2, 2024 letter, CDK further advised that any action taken by Tekion (1) to access screen displays generated by CDK's products or services, (2) to access the products or services themselves, or (3) to induce the Dealership not to comply with the MSA, would constitute tortious interference with the MSA and also violate CDK's intellectual property rights.

69.     In the April 2, 2024 letter, CDK reiterated that the Dealer Conversion Support Agreement contained the sole, agreed-upon method of procedure to transfer data in connection with the conversion of an automotive dealership customer between Tekion's and CDK's respective DMS systems. Any direct or indirect action by Tekion to access, use or obtain data from CDK's DMS outside the process in the Dealer Conversion Support Agreement, was unauthorized.

70.     On April 5, 2024, Tekion responded to CDK's cease and desist with a terse note acknowledging receipt and claiming Tekion conducts its business consistent with applicable legal obligations.

71.     Unbeknownst to CDK, at some point in 2024, Tekion began working hand-in-hand with InDesign to provide Dealerships software scripts and technical assistance to conduct mass data exports from the DMS, in violation of Dealerships' MSAs and outside of Tekion's authorized methods to obtain data from CDK.

### *InDesign's Illegal Business Model*

72.     InDesign is a Florida business that acquired a product called "DMSConnect" in February 2013. The DMSConnect product is also referred to as "1DMS."

73.     InDesign's business model appears to revolve around designing technology to circumvent the security and access protocols established by CDK to protect its intellectual property and confidential information. This technology is designed for InDesign to be able to access, scrape, and collect data from CDK's DMS without CDK's permission. InDesign also markets its technological capabilities to Dealerships as an alternative to the normal, contractual transition process and payment obligations under CDK's MSAs.

74.    InDesign describes itself as "the ultimate bidirectional data pipeline to the DMS" provided by major DMS providers, including CDK. InDesign advertises that "[m]any of our clients have come to us after being told 'No!'" It claims its users can access "every part of the DMS that your application demands," including sales, service, parts, accounting, and customer resource management, "to mention a few."[1]

75.    InDesign, both independently and in collaboration with Tekion, solicits Dealerships to execute a "Document Conversion Agreement," pursuant to which InDesign would be provided unauthorized access to the DMS in order to allow InDesign to install its data extraction software, "1DMS" on the Dealership's computers, which are connected by VPN or MPLS to CDK's servers containing the DMS. A copy of the Document Conversion Agreement is attached as **Exhibit 2**. The Document Conversion Agreement states, in relevant part:

> Dealer shall provide InDesign with access to the Existing DMS (the "DMS Access") by providing InDesign with Dealer's DMS user credentials, or alternatively as may be required for some DMS, requesting the documents and keywords from the Existing DMS provider, and installing the lDMS software on one or more Dealer computers with access to the Existing DMS.[2]
>
> . . . . InDesign shall extract the Dealer Data beginning first with the extraction of Dealer Data from the one-year period preceding the Start Date, and then extracting all remaining historical Dealer Data including data stored between the Start Date and the Deadline Date. InDesign shall first transfer the extracted Dealer Data to its secure servers, and thereafter transfer the Dealer Data to the New DMS.
>
> ***Once the extraction of Dealer Data is complete, InDesign shall uninstall 1DMS software from the Dealer computers and remove***

---

[1] *See* https://web.archive.org/web/20220129070118if_/http://dmsconnect.com. It appears that, on or about February 7, 2025, InDesign disabled public access to its website.
[2] Document Conversion Agreement, § 1a.

*any Dealer Data from its secure servers*.[3]

* * * *

**The Dealer shall release, indemnify and hold harmless InDesign** and its successors, assigns, subsidiaries and affiliates, and their respective officers, directors, agents, servants, employees, associates, and representatives, from and **against any loss, claim, suit or expense due to or arising out of the unauthorized use of the Dealer Data or the Dealer's granting to InDesign any unauthorized access to the Existing DMS**.[4]

76.    Though InDesign claims on its website that it complies with "federal law regarding safeguarding privacy of data" and "safely accesses DMS without installing code on DMS server," its Document Conversion Agreement tells another story. There, InDesign:

**Makes no guarantee, representation or warranty, express or implied, regarding the use or performance of 1DMS with any law, regulation or industry best practice. InDesign specifically disclaims any warranty, express or implied regarding the use, performance and compliance of 1DMS**, including without limitation, the implied warranties of merchantability, **non-infringement** and fitness for a particular purpose. **In no event and under no legal theory, including without limitation, tort, contract or products liability, shall InDesign**, subsidiaries, affiliates, employees, agents, contractors, third party providers or representatives be **liable to the Dealer for** any actual, indirect, special, incidental or consequential damages of any kind whatsoever, including without limitation, damages for loss of data,

---

[3] *Id*., § 1b (emphasis added).
[4] *Id*., § 5 (emphasis added).

Complaint For Damages and Injunctive Relief

non-compliance, computer malfunction or any other kind of damage, even if they have been advised of the possibility of such damage.[5]

77.    Deploying 1DMS necessarily requires that InDesign obtain information about CDK's systems and infrastructure, including elements involving confidential and proprietary forms, rules, structured tables, software code, tools, and data compilations.

### Defendants' Covert, Intentional, and Wrongful Hacking of CDK's DMS

78.    In November 2024, CDK began to discover warning signs about Tekion's conduct that caused CDK to conduct an extensive investigation.

### The November 1 Tekion Email

79.    On November 1, 2024, an employee of a California Dealership e-mailed a CDK Account Sales Executive, requesting certain login credentials for the DMS to allow Tekion to gain access to the DMS and transfer data from the DMS to Tekion.

80.    Included in the e-mail chain sent to CDK by the Dealership was an earlier discussion between the Dealership and an engineer on Tekion's Data Migration Team.

81.    According to the email chain:

a.    On October 15, 2024, a Tekion "Field Service Engineer" named Mohneet Singh emailed the Dealership to introduce himself as part of the "Technology Team at Tekion" that "work[s] closely with the Data Migration Team." He said he was being tasked with "gaining access to the CDK system" through the Dealership.

b.    Singh informed the Dealership that Tekion would be shipping a Meraki VPN Endpoint device to the Dealership and provided the Dealership with instructions on how to install the Meraki device. Elsewhere in the chain, he confirmed that Tekion had shipped the device to the Dealership.

---

[5] *Id*. § 8 (emphasis added).

  c. Singh explained that the Meraki device would allow Tekion to build a "tunnel" from its network to the Dealership network, which would then connect to the CDK network.

  d. Singh additionally requested that the Dealership provide login credentials for the DMS.

  e. With the Dealership's login credentials and the Meraki device installed, the Tekion Engineer explained that Tekion would be able to extract data from the DMS.

82. By furnishing Dealerships with a network device to create a secret network tunnel between Tekion's network and the Dealerships network, Tekion could cause its computers and virtual machines to appear as though they were located at the Dealership, thereby circumventing CDK's technological measures that otherwise effectively prevent unauthorized access and copying of data and information residing on the DMS.

83. After receiving this e-mail, CDK initiated a digital forensic investigation into Tekion's potential unauthorized access to and use of the DMS.

84. In the following month, CDK discovered that Tekion employed multiple methods to hack into the DMS, which Tekion has continued to evolve to this day, in order to avoid detection.

85. Initially, CDK discovered that Tekion employed "virtual machines" to create user accounts and run software scripts that download information from the DMS to Tekion's virtual desktops.

86. When CDK discovered access from any Tekion virtual machine, CDK disabled the user credentials to prevent further unauthorized access.

87. Disabling credentials did not stop Tekion's access. CDK detected several new user accounts bearing variations of the name "tekion," which are run through the same virtual desktops.

88. CDK also learned that Tekion had created reports to extract dealership data, including use of scripts to create thousands of reports at time.

89.     CDK continues to disable Tekion user credentials as soon as CDK detects new Tekion usernames being created. Since November 1, 2024, CDK has disabled dozens of Tekion user credentials.

### The December 6 Cease and Desist Letter

90.     As a result of its investigation, on Friday, December 6, 2024, CDK sent a letter to Tekion, demanding it immediately cease and desist from unauthorizedly accessing and using the DMS. *See* December 6, 2024 Cease and Desist, attached as **Exhibit 3**.

91.     CDK's letter explained that CDK had recently detected several new user accounts bearing variations of the name "tekion," which were accessing the DMS through the same two virtual desktops.

a.      CDK further advised that it discovered Tekion had induced Dealerships to provide Tekion login credentials with administrative access to the DMS so that Tekion could use software scripts to extract mass volumes of Dealership data – all in violations of the Dealerships' MSAs.

b.      Additionally, CDK informed Tekion that it had obtained evidence of Tekion sending Dealerships VPN devices in order to create secret network connections to the DMS, which Tekion used to surreptitiously run software scripts and extract data, among other unlawful access and activities.

92.     Despite putting Tekion on notice of its unlawful conduct, Tekion persisted in using a multitude of methods to gain unauthorized access to the DMS and computer systems.

### The December 10 Tekion Call

93.     On December 10, 2024, another Dealership informed CDK's Vice President and Regional General Manager that the Dealership was contacted by Tekion's Senior Manager of Implementation. The Dealership explained that:

a.      Tekion's "Senior Manager of Implementation," James Livingstone, instructed the Dealership to use a CDK feature called "Data Your Way" to

extract data from the DMS in order to participate in a "pilot program" with Tekion.

b.      When the Dealership explained there was a formal process with CDK for extracting data from the DMS, Livingstone responded—falsely—that CDK was not allowing Dealerships to access their own data from the DMS, which is why Tekion was advising CDK's Dealerships to do it preemptively.

c.      Livingstone further stated that if data could not be extracted via "Data Your Way," Tekion would ship to the customer a "Meraki" VPN (virtual private network) device to install in the Dealership's locations.

d.      Livingstone attempted to further persuade the Dealership by adding that Tekion had already successfully extracted data for other Dealerships currently using the DMS through these methods.

***The December 13 Email Chain from InDesign and Tekion***

94.      On December 17, 2024, the same Dealership forwarded CDK's Vice President and General Regional Manager an email chain. This email chain began on December 13, 2024 with an email from the same Tekion Senior Manager of Implementation who had called the Dealership on December 10, 2024.

95.      This email chain illustrated that the Tekion Senior Manager of Implementation, along with InDesign, (referenced by its trade name "DMS Connect"), were attempting to persuade the Dealership to covertly allow Defendants to latch onto the DMS to extract data.

96.      The solicitation e-mail is from "Support Team" at "dmsconnect.com" and was sent to the Dealership and included Tekion's Senior Manager of Implementation on the email. In it, InDesign's representative states, among other things:

a.      "We convert dealers to Tekion (data and docs). I've already got your 2 dealerships in my system with Tekion ID numbers. We are ready to begin."

b.      "Our Tekion conversion process has 3 steps: (A) signing the agreement below, (B) installing our automation software, and (C) **creating a CDK user**

19

**so we can extract all the data and docs before your CDK service ends**."
(Emphasis added.)

97.     The December 13, 2024 e-mail also attached an InDesign template contract, entitled the "Document Conversion Agreement," and InDesign in the email asked the Dealership to sign it.

98.     The Document Conversion Agreement sent to the Dealership contained all the abovementioned provisions that InDesign uses in its contracts, including InDesign's seeking of indemnity from the Dealership for the "unauthorized use of the Dealer Data or the Dealer's granting to InDesign any unauthorized access to the Existing DMS."

99.     As evidenced in the December 13, 2024 email chain, the Dealership responded to InDesign's email by requesting that InDesign not do anything because it had spoken to a CDK representative and would be "extracting data the traditional way and will not be using your services. **We certainly will not be giving you a login as it violates our MSA**." (emphasis added.)

100.    In response, Dave Lampert, believed to be the Principal of InDesign, emailed the Dealership (again including Tekion) stating that if CDK provides approval then CDK could provide the data directly. He then stated that: "If for any reason they're not able to, **or they don't give you AR Approval, then we can be your Plan B**." (emphasis added.)

101.    The Dealership forwarded this e-mail to CDK's Vice President and General Regional Manager, noting: "This is a company that partnered with Tekion to go in and get the CDK data from us. I told him to leave us alone."

102.    InDesign's email is a confession of Defendants' unlawful conspiracy, in which Defendants work together to induce Dealerships into breaching their Master Services Agreements with CDK, thereby directly accessing and interfering with the DMS, and costing CDK millions of dollars in lost customers and deprived revenue.

103.    Tekion responded to CDK's December 6 letter by racing to the courthouse three days later to file a meritless complaint pending in this Court as Case No. 3:24-cv-08879, *Tekion Corp. v. CDK Global, LLC*. Tekion then sent CDK a December 13, 2024 letter that falsely asserted that Tekion simply helps Dealerships access their own data.

104.    As described below, CDK's investigation to date indicates that Tekion, both independently and in concert with InDesign, has itself secretly accessed CDK's DMS and indiscriminately scraped all manner of data and information from CDK's DMS in a manner that tortiously interferes with CDK's Dealership contracts, violates federal and state laws, undermines the security and integrity of CDK's DMS, and unduly burdens CDK's systems.

### *CDK's Investigation Reveals Hacking by Defendants, Separately and in Concert*

105.    Based on the information learned above, in December 2024, CDK expanded its investigation into InDesign and discovered similar patterns of activity across multiple Dealerships converting from CDK to Tekion, which indicates that the Dealerships were using the same or similar third-party software to automate the download of large volumes of data from the DMS.

106.    The Dealerships' normal, authorized user activity involves conducting targeted searches to download one report at a time during normal business hours.

107.    CDK's investigation unveiled digital evidence of atypical user activity across multiple accounts at multiple Dealerships in California and beyond, including: (i) tens of thousands of queries and downloads occurring every few seconds, running continuously during both business and non-business hours and often for several days straight; and (ii) use of identical queries and transaction types by multiple accounts associated with multiple Dealerships to retrieve all data from a particular source for an entire month at a time.

108.    Often, this atypical user activity is conducted on a newly created account by a user with the e-mail domain "@mail.1dms.com".

109.    The digital evidence of Dealership accounts running identical, automated queries requesting similar information, often by a user whose e-mail domain is "@mail.1dms.com," is consistent with the e-mails, contracts and other communications discussed above, establishing that InDesign is providing Dealerships automated script software for the purpose of extracting data for conversion to Tekion. And, in some instances, as evidenced by The November 1 email, the December 10 call and the forensic evidence of access by Tekion's virtual desktops, Tekion is directly extracting the DMS data on its own accord.

110.    Each time that Defendants access the DMS through a Dealership computer, they access and use valuable pieces of CDK's intellectual property, including patented technologies and original software elements and programs, and the CDK Trade Secrets.

111.    Each time that Defendants access and scrape data from the DMS, they create a copy of portions of the DMS program code in their computer's Random Access Memory, as well as copies of the original and distinctive page layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

112.    In addition, Defendants' data-scraping queries regularly access files containing proprietary information that belong to neither of them nor the Dealerships they purport to service.

### *Security Threats, Compromised Data Integrity, and System Degradation*

113.    Defendants' methods of accessing and extracting data, in addition to being unlawful, also place considerably more strain on the DMS than a CDK-facilitated data conversion or the ordinary Dealership employee account usage. This degrades the DMS system's performance and consumes valuable computing resources.

114.    When CDK facilitates a data conversion project, it utilizes secure servers dedicated to data extraction services, which reduces or eliminates the burden on its main DMS servers.

115.    CDK has a team of engineers and implementation specialists who develop and implement CDK's proprietary conversion software code. This code is designed to extract data efficiently and accurately for the specific purpose of transitioning a Dealership from the DMS to a new DMS provider.

116.    CDK has invested significant resources to customize its proprietary conversion software code to each major DMS provider, including Tekion, which it tailored to extract data to be easily mapped into the new DMS provider's relational databases.

117.    Typically, CDK conducts three data pulls when facilitating a data conversion: (a) one to provide all historical data, (b) another to update the data generated while the new DMS provider is integrating the first data pull, and (c) a third and final data pull completed immediately

before the Dealership goes live with the new DMS provider. This process ensures there is no data loss or business interruption when converting from one DMS provider to another.

118.    When performing their unauthorized data extraction activities, Defendants use "virtual machines" to execute poorly constructed and inefficient data queries that extract duplicative records, creating unnecessary strain on computing resources. The effects are compounded by Defendants' use of "virtual machines" to multiply the number of queries running simultaneously. These queries sometimes run continuously for 24-hours a day during business hours when Dealerships require computing resources to use CDK's products and services.

119.    Defendants' unauthorized extraction activities slow system performance, hampering Dealerships' ability to access the DMS in real time and negatively impacting their product experience with CDK.

120.    Because Defendants hack into the DMS and use automated methods to extract data through decentralized interfaces that were designed for manual use by Dealership employees, CDK effectively has no control over the queries they run or how frequently they run them. CDK cannot manage the strain on system resources created by Defendants or mitigate any performance issues that result.

121.    Defendants' methods of accessing the DMS are also significantly less secure than CDK-facilitated data transfers.

122.    Defendants use Dealership-issued login credentials that they obtain through unsecured channels, including plain-text email. This exposes the credentials—and by extension, the DMS—to the risk of interception or compromise and violates widely accepted cybersecurity practices.

123.    Moreover, Tekion provides Dealerships VPNs with no or unknown security protocols, creating new access channels to CDK's DMS, which CDK has no ability to control or monitor, thereby exposing the DMS to additional threat actors.

124.    Further, InDesign claims to not only "pull" data from a DMS, but also "push" data into a DMS. In other words, InDesign markets that it can write back altered data to the DMS on

behalf of a Dealership. This creates a high risk of introducing data errors and undermining the integrity of the DMS.

125.    CDK has formatting requirements called "business rules" for data fields in the DMS's various databases, which govern precisely how applications should input data. When unauthorized third parties attempt writeback functions, they often apply business rules incorrectly (or not at all) and cause data entry errors—which CDK is then responsible for fixing. While a manual error by a Dealership employee can be a minor annoyance, a series of errors by automated systems—such as the scripts that InDesign runs on the DMS—can rapidly propagate across an entire dataset, causing major disruption or denial of service.

126.    InDesign's methods also seek to circumvent the restrictions that CDK places on user access by providing users access to "every part of the DMS" as part of its mission to "reject[] the paradigm" that DMS are "restrictive interfaces."

127.    Moreover, by creating a copy of the data on its servers, InDesign exposes the data to security risks wholly outside of CDK's control or monitoring.

### Burdens on CDK to Thwart Tekion's and InDesign's Ever-Evolving Methods

128.    To attempt to combat Tekion's and InDesign's unauthorized access and activities, CDK has been forced to deploy software engineers and other specialists to investigate Tekion's and InDesign's activities and block them, including by disabling user accounts unlawfully accessing the DMS.

129.    Tekion has obscured user account names to evade detection. As soon as CDK disables an unauthorized Tekion or InDesign user account, new ones spring up in its place. It's a cybersecurity version of Whack-a-Mole.

130.    Since putting Tekion on notice that CDK was aware of its unlawful activities, Tekion appears to have doubled down on its use of networking devices, instructing Dealerships on how to create a "tunnel" directly from the DMS to Tekion.

131.    As another avenue to unlawfully obtain data from the DMS, Tekion now encourages Dealerships to use InDesign's software to download data from the DMS using methods that violate the Dealerships' MSAs.

132.    The burdens on the DMS that result from Tekion's and InDesign's constant and evolving access and querying are real and significant.

133.    Defendants do not have any incentive to minimize the burdens they place on the DMS. They did not build the DMS, do not pay to operate or maintain it, and do not deal with any issues that may arise in its operation or have liability if the system fails.

134.    Given Defendants' evolving methods for bypassing CDK's security controls and evading detection, and their continued egregious legal violations despite CDK's cease and desist demands, it is clear that Defendants will continue to pursue their unlawful business models absent judicial intervention.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### Count I - Computer Fraud and Abuse Act – 18 U.S.C. § 1030

(All Defendants)

135.    CDK repeats and re-alleges all of the allegations above as if set forth fully herein.

136.    The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, provides a civil cause of action for certain enumerated cybercrimes.

137.    CFAA provides that "[w]hoever … intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer," is subject both to criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief).

138.    CFAA further provides for liability against "whoever . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value…" *Id.* § 1030(a)(4).

139.    CFAA further provides for liability against anyone who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." *Id.* § 1030(a)(5)(A).

140.    CFAA further provides for liability against anyone who "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage." *Id.* § 1030(a)(5)(B).

141.    CFAA further provides for liability against "whoever… intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." *Id.* § 1030(a)(5)(C).

142.    CFAA further provides liability against "whoever …knowingly and with intent to defraud traffics in any password or similar information through which a computer may be accessed without authorization, if—such trafficking affects interstate or foreign commerce." *Id.* § 1030(a)(6)(A).

143.    CFAA provides a private cause of action for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms. *Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

144.    The DMS is a "computer" within the meaning of the CFAA, which defines that term to include "any data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." *Id.* § 1030(e)(1). The DMS also relies on the operation of one or more computing devices in its operations.

145.    The DMS, itself, and the computing devices by which it operates, are "protected computers" within the meaning of the CFAA because they are connected to the internet and thus are used in and affect interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

146.    Defendants repeatedly and intentionally accessed, and conspired with each other to access, without authorization, data and information on CDK's servers and housed within the DMS

through the Dealerships' and Defendants' own computers and servers located inside and outside the State of California.

147.    Defendants utilized, and conspired with each other to utilize, technology, consisting of programs, devices, information, code and commands that Defendants specifically designed to access, scrape, and download information from the DMS and related platforms without CDK's authorization.

148.    Defendants induced, and conspired with each other to induce, the Dealerships to allow Defendants to utilize Defendants' technology, as well as the Dealerships' computers, to access, scrape and download information from the DMS and related platforms for dissemination to Tekion.

149.    Defendants traffic in the technology they use to obtain unauthorized access to the DMS, including providing these means of unauthorized access to each other and the Dealerships they induce to install that technology.

150.    The Dealerships agreed under the CDK MSAs to decline access by third parties to the DMS and related platforms except in certain inapplicable circumstances and not to cause or permit any third-party software to access the DMS and related platforms, making any grant of access by the Dealerships to Defendants unlawful and unauthorized.

151.    At all relevant times, Defendants were aware of these restrictions and intentionally chose to violate them.

152.    At all relevant times, Defendants were aware that the Dealerships did not have authorization from CDK to allow Defendants to utilize their own technology, as well as the Dealerships' computers, to access, scrape and download information from the DMS and related platforms for dissemination to Tekion.

153.    At all relevant times, Defendants were aware that CDK had not and would not authorize their access and use of the DMS and related platforms.

154.     At all relevant times, Defendants took several steps to hide their conduct from CDK, including through the use of secret VPN tunnels into Dealerships' computers, anonymous devices and usernames, and deceitful statements to CDK.

155.     Defendants' access of the protected computers and servers without authorization was willful and undertaken with the specific intent to deceive, defraud, and harm CDK and specifically for the purpose of making a financial gain for Defendants at CDK's expense.

156.     Defendants furthered their unlawful conspiracy and scheme for the purpose of diverting CDK's Dealership customers and revenue to Tekion, interfering with CDK's contracts with the Dealerships, depriving CDK of the contractual revenue Dealerships were obligated to pay CDK, undermining CDK's computer systems, and unlawfully accessing and learning about these systems and the features of CDK's proprietary DMS.

157.     Defendants further hid their tracks by deleting CDK's DMS data and records of Defendants' actions from CDK's and Dealerships' computer systems. Defendants even sought indemnification from Dealerships for any unauthorized access or damage to CDK's systems.

158.     Defendants conducted these unlawful actions in coordination with several Dealerships located inside and outside the State of California, and through devices located inside and outside the State of California.

159.     Defendants conducted these unlawful actions in coordination with several Tekion implementation managers located in the State of California.

160.     CDK has informed Tekion that its access to the DMS and related CDK platforms, or access to the same by any of its agents or coconspirators, like InDesign, is unauthorized.

161.     Defendants continue to take the wrongful actions alleged herein.

162.     Defendants' violations of CFAA have proximately caused substantial damages and losses to CDK. These damages and losses include the costs of investigating and responding to Defendants' unlawful actions; the costs of conducting a damage assessment and restoring the DMS and the data it contains to their condition prior to Defendants' unlawful actions; lost or deleted data or corrupted computer systems; and all diverted customers, revenue lost, harm to CDK's business

reputation, costs incurred, and other consequential damages incurred as a proximate cause of Defendants' wrongful actions. These damages and losses far exceed $5,000 within a one year period.

163.    Moreover, Defendants' unauthorized access of the DMS and related platforms has caused and will continue to cause irreparable harm to CDK by dramatically increasing the risk that CDK will suffer a major security breach, widespread data corruption issues, degraded performance of its DMS, and the associated loss of goodwill and injury to its reputation.

164.    Defendants' wrongful actions are ongoing, and Defendants will continue to violate CFAA if not preliminarily and permanently enjoined by this Court.

165.    CDK also is entitled to equitable relief in the form of restitution for the benefits that Defendants wrongfully accrued and/or disgorgement of their wrongful profits.

166.    CDK respectfully requests the following relief:

      a.    Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and acquisition of data, and the utilization of any products and services designed or utilized to circumvent CDK's systems and technological measures to protect its computer systems;

      b.    Upon final trial, judgment against Defendants for the full amount of CDK's damages and losses proximately caused by Defendants as well as the benefits Defendants wrongfully accrued and/or disgorgement of their wrongful profits;

      c.    Pre- and post-judgment interest at the maximum legal rate; and

      d.    Such other and further relief, at law or in equity, to which CDK may be justly entitled.

## Count II - Digital Millenium Copyright Act – 17 U.S.C. § 1201

(All Defendants)

167.    CDK repeats and re-alleges all of the allegations above as if set forth fully herein.

29

168.    The Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.* ("DMCA"), prohibits three types of conduct:

    a.    "[C]ircumvent[ing] a technological measure that effectively controls access to a work protected under this title." (*Id.* § 1201(a)(1)(A));

    b.    "[M]anufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that—(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title" (*Id.* § 1201(a)(2)); and

    c.    "[M]anufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that—(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that

effectively protects a right of a copyright owner under this title in a work or a portion thereof." *Id.* § 1201(b)(1).

169.    CDK owns valid copyrights over its proprietary DMS system.

170.    CDK uses several technological measures to control access to, and prevent copying of, the DMS software program, as alleged above.

171.    Defendants make, import, offer to the public, provide, or otherwise traffic in technology designed to access, scrape, download and transfer data from the DMS system, and circumvent CDK's technological measures without CDK's authorization and in knowing violation of the Dealerships' contracts with CDK.

172.    Defendants repeatedly and intentionally accessed, and conspired with each other to access, without authorization, data and information from CDK's servers and housed within the DMS, through both the Dealerships' and Defendants' own computers and servers located inside and outside the State of California.

173.    Defendants utilized, and conspired with each other to utilize technology, consisting of programs, devices, information, code and commands that Defendants specifically designed to access, scrape and download information from the DMS and related platforms.

174.    Defendants induced, and conspired with each other to induce, the Dealerships to allow Defendants to utilize their own technology, as well as the Dealerships' computers, to access, scrape and download information from the DMS and related platforms for dissemination to Tekion.

175.    Defendants circumvented the technological measures employed by CDK to effectively control access to its copyrighted material and thereby obtained unauthorized access to same, in violation of Section 1201(a)(1) of the DMCA.

176.    Defendants have circumvented the technological measures employed by CDK to unlawfully compete with CDK and divert CDK's customer business and revenue.

177.    Defendants violated Section 1201(a)(2) and 1201(b)(1) by offering their data extraction services to the public. Aspects of Defendants' technology and service offerings are primarily designed or produced for use in circumventing the access and copy controls on the DMS

because portions of the product are designed and produced primarily for the purpose or marketed as for the purpose of bypassing CDK's password controls, text prompts, credential disabling and encryption of CDK's secure, private networks. Defendants' technology has limited commercially significant purpose or use other than circumventing the access and copy controls on the DMS or is marketed for use specifically related to circumventing the access and copy controls on the DMS.

178.    Defendants conducted these unlawful actions in coordination with several Dealerships located inside and outside of California, and through devices located inside and outside of California.

179.    Under 17 U.S.C. § 1203(c), CDK is entitled to recover either actual damages and any additional profits from Defendants' violations of the DMCA or statutory damages, at CDK's election.

180.    Defendants' violations of the DMCA have proximately caused substantial damages and losses to CDK. These damages and losses include the costs of investigating and responding to Defendants' unlawful actions; the costs of conducting a damage assessment and restoring the DMS and the data it contains to their condition prior to Defendants' unlawful actions; lost or deleted data or corrupted computer systems; and any revenue from customers Defendants wrongfully diverted from CDK as a result of their wrongful actions, thereby depriving CDK of DMS and related copyright license fees under the MSAs, and other consequential damages incurred as a proximate cause of Defendants' wrongful actions.

181.    Moreover, Defendants' unauthorized access to the DMS and circumventing of CDK's technological measures dramatically increases the risk that CDK will suffer a major security breach that compromises CDK's and its Dealerships' interests in the security, integrity, and functionality of CDK's DMS.

182.    CDK is entitled to injunctive relief under 17 U.S.C. § 1203(b)(1). Defendants' wrongful actions are ongoing and will continue if not enjoined by this Court.

183.    CDK also is entitled to equitable relief in the form of restitution for the benefits that Defendants wrongfully accrued and/or disgorgement of their wrongful profits.

184.    CDK respectfully requests the following relief:

a.    Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and acquisition of CDK data, and the utilization of any products and services designed or utilized to circumvent CDK's systems and technological measures to protect its copyrighted information;

b.    While the action is pending, the impounding of any device or product that is in the custody or control of Defendants and that the Court has reasonable cause to believe was involved in a violation;

c.    As part of a final judgment, the remedial modification or destruction of any device or product that is in the custody or control of Defendants and that the Court has reasonable cause to believe was involved in a violation;

d.    Upon final trial, judgment against Defendants for the full amount of CDK's damages proximately caused by Defendants as well as the benefits Defendants wrongfully accrued and or disgorgement of their wrongful profits, or an alternative award of statutory damages if CDK so elects prior to final judgment;

e.    Pre- and post-judgment interest at the maximum legal rate; and

f.    Reasonable attorneys' fees incurred in prosecuting the claims through trial, and, if necessary, any subsequent appeals to the intermediate court of appeals;

g.    All costs of suit; and

h.    Such other and further relief, at law or in equity, to which CDK may be justly entitled.

## Count III - Stored Communications Act (18 U.S.C § 2701 *et seq.*)

### (All Defendants)

185.    CDK repeats and re-alleges all the allegations above as if set forth fully herein.

186.    The Stored Communications Act ("SCA") creates statutory liability and punishments for anyone who:

a.    intentionally accesses without authorization a facility through which an electronic communication service is provided; or

b.    intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system. 18 U.S.C. § 2701(a).

187.    At all times relevant to this action, the DMS constitutes a "facility" through which electronic communication services are provided.

188.    At all relevant times to this action, the DMS constitutes an "electronic storage system."

189.    Defendants utilized, and conspired with each other to utilize, technology, consisting of programs, devices, information, code and commands, which were specifically designed to access, scrape and download data, electronic communications and information from the DMS and related platforms, without CDK's authorization, and in excess of any Dealership's authorization to the DMS.

190.    Defendants intentionally accessed the DMS, including without limitation, the DMS's electronic communication service and electronic storage, without authorization from CDK, and in excess of any Dealership's authorization to the DMS, and thereby obtained electronic communications from the DMS.

191.    Defendants conducted these unlawful actions in coordination with several Dealerships located inside and outside the State of California, and through devices located inside and outside the State of California.

192.    CDK has informed Tekion that its access to the DMS and related CDK platforms is unauthorized. CDK further demanded that Tekion and any parties under its direction or affiliation cease these unlawful actions and hostile access.

193.   Tekion has refused to cease its actions. To the contrary, Tekion has admitted to this access and communicated to CDK that such access is lawful.

194.   Defendants' violations of the SCA have proximately caused substantial damages and losses to CDK. These damages and losses include the costs of investigating and responding to Defendants' unlawful actions; the costs of conducting a damage assessment and restoring the DMS and the data it contains to their condition prior to Defendants' unlawful actions; lost or deleted data or corrupted computer systems; and all diverted customers, revenue lost, harm to CDK's business reputation, costs incurred, and other consequential damages incurred as a proximate cause of Defendants' wrongful actions.

195.   Moreover, Defendants' unauthorized access to the DMS and related platforms dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, which constitutes irreparable harm.

196.   Defendants' wrongful actions are ongoing, and Defendants will continue to violate the SCA if not preliminarily and permanently enjoined by this Court.

197.   CDK also is entitled to equitable relief in the form of restitution for the benefits that Defendants wrongfully accrued and/or disgorgement of their wrongful profits.

198.   CDK is entitled to injunctive relief, compensatory damages, reasonable attorneys' fees and any other equitable relief for the damage sustained as a result of Defendants' conduct in violation of 18 U.S.C. § 2701(a).

199.   CDK respectfully requests the following relief:

a.   Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and acquisition of CDK data, the utilization of any products and services designed or utilized to circumvent CDK's systems and technological measures to protect its data, and the unauthorized interception and disclosure of CDK's electronic communications;

35

b.    Upon final trial, judgment against Defendants for the full amount of CDK's damages proximately caused by Defendants as well as the benefits Defendants wrongfully accrued and or disgorgement of their wrongful profits;

c.    Punitive damages pursuant to 18 U.S.C. 2707(c);

d.    Pre- and post-judgment interest at the maximum legal rate;

e.    Reasonable attorneys' fees incurred in prosecuting the claims through trial, and, if necessary, any subsequent appeals to the intermediate court of appeals;

f.    All costs of suit; and

g.    Such other and further relief, at law or in equity, to which CDK may be justly entitled.

## Count IV - Defend Trade Secrets Act (18 U.S.C. § 1836)

(All Defendants)

200.    CDK repeats and re-alleges all the allegations above as if set forth fully herein.

201.    The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

202.    CDK has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate commerce.

203.    The DMS and the information contained therein are used in interstate commerce as it is transmitted across the internet and used both within and outside of the State of California.

204.    The CDK Trade Secrets are embedded within the DMS.

205.    CDK considers the CDK Trade Secrets to be confidential and proprietary, and CDK derives significant value from the CDK Trade Secrets not being known to the public or the automotive industry.

206.    CDK utilizes significant and reasonable efforts to secure the DMS and protect the CDK Trade Secrets, including through contractual, technological and personnel safeguards.

207.   Defendants misappropriated the CDK Trade Secrets by utilizing, and conspiring with each other to utilize technology, consisting of programs, devices, information, code and commands, which were specifically designed to access, scrape and download the CDK Trade Secrets, without CDK's authorization, and in excess of any Dealership's authorization to the DMS.

208.   Defendants' wrongful access to the DMS allowed them to access, copy and use the CDK Trade Secrets to further their businesses in direct competition with CDK, and to wrongfully divert CDK's business model and Dealership clients.

209.   Defendants used improper means to access, acquire and use the CDK Trade Secrets while knowing that the acquisition and use of the CDK Trade Secrets was improper.

210.   As a proximate result of Defendants' unlawful actions, CDK has suffered harm, including the loss of its proprietary information, the diminution in value of the CDK Trade Secrets, CDK's lost business and revenue as a result of Defendants' misappropriation, reputational harm to CDK, and other damages that continue to accrue to the present, in an amount to be determined at trial.

211.   Defendants' wrongful actions are ongoing, and Defendants will continue to violate the DTSA if not preliminarily and permanently enjoined by this Court.

212.   CDK also is entitled to equitable relief in the form of restitution for the benefits that Defendants accrued and/or disgorgement of its profits.

213.   Given the continued willful and malicious nature of Defendants' misappropriation, CDK is also entitled to exemplary damages and attorneys' fees.

214.   CDK respectfully requests the following relief:

a.   Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and the CDK Trade Secrets, and the utilization of any products and services designed or utilized to misappropriate the CDK Trade Secrets;

b.    Upon final trial, judgment against Defendants for the full amount of CDK's damages proximately caused by Defendants as well as the benefits Defendants wrongfully accrued and/or disgorgement of their wrongful profits, or a reasonable royalty for Defendants' unauthorized misappropriation of the CDK Trade Secrets;

c.    Punitive damages;

d.    Pre- and post-judgment interest at the maximum legal rate;

e.    As a result of Defendants' willful and malicious misappropriation of the CDK Trade Secrets, reasonable attorneys' fees incurred in prosecuting the claims through trial, and, if necessary, any subsequent appeals to the intermediate court of appeals;

f.    All costs of suit; and

g.    Such other and further relief, at law or in equity, to which CDK may be justly entitled.

**Count V - The California Comprehensive Computer Data Access and Fraud Act**

(All Defendants)

215.    CDK repeats and re-alleges all the allegations above as if set forth fully herein.

216.    The California Comprehensive Computer Data Access and Fraud Act ("Section 502") provides a civil cause of action to "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision." Cal. Penal Code § 502(e)(1).

217.    In any action brought under Section 502, the court may award reasonable attorney's fees and compensatory damages. *Id*. § 502(e)(2).

218.    In any action brought under Section 502 for a willful violation of the act, "where it is proved by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice," the court may award punitive or exemplary damages. *Id*. § 502(e)(4).

219.    Section 502 prohibits any person from knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using "any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." *Id*. § 502(c)(1).

220.     Section 502 prohibits any person from knowingly accessing and without permission taking, copying, or making use of "any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." *Id*. § 502(c)(2).

221.    Section 502 prohibits any person from knowingly accessing and without permission using or causing to be used "computer services." *Id*. § 502(c)(3).

222.    Section 502 defines "computer services" as including, but not limited to "computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network." *Id*. § 502(b)(4).

223.    Section 502 prohibits any person from knowingly accessing and without permission adding, altering, damaging, deleting, or destroying "any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network." *Id*. § 502(c)(4).

224.    Section 502 prohibits any person from knowingly and without permission providing or assisting in providing "a means of accessing a computer, computer system, or computer network in violation of this section." *Id*. § 502(c)(6).

225.    Section 502 prohibits any person from knowingly and without permission accessing or causing to be accessed "any computer, computer system, or computer network." *Id*. § 502(c)(7).

226.    Section 502 prohibits any person from knowingly introducing "any computer contaminant into any computer, computer system, or computer network." *Id*. § 502(c)(8).

227.    Section 502 defines "computer contaminant" as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the

39

information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." *Id*. § 502(b)(10).

228.    Section 502 prohibits any person from knowingly accessing and without permission adding, altering, damaging, deleting, or destroying "any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network." *Id*. § 502(c)(4).

229.    The DMS and the servers and devices by which it operates each constitute a "computer system" within the meaning of Section 502, which defines that term to include "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." *Id*. § 502(a)(5).

230.    The servers and devices by which the DMS operates each constitute a computer system because they are electronic processing devices that contain computer programs, electronic instructions, input data, and output data and perform functions including logic, arithmetic, data storage and retrieval, communication, and control, all which support the DMS and its related services.

231.    The DMS similarly constitutes a computer system because it is a computer program that stores and otherwise processes both inputs and outputs of the computers on which it runs and that supports the functionality of a computer and a computer network.

232.    The DMS and the devices by which it operates constitutes a "computer network" within the meaning of Section 502, which defines the term as "any system that provides communications between one or more computer systems and input/output devices including, but

Complaint For Damages and Injunctive Relief

not limited to, display terminals and printers connected by telecommunication facilities." *Id.* § 502(a)(2).

233.　The network of devices on which the DMS runs constitutes a computer network because they host and allow the communication of information through the DMS.

234.　Further, the DMS is a computer network because it is, among other things, a communication medium with the capability to transmit information between computers.

235.　Technological and contractual measures protect the DMS and clearly notified Defendants that they were not permitted to access the DMS. These measures included restricted access provisioning; text prompts asking users to certify their status as an authorized dealer employee; the disabling of credentials that CDK found to be used for unauthorized access by third parties; and providing access to the DMS solely through closed network VPNs and MPLSs installed on Dealership computers. These measures specifically notify users that they are not permitted to access the DMS without permission and prohibited Defendants from accessing the network.

236.　Defendants knew that the Dealerships did not have the authority to act on behalf of CDK to grant access to the DMS. CDK's MSA specifically prohibited Dealerships from sharing login credentials, providing login credentials to third parties, using unauthorized tools to scrape data from CDK's DMS and using unauthorized devices to connect to the DMS.

237.　Defendants knew their access to the DMS was not permitted. That is why Defendants instructed the Dealerships to share dedicated login credentials, create fictitious login credentials, and misrepresent to—and conceal from—CDK the true purpose of the fictitious login credentials.

238.　Defendants were also notified directly by both CDK and at least one Dealership that the Dealerships did not have the authority to authorize Defendants to access the DMS.

239.　Despite this clear prohibition, Defendants repeatedly and intentionally accessed the computers, computer networks, and computer systems that comprise the DMS for the purposes of obtaining, using, altering, and deleting the CDK protected files, data, and proprietary information stored therein.

240.   Once they gained access, Defendants utilized technologies, consisting of programs, devices, information, code, and commands, that were specifically designed to access, scrape and download information from the DMS and related platforms.

241.   These technologies constitute computer contaminants within the meaning of Section 502. *Id*. § 502(a)(10).

242.   On information and belief, Defendants' technology also altered, damaged, and destroyed data, computer software, or computer programs that exist on the DMS.

243.   Defendants attempted to hide their tracks by deleting CDK's DMS data and records of Defendants' actions from CDK's and Dealerships' computer systems. Defendants even sought indemnification from Dealerships for any unauthorized access or damage to CDK's systems.

244.   Defendants' access to the computers, computer networks, and computer systems without permission was willful and undertaken with the specific intent to defraud or harm CDK and to obtain, alter, and delete property while making a financial gain for Defendants at CDK's expense.

245.   Defendants' access to the computers, computer networks, and computer systems without permission was willful and Defendants knowingly caused the disruption of the computer services of the DMS by hacking into the DMS and running unauthorized code and programs.

246.   Defendants are aware that their actions are unauthorized. Despite this knowledge, Defendants' hostile, unauthorized access continues.

247.   Defendants' violations of Section 502 have proximately caused substantial damages and losses to CDK, captured as "injury" and "victim expenditure" by Section 502, which defines these terms to mean, respectively, "any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program" and "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access." *Id*. § 502(a)(8–9).

248.    CDK's damages and losses include the costs of investigating and responding to Defendants' unlawful actions; the costs of conducting a damage assessment and restoring the DMS and the data it contains to their condition prior to Defendants' unlawful actions; lost or deleted data or corrupted computer systems; and all revenue lost, costs incurred, other consequential damages incurred as a proximate cause of Defendants' wrongful actions; and CDK's attorneys' fees and other costs incurred as a result of this immediate action.

249.    Moreover, Defendants' knowing and unauthorized access to CDK's DMS and related platforms dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues. It also degrades the performance of its DMS, overburdening CDK systems with extensive requests and queries.

250.    This claim is not alleged based on Defendants' misappropriations of CDK trade secrets but on Defendants knowingly and without permission accessing and using CDK's computer systems and computer programs and knowingly and without permission introducing computer contaminants to the network and systems, causing disruption of computer services, and providing means of accessing the computer systems without permission.

251.    Defendants' wrongful actions are ongoing, and Defendants will continue to violate the California Criminal Code if not preliminarily and permanently enjoined by this Court.

252.    CDK is entitled to equitable relief in the form of the damages it has faced as a result of Defendants' conduct, along with attorneys' fees and the costs of the matter.

253.    CDK respectfully requests the following relief:

a.    Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and acquisition of CDK data, and the utilization of any products and services designed or utilized to circumvent CDK's systems and technological measures to protect its computer systems;

b.    Upon final trial, judgment against Defendants for the full amount of CDK's damages and losses proximately caused by Defendants as well as the benefits

Defendants wrongfully accrued and/or disgorgement of their wrongful profits;

c.     Pre- and post-judgment interest at the maximum legal rate;

d.     Punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4).

e.     Reasonable attorneys' fees incurred in prosecuting and defending the claims through trial, and, if necessary, any subsequent appeals to the intermediate court of appeals;

f.     All costs of suit; and

g.     Such other and further relief, at law or in equity, to which CDK may be justly entitled.

**Count VI - California Uniform Trade Secrets Act**

(All Defendants)

254.   CDK repeats and re-alleges all the allegations above as if set forth fully herein.

255.   The California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, prohibits the misappropriation of trade secrets.

256.   The CUTSA defines trade secrets as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d).

257.   The CDK Trade Secrets are embedded within the DMS.

258.   CDK considers the CDK Trade Secrets to be confidential and proprietary, and CDK derives significant value from the CDK Trade Secrets not being known to the public or the automotive industry.

259.   CDK utilizes significant and reasonable efforts to secure the DMS and protect the CDK Trade Secrets, including through contractual, technological and personnel safeguards.

260.    Defendants misappropriated the CDK Trade Secrets by utilizing, and conspiring with each other to utilize technology, consisting of programs, devices, information, code and commands that were specifically designed to access, scrape and download the CDK Trade Secrets, without CDK's authorization, and in excess of any Dealership's authorization to the DMS.

261.    Defendants' wrongful access of the DMS allowed them to access, copy and use the CDK Trade Secrets to further their businesses in direct competition with CDK, and to wrongfully divert CDK's business model and Dealership clients.

262.    Defendants used improper means to access, acquire and use CDK's trade secrets while knowing that the acquisition and use of CDK's trade secrets was improper.

263.    As a proximate result of Defendants' unlawful actions, CDK has suffered harm, including the loss of its proprietary information, the diminution in value of the CDK Trade Secrets, CDK's lost business and revenue as a result of Defendants' misappropriation, reputational harm to CDK, and other damages that continue to accrue to the present, in an amount to be determined at trial.

264.    Defendants' wrongful actions are ongoing, and Defendants will continue to violate CUTSA if not preliminarily and permanently enjoined by this Court.

265.    Given the continued willful and malicious nature of Defendants' misappropriation, CDK is also entitled to exemplary damages and attorneys' fees.

266.    CDK also is entitled to equitable relief in the form of restitution for the benefits that Defendants accrued and/or disgorgement of its profits.

267.    CDK respectfully requests the following relief:

      a.    Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and the CDK Trade Secrets, and the utilization of any products and services designed or utilized to misappropriate the CDK Trade Secrets;

b.     Upon final trial, judgment against Defendants for the full amount of CDK's damages proximately caused by Defendants as well as the benefits Defendants wrongfully accrued and/or disgorgement of their wrongful profits, or a reasonable royalty for Defendants' unauthorized misappropriation of CDK's trade secrets;

c.     Punitive damages;

d.     Pre- and post-judgment interest at the maximum legal rate;

e.     As a result of Defendants' willful and malicious misappropriation of the CDK Trade Secrets, reasonable attorneys' fees incurred in prosecuting the claims through trial, and, if necessary, any subsequent appeals to the intermediate court of appeals;

f.     All costs of suit; and

g.     Such other and further relief, at law or in equity, to which CDK may be justly entitled.

### Count VII - Tortious Interference with Existing Business Relations

(All Defendants)

268.     CDK repeats and re-alleges all the allegations above as if set forth fully herein.

269.     CDK develops, deploys products and services, including its DMS, for use in the automobile dealership industry.

270.     As part of this business, CDK has service contracts with Dealerships, including Dealerships located in California, whereby CDK deploys, services, and maintains proprietary DMS software and access to CDK's DMS and products on Dealership-owned computers for use by Dealership employees.

271.     The Dealerships are, or were, customers of CDK, with whom CDK has or had a Master Service Agreement ("MSA"), specifying the scope of services, products and intellectual property that CDK is agreeing to provide.

272.     The MSAs are valid and enforceable contracts.

273.    In CDK's standard MSA, the Dealerships acknowledge that CDK owns the "Products and Services," including the databases which are part of the Products and Services, and related materials, and all copyrights, patents, trade secrets and other intellectual and proprietary rights therein and thereto. Ex. 1, § 4(a).

274.    In CDK's standard MSA, a Dealership expressly agrees, among other things, that it will only use CDK's software for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any Products or Services, or any portion thereof to any third party. *Id*. § 4(b).

275.    Likewise, in CDK's standard MSA, a Dealership acknowledges that all CDK Products and Services are licensed only to the Dealership, and only for the term of the MSA. *Id*. § 4(a).

276.    In order to protect against unauthorized access to the sensitive and proprietary data maintained in the DMS, CDK's standard MSA expressly prohibits the Dealership from supplying login credentials to third parties or otherwise granting third parties' access to the DMS. *Id*. § 4(d).

277.    Dealerships are also prohibited from causing or permitting any third-party software to access the DMS except as otherwise permitted by the MSA. CDK prominently puts this prohibition in all-caps in its standard MSAs. *Id*. § 4(b).

278.    Nowhere does any of CDK's standard MSAs permit access to the DMS by Tekion, InDesign or any other third party without CDK's consent.

279.    CDK's standard MSAs further provide that the Dealerships will treat as confidential and will not disclose or otherwise make available any of the Products or Services (including, without limitation, screen displays or user documentation) or any proprietary data, information, or documentation related thereto, in any form, to any person other than employees of the Dealership. *Id*. § 4(d).

280.    When an MSA is terminated or expires, CDK will assist in transferring the Dealership's data electronically to a new DMS provider under the terms of the MSA, provided the

Complaint For Damages and Injunctive Relief

Dealership is not in default of its contractual obligations to CDK, including its obligation to pay fees owed under the MSA.

281.    Defendants are well aware of the above contractual provisions that CDK utilizes with the Dealerships.

282.    Defendants willfully and intentionally interfered with CDK's MSAs with the Dealerships, including the Dealerships in California, to breach the MSAs by providing unauthorized third-party access to CDK's DMS system to facilitate the download and use of unauthorized software to access the DMS and scrape, download and use information illegally obtained from the DMS.

283.    Defendants further willfully and intentionally interfered with the MSAs by encouraging the Dealerships to bypass CDK's contract provisions providing for the agreed method of how CDK will transition data to a competitor in order to avoid paying fees owed to CDK under the MSA.

284.    Defendants' actions have caused actual breach of CDK's valid contracts with Dealerships.

285.    Defendants' actions have proximately caused substantial damages and losses to CDK. These damages and losses include the costs of investigating and responding to Defendants' unlawful actions; the costs of conducting a damage assessment and restoring the DMS and the data it contains to their condition prior to Defendants' unlawful actions; lost or deleted data or corrupted computer systems; and all diverted customers, revenue lost, harm to CDK's business reputation, costs incurred, and other consequential damages incurred as a proximate cause of Defendants' wrongful actions.

286.    Moreover, Defendants' unauthorized access to CDK's DMS and related platforms dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, which constitutes irreparable harm.

287.    Defendants' wrongful actions are ongoing, and Defendants will continue to violate the law if not preliminarily and permanently enjoined by this Court.

288.    CDK also is entitled to equitable relief in the form of restitution for the benefits that Defendants wrongfully accrued and/or disgorgement of their wrongful profits.

289.    CDK respectfully requests the following relief:

a.    Preliminary and permanent injunctive relief against Defendants, enjoining from engaging in further violative conduct, including the continued unauthorized access to and acquisition of CDK's systems and proprietary data;

b.    Upon final trial, judgment against Defendants for the full amount of CDK's damages;

c.    Pre- and post-judgment interest at the maximum legal rate;

d.    Reasonable attorneys' fees incurred in prosecuting and defending the claims through trial, and, if necessary, any subsequent appeals to the intermediate court of appeals;

e.    All costs of suit; and

f.    Such other and further relief, at law or in equity, to which CDK may be justly entitled.

### Count VIII - Unfair, Unlawful, or Fraudulent Actions

(All Defendants)

290.    CDK repeats and re-alleges all the allegations above as if set forth fully herein.

291.    Defendants' actions described above constitute unlawful, unfair, or fraudulent acts or practices in the conduct of a business, in violation of California's Business and Professions Code Section 17200, *et seq*., ("California's Unfair Competition Law" or "UCL"), including actions forbidden by other laws.

292.    Defendants' business practices are unfair because Defendants have acted in a manner that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to CDK.

293.    Defendants mislead Dealerships about their ability to retrieve their data from CDK in an authorized, secure, contractually permissible way. Defendants convince Dealers the best way

to extract their data from the CDK system is to allow Defendants access to the DMS. Defendants then trick CDK into providing them with access to its computer network by secretly tunneling into CDK's secure system and using the login credentials of other users, which CDK did not and would not permit. Once gaining access, Defendants scrape massive amounts of data from CDK's system, including CDK's confidential information. Defendants obscure their location and unauthorized access from CDK to perform the scraping and subvert CDK's attempts to control access to its system.

294.    Scraping data and information from CDK's DMS, as well as circumventing CDK's ability to control access to its DMS and the proprietary and confidential information therein, is substantially injurious because of the significant harm that it poses to CDK's DMS system. Unauthorized access to the DMS system undermines CDK's ability to ensure security of the system and threatens to overload system functions. Unauthorized access to the data CDK obtains from third parties, including OEMs, violates federal laws and CDK's obligations to keep third party information secure.

295.    Further, the impact of the practice against CDK far outweighs any possible justification or motive on the part of Defendants. CDK actively transfers client data for conversion to Tekion and other DMS competitors through established processes. CDK's customers, third party data providers, and the car buying public at large have a strong interest in the integrity, functionality, and accuracy of CDK's platforms and CDK's ability to enforce cybersecurity measures to protect confidential consumer, third party, and Dealership data and secure communications.

296.    Defendants' business practices also are unlawful. As stated above, Defendants' conduct violated CFAA, California Penal Code § 502, the SCA, and the DMCA.

297.    As a result of Defendants' various acts and omissions, CDK has been injured in fact and has lost money and property in the form of, among other things, costs to investigate, remediate, and prevent Defendants' wrongdoings. CDK has engineers working around the clock to detect and deactivate unauthorized logins from Tekion and InDesign.

298.    As a result of Defendants' various acts and omissions, CDK has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

299.    CDK respectfully requests the following relief:

    a.    Preliminary and permanent injunctive relief against Defendants, enjoining them from engaging in further violative conduct, including the unauthorized access to CDK systems and acquisition of data, and the utilization of any products and services designed or utilized to circumvent CDK's systems and technological measures to protect its computer systems;

    b.    Preliminary and permanent injunctive relief against Defendants, requiring Defendants to identify the location of any and all data obtained from CDK, to delete such data, and to identify any and all entities with whom Defendants shared such data;

    c.    Preliminary and permanent injunctive relief restraining Defendants from developing, distributing, using and causing others to use any software of other products or devices designed to scrape data from CDK's DMS system without CDK's authorization;

    d.    Upon final trial, judgment against Defendants for the full amount of CDK's damages and losses proximately caused by Defendants as well as the benefits Defendants wrongfully accrued and or disgorgement of their wrongful profits;

    e.    Pre- and post-judgment interest at the maximum legal rate; and

    f.    Attorney's fees, costs, and such other and further relief, at law or in equity, to which CDK may be justly entitled.

Dated: February 10, 2025                SUSMAN GODFREY L.L.P.

                                      By:   */s/ Jesse-Justin Cuevas*
                                      VINEET BHATIA *(PHV Forthcoming)*

51

SHAWN RAYMOND *(PHV Forthcoming)*
ROBERT SAFI *(PHV Forthcoming)*
SUSMAN GODFREY L.L.P.
1000 Louisiana
Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com
rsafi@susmangodfrey.com

JESSE-JUSTIN CUEVAS (SBN 307611)
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
jcuevas@susmangodfrey.com

*Attorneys for Plaintiff CDK GLOBAL, LLC, a Delaware Limited Liability Company*

Complaint For Damages and Injunctive Relief

## **DEMAND FOR JURY TRIAL**

CDK hereby requests a trial by jury.

Dated: February 10, 2025

SUSMAN GODFREY L.L.P.

By:  /s/ *Jesse-Justin Cuevas*
─────────────────────────

VINEET BHATIA *(PHV Forthcoming)*
SHAWN RAYMOND *(PHV Forthcoming)*
ROBERT SAFI *(PHV Forthcoming)*
SUSMAN GODFREY L.L.P.
1000 Louisiana
Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com
rsafi@susmangodfrey.com

JESSE-JUSTIN CUEVAS (SBN 307611)
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
jcuevas@susmangodfrey.com

*Attorneys for Plaintiff CDK GLOBAL, LLC, a
Delaware Limited Liability Company*