VINEET BHATIA (*admitted pro hac vice*)
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*admitted pro hac vice*)
sraymond@susmangodfrey.com
ROBERT SAFI (*admitted pro hac vice*)
rsafi@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

RACHEL L. SCHALLER (*admitted pro hac vice*)
rachel.schaller@blankrome.com
BLANK ROME LLP
444 West Lake Street, Suite 1650
Chicago, Illinois 60606
Telephone: (312) 776-2600
Facsimile: (312) 776-2601

*Attorneys for Plaintiff CDK Global, LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CDK GLOBAL, LLC, a Delaware limited liability company<br><br>Plaintiff,<br><br>vs.<br><br>TEKION CORP., a Delaware corporation, and INDESIGN DATA, LLC, a Florida limited liability company,<br><br>Defendants. | Case No. 25-cv-01394-JSC<br><br>**CDK GLOBAL, LLC'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date        April 24, 2025<br>TIME:      10:00 a.m.<br>PLACE:    San Francisco Courthouse, Courtroom 8 – 19th Floor 450 Golden Gate Avenue, San Francisco, CA 94102 |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ......................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND.......................................... 4

    A.    CDK licenses its DMS software system and uses technological and contractual restrictions to ensure the security of the DMS. ........................ 4

    B.    CDK has an established process for transitioning Dealership data to Tekion in a secure, authorized manner. ..................................................... 5

    C.    Tekion and InDesign convince dealerships to breach their contracts and give them unauthorized access to CDK's DMS............................................ 6

    D.    CDK investigates the scope of Tekion and InDesign's ongoing misconduct.......... 8

    E.    Tekion and InDesign's access to CDK's DMS causes continuous harm. .............. 8

    F.    Tekion and InDesign refuse to stop their unauthorized access despite CDK's clear notice of their misconduct..................................................... 10

III.    LEGAL STANDARD........................................................................... 10

IV.    ARGUMENT ................................................................................... 11

    A.    CDK likely will succeed on the merits of its claims............................................ 11

        1.    CDK likely will succeed on the merits of its computer access claims. ................................................................................ 11

        2.    CDK will likely succeed on the merits of its DMCA claim. .................... 14

        3.    CDK will likely succeed on the merits of its tortious interference claim................................................................................ 17

    B.    CDK is likely to suffer irreparable harm absent an injunction. ............................. 20

        1.    Continuing unauthorized access is irreparable harm. ................................ 20

        2.    The threat to data security is irreparable harm........................................... 21

        3.    Impact on contractual relationships and goodwill is irreparable harm........................................................................... 23

C.     The balance of equities and public interest favor an injunction. ........................... 25

V.     CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*321 Studios v. MGM Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) (N.D. Cal. 2004) ...................................... 17

*Actuate Corp. v. Internat'l Bus. Machines Corp.*,
  2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ......................................................... 17

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)................................................................................ 11

*Axia Fin., LLC v. Mason McDuffie Mortg. Co.*,
  2023 WL 7280443 (N.D. Cal. Sept. 20, 2023) ......................................... 17, 18, 23

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
  28 F. Supp. 3d 1006 (C.D. Cal. 2013)............................................................... 19, 25

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016)................................................................................ 20

*Chegg, Inc. v. Doe*,
  2023 WL 7392290 (N.D. Cal. Nov. 7, 2023)..................................................... 13, 21

*Craigslist Inc. v. 3Taps Inc.*,
  942 F. Supp. 2d 962 (N.D. Cal. 2013) ............................................................... 11, 13

*Dish Network L.L.C. v. Ramirez*,
  2016 WL 3092184 (N.D. Cal. June 2, 2016) ..................................................... 23, 24

*Dish Network, L.L.C. v. SatFTA*,
  2011 WL 856268 (N.D. Cal. Mar. 9, 2011)............................................................ 25

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017)............................................................................. 23, 25

*Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*,
  232 Cal. App. 4th 1171 (Cal. App. 5 Dist., 2014) ................................................. 24

*E*Trade Fin. Corp. v. Eaton*,
  305 F. Supp. 3d 1029 (D. Ariz. 2018)..................................................................... 24

*Facebook, Inc. v. Power Ventures, Inc.*,
  252 F. Supp. 3d 765 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019) ......... 3, 20, 25

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016).......................................................................... *passim*

*Fla. Atl. Univ. Bd. of Trustees v. Parsont*,
   465 F. Supp. 3d 1279 (S.D. Fla. 2020) .................................................................... 22

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013)................................................................................... 24

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010).............................................................................. 15, 19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   518 F. Supp. 2d 1197 (C.D. Cal. 2007)................................................................... 24

*Microsoft Corp. v. EEE Bus. Inc.*,
   555 F. Supp. 2d 1051 (N.D. Cal. 2008) ................................................................. 17

*Multiven, Inc. v. Cisco Sys., Inc.*,
   725 F. Supp. 2d 887 (N.D. Cal. 2010) ................................................................... 12

*Nat'l Ass'n of Manufacturers v. United States Dep't of Homeland Sec.*,
   491 F. Supp. 3d 549 (N.D. Cal. 2020) ................................................................... 20

*New York v. Trump*,
   2025 WL 435411 (S.D.N.Y. Feb. 8, 2025) (Engelmayer, J.) ................................ 22

*Niantic, Inc. v. Global++*,
   2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ................................................. 11, 13

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*
   50 Cal.3d 1118 (1990) ........................................................................................... 17

*Pearl Invs., LLC v. Standard I/O, Inc.*,
   257 F. Supp. 2d 326 (D. Me. 2003) ....................................................................... 16

*Sierra On–Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984)................................................................................. 11

*Stewart v. City & Cnty. of San Francisco, California*,
   608 F. Supp. 3d 902 (N.D. Cal. 2022) ................................................................... 11

*SuccessFactors, Inc. v. Softscape, Inc.*,
   544 F. Supp. 2d 975 (N.D. Cal. 2008) ................................................................... 14

*Synopsys, Inc. v. AzurEngine Techs.*, Inc.,
   401 F. Supp. 3d 1068 (S.D. Cal. 2019)............................................................. 23, 25

*Synopsys, Inc. v. InnoGrit, Corp.*,
   2019 WL 4848387 (N.D. Cal. Oct. 1, 2019) (Koh, J.)................................. 2, 16, 17

*Tekion Corp. v. CDK Global, LLC*,
   No. 3:24-cv-08879-JSC (N.D. Cal.) ......................................................................... 7

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
  315 F. Supp. 3d 1147 (C.D. Cal. 2018) ............................................................. 15

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) ............................................................................. 14

*WalkMe Ltd. v. Whatfix, Inc.*,
  2024 WL 3364019 (N.D. Cal. July 9, 2024) ...................................................... 14

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 11

**Statutes**

17 U.S.C. § 1201 ............................................................................ 15, 16, 17

18 U.S.C. § 1030 ........................................................................ 11, 12, 14

Cal. Penal Code § 502(e)(1) .................................................................... 11

**Rules**

Federal Rule of Civil Procedure 65(a) .................................................... 1

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on April 24, 2025, at 10:00 a.m., before the Honorable Jacqueline S. Corley, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, Courtroom 8, 19th Floor, Plaintiff CDK Global, LLC (CDK) will and hereby does move under Federal Rule of Civil Procedure 65(a) for an order granting a preliminary injunction against Defendants Tekion Corporation (Tekion) and InDesign Data, LLC (InDesign). The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the evidence submitted herewith, the pleadings and papers on file in this action, including CDK's Complaint, the arguments of counsel, and any other matter that the Court may properly consider.

CDK respectfully requests that the Court enter a preliminary injunction against Tekion's and InDesign's unauthorized access to CDK's computer systems and copyrighted material and associated tortious interference with CDK's contractual relations.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether CDK the Court should preliminarily enjoin Defendants' unauthorized access to CDK's Dealer Management System (DMS) and tortious interference with CDK's contracts.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

CDK and Tekion are competitors. They both sell information technology and digital marketing solutions to the automotive retail industry. They offer competing Dealer Management System (DMS) products that enable car and truck retailers (the Dealerships) to manage and automate core aspects of their business. Tekion is a relatively new entrant to the DMS market, but has succeeded in obtaining new customers, including a number of CDK's Dealership customers. In the past, each time a customer switched service, CDK's engineers have worked with their counterparts at Tekion to convert Dealership data to Tekion's system.

In late 2024, however, Tekion broke the status quo. Tekion began using Dealership networks to enter CDK's DMS and extract data. After CDK caught Tekion in the act and demanded it cease and desist, Tekion joined forces with InDesign to use its "1DMS" software product designed to run queries on CDK's DMS and extract data in bulk. In so doing, Tekion and InDesign

have induced Dealerships to breach their service agreements with CDK by giving up password-protected user credentials and installing virtual private network (VPN) devices that allow Tekion and InDesign to appear to enter CDK's DMS from authorized Dealerships' IP addresses. Through their unauthorized access, Tekion and InDesign are able to observe and copy the structure of CDK's DMS, which gives an unfair advantage to CDK's competitors—including Tekion. Their misconduct also creates an immediate cybersecurity risk of additional hostile access and public disclosure of the sensitive and valuable third-party data housed on CDK's servers.

This motion seeks narrow relief to protect CDK's intellectual property and contractual rights, the security of its computing systems, and the confidentiality of third-party data. Injunctive relief is warranted under these circumstances.

CDK is likely to prevail on the merits of its claims. With respect to the Computer Fraud and Abuse Act (CFAA) and California Computer Data Access and Fraud Act (CDAFA) claims, Tekion and InDesign have violated these statutes by usurping administrative access controls and using them to run software scripts on CDK's DMS ███████████████████. The Ninth Circuit has made clear that a "defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). Tekion and InDesign never had permission to access CDK's DMS, and CDK has sent multiple cease-and-desist letters making plain their conduct is not allowed. They have nevertheless persisted in unauthorized access.

Tekion and InDesign also have violated the Digital Millennium Copyright Act (DMCA). CDK has invested hundreds of millions of dollars in IT infrastructure, including the private, secure networks between its data centers and Dealerships. Tekion and InDesign are circumventing CDK's security measures by using VPN tunnels and unauthorized password-protected user credentials. The use of VPN tunnels to circumvent CDK's access restrictions plainly violates the DMCA, and the vast majority of courts in this district have found that unauthorized use of passwords also amounts to circumvention in violation of the DMCA. *See Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 4848387, at *8 (N.D. Cal. Oct. 1, 2019) (Koh, J.).

Finally, Tekion and InDesign's scheme depends on convincing CDK's Dealership customers to breach the terms of their contracts. CDK's standard Master Services Agreement (MSA) prohibits Dealerships from giving third parties access to CDK's DMS, sharing password-protected user credentials, and using third-party software on CDK's DMS. Tekion and InDesign are aware of these contractual restrictions—no less because many former CDK employees work for Tekion. Yet Tekion and InDesign have spread misinformation that CDK will not assist in data conversion, demanded user credentials, instructed Dealerships to set up VPN tunnels, and suggested Dealerships not pay for services rendered by CDK—all to induce Dealerships to breach.

Tekion and InDesign's misconduct is causing immediate, irreparable injury. By interfering with CDK's contracts and taking CDK's intellectual property, they are undermining CDK's customer contracts and goodwill. But their conduct risks an even greater harm. "Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm." *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019). That harm arises from not only the loss of control of intellectual property, but also the imminent cybersecurity threat that unauthorized access creates. CDK's DMS houses sensitive personally identifying information ("PII")—such as social security numbers, credit scores, and financial account numbers—and proprietary data belonging to CDK, automakers, and other third parties. Tekion and InDesign's conduct imperils the confidentiality of that information. It increases the likelihood of public disclosure and further hostile attacks on CDK's servers.

Tekion and InDesign cannot justify their misconduct. If they are enjoined, Dealerships will remain free to switch DMS providers and to access their own data. Should any Dealership decide to switch DMS providers, CDK will continue to work with Tekion to securely transfer data, consistent with the parties' established course of dealing and CDK's obligations to Dealerships.

CDK respectfully requests a preliminary injunction consistent with its proposed order, which would preserve the status quo during this litigation.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    CDK licenses its DMS software system and uses technological and contractual restrictions to ensure the security of the DMS.

CDK is a leading provider of a dealer management system (DMS). Declaration of David LaGreca (LaGreca Decl.) ¶¶ 3-4. CDK's DMS is a suite of software applications for Dealerships to manage inventory, service vehicles, close vehicle sale or lease transactions with consumers, handle accounting, meet compliance requirements, and integrate and store data. *Id.* ¶ 5. CDK's DMS facilitates quick and efficient deal flow by establishing a single platform for Dealerships to transact with consumers, original equipment manufacturers (OEMs) (*e.g.*, Ford, General Motors), lenders, credit bureaus, and state DMVs. *Id.* ¶¶ 6-7. The automotive data ecosystem that CDK supports is massive, with millions of daily transactions and billions of dollars in annual commerce. *Id.* ¶ 6. CDK has invested hundreds of millions of dollars in product research and development and IT infrastructure to serve its Dealership customers. *Id.* ¶ 3.

CDK's DMS software runs on CDK's original, proprietary source code. *Id.* ¶ 14. The user interface features graphical content, text, fonts, colors, and images arranged in a distinctive layout. *Id.* ¶ 16. Users can click through pages that look similar to tabs on a web browser to enter and query data, generate reports, and pull up "accounts." *Id.* ¶ 16. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮    *Id.* ¶¶ 17-27. CDK's platform has intuitive features, but CDK also offers training so that Dealership employees can understand and use the entire suite of software tools. *Id.* ¶ 15.

In addition to CDK's proprietary data, CDK's DMS stores large amounts of sensitive and/or proprietary data exchanged among Dealerships, consumers, OEMs, and other third parties. *Id.* ¶ 8. A typical sale transaction involves consumers' PII—including social security numbers, birth dates, credit reports, and financial account numbers, email addresses, and drivers' licenses. *Id.* ¶¶ 9-10. CDK's DMS also contains data that belongs to OEMs—such as vehicle warranty details, performance history, and recall data—as well as DMVs, lenders, and credit bureaus. *Id.* ¶¶ 11-13.

Given the vast amount of data stored on CDK's DMS, cybersecurity is critical. *Id.* ¶ 28. CDK invests in technology to store, process, and transmit this confidential information securely, and to operate its DMS systems without significant disruption or failure. *Id.* ¶¶ 3, 28. CDK commits to protecting this data under the same statutory and regulatory requirements followed by Dealerships. *Id.* ¶ 29. A critical element of CDK's data security protocol is controlling access to its DMS, which it does in two ways.

First, CDK utilizes hardware and software to keep connections to the DMS private. *Id.* ¶ 30. To use the DMS, ███████████████████████████████████████████████████████ ███████████████████ *Id.* ¶¶ 31-32. ██████████████████████████████████ ███████████████████████████████████████ *Id.* ¶ 31. CDK ████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* ¶¶ 33-34. Only Dealership employees with password-protected user credentials can access CDK's DMS, and CDK gives Dealerships the tools necessary to limit DMS access to employees on a "need to know" basis. *Id.* ¶¶ 35-37.

Second, CDK requires its Dealership customers to enter a Master Services Agreement (MSA) that imposes contractual access restrictions. *Id.* ¶¶ 38-41. Each MSA grants a Dealership a "personal, non-exclusive, non-transferable" license to CDK's software that can only be used "at the sites indicated on the Schedules"—*i.e.*, ██████████████████████████████. *Id.* ¶ 42 (MSA § 2.C). The MSA prohibits Dealerships from sharing login credentials with third parties or creating new accounts for them, and states in all-caps that "CLIENT IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS THE PRODUCTS AND SERVICES EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT." *Id.* ¶ 45 (MSA § 4(b)); *see also id.* ¶¶ 43-44, 46 (quoting MSA §§ 4(b), 4(d), 4.B(2), 5, 8.J).

**B.    CDK has an established process for transitioning Dealership data to Tekion in a secure, authorized manner.**

The DMS market is competitive, and Dealerships are free to switch providers. When such a need arises, CDK works with the Dealership to convert its data to a competitor's DMS. LaGreca Decl. ¶ 48. CDK has invested significant resources to customize a "Conversion Code" to each major

DMS provider that competes with CDK—including Tekion. *Id.* ¶¶ 50-55. CDK first verifies the Dealership is current on all of its accounts, has satisfied its financial obligations through the end of its contract term, and otherwise is in compliance with its MSA obligations—and then deploys its engineers and implementation specialists to transfer the data. *Id.* ¶¶ 48-51. CDK's team ensures the data conversion complies with appropriate data security practices, does not burden its system, and does not include the vast amounts of proprietary or third-party data stored on the DMS. LaGreca Decl. ¶¶ 49, 95. For example, in a CDK-controlled conversion, CDK does not provide its competitors ████████████████████████████████████████████████████████ ████████████████████████████████████████████. *Id.* ¶ 49.

CDK has followed these orderly procedures to complete CDK-to-Tekion data conversions. Its engineers use a custom Tekion Conversion Code and work directly with their Tekion counterparts to export customer data in the form specified by Tekion. *Id.* ¶ 55. Since April 2020, CDK has completed dozens of data conversions for customers leaving CDK for Tekion. *Id.* ¶ 56.

**C.    Tekion and InDesign convince dealerships to breach their contracts and give them unauthorized access to CDK's DMS.**

In late 2024, CDK learned Tekion had disrupted years of data conversions pursuant to CDK's secure, authorized process. Tekion had begun calling and emailing CDK's Dealership customers to obtain access to CDK's DMS ████████████████████████ for purposes of extracting data. On October 15, 2024, Tekion emailed one of CDK's Dealership customers with instructions ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Declaration of Denton Bales (Bales Decl.) ¶ 8; Ex. 8. ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. LaGreca Decl. ¶ 57.

A former Dealership employee has described the same pattern of misconduct by Tekion at another Dealership: ████████████████████████████████████████████

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████. Declaration of Samuel Garcia (Garcia Decl.) ¶¶ 10-23.

5  ████████████████████████████████████████████████████████

6  ██████████████████████████████ Bales Decl. ¶ 19.

On December 6, 2024, before learning of InDesign's role, CDK sent Tekion a cease-and-desist letter demanding an end to data extraction "without authorization." LaGreca Decl. ¶ 62; Ex. 3. Tekion responded with a letter denying wrongdoing. *Id.* ¶ 63; Ex. 4. Three days after receiving CDK's letter, Tekion filed a lawsuit in this Court claiming that CDK was engaged in anti-competitive conduct. *See Tekion Corp. v. CDK Global, LLC*, No. 3:24-cv-08879-JSC (N.D. Cal.).

On December 10, 2024, the CFO of yet another Dealership called CDK to report contact by two Tekion employees—one a former CDK salesman. LaGreca Decl. ¶ 64; Bales Decl. ¶ 10. Tekion had repeatedly urged that Dealership to self-extract CDK's DMS data or to allow Tekion to access CDK's DMS through a Meraki VPN device and administrative user credentials. *Id.* ¶¶ 12-18.

When the Dealership CFO informed Tekion about CDK's standard process for DMS data conversion, Tekion falsely claimed that CDK was not allowing Dealerships to access their data. Bales Decl. ¶ 16. Days later, that Dealership CFO forwarded CDK an email chain that revealed InDesign was collaborating with Tekion. Bales Decl. ¶¶ 20-21. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *Id.* ¶ 22; Ex. 9. In the same email chain, InDesign instructed ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 9. (All emphasis in this brief is added.) The Dealership rejected the request for access and explained "***We certainly will not be giving you a login as it violates our MSA.***" Bales Decl. ¶ 29; Ex. 9. But Tekion and InDesign have convinced other Dealerships to breach their MSAs, as described below.

D.    **CDK investigates the scope of Tekion and InDesign's ongoing misconduct.**

CDK hired an outside forensic analyst to investigate the scope of Defendants' unauthorized access. LaGreca Decl. ¶ 65. That analysis revealed that both Tekion *and* InDesign have entered CDK's private network from ███████████████████████████████████████████████████████████ ██████████ *Id.* ¶¶ 65-70; Declaration of Vaidhyanathan Swaminathan (VS Decl.) ¶¶ 12-69.

A forensic examination of CDK's audit logs revealed that Defendants ███████████████ ████████████████████████████████████████████████████████████████. VS Decl. ¶¶ 12-69. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████. *E.g.*, *id.* ¶¶ 11, 32, 39-40, 43, 46. ████████████████    ████████    █████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █. *E.g.*, *id.* ¶¶ 8, 19-20. ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████ *Id.* ¶¶ 10, 49, 54, 58, 60, 65. The usernames ████████████████ are associated with both Tekion and InDesign email domains or have variations of the name "tekion" or "1DMS"— InDesign's software product. *Id.* ¶¶ 8, 13-26.

As part of this process, Tekion and InDesign are operating CDK's DMS software and, ████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. VS Decl. ¶¶ 7-11; LaGreca Decl. ¶¶ 8-27, 87-90.

CDK filed this action on February 10, 2025, and delivered a cease-and-desist letter to InDesign (and again to Tekion) on February 11, 2025. LaGreca Decl. ¶ 70 & Ex. 6.

E.    **Tekion and InDesign's access to CDK's DMS causes continuous harm.**

Tekion and InDesign's misconduct has and will continue to cause several harms. CDK has

---

[1] A virtual machine is a digital copy of a computer that enables the user to run applications within a physical computer. VS Decl. ¶ 14.

lost $36,750 in the form of employee time and forensic analysis to uncover the scope of Tekion and InDesign's unauthorized access to CDK's DMS. LaGreca Decl. ¶ 91. And CDK is losing Dealership customers and revenue due to Tekion and InDesign's interference and misrepresentations that CDK is restricting Dealerships' access to data. CDK's experience with one former Dealership customer exemplifies the harm. In order to switch to Tekion's DMS, that Dealership terminated its MSA early—which is contractually allowed provided that the Dealership pays CDK for services rendered and an early termination fee. *Id.* ¶¶ 80-83; Ex. 10 (Dealership MSA § 10). But that Dealership refused to pay amounts owed under the contract. *Id.* ¶ 83. CDK's investigation revealed user accounts associated with Tekion and InDesign had ████████ ████████████████████████████████████████████████ LaGreca Decl. ¶ 68; VS Decl. ¶ 49. The timing of these actions evidences that Tekion and the Dealership worked together so that Tekion could access CDK's DMS and the Dealership could avoid its payment obligations.

Other harms cannot be easily quantified. Tekion and InDesign have circumvented CDK's private, encrypted network and compromised CDK's ability to limit access to its own software. LaGreca. ¶ 71. Tekion—one of CDK's competitors—and InDesign—a company that work's with CDK's competitors—are able to view and "screen scrape" CDK's software and database elements. *Id.* ¶¶ 88-89. CDK has invested decades of time and money into creating these proprietary data relations and structures, which gives CDK a competitive advantage. *Id.* ¶ 90. Its competitors are leapfrogging that investment by scraping, data to which they have no right.

Tekion and InDesign also are impacting CDK's contractual relationships and goodwill with Dealership customers. They are giving Dealerships a pathway to data conversion that disregards CDK's security system, while painting CDK as a bad actor who holds data captive. LaGreca Decl. ¶¶ 79-86; Bales Decl. ¶ 16. InDesign has given at least one Dealership the misimpression that its software is part of CDK's authorized conversion process. Declaration of Mark Kiser (Kiser Decl.) ¶¶ 2-6. CDK is losing not only its ability to ensure Dealerships honor obligations under their MSAs, but also goodwill due to Tekion and InDesign's misrepresentations.

And Tekion and InDesign's unauthorized access compromises CDK's ability to safeguard sensitive and proprietary data and thus poses a real cybersecurity risk. LaGreca Decl. ¶¶ 71-78;

Declaration of Edward Stroz (Stroz Decl.) ¶¶ 10-12. By tunneling into CDK's private network, running automated software scripts, and requesting secure user credentials over unsecured email systems, Tekion and InDesign are jeopardizing the confidentiality and integrity of data stored on CDK's DMS. Stroz Decl. ¶¶ 67-97.

   **F.   Tekion and InDesign refuse to stop their unauthorized access despite CDK's clear notice of their misconduct.**

   Tekion and InDesign have made clear they have no intention of stopping their unauthorized access. Tekion's misconduct persisted after CDK ███████████████████ associated with Tekion. LaGreca Decl. ¶ 61. Email and other evidence shows Tekion has worked with InDesign to access the DMS since CDK's December 6, 2024 letter. Bales Decl. ¶¶ 20-31; Ex. 9. InDesign's unauthorized activity has continued unabated since CDK's February 11, 2025 letter. CDK continues to observe ongoing unauthorized DMS access and scraping by InDesign at Dealerships that have indicated they are transitioning from CDK to Tekion. LaGreca Decl. ¶ 85.

   After CDK filed this action, Tekion embarked on a press tour in an effort to paint CDK as "bullying" and "keeping CDK customers captive" while Tekion "will stand behind" Dealerships' "right to access their data." Ex. 20. On February 18, 2025, Tekion responded to CDK's December 6, 2024 letter with a different tune, asserting that it "had stopped providing technical assistance to dealers in exporting and migrating their data from CDK's DMS, and it has no plans to resume this activity until the Court rules on Tekion's requested declaratory relief." Ex. 7. But Tekion is hiding behind InDesign and remains active in an evolving hacking scheme.

   CDK respectfully requests a preliminary injunction restraining Tekion and InDesign's unauthorized access to its DMS and tortious interference with its contracts. This order would not interfere with the parties' data conversion process that they have followed for years before this dispute arose. Nor would it affect a Dealership's right to access and download their data consistent with the contractual terms to which they agreed.

## III.   LEGAL STANDARD

   An order granting interim relief is "not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment."

*Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, courts apply a sliding scale in which "serious questions going to the merits and a hardship balance that tips sharply toward plaintiff" support issuance of a preliminary injunction provided that "the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    CDK likely will succeed on the merits of its claims.

To obtain interim relief, a plaintiff need only show a "a 'fair chance' of success" and "need not conclusively prove their case or show that they are more likely than not to prevail." *Stewart v. City & Cnty. of San Francisco, California*, 608 F. Supp. 3d 902, 911 (N.D. Cal. 2022). CDK makes that showing for its computer access, copyright, and tortious interference claims.[2]

#### 1.    CDK likely will succeed on the merits of its computer access claims.

CDK asserts that Tekion and InDesign have violated (a) the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 and (b) the California Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502(e)(1). The CFAA requires a showing that defendants "(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that they (3) thereby obtained information (4) from any protected computer ..., and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Niantic, Inc. v. Global++*, 2019 WL 8333451, at *6 (N.D. Cal. Sept. 26, 2019) (cleaned up). CDAFA is the "a state law corollary to the CFAA" and the "requirements of both statutes are functionally identical." *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 968 (N.D. Cal. 2013). CDK is likely to succeed on a showing of each element.

---

[2] CDK also asserts claims for violations of the UCL, the Stored Communications Act, the Defend Trade Secrets Act, and the California Uniform Trade Secrets Act, which are not bases for this motion.

<u>First</u>, Tekion and InDesign have intentionally accessed CDK's computer. CDK's DMS is a "computer" within the meaning of the CFAA—*i.e.*, it is a "data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." 18 U.S.C. § 1030(e)(1); LaGreca Decl. ¶¶ 5-13, 30-34 (describing data storage and communications between Dealerships and CDK data centers). Transaction logs demonstrate that user account names and email addresses associated with Tekion and InDesign have accessed CDK's DMS. *Id.* ¶¶ 65, 70.

This access is intentional. In *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892–94 (N.D. Cal. 2010), this Court applied the "ordinary, contemporary, common meaning" of "knowingly" and "intentionally" and granted summary judgment in favor of Cisco because there was "no genuine issue of material fact that [Cisco's former employee] acted with the requisite mental state for liability under the CFAA" when that former employee logged onto Cisco's computer network using a current employee's password-protected user credentials. At least one former CDK salesman who now works for Tekion has contacted a Dealership to obtain access through the Dealership's password-protected credentials. Bales Decl. ¶ 14. InDesign contacted that same Dealership requesting credentials. *Id.* ¶¶ 20-22. Other communications with Dealerships indicate this is a common practice, which leaves no doubt about the intentionality of Tekion and InDesign's conduct. Bales Decl. ¶ 8; Ex. 8; Garcia Decl. ¶¶ 10-24; LaGreca Decl. ¶¶ 57-61.

<u>Second</u>, Tekion and InDesign accessed CDK's DMS "without authorization." Tekion and InDesign have never had CDK's permission to access the DMS. LaGreca Decl. ¶ 47. That fact is made plain through the dozens of data conversions in which CDK gave Tekion data without permitting Tekion's access. *Id.* ¶¶ 48-56. Now Tekion and InDesign have ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████. *Id.* ¶¶ 57-60, 64-65; VS Decl. ¶¶ 23-26.

Supposed "permission" from Dealerships is not a defense. CDK has never authorized Tekion and InDesign to use Dealerships' credential. LaGreca Decl. ¶ 47. And Dealerships are "not authorized to cause or permit any third party software to access" CDK's DMS. *Id.* ¶ 45 (MSA § 4(b)); *see also id.* ¶¶ 43-44, 46 (quoting MSA §§ 4(b), 4(d), 4.B(2), 5, 8.J). Tekion has known this since at least 2019. *Id.* ¶ 62 n.2; Ex. 5. And since November 1, 2024, ████████████████

██████████████████████, which further put Tekion on notice that its activity is not permitted. *Id.* ¶ 61. CDK notified Tekion ***again*** in cease-and-desist letters on December 6, 2024 and February 11, 2025. *Id.* ¶¶ 62, 70; Ex. 3; Ex. 6. InDesign received the February 11 letter. LaGreca Decl. ¶ 70.

These measures are enough to establish the "without authorization" element of a CFAA claim. In *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016), the Ninth Circuit explained the general rule that a "defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly" and held even if social media users "arguably gave [defendant] permission to use Facebook's computers," then "Facebook expressly rescinded that permission when Facebook issued its written cease and desist letter" and "imposed IP blocks . . . to prevent [defendant's] continued access." District courts agree. *See, e.g.*, *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *6 (N.D. Cal. Nov. 7, 2023) ("Defendants surely accessed the site <u>without</u> authorization once Chegg revoked any and all access to its website in the letter." (emphasis in original)); *Niantic*, 2019 WL 8333451, at *6 ("Defendants have exceeded their authorized access to Niantic's computers, which prompted Niantic to revoke Defendants' access altogether in a cease-and-desist letter."); *Craigslist*, 942 F. Supp. 2d at 969–70 (continued use of website after receipt of cease-and-desist letter and implementation of "technological measures to block access form IP addresses" constitutes unauthorized access).

Despite being notified that they are not authorized to access CDK's DMS, and CDK's ████████████████████████, Tekion and InDesign have continued to engage in the same unauthorized conduct. One week after CDK's December 6, 2024 letter, Tekion was still working with InDesign to obtain user credentials from a Dealership for the purpose of obtaining unauthorized access to CDK's DMS. *See* Bales Decl. ¶¶ 20-31; Ex. 9; *see Power Ventures*, 844 F.3d at 1067 ("Once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability."). Since CDK's February 11, 2025 letter, InDesign has continued to access CDK's DMS without authorization ███████████████ ████ from multiple Dealerships' networks. VS Decl. ¶¶ 27-57.

<u>Third</u>, through their unauthorized access, Tekion and InDesign "obtain information." InDesign has performed "RPG" function calls, which is used to analyze database structures,

identify queries for extracting data. VS Decl. ¶ 11. Tekion has learned the DMS's organizational structure through its direct, weeks-long access to the DMS using virtual machines and VPN tunnels. LaGreca Decl. ¶¶ 87-88; Garcia Decl. ¶ 14. Tekion used its ill-gotten information to craft "RXR" function calls, which it automated to target and extract specific data fields, including confidential and proprietary field name codes. VS Decl. ¶ 10.  InDesign used different functions to download, access, or otherwise extract data, and send it directly to itself. *Id.* ¶ 11. CDK has confirmed that at least several terabytes of data downloaded from its DMS have flowed from the Dealership network to computers associated with InDesign. LaGreca Decl. ¶ 74.

Fourth, CDK's DMS is a "protected computer" within the meaning of the CFAA. The CFAA defines "protected computer" to mean a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2). The Ninth Circuit has explained "effectively all computers with Internet access" meet that requirement. *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012). The DMS uses the Internet to connect CDK data centers with hardware components residing at Dealerships across the country. LaGreca Decl. ¶¶ 30-33.

Fifth, CDK has suffered a loss of at least $5,000. The CFAA defines "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense." 18 U.S.C. § 1030(e)(11). "[C]ourts have considered the cost of discovering the identity of the offender or the method by which the offender accessed the protected information to be part of the loss for purposes of the CFAA." *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008). CDK has spent at least $36,750 to investigate the scope of the misconduct and ███████████ ██████. LaGreca Decl. ¶¶ 91-92. This expenditure is a loss. *See, e.g.*, *Power Ventures*, 844 F.3d at 1066 ("many hours" spent by Facebook employees "analyzing, investigating, and responding to [defendant's] actions" was "a loss under the CFAA"); *WalkMe Ltd. v. Whatfix, Inc.*, 2024 WL 3364019, at *7 (N.D. Cal. July 9, 2024) ("loss" established where plaintiff "discovered an initial unauthorized intrusion," "spent time to investigate and document subsequent intrusions," and "suspended one of the 'fake' accounts and sent a cease and desist letter").

### 2.  CDK will likely succeed on the merits of its DMCA claim.

The Digital Millennium Copyright Act (DMCA) states that for (1) "a work protected under

this title," (2) that is subject to "a technological measure that effectively controls access;" (3) "no person shall circumvent" that technological measure in order to access the copyrighted work. 17 U.S.C. § 1201(a)(1). CDK has a likelihood of success on its "access" claim.[3]

<u>First</u>, because it is a software program, CDK's DMS is "a work protected" under the DMCA. Software generally includes three distinct "elements," all of which are protectable: (1) the "software's **literal elements**," such as source code; (2) the software's "**individual non-literal elements**," such as the discrete visual components; and (3) the software's "**dynamic non-literal elements**" such as the real-time experience and operation of the software. *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 943 (9th Cir. 2010). In *MDY*, the Ninth Circuit held the "dynamic non-literal elements" of a video game—*i.e.*, the "real-time experience of traveling through different worlds, hearing their sounds, viewing their structures, encountering their inhabitants and monsters, and encountering other players"—"constitute a copyrighted work." *Id.* at 953.

Following *MDY*, in *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1160 (C.D. Cal. 2018), the court explained that the Ticketmaster live entertainment sales website contained (1) "individual non-literal elements" such as "logos, images, fonts" and (2) "dynamic non-literal elements" such as "responding to the user's input by generating a unique presentation of content and information for each user." The court held "[e]ach of these elements is a work of authorship, which gets copyright protection, as long as it contains the required modicum of originality." *Id.* CDK's DMS also contains literal elements (source code), individual non-literal elements (*e.g.*, the DMS's images, fonts, and graphical display), and dynamic non-literal elements (*e.g.*, the real-time experience of navigating the DMS terminal and running search queries). LaGreca Decl. ¶¶ 14-25. These features are original creations, *id.* ¶¶ 26-27, 90, and thus protectable.

<u>Second</u>, CDK limits access to the DMS by creating a private network between the Dealership and CDK's data centers, restricting network access ███████████████,

---

[3] The DMCA also prohibits **trafficking** "in devices that facilitate circumvention of access control measures" and "in devices that facilitate circumvention of measures that protect against *copyright infringement*." *MDY*, 629 F.3d at 946 (emphasis in original) (citing 17 U.S.C. §§ 1201(a)(2), 1201(b)(1)). CDK alleges that Tekion and InDesign have also violated §§ 1201(a), 1201(b)(1), but those claims do not form the basis of this motion.

and requiring password-protected user credentials to connect to the CDK network. LaGreca Decl. ¶¶ 30-37. This password-protected, private network is a "technological measure that effectively controls access" to the non-literal elements of CDK's software. 17 U.S.C. § 1201(a)(1). In *Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 350 (D. Me. 2003), the court held plaintiff's encrypted, password-protected private network, "squarely fits the definition of 'a technological protection measure put in place by a copyright owner to control access to a copyrighted work'" because it is "the 'electronic equivalent' of a locked door." CDK has likewise locked the door.

<u>Third</u>, Tekion and InDesign circumvent CDK's private network restrictions by using ▮▮▮▮ ▮▮▮▮ and unauthorized user credentials. Tekion sends Dealerships VPN devices that enable Tekion ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bales Decl. ¶ 8, Ex. 8, and then uses InDesign's 1DMS or similar software ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. LaGreca Decl. ¶ 60. Tekion instructs Dealerships to physically connect the VPN device to their "same switch (or switch connected in series) as the computers that access the CDK system" so that the access ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Ex. 8. Once connected, Tekion and CDK need login credentials from the Dealership. *See* Ex. 8 ("[W]e will need 1 User login credential with the MAINT function enabled."); Ex. 9 ("Our Tekion conversion process has 3 steps" including "creating a CDK user so we can extract all the data and docs before your CDK service ends."). Tekion has instructed Dealerships to create disguised administrative-level usernames for the purpose of allowing Tekion to access CDK's DMS and create new user accounts. Bales Decl. ¶ 18; Garcia Decl. ¶ 13, 20-23. After circumventing these access controls, Tekion and InDesign are able to view the look, feel, contents, and organization of CDK's DMS. LaGreca Decl. ¶¶ 87-89.

This Court has held that manipulation of authorized credentials to access software from unauthorized IP addresses amounts to circumvention. In *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 4848387, at *1-2 (N.D. Cal. Oct. 1, 2019) (Koh, J.), the parties had executed a software license for InnoGrit to use Synopsys software at a location in Shanghai, China—but InnoGrit "affirmatively manipulated the identifying information of at least 15 InnoGrit computers in San Jose, California in order to bypass" restrictions intended to limit InnoGrit's access to Shanghai.

The Court denied a motion to dismiss and found Synopsys adequately alleged that InnoGrit violated § 1201(a)(1) by "circumvent[ing] Synopsys's license key system when it altered identifying information on their computers and servers located in California." *Id.* at *8. Here, Tekion and InDesign have circumvented CDK's private network by (1) employing networking devices to tunnel into private encrypted pathways and (2) inducing Dealerships to provide administrative-level access controls in order to create dozens of new accounts. By camouflaging their location and pretending to be authorized Dealership users, Tekion and InDesign have circumvented CDK's access controls.

Supposed "permission" from the Dealerships does not defeat the DMCA access claim. "The majority of the courts in this district have found that a defendant's unauthorized use of license keys or passwords . . . constitutes circumvention under Section 1201(a)(1)." *InnoGrit*, 2019 WL 4848387, at *8; *see also Actuate Corp. v. Internat'l Bus. Machines Corp.*, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ("[U]nauthorized distribution of passwords and usernames avoids and bypasses a technological measure in violation of sections 1201(a)(2) and (b)(1)."); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) ("By distributing a [license key] without authorization, [defendant] effectively circumvented [plaintiff's] technological measure to control access to a copyrighted work in violation of the DCMA."); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) (N.D. Cal. 2004) ("However, while [defendant's] software does use the authorized key to access the DVD, it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological measure]."). The Dealerships are prohibited by contract from sharing credentials with third parties and have no authority to enable Tekion and InDesign's circumvention. LaGreca Decl. ¶¶ 38-46.

### 3. CDK will likely succeed on the merits of its tortious interference claim.

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Axia Fin., LLC v. Mason McDuffie Mortg. Co.*, 2023 WL

7280443, at *11 (N.D. Cal. Sept. 20, 2023) (citing *Pacific Gas & Electric Co. v. Bear Stearns & Co.* 50 Cal.3d 1118, 1126 (1990)). CDK is likely to succeed in showing Tekion and InDesign have intentionally interfered with its Dealership contractual relations.

First, CDK requires all Dealerships to execute an MSA, which prohibits Dealerships from "mak[ing] available any of the Products and Services" to third parties. LaGreca Decl. ¶ 44 (MSA § 4(d)). Tekion and InDesign have accessed the DMS through ███████ Dealerships networks, and CDK has a valid MSA with each Dealership. *See* LaGreca Decl. ¶ 79; Exs. 10-17.

Second, Tekion and InDesign have knowledge of the MSAs. As industry members, both entities should know that contracts governing access to a DMS are standard, and former CDK sales employees, who are knowledgeable about CDK's contracts, work for Tekion's salesforce. Bales Decl. ¶¶ 3, 14. InDesign must be aware of these contractual restrictions because it seeks indemnification from Dealerships for "unauthorized use of the Dealer Data or the Dealer's granting to InDesign any unauthorized access to the Existing DMS." Ex. 19 (InDesign Agrmt.) ¶ 5. This constructive knowledge is enough. *See Axia*, 2023 WL 7280443, at *11 (finding likelihood of success on the merits of tortious interference claim where "Defendant ***knew or should have known*** . . . of Plaintiff's contracts with former employees"). And it is undisputed that Tekion and InDesign currently know of the MSAs. On December 13, 2024, CDK's Dealership customer responded to a request for login credentials, writing to both Tekion and InDesign: "***We certainly will not be giving you a login as it violates our MSA.***" Ex. 9.

Third, despite knowing about the contractual restrictions, Tekion and InDesign have intentionally induced the Dealerships to breach the MSA's prohibition on providing unauthorized third-party access. MSA §§ 4(b), 4(d), 8.J prohibit the Dealership from "allow[ing] access to any Products or Services by any third parties except as otherwise permitted by this Agreement," permitting "third party software to access the Products and Services," and connecting third-party devices without CDK's approval. LaGreca Decl. ¶¶ 43, 45-46, Tekion and InDesign's intentional actions include (1) misinforming Dealerships that CDK will not assist in data conversion, Bales Decl. ¶ 16; (2) ████████████████████████████████████, *id.* ¶¶ 8, 17, 19; Garcia Decl. ¶¶ 15-19; (3) ████████████████

1  ████████████████████████████████████████████████, Bales Decl. ¶ 18; Garcia Decl. ¶¶ 13-14;

2  (4) ███████████████████████████████████████████████████████████████████████

3  █████████████████ *id.* ¶¶ 20-23; (5) ██████████████████████████████████████

4  ████████████, LaGreca Decl. ¶¶ 60, 89; VS Decl. ¶¶ 24-26, and (6) suggesting Dealerships not pay

5  amounts owed under their MSAs. Bales Decl. ¶ 30.

6      *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013)

7  is instructive. Defendant Ceiling Fan marketed a software program designed to run software "bots"

8  to play plaintiff's "World of Warcraft" (WoW) online video game. *Id.* at 1010. The court granted

9  summary judgment in favor of plaintiff on its tortious interference claim. *Id.* at 1015-16. The court

10 found Ceiling Fan "engaged in a number of intentional acts that were designed to induce WoW

11 game players' breach of the bot prohibition" including "the design and sale of the botting software"

12 and "educating their customers regarding how best to use the Bots to avoid detection of such use."

13 *Id.* at 1016. Similar to the "bot" software program in *Blizzard*, InDesign designed and sells 1DMS—

14 a software created to run automated scripts on CDK's DMS. VS Decl. ¶¶ 8, 24-26. Tekion likewise

15 teaches Dealerships how to install VPN devices and create administrative credentials so that

16 Tekion/InDesign can use software scripts while remaining undetected and entering the CDK DMS

17 ████████████████████████████████. Bales Decl. ¶¶ 8, 18, 22; Exs. 8-9.

18     Fourth, ██████████ Dealerships have breached their MSAs by allowing Tekion and

19 InDesign to access the DMS through the Dealerships' IP addresses and run automatic scripts to

20 extract data. LaGreca Decl. ¶ 79; VS Decl. ¶¶ 12-69.

21     Fifth, Tekion and InDesign's intentional acts have caused damage in the form of lost

22 revenue and goodwill. In 2024, a Dealership switching from CDK's to Tekion's DMS announced

23 its refusal to pay CDK money owed under the MSA for services rendered and early contract

24 termination. LaGreca Decl. ¶¶ 80-83. Through its forensic investigation, CDK learned that ████

25 ████████████████████████████████████████████████████████. *Id.* ¶ 84; VS Decl.

26 ¶¶ 49-57. These █████████ evidence that Tekion induced the Dealership to breach its MSA by

27 ████████████████████████████████████████████████████████████████████████

28 ██████████ That Dealership's breach has caused millions in monetary damages. LaGreca Decl.

¶ 82. This is just one example of a known breach. CDK has observed DMS activity by user accounts associated with ███████████████████████████████████████ *Id.* ¶ 85. The full scope of damage from Tekion and InDesign's interference with CDK's customers—to an extent unknown—is not easily quantifiable. *See infra* at 23-25.

**B.    CDK is likely to suffer irreparable harm absent an injunction.**

"Irreparable harm is harm for which there is no adequate legal remedy." *Nat'l Ass'n of Manufacturers v. United States Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 569 (N.D. Cal. 2020). To obtain a preliminary injunction, "a plaintiff must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). CDK clears the bar. Tekion and InDesign's misconduct (1) strips CDK of its right to control access to its DMS; (2) threatens the security of sensitive third-party data; and (3) injures CDK's contractual relationships and goodwill. These harms are immediate and not compensable with a monetary award.

**1.    Continuing unauthorized access is irreparable harm.**

"Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm." *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017) (citing cases), *aff'd*, 749 F. App'x 557 (9th Cir. 2019). In *Power Ventures*, the defendants operated a website "to integrate users' various social media accounts into a single experience" and "induc[ed] Facebook users to provide their login information and then us[ed] that information to 'scrape' Facebook's proprietary material." *Id.* at 768-69. The Court granted a permanent injunction based on a finding of irreparable harm because when defendants accessed Facebook's website without authorization, they "interfered with Facebook's right to control access to its own computers and have acquired data to which [the competitors] have no lawful right in violation of the CFAA and § 502." *Id.*

The same is true here. Tekion and InDesign have accessed CDK's DMS without authorization and used their unauthorized access to extract documents and data and, at a minimum, observe the non-literal elements of CDK's proprietary software. LaGreca Decl. ¶¶ 47, 71-74, 87-89. CDK can no longer prevent Tekion—a direct competitor—and InDesign—a company that works with CDK's competitors— from accessing its DMS and acquiring data to which they have

no right. This loss of control is not quantifiable.

The recurring nature of Tekion and InDesign's unauthorized computer access further supports a finding of irreparable harm. "[C]ourts in this district . . . have granted injunctive relief upon a showing that a defendant continued to access a plaintiff's computers, in an unauthorized manner, regardless of attempts to halt the access." *Chegg*, 2023 WL 7392290, at *8 (citing cases). In *Chegg*, this court found irreparable harm and granted a preliminary injunction to prohibit the operators of a website "Homeworkify" from accessing plaintiff's "online learning platform" where "unauthorized access of Chegg's materials . . . has continued despite Chegg's attempts to halt the access, including by sending a cease-and-desist letter." *Id.* at *8; *see also Power Ventures*, 252 F. Supp. at 782 (finding that because defendants ignored cease-and-desist letters "it is very likely that Facebook will suffer irreparable harm ***again***"). Tekion and InDesign have continued to access the DMS despite receiving cease-and-desist letters and the filing of this lawsuit. LaGreca Decl. ¶¶ 61-62, 64, 70, 85, 92. Tekion has dug in its heels, claiming that "dealerships have a right to access their own data, and Tekion will stand behind this right" and continue with its unauthorized access. Ex. 20. Without injunctive relief, CDK's loss of control will be ongoing.

### 2. The threat to data security is irreparable harm.

Tekion and InDesign's unauthorized access threatens the security of third-party data. CDK's DMS contains sensitive data and PII belonging to end consumers—including social security numbers, credit scores, financial account numbers, and tax forms. LaGreca Decl. ¶¶ 9-10. CDK's DMS also contains confidential commercial data belonging to OEMs, DMVs, credit bureaus, and lenders. *Id.* ¶¶ 11-13. Federal statutes and regulations require that Dealerships develop, implement, and maintain comprehensive security programs for handling consumer data, and CDK commits to following those rules—including by ███████████████████████████████████████████ , limiting access to ███████████████████ , and requiring password-protected credentials. *Id.* ¶¶ 28-37; Stroz Decl. ¶¶ 42-52. Tekion and InDesign's unauthorized access into CDK's DMS undoes that work. They demand that Dealerships share credentials over unencrypted plain text emails, which creates a serious risk that those credentials will fall into the hands of an adversary. Stroz Decl. ¶¶ 72-79. They extract data in bulk, which burdens CDK's system and

creates an attractive target for criminal hackers. *Id.* ¶¶ 90-92. They have increased the "attack surface" for malware, making data exposure or a ransomware attack more likely. *Id.* ¶¶ 80-89. And they disrupt CDK's audit trails by ███████████████████████████, which hinders CDK's ability to monitor and secure access to its system. *Id.* ¶¶ 93-97. These factors together increase the likelihood that CDK's DMS will undergo a data breach and public disclosure of sensitive, confidential data, which would be detrimental CDK's goodwill. LaGreca Decl. ¶¶ 71-78.

These increased cybersecurity risks are irreparable harm. The Southern District of New York recently granted a temporary restraining order against a policy that "expands access to the payment systems of the Bureau of Fiscal Services (BFS) to political appointees and 'special government employees'" and found a likelihood of "irreparable harm in the absence of injunctive relief" based on "the risk that the new policy presents of the *disclosure of sensitive and confidential information* and the heightened risk that the systems in question will be *more vulnerable than before to hacking*." *New York v. Trump*, 2025 WL 435411, at *1 (S.D.N.Y. Feb. 8, 2025) (Engelmayer, J.). Courts reach similar conclusions for violations of the CFAA. In *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020), the court found unauthorized access to a university's email servers likely violated the CFAA and threatened an irreparable injury because the university "*could never be certain that it was adequately protecting its students' proprietary information*." If Tekion and InDesign are permitted to continue their unauthorized access, CDK never can be certain it is adequately protecting third-party data. And any cybersecurity breach is an injury that a monetary award cannot remedy.

Tekion has suggested its conduct poses no harm because "the dealerships have a right to access their own data." Ex. 20. This argument suffers from two flaws. <u>First</u>, Tekion ignores that CDK's DMS also contains data belonging to OEMs, DMVs, credit bureaus, lenders, and CDK. LaGreca Decl. ¶¶ 11-26. The Dealerships have no right to possess this data. In the parties' agreed data-conversion process, CDK can ensure that Tekion receives only Dealership data in a way that does not burden CDK's system. *Id.* ¶¶ 49, 54, 95. But CDK loses the ability to safeguard third-party data when Tekion and InDesign break into the system. <u>Second</u>, Tekion underestimates that its conduct makes it more likely another entity can hack into CDK's data centers. Hackers can

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████████

3 ███████████  Stroz Decl. ¶¶ 88-89. Tekion and InDesign thus create technical weaknesses that

4 threaten the security of **all** data stored on the DMS.

**3. Impact on contractual relationships and goodwill is irreparable harm.**

6 "In the DMCA context, irreparable harm may be established by evidence that

7 circumvention is undermining the copyright owner's negotiating position" and "damaging goodwill

8 with licensees." *Synopsys, Inc. v. AzurEngine Techs.*, Inc., 401 F. Supp. 3d 1068, 1074 (S.D. Cal.

9 2019). Similarly, tortious interference can create "intangible injuries, such as damage to ongoing

10 . . . goodwill [that] qualify as irreparable harm." *Axia*, 2023 WL 7280443, at *5. These harms are

11 "irreparable because [they are] neither easily calculable, nor easily compensable and [are] therefore

12 an appropriate basis for injunctive relief." *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at

13 *6 (N.D. Cal. June 2, 2016). "Actual loss" is not required because "'[e]vidence of threatened loss

14 of prospective customers or goodwill' is sufficient." *Id.*

15 Tekion and InDesign's misconduct compromises CDK's contractual position with

16 Dealerships. When a Dealership plans to switch DMS providers, CDK's dedicated data conversion

17 team facilitates the data transition—provided that the Dealership has met its contractual obligations.

18 LaGreca Decl. ¶ 48. But when Tekion and InDesign access CDK's DMS software—copyrighted

19 material under the DMCA, *see supra* at 15—and extract data while Dealerships' contracts with

20 CDK remain in effect and their financial obligations with CDK remain unfulfilled, their misconduct

21 undermines CDK's contractual position and goodwill with Dealerships. *See, e.g.*, *id.* ¶¶ 80-84.

22 Irreparable harm has been found in similar cases when a defendant violated the DMCA to

23 the detriment of the copyright holder's contractual relationships and goodwill. In *Disney*

24 *Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017), the Ninth Circuit affirmed a

25 finding of irreparable harm when defendant decrypted DVDs and Blu-Ray discs in order to stream

26 movies online because, *inter alia*, the service undermines movie studios' "negotiating leverage with

27 licensees." In *AzurEngine*, 401 F. Supp. 3d at 1071–74, the court found a likelihood of irreparable

28 harm absent a TRO because the defendant "used counterfeit license keys to circumvent Synopsys'

software protections more than 15,000 times" and this conduct "undermines Synopsys' negotiating position with other licensees" who questioned why they should pay for the software. In *Dish*, 2016 WL 3092184, at *6, Dish faced an irreparable injury when defendant used software to bypass encrypted satellite television transmissions that undermined Dish's investment of "millions of dollars each year in security measures," "business reputation [that] depends on the delivery of secured content," and its "contractual and prospective relationship with programming providers and customers." Here, Tekion and InDesign illegally access copyrighted material which undermines CDK's contractual relationships with Dealerships and devalues CDK's significant investment in data security, which impacts CDK's goodwill. LaGreca Decl. ¶¶ 71-78, 79-86.

Tekion and InDesign's interference with Dealership-CDK contractual relationships also injures goodwill. In order to access the DMS, Tekion and InDesign are disparaging CDK and undermining its business model. In December 2024, Tekion tried to convince a Dealership to breach its MSA by indicating CDK was not allowing its customers to access Dealership data. Bales Decl. ¶ 16. InDesign instructed the same Dealership that ███████████████████████ ████████████████████████████████████████████████████ *Id.* ¶ 30; Ex. 9. The full scope of Tekion and InDesign's outreach to CDK customers is unknowable.[4]

In *E*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029 (D. Ariz. 2018), the court found a likelihood of success on a tortious interference claim based on a competitor's solicitation of a banking customer and found irreparable harm because "while the loss of revenue associated with client accounts definitively identified as having moved as a result of solicitation in breach of the Agreement can be quantified, ***the loss of follow-on business, goodwill and reputation flowing***

---

[4] Absent a preliminary injunction, CDK will have to file an action every time Tekion and InDesign induce a breach. *Cf.* LaGreca Decl. ¶¶ 85-86. Courts have found irreparable harm where misconduct threatens to burden the plaintiff with continuous litigation. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007) ("[T]he very need to file multiple lawsuits as a consequence of Streamcast's inducement [of copyright infringement] is itself supportive of an irreparable harm finding."); *Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*, 232 Cal. App. 4th 1171, 1184 (Cal. App. 5 Dist., 2014) ("[T]respass of a continuing nature, whose constant recurrence renders the remedy at law inadequate, unless by a multiplicity of suits, affords sufficient ground for relief by injunction." (cleaned up)).

***from such breach or interference cannot be so compensated***." *Id.* at 1036 (citing *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)). This case is the same. Tekion and InDesign have interfered and disparaged CDK to CDK customers, *see supra* at 17-19, which impacts CDK's goodwill and reputation. CDK cannot easily identify which Dealerships have departed to Tekion due to lawful competition and which have moved on as a result of Tekion's wrongful interference. The harm from CDK's lost business, goodwill, and damaged reputation among an unknown number of Dealerships cannot be compensated.

### C.    The balance of equities and public interest favor an injunction.

The balance of equities favors a preliminary injunction. In contrast to the irreparable harm that CDK faces, the hardships to Tekion and InDesign are minimal. Tekion will be able to obtain Dealership data because CDK helps Dealerships migrate their data. LaGreca Decl. ¶¶ 48-56. InDesign cannot complain about damages if it is no longer able to run its 1DMS software script on CDK's DMS because a party does not have a right to profit from wrongful conduct. *See VidAngel*, 869 F.3d at 866 (affirming district court's conclusion that "lost profits from an activity which has been shown likely to be infringing merit little equitable consideration") (cleaned up).

The public interest favors an injunction. "[T]he public has an interest in the enforcement of statutes," *Dish Network, L.L.C. v. SatFTA*, 2011 WL 856268, at *8 (N.D. Cal. Mar. 9, 2011), including the DMCA and CFAA. *See AzurEngine*, 401 F. Supp. 3d at 1075 ("In cases related to the DMCA, courts ordinarily presume that an injunction will serve the public interest if the copyright holder shows a likelihood of success on the merits."); *Power Ventures*, 252 F. Supp. 3d at 785 ("The Court also finds that the public interest weighs in favor of an injunction, as courts have consistently held in CFAA cases."). As to tortious interference, "the public interest is served by parties' performing as promised under their contracts rather than seeking out surreptitious methods to commit difficult-to-detect breaches of those contracts." *Blizzard*, 28 F. Supp. 3d at 1019. Because CDK is likely to prevail on the merits, the public interest would be served by entering the injunction.

## V.    CONCLUSION

CDK respectfully requests a preliminary injunction consistent with its proposed order.

Dated: March 13, 2025

**SUSMAN GODFREY L.L.P.**

By:  */s/ Vineet Bhatia*

VINEET BHATIA *(Admitted Pro Hac Vice)*
vbhatia@susmangodfrey.com
SHAWN RAYMOND *(Admitted Pro Hac Vice)*
sraymond@susmangodfrey.com
ROBERT SAFI *(Admitted Pro Hac Vice)*
rsafi@susmangodfrey.com
KATHERINE JAMES *(Admitted Pro Hac Vice)*
rjames@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

AMY GREGORY *(Admitted Pro Hac Vice)*
agregory@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 100001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

RACHEL SCHALLER *(Admitted Pro Hac Vice)*
rachel.schaller@blankrome.com
BLANK ROME LLP
444 West Lake Street, Suite 1650
Chicago, Illinois 60606
Telephone: (312) 776-2600
Facsimile: (312) 776-2601

*Attorneys for Plaintiff CDK Global, LLC*