TYLER G. NEWBY (CSB No. 205790)
tnewby@fenwick.com
ARMEN N. NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

ADAM GAHTAN (admitted *pro hac vice*)
agahtan@fenwick.com
ERICA R. SUTTER (CSB No. 309182)
esutter@fenwick.com
CORTNAY-BETH CYMROT (admitted *pro hac vice*)
ccymrot@fenwick.com
FENWICK & WEST LLP
902 Broadway, Floor 18
New York, NY 10010-6035
Telephone:    212.430.2600

Attorneys for Defendant
TEKION CORP.

<em>Fenwick & West LLP<br>Attorneys at Law</em>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CDK GLOBAL, LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>TEKION CORP. et al.,<br><br>                    Defendants. | Case No.: 3:25-cv-01394-JSC<br><br>**DEFENDANT TEKION CORP.'S OPPOSITION TO PLAINTIFF CDK GLOBAL, LLC'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:    June 26, 2025<br>Time:    10:00 a.m.<br>Courtroom:  8 – 19th Floor<br>Judge:   Honorable Jacqueline Scott Corley<br><br>Trial Date:  None set |

# Redacted Version of Document Sought To Be Filed Under Seal

1

**TABLE OF CONTENTS**

2

Page

3  INTRODUCTION .................................................................. 1

4  FACTUAL BACKGROUND .................................................... 3

5      A.   DMS Is Essential to Franchise Dealership Operations ............................. 3

6      B.   CDK Obstructs Dealer Access to Data, Discouraging Dealer
7          Moves ............................................................................ 4

8      C.   Tekion Has Helped Dealers Access and Convert Data For Years ............. 5

9  ARGUMENT ........................................................................ 6

10    I.    CDK IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS
        CLAIMS ........................................................................ 7

11      A.   CDK's CFAA And Related Claims .......................................... 7

12          1.   Tekion Was Authorized To Access CDK Computers ................... 7

13          2.   CDK Has No Evidence That Tekion Obtained CDK
14               Information ............................................................... 10

15      B.   CDK Is Not Likely To Succeed On Its DMCA Claim ........................... 11

16          1.   CDK Does Not Identify A Protected Work ............................. 11

17          2.   There Was No "Circumvention" ........................................ 12

        3.   CDK's Copyright Misuse Bars Its DMCA Claim ..................... 14
18

19      C.   CDK Is Unlikely To Succeed On Its Tortious Interference
        Claim. ......................................................................... 15

20    II.   CDK CANNOT SHOW IRREPARABLE HARM. ............................... 20

21      A.   CDK's Years of Delay Defeats Its Claim of Irreparable Harm ............... 20

22      B.   CDK Fails To Show A Threat of Harm. .................................... 22

23          1.   CDK Presents Purely Speculative Cybersecurity Risks ............... 22

24          2.   Tekion's Access to Dealer DMS Accounts Does Not, on
25               Its Own, Establish a Threat of Irreparable Harm ...................... 23

26    III.  THE EQUITIES AND PUBLIC INTEREST FAVOR TEKION,
        NOT CDK ..................................................................... 24

27  CONCLUSION ...................................................................... 25

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adobe Sys. Inc. v. A&S Electronics, Inc.*,
  No. 15-2288, 2015 WL 13022288 (N.D. Cal. Aug. 19, 2015) ............................................. 13

*Assessment Technologies of WI, LLC v. WIREdata, Inc.*,
  350 F.3d 640 (7th Cir. 2003) ........................................................................................ 14

*ATPAC, Inc. v. Aptitude Sols., Inc.*,
  No. 2:10294, 2010 WL 1779901 (E.D. Cal. Apr. 29, 2010) .............................................. 8

*Authenticom, Inc. v. CDK Global, LLC*,
  874 F.3d 1019 (7th Cir. 2017) ........................................................................................ 5

*Axia Fin., LLC v. Mason McDuffie Mortg. Co.*,
  No. 23-03256, 2023 WL 7280443 (N.D. Cal. Sept. 20, 2023) ......................................... 16

*Bennett v. Isagenix Int'l LLC*,
  118 F.4th 1120 (9th Cir. 2024) ..................................................................................... 24

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
  28 F. Supp. 3d 1006 (C.D. Cal. 2013) ......................................................................... 19

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ..................................................................................... 22

*Brodsky v. Apple Inc.*,
  445 F. Supp. 3d 110 (N.D. Cal. 2020) ........................................................................... 7

*Bull Mountain Sanitation, LLC v. Allied Waste Servs. Of N. Am., LLC*,
  No. 18-147, 2020 WL 8812843 (D. Mont. July 17, 2020) ............................................... 20

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ....................................................................................... 22

*CDK Glob. LLC v. Brnovich*,
  16 F.4th 1266 (9th Cir. 2021) ........................................................................... 4, 6, 11

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
  16 F. Supp. 3d 1141 (S.D. Cal. 2014) ......................................................................... 20

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ....................................................................................... 24

*Egilman v. Keller & Heckman, LLP*,
  401 F. Supp. 2d 105 (D.D.C. 2005) ............................................................................. 13

FENWICK & WEST LLP
ATTORNEYS AT LAW

## TABLE OF AUTHORITIES
### (Continued)

**Page**(s)

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
   893 F.3d 1176 (9th Cir. 2018) .............................................................. 12

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F. 3d 1058 (9th Cir. 2016) ........................................................... 8, 10

*Famous Birthdays, LLC v. SocialEdge, Inc.*,
   No. 21-9562, 2022 WL 1592726 (C.D. Cal. Feb. 11, 2022) ....................... 21

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ........................................................................... 12

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ............................................................... 21

*Gigacloud Tech., Inc. v. Linon Home Décor Prods., Inc.*,
   No. 24-4308, 2024 WL 4766202 (C.D. Cal. Sept. 9, 2024) ....................... 21

*Gillette Co. v. Ed Pinaud, Inc.*,
   178 F. Supp. 618 (S.D.N.Y. 1959) ........................................................ 20

*Hansen Bev. Co. v. N2G Dist., Inc.*,
   No. 08-1613, 2008 WL 5427602 (S.D. Cal. Dec. 30, 2008) ....................... 21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ............................................................. 7, 9

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys.*,
   307 F. Supp. 2d 521 (S.D.N.Y. 2004) .................................................... 13

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 558 (N.D. Ill. 2019) ................................................. 16, 22

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d at 1022-23 .................................................................. 23

*iSpot.tv, Inc. v. Teyfukova*,
   No. 21-06815, 2023 WL 3602806 (C.D. Cal. May 22, 2023) ..................... 13

*Little v. Amber Hotel Co.*,
   202 Cal. App. 4th 280 (2011) ............................................................... 15

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,
   634 F.2d 1197 (9th Cir.1980) ............................................................... 22

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) ............................................................... 7

FENWICK & WEST LLP
ATTORNEYS AT LAW

**TABLE OF AUTHORITIES**
(Continued)

**Page**(s)

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984)................................................................................. 20

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011);
    *opinion amended and superceded on denial of reh'g,* No. 09-15932,
    2011 WL 538748 (9th Cir. Feb. 17, 2011)........................................................ 12, 15

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................. 19

*Navistar, Inc. v. New Baltimore Garage, Inc.*,
    No. 11-6269, 2012 WL 4338816 (N.D. Ill. Sept. 20, 2012) ................................... 13

*Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Ref. & Mktg. LLC*,
    474 F. Supp. 3d 1087 (N.D. Cal. 2020) ............................................................ 17, 18

*Niantic, Inc. v. Global++*,
    No. 19-03425, 2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ................................. 9

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985)................................................................................. 21

*Power v. Connectweb Techs., Inc.*,
    740 F. Supp. 3d 39 (D. Mass. 2024) ...................................................................... 13

*Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*,
    121 F.3d 516 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998) ........................ 14, 15

*Protech Diamond Tools v. Liao*,
    No. C 08-3684, 2009 WL 1626587 (N.D. Cal. June 5, 2009) ................................. 21

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
    657 F. Supp. 2d 878 (N.D. Ohio 2009), *aff'd*, 606 F.3d 262 (6th Cir. 2010) ........................ 13

*Reeves v. Hanlon*,
    33 Cal. 4th 1140 (2004) .................................................................................... 15, 16

*Rodriguez v. Google LLC*,
    No. 20-04688, 2025 WL 50425 (N.D. Cal. Jan. 7, 2025)....................................... 10

*Savage v. Pacific Gas & Elec. Co.*,
    21 Cal. App. 4th 434 (1993)................................................................................... 17

*Sonic Automotive, Inc. v. Younis*,
    No. 15-00717, 2015 WL 13344624 (C.D. Cal. May 6, 2015) ................................... 7

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES
**(Continued)**

**Page**(s)

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .................................................................................................. 6

*Stern v. Weinstein*,
2010 WL 11459791 (C.D. Cal. Jan. 6, 2010), *aff'd*, 512 F. App'x 701 (9th Cir. 2013) ......... 9

*Swipe & Bite, Inc. v. Chow*,
147 F. Supp. 3d 924 (N.D. Cal. 2015) ...................................................................... 16

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
401 F. Supp. 3d 1068 (S.D. Cal. 2019) ..................................................................... 24

*Synopsys, Inc. v. InnoGrit, Corp.*,
2019 WL 4848387 (N.D. Cal. Oct. 1, 2019) ............................................................. 14

*Tekion Corp. v. CDK Global, LLC*,
No. 3:24-08879-JSC (N.D. Cal.) ................................................................................ 4

*Televisa v. Liberman Broadcasting, Inc.*,
No. 12-9799, 2012 WL 12893444 (C.D. Cal. Dec. 6, 2012) ..................................... 15

*Ticketmaster LLC v. Prestige Ent. W., Inc.*,
315 F. Supp. 3d 1147 (C.D. Cal. 2018) ............................................................... 11, 12

*Trindade v. Reach Media Grp., LLC*,
No. 12-4759, 2013 WL 3977034 (N.D. Cal. July 31, 2013 .................................... 15

*Trujillo v. F.D.I.C., as Receiver of Empire Nat. Bank.*,
No. 87-5625, 1988 WL 235959 (C.D. Cal. Jan. 13, 1988) ..................................... 18

*Vascular Imaging Professionals, Inc. v. Digirad Corp.*,
401 F. Supp. 3d 1005 (S.D. Cal. 2019) .................................................................... 18

*WalkMe Ltd. v. Whatfix, Inc.*,
No. 23-03991, 2024 WL 1221960 (N.D. Cal. Mar. 21, 2024)................................... 8

*Watters v. Breja*,
No. 23-03183 2024 WL 201356 (N.D. Cal. Jan. 18, 2024)..................................... 8

*Winchester Mystery House, LLC v. Glob. Asylum, Inc.*,
210 Cal. App. 4th 579 (2012).................................................................... 16, 17, 18

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ....................................................................................................... 6

**TABLE OF AUTHORITIES**
(Continued)

**Page**(s)

**STATUTES AND RULES**

17 U.S.C. § 1201(a) ............................................................................................ 11, 13

18 U.S.C. § 1030 .................................................................................................... 7, 24

Ariz. Rev. Stat. Ann. § 28-4653(A)(3) ...................................................................... 4

Cal. Penal Code §§ 502(c)(1)–(8) ............................................................................. 7

California Comprehensive Data Access and Fraud Act ("CDAFA") ........................... 7

Computer Fraud and Abuse Act ("CFAA") .................................................. 7, 8, 9, 24

Digital Millenium Copyright Act ("DMCA") .................................................... *passim*

Sherman Act .............................................................................................................. 1

**OTHER AUTHORITIES**

Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1178 (2016) ................... 8

Restatement (Second) Torts § 766 ........................................................................... 15

FENWICK & WEST LLP
ATTORNEYS AT LAW

**INTRODUCTION**

Without a dealer management system (DMS), car dealers cannot run their businesses. Dealers store and process their essential business data in a DMS, which they use to sell and service cars, run payroll, coordinate with manufacturers and others, and meet legal and other reporting requirements.  To switch from one DMS provider to another, an enormous undertaking, dealers must have access to their data.  Because they often lack the technical resources to extract it from their current DMS, dealers have long engaged others to help.  CDK Global, LLC has dominated the DMS market for decades, but its product is outdated compared to the modern DMS that Tekion Corp offers.  To stifle competition, CDK has therefore been making data access unreasonably hard for dealers that have considered switching.  It has even sued its own customers to prevent their access to what is indisputably theirs.  This motion, by which CDK seeks to prevent Tekion from assisting dealers with such access, is another meritless extension of CDK's anticompetitive strategy.  The Court should deny CDK's motion.  CDK cannot show likelihood of success on the merits of any claim.  Nor can it show a threat of irreparable harm: CDK has been aware of Tekion's conduct, indeed complaining to Tekion about it, for six years, but it did not act until Tekion sued it for Sherman Act and related violations.  The balance of equities also decidedly favors denial.

CDK is not likely to succeed on the merits of its federal or state computer fraud claims because it cannot show that Tekion accessed CDK's DMS without authorization.  The computer hacking laws that it asserts are a bad fit for CDK.  They are meant to stop malicious actors from what the Ninth Circuit describes as the equivalent of "breaking and entering."  But when Tekion accessed dealer CDK accounts, it was always with the dealers' assistance and express permission, with valid CDK credentials, through authorized CDK/dealer networks, and solely for the purpose of accessing dealer data, not CDK information.  CDK's declarants admit that they have no evidence to the contrary.  Moreover, CDK at least tacitly acknowledges that Tekion's access was authorized until December 2024, and it offers no evidence of Tekion access after that.  This is no surprise, as Tekion stopped assisting dealers in late 2024 pending the outcome of its suit in this Court for declaratory judgment that its assistance is legal.  CDK's declarants also admit that they have no

evidence that Tekion obtained information other than dealer data, a separate ground for holding that CDK is not likely to succeed with this claim.

The Digital Millenium Copyright Act ("DMCA") is also a poor fit for CDK. It was meant as a tool to prevent pirates from defeating the encryption and content scrambling that protects copyrighted works on DVDs and the like, not to prevent an accountholder's agent (Tekion) from using the accountholder's valid credentials, at the accountholder's request, to access the accountholder's own data. CDK offers no evidence that Tekion "decrypted" or otherwise "impaired" any CDK technology, let alone technology employed to protect CDK's own, copyrighted work. Accordingly, it cannot prove circumvention under the DMCA. And because Tekion used valid access credentials, as CDK's witnesses admit, there was no circumvention even if dealers had not authorized Tekion to use them (they did), and even if the dealers breached their agreements with CDK by doing so. In addition, CDK does not identify works subject to copyright protection in the first place, and its declarants admit that they have no evidence that Tekion accessed any such works or, indeed, anything other than dealers' raw data, extracted in bulk. CDK's effort to use the DMCA to prevent access to dealer's data is copyright misuse. Finally, CDK is not likely to prevail on its intentional interference claim because, among other reasons, CDK offers no evidence that Tekion knew the relevant terms of the allegedly breached CDK/dealer contracts. CDK kept these confidential.

The Court should deny CDK's motion for the separate reason that CDK cannot show irreparable harm. In fact, the Court could skip the other factors and deny CDK's motion on this ground alone. First, CDK has waited far too long to seek this extraordinary relief. It has been aware of Tekion's assistance to dealers since as early as May 2019, when it raised the same issues with Tekion that it raises now, down to the technical signatures that identify Tekion's involvement. CDK then did nothing until April 2024, when it complained (incorrectly) to Tekion again. It then waited eleven months more to bring this motion. CDK's delay negates its claim of irreparable harm. Second, CDK's declarants admit that they are aware of no evidence that Tekion's access has in fact caused any damage to CDK's DMS. CDK's cybersecurity expert Mr. Stroz admits that his job was to describe only the types of harm that might result if a hypothetical malicious actor were

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   able to commandeer Tekion's access to a dealership's DMS account.  CDK has tried this before,

2   without success.  Another district court granted summary judgment against CDK when CDK last

3   offered exactly this kind of theoretical risk opinion from Mr. Stroz.  CDK's declarants agreed that

4   Tekion had no more access to CDK's DMS than dealers themselves have, and Mr. Stroz admitted

5   that thousands of dealers have such access, such that the risk was already broad.  Speculation is no

6   substitute for evidence of the threat of irreparable harm.  The Court should deny CDK's motion.

## FACTUAL BACKGROUND

### A.    DMS Is Essential to Franchise Dealership Operations

DMS is software that dealerships use to manage all essential operations, including
compliance with legal, financial, and other reporting requirements.  *See* Plaintiff's Complaint for
Damages and Injunctive Relief, Dkt. 1 ("Compl.") ¶ 26; Declaration of James Bradley Fox ("Fox
Decl.") ¶¶ 5-6.   CDK, in business for over 40 years, is the incumbent DMS provider.  Compl. ¶ 2.
In 2020, Tekion launched the world's first end-to-end cloud-based DMS platform, which offers
dramatically improved products and services to its franchise dealership and OEM customers.
Declaration of James Livingstone ("Livingstone Decl.") ¶ 4.  For a DMS to work, dealerships store
their customer, inventory, sales, service, financial, and other data with the DMS provider.  This
data indisputably belongs to the dealerships.  *See, e.g.,* Fox Decl. ¶ 7; Declaration of Tyler Newby
("Newby Decl.") Ex. 1 (LaGreca Tr. 31:19-32:9, 35:10-20, 37:12-38:20, 42:13-43:8, 43:21-44:20,
46:3-10, 49:10-18, 52:18-21), Ex. 3 (Kiser Tr. 19:8-20:10), Ex. 4 (Garcia Tr. 76:4-25), Ex. 6 (Bales
Tr. 17:6-18:2, 18:24-20:15, 60:24-61:14).  As CDK's contracts with dealers provide, ███████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████  Dkts. 45-8, 45-17 through 45-24 at § 5(a); *see also, e.g.,*
Newby Decl. Ex. 1 (LaGreca Tr. 31:8-32:1).  Because dealerships cannot operate or meet reporting
requirements without access to their data, switching DMS providers is a significant, fraught
undertaking.  Fox Decl. ¶ 8.  To switch, dealers must access and validate their data in the new DMS
well before the switch.  Fox Decl. ¶¶ 8-9; Livingstone Decl. ¶ 6.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

**B.    CDK Obstructs Dealer Access to Data, Discouraging Dealer Moves**

Historically, CDK helped dealers access and export their own data from its DMS, including for purposes of switching providers. *See CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1272 (9th Cir. 2021); Fox Decl. ¶ 10; Livingstone Decl. ¶¶ 7-8. But as superior, modern DMSs, including Tekion's, have emerged, CDK has been interfering with dealer access, to slow or prevent dealers from switching providers. Fox Decl. ¶ 13; Livingstone Decl. ¶ 10. Asbury Automotive Group, one of the nation's largest dealers, recently had to sue CDK to get access to its own data—just so that it could give Tekion's DMS a test run—after CDK had sued Asbury to prevent access. *See* Newby Decl. Ex. 15. The court entered a preliminary injunction requiring CDK to turn over the data. *See* Newby Decl. Exs. 16-17. CDK has also required dealers to terminate their contracts as the first step to obtaining their own data, and it has routinely manufactured pretexts for delaying or denying access even where the dealer has met all obligations. *See, e.g.*, Newby Decl. Ex. 19; Fox Decl. ¶ 13; Livingstone Decl. ¶ 10.

CDK has also fought enactment of state laws codifying dealer control of data. *See Brnovich*, 16 F.4th 1266 (9th Cir. 2021) (affirming denial of CDK motion to enjoin Arizona's so-called "Dealer Law"). These laws generally prohibit DMS providers from "tak[ing] any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use" data the dealer has stored in its DMS. Ariz. Rev. Stat. Ann. § 28-4653(A)(3). In 2018, software vendors and dealers brought antitrust class actions against CDK and another incumbent, alleging a conspiracy to coordinate data access policies for purposes of eliminating competition from independent data integrators. Newby Decl. Exs. 12, 13, 14. CDK paid $100 million to settle the dealer class claims and, in January 2025, it agreed to pay $630 million to settle the vendor claims. Newby Decl. Exs. 18, 20, 21. To stop CDK's anticompetitive interference with its customers' efforts to switch to competing DMS providers, Tekion filed its own antitrust lawsuit against CDK in December 2024, which is currently pending before this Court. *Tekion Corp. v. CDK Global, LLC*, No. 3:24-08879-JSC (N.D. Cal.).

FENWICK & WEST LLP
ATTORNEYS AT LAW

### C. Tekion Has Helped Dealers Access and Convert Data For Years

Dealers often lack the technical expertise and resources to access and convert their data, including for switching to new DMS providers. Fox Decl. ¶ 12. As CDK knows, data integration services like InDesign have assisted dealers with access to their data in CDK's system for years. Livingstone Decl. ¶ 8. In fact, CDK itself operates data integrator services. *See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1022 (7th Cir. 2017). CDK also knows that Tekion had offered technical access for dealer data access for years. Fox. Decl. ¶ 15. In May 2019, for example, CDK raised the same alleged violations with Tekion that it raises here, and it ███████ ███████████████████████████████████████████████████████████████████ ███████████████████████████ *Compare* Dkt. 45-12 ███████████████████████████ *with* Dkt. 45-5 at 7 (same). Tekion refuted CDK's allegations, explaining that the dealers themselves directed use of Tekion's software, and that the use of legitimate dealer credentials was not circumvention of copyright access controls. Newby Decl. Ex. 8. In 2021, CDK entered a data conversion agreement with Tekion. Fox Decl. ¶ 11, Ex. A. ████████████████████████ ██████████████████████████████████ *Id*. Tekion continued to assist dealers as it always had without complaint from CDK for nearly five years. Fox Decl. ¶ 29. CDK next complained to Tekion in April 2024, Compl. ¶¶ 67-69, and although in that case Tekion had *not* been helping the dealer in question (Asbury) access CDK's DMS, CDK was clearly attuned to the kind of conduct that it raises again now. Fox Decl. ¶ 28; *see also* Newby Decl. Ex. 11. For these reasons, CDK's assertion that Tekion began that conduct in "late 2024," Motion at 1, and that CDK acted promptly to stop it by filing this suit and motion, is just not true. In fact, late 2024 is when Tekion stopped assisting dealers, pending the outcome of its declaratory judgment claim that its assistance is lawful. Fox Decl. ¶ 27.

When Tekion did assist dealers with access to their data in CDK's DMS, it was always with the dealers' express permission, using ██████████████████████████████████████ ███████████████████ Fox Decl. ¶ 17; Livingstone Decl. ¶ 18; *see also* Newby Decl. Ex. 1 (LaGreca Tr. 173:19-174:1), Ex. 2 (Stroz Tr. 57:9-17, 71:18-25, 76:21-77:5, 135:2-13), Ex. 3 (Kiser Tr. 25:19-22), Ex. 4 (Garcia Tr. 24:13-17), Ex. 5 (Swaminathan Tr. 67:21-68:1), Ex. 6 (Bales Tr.

FENWICK & WEST LLP
ATTORNEYS AT LAW

43:5-9. ██████████████████████████████████████████████████████

████████████████████████ Fox Decl. ¶¶ 18-19; Livingstone Decl. ¶ 18; *see also* Newby Decl. Ex. 1 (LaGreca Tr. 100:17-101:1), Ex. 2 (Stroz Tr. 57:9-17), Ex. 4 (Garcia Tr. 59:10-62:14).  In each case, Tekion accessed only the data that dealers could themselves access through the DMS— the dealers' own data—which was all Tekion *could* access.  Fox Decl. ¶¶ 24-26; *see also* Newby Decl. Ex. 2 (Stroz Tr. 62:7-63:22, 71:18-25, 76:21-77:5), Ex. 4 (Garcia Tr. 51:15-52:9), Ex. 6 (Bales Tr. 36:1-17). And when exporting the dealer data from CDK's DMS, Tekion ████████████ ███████████████████████████████████████████████████████ Fox Decl. ¶ 21.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████ Fox Decl. ¶ 19.  Tekion's assistance never exposed CDK source code or other proprietary CDK material to review, let alone appropriation.  Fox Decl. ¶ 26; Newby Decl. Ex. 1 (LaGreca Tr. 95:11-14, 104:12-105:11).  Tekion did not use measures designed or even able to circumvent or disable CDK's security measures or access controls.  *See, e.g.,* Newby Decl. Ex. 5 (Swaminathan Tr. 67:21-68:1).  The purpose of Tekion's assistance was extracting the dealers' own data after the dealers had decided to switch to Tekion's DMS.  Fox Decl. ¶ 15; Livingstone Decl. ¶¶ 6-7, 14; *see also* Newby Decl. Ex. 4 (Garcia Tr. 79:14-18, 79:20-23, 83:20-84:25, 98:15-23).  And to minimize impact to dealer operations, Tekion ████████ ████████████████████████████████ Fox Decl. ¶ 20.

## ARGUMENT

Preliminary injunctions are an "'extraordinary' equitable remedy that are 'never awarded as of right.'"  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)).  A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 346; *see also CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021) (affirming denial of CDK's motion for preliminary injunction seeking to enjoin Arizona Dealer Law).  The Court should deny CDK's motion because CDK cannot satisfy the elements.

FENWICK & WEST LLP
ATTORNEYS AT LAW

## I.    CDK IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.    CDK's CFAA And Related Claims

The Computer Fraud and Abuse Act (CFAA) is a federal criminal anti-hacking statute. *See* 18 U.S.C. § 1030(a)(2).  It was "designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possessed the capacity to access and control high technology processes vital to our everyday lives." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009).  To prevail on a civil CFAA claim, a plaintiff must show that defendant intentionally accessed plaintiff's protected computer without authorization and obtained information from it, and that plaintiff suffered at least $5,000 in loss. *See, e.g., Sonic Automotive, Inc. v. Younis*, No. 15-00717, 2015 WL 13344624, at *4 (C.D. Cal. May 6, 2015) (citing *LVRC Holdings*, 581 F.3d at 1132).  The California Comprehensive Data Access and Fraud Act (CDAFA) criminalizes "knowingly" and "without permission" accessing and making use of a computer system for certain purposes. Cal. Penal Code §§ 502(c)(1)–(8).  Like the CFAA, the CDAFA has a civil right of action.  Because the elements of the CDAFA and CFAA are not materially different (except as to damages), CDK's CDAFA claims rise or fall with its CFAA claims. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 131 (N.D. Cal. 2020) (collecting cases).  CDK cannot prove that Tekion accessed CDK's DMS without authorization.

### 1.    Tekion Was Authorized To Access CDK Computers

CDK argues that Tekion's use of valid CDK credentials to access dealer accounts was unauthorized because only dealers, not CDK, had authorized it, or that, even if dealer consent authorized Tekion's access initially, Tekion continued access after CDK revoked authorization. Motion at 12-13.  CDK cannot succeed under either theory.  A person accesses a computer "without authorization" in violation of the CFAA only when she "has not received permission to use the computer for any purpose, such as "when a hacker accesses someone's computer without *any* permission." *LVRC Holdings*, 581 F.3d at 1135 (emphasis added).  Courts must construe authorization narrowly, so as "not to turn a criminal hacking statute into a sweeping Internet policing mandate." *hiQ Labs*, *Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200-01 (9th Cir. 2022).  They should "look to whether the conduct at issue is analogous to 'breaking and entering.'" *Id.* at 1197.

An agent's access to an online account is not "unauthorized" under the CFAA when the agent has the accountholder's permission and uses the valid credentials. *See Watters v. Breja*, No. 23-03183 2024 WL 201356, at *3 (N.D. Cal. Jan. 18, 2024) (dismissing CFAA claim where defendant did not use "false credentials"); *ATPAC, Inc. v. Aptitude Sols., Inc.*, No. 2:10294, 2010 WL 1779901, at *5-6 (E.D. Cal. Apr. 29, 2010) (dismissing CFAA claim where defendant received access code from a third party and there were no allegations that the third party "wrongfully provided" them). "If the agent accesses the account on the account holder's behalf, the agent is acting in the place of the account holder and is authorized." Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1178 (2016). In *WalkMe Ltd. v. Whatfix, Inc.*, an analogous case, Judge White held that defendant's access to a SaaS user's data stored in plaintiff's service, for the purpose of migrating the data to defendant's service, was authorized under the CFAA because defendant had the user's permission. No. 23-03991, 2024 WL 1221960, at *5 (N.D. Cal. Mar. 21, 2024). Because there was no evidence that defendant had tricked plaintiff's customers into providing credentials, defendant's use of them did not constitute unauthorized access notwithstanding that such use was "not allowed under the customers' contracts or authorized in any way." *Id*. The only allegations that Judge White allowed to proceed involved use of the credentials after the customer's account with the plaintiff had ended. *Id*.

██████████████████████████████████████████████████████████████
█████████████  ████████████████████████████████████ CDK's fact and expert witnesses agree that, ██████████████████████████████████
███████████████████████████████████████████████████████████ *See, e.g.,* Newby Decl. Ex. 1 (LaGreca Tr. 100:17-101:1), Ex. 2 (Stroz Tr. 57:9-17). And CDK does not argue that Tekion tricked dealers into divulging credentials or that Tekion accessed dealer accounts after the dealers had moved to different DMS providers.

Tekion's access was therefore authorized even under *Facebook, Inc. v. Power Ventures, Inc.*, 844 F. 3d 1058, 1068 (9th Cir. 2016), CDK's primary authority. In *Power Ventures*, the court recognized that "consent from Facebook users" might initially have authorized defendant's access to Facebook's computers. *Id.* at 1067. And user consent in that case—a mere button click—was

FENWICK & WEST LLP
ATTORNEYS AT LAW

far less clear than it was here, where dealers authorized Tekion's access, gave Tekion valid CDK credentials, and set up network devices in their dealerships. And *Niantic, Inc. v. Global++* is distinguishable. No. 19-03425, 2019 WL 8333451 (N.D. Cal. Sept. 26, 2019). In that case, an "association of hackers" accessed Niantic's servers and proprietary data to create derivative copies of its games, so that players could cheat. *Id.* at *1. Neither the hackers nor users of the derivative games were authorized to access Niantic's proprietary data. *Id.* at *6-7. Here, in contrast, the dealers (not CDK) own the data, dealers are authorized to access it, the dealers authorized Tekion (a DMS provider, not a hacker association) to help them with their access, access was always with legitimate login credentials, and neither the dealers nor Tekion accessed, or could access, CDK's source code. Fox. Decl. ¶ 26.

CDK argues that "supposed 'permission' is not a defense," citing alleged terms from its non-public agreements (MSA) with dealers. Motion at 12. But the Ninth Circuit has expressly rejected contract-based CFAA liability. *See hiQ Labs*, 31 F.4th at 1196. In addition, CDK did not publish its MSAs, Tekion had not seen them, and publicly available information indicated that the MSAs *allowed* dealers to give agents access to their accounts. *See* Livingstone Decl. ¶ 20; Fox Decl. ¶ 16. Indeed, it was a widespread, known industry practice for third parties, including integrators, independent software providers, and other DMS providers to use dealer credentials, with dealer authorization, to access and extract dealer data from a DMS. Livingstone Decl. ¶¶ 7-9. Tekion's access to CDK's DMS—always with express dealer permission, with valid credentials, over authorized CDK/dealer networks, for the purpose of accessing dealer data—was nothing like "breaking and entering," *hiQ Labs*, 31 F.4th at 1196, let alone to steal something that belonged to CDK.

Presumably aware that dealer consent authorized Tekion's access for at least five years, CDK argues that Tekion is liable for access in the period after CDK expressly revoked authorization. Motion at 12-13. CDK cannot win on this theory, either, because there is no evidence of Tekion access after any CDK conduct that might qualify as revocation. The Ninth Circuit "requir[es] affirmative conduct terminating authorization *before* the defendant can be held accountable on the same terms as a computer 'hacker.'" *Stern v. Weinstein*, 2010 WL 11459791,

FENWICK & WEST LLP
ATTORNEYS AT LAW

at *2 (C.D. Cal. Jan. 6, 2010) (emphasis added), *aff 'd*, 512 F. App'x 701 (9th Cir. 2013).  When evaluating whether permission was revoked, the focus is on "what a defendant knew or should have known" at the time of access.  *Rodriguez v. Google LLC*, No. 20-04688, 2025 WL 50425, at *8 (N.D. Cal. Jan. 7, 2025).  ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████  A plaintiff must revoke authorization "explicitly."  *Power Ventures*, 844 F. 3d at 1067.  In that case, revocation was effective only after plaintiff had blocked defendant's IP address and sent a cease-and-desist letter.  *Id.* at 1067-69.  Thus, there was no revocation here as of November 1, 2024.  And Tekion stopped assisting with access once CDK sent its cease-and-desist letter on December 6.  Fox Decl. ¶ 27.  Neither CDK nor its witnesses can identify instances of Tekion access after that date.

CDK therefore argued that Tekion conspired with InDesign, a third-party data integrator that had been helping dealerships convert data from DMSs, including CDK's, since before Tekion came into existence.  There was no such conspiracy, and CDK's only support for that argument is a single email from InDesign to a dealer that copies a CDK employee.  Livingstone Decl. ¶¶ 15-21.  To the contrary, InDesign is an independent integrator that is well-known in the industry for helping dealerships extract their data from DMSs, including CDK's.  Livingstone Decl. ¶ 9.  Tekion has never been a party to InDesign's agreements with dealers, nor has it received any commissions from InDesign.  *Id.* ¶ 11.  Tekion does not direct or control InDesign's activities.  *Id.* ¶¶ 11, 15-21.

## 2.    CDK Has No Evidence That Tekion Obtained CDK Information

CDK argues that, through its allegedly unauthorized (in fact authorized) access, Tekion obtained information other than dealer data, including the "organizational structure" of CDK's DMS, and confidential and proprietary field name codes.  Motion at 14.  In support, CDK cites to the Declarations of David LaGreca, Dkt. 45-1 ("LaGreca Decl."), Sam Garcia, Dkt. 45-4 ("Garcia Decl."); and Vaidhyanathan Swaminathan, Dkt. 45-5 ("Swaminathan Decl.").  But Mr. LaGreca



admitted that ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████    Newby Decl. Ex. 1 (LaGreca Tr. 56:19-23, 63:7-22,

64:22-65:1, 69:6-9, 72:3-8, 95:11-14, 104:12-105:11, 157:13-16).    Nor could he identify

█████████████████████████████████████████████████████    *Id.*

(LaGreca Tr. 104:12-105:11).    CDK's other declarants likewise █████████████████

████████████████████████████████████████████████████████

████████████████████████████    *See, e.g.,* Newby Decl. Ex. 2 (Stroz Tr. 71:18-25, 76:21-

77:5), Ex. 4 (Garcia 51:22-52:3).

**B.    CDK Is Not Likely To Succeed On Its DMCA Claim**

CDK limits its DMCA arguments to alleged violations of 17 U.S.C. § 1201(a)(1).    Motion

at 15 n.3.    To prevail, CDK must prove ownership of a copyrighted work, that it effectively

protected access to the work by a "technological measure," and that Tekion "circumvented" that

measure to obtain access to the work. 17 U.S.C. § 1201(a)(1)(A).    It cannot succeed on any element.

**1.    CDK Does Not Identify A Protected Work**

DMCA Section 1201(a)(1) prohibits circumvention that enables access to a work "protected

under the Copyright Act" only.    17 U.S.C. § 1201(a)(1)(A).    CDK identifies no such work.    It

asserts only that, as software, its DMS contains protectable source code and certain "non-literal"

elements (the experience of navigating the DMS and running search queries).    Motion at 15.    These

are categories of protectable work, not actual works.    CDK acknowledges, moreover, that such

elements are entitled to copyright protection only when they "contain[] the required modicum of

originality," *id.* (quoting *Ticketmaster LLC v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1160

(C.D. Cal. 2018)), but it does not identify any qualifying originality, either.

Simply "making copies of the raw data in DMS databases" or even "copying subsets of that

data arranged in particular ways by the provider" does not implicate a DMS provider's

copyright.    *CDK Glob. LLC v. Brnovich*, 16 F.4th at 1279.    CDK's declarant touts the software's

"distinctive layout," but he points only to tabs labeled, ███████████████████    LaGreca

Decl. ¶ 16, hardly the "creative spark" required for copyright, especially in the context of software

FENWICK & WEST LLP
ATTORNEYS AT LAW

for car dealers. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991). And "compilations of factual or other non-copyrightable elements" receive no copyright protection. *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1183 (9th Cir. 2018). Mr. LaGreca also describes the ████████████████████████ LaGreca Decl. ¶ 16, but copyright protects expression, not function.

CDK's reliance on *MDY Indus., LLC v. Blizzard Ent., Inc.* emphasizes the deficiency in its evidence for a copyrighted work. 629 F.3d 928 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). The work there involved the "real-time experience of traveling through different worlds, hearing their sounds, viewing their structures, encountering their inhabitants and monsters, and encountering other players." *Id.* at 943. *Ticketmaster L.L.C. v. Prestige Entertainment West, Inc.* concerned the circumvention of CAPTCHA access controls, not use of valid credentials, and the non-literal dynamic elements were "a unique presentation of content and information for each user." 315 F. Supp. 3d at 1160. CDK's DMS is a database (not a fantasy world) that lets dealers access their own data (about, e.g., car parts). And although copyright registrations might not be a DMCA prerequisite, CDK certainly does not claim any.

CDK also offers no evidence that Tekion accessed copyrighted works. CDK's witnesses agree that there is ████████████████████████████ *See, e.g.*, Newby Decl. Ex. 1 (LaGreca Tr. 95:11-14), Ex. 4 (Garcia Tr. 46:4-8). They also testified that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████ Swaminathan Decl. ¶¶ 7-10, 26, 30, 31, 34, 49, 53, 58-64, 66-69; LaGreca Decl. ¶¶ 70, 74, 94; Newby Decl. Ex. 1 (LaGreca Tr. 99:20-100:1).

### 2. There Was No "Circumvention"

CDK argues that Tekion "circumvented" CDK private network restrictions by using ████ ████ and unauthorized login credentials." Motion at 16. The facts and law are to the contrary. To prove circumvention, CDK must show that Tekion affirmatively performed an action "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove,

deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). Circumvention is something more than transferring usernames and passwords "into the hands of another." *iSpot.tv, Inc. v. Teyfukova*, No. 21-06815, 2023 WL 3602806, at *6 (C.D. Cal. May 22, 2023). Indeed, many courts have held that access gained with a valid password is not circumvention, even when the password-holder does not authorize its use, because it does not involve descrambling, decrypting, or the other specific acts directed at impairing a "technological measure" described in the statute. *Adobe Sys. Inc. v. A&S Electronics, Inc.*, No. 15-2288, 2015 WL 13022288, *8 (N.D. Cal. Aug. 19, 2015) (license keys used by unauthorized recipients did not constitute circumvention under DMCA Section 1201(a)(1)); *accord Navistar, Inc. v. New Baltimore Garage, Inc.*, No. 11-6269, 2012 WL 4338816, at *5 (N.D. Ill. Sept. 20, 2012); *see also, e.g., Power v. Connectweb Techs., Inc.*, 740 F. Supp. 3d 39, 59 (D. Mass. 2024) (same); *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys.,* 307 F. Supp. 2d 521, 531-532 (S.D.N.Y. 2004); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 878, 889 (N.D. Ohio 2009), *aff'd*, 606 F.3d 262 (6th Cir. 2010) (defendant that used login credentials from one of plaintiff's clients to access plaintiff's website did not "avoid[] or bypass[] the deployed technological measure in the measure's gatekeeping capacity"); *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 113 (D.D.C. 2005) ("[U]sing a username/password combination as intended—by entering a valid username and password, albeit without authorization—does not constitute circumvention under the DMCA"); *iSpot.tv, Inc.*, 2023 WL 3602806, at *3-4 (defendant's use of username and password that was provided to her without evidence of deception was not circumvention); *Adobe Sys. Inc.*, 2015 WL 13022288, *8.

Tekion did not decrypt, descramble, "avoid, bypass, remove, deactivate, or impair" anything. 17 U.S.C. § 1201(a)(3)(A). CDK does not assert otherwise, and its expert admits ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.,* Newby Decl. Ex. 5 (Swaminathan Tr. 67:21-68:1). Tekion used valid, dealer-authorized credentials ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That is not "circumvention" under the DMCA. And because the valid credentials and dealer network connections "function[ed] precisely as intended," there would have been no circumvention even had their use been unauthorized. *See Adobe*, 2015 WL 13022288, *8.

FENWICK & WEST LLP
ATTORNEYS AT LAW

CDK cites *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 4848387, at *1-2 (N.D. Cal. Oct. 1, 2019), to support its argument that Tekion manipulated DMS access controls by connecting to dealers' internal networks using a VPN and Meraki device, then logging into the DMS to run automated scripts in the dealers' DMS accounts. Motion at 16-17. But *InnoGrit* is inapposite, and CDK is wrong on the facts. In *InnoGrit*, defendant had licensed plaintiff's software only for use on defendant's computers in China. *InnoGrit*, 2019 WL 4848387, at *1. To ensure that defendant was using only licensed copies of its software, plaintiff's software had a license key file that collected a "Host ID" from the computer on which it was installed. If the Host ID did not match the approved computer and location, the computer could not run the software. *Id.* at *1-2, *9. Defendant made unauthorized copies of the software, which it installed on computers in California. To get around the Host ID restriction, it manipulated the identifying information of the computers on which the software was installed. *Id.* at *9. These manipulated, illegal copies of software interacted with and circumvented plaintiff's protective software. The facts here are different.

██████████████████████████████████████████████████

██████ Fox Decl. ¶ 26; Newby Decl. Ex. 1 (LaGreca Tr. 173:15-18), Ex. 4 (Garcia Tr. 24:18-22).

███████████████████████████████████████████████

█████████████████████████████████████████ Newby Decl. Ex. 1 (LaGreca Tr. 100:17-101:1), Ex. 2 (Stroz Tr. 57:9-17). ████████

█████████████████████████████████████████████████

████████████████████████████

### 3.  CDK's Copyright Misuse Bars Its DMCA Claim

Even if CDK had identified protectable copyrighted works and shown circumvention (it has done neither), its attempt to use the DMCA to bar access to non-copyrighted data that dealers own is copyright misuse. The copyright misuse doctrine "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office." *Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998) (copyright misuse where holder required licensee to use holder's copyrighted coding system, giving holder a "substantial and unfair advantage over its competitors"); *Assessment Technologies of WI,*

*LLC v. WIREdata, Inc.*, 350 F.3d 640, 641, 645, 647 (7th Cir. 2003) (rejecting "attempt of a copyright owner to use copyright law to block access to data that not only are neither copyrightable nor copyrighted, but were not created or obtained by the copyright owner" and observing that a contract that makes it difficult for a database user to furnish raw data to third parties in formats other than that prescribed by the database owner may be copyright misuse).  In *MDY*, the Ninth Circuit recognized that litigants could abuse the DMCA's anti-circumvention provisions to achieve unlawfully anticompetitive ends.  629 F.3d at 951.  Although there was no misuse in that case, the court warned that if plaintiffs in futures cases attempt to enforce DMCA anti-circumvention rights in violation of antitrust law, it would "consider the interplay between this new anti-circumvention right and antitrust law."  *Id*.  This is such a case: CDK is attempting to use access controls to prohibit dealers (through their agents) from accessing the dealers' own data, to deter dealer migration to CDK competitors.  This unlawfully extends CDK's DMCA rights, if any.  *See also Prac. Mgmt.*, 121 F.3d at 520-21.

## C.    CDK Is Unlikely To Succeed On Its Tortious Interference Claim.

To prevail on a claim for intentional interference with contractual relations, a plaintiff must prove five things: (1) it had a valid contract with a third party; (2) the defendant had knowledge of the contract; (3) the defendant acted intentionally to induce a breach or disruption of the contractual relationship; (4) a breach or disruption occurred; and (5) resulting damage.  *See, e.g., Trindade v. Reach Media Grp., LLC*, No. 12-4759, 2013 WL 3977034, at *15 (N.D. Cal. July 31, 2013) (discussing *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004)).  Defendant must have knowledge of the contract "*and of the fact that he is interfering with the performance of the contract*" to be liable.  *Televisa v. Liberman Broadcasting, Inc.*, No. 12-9799, 2012 WL 12893444, at *1 (C.D. Cal. Dec. 6, 2012) (denying preliminary injunction where plaintiffs failed to demonstrate defendants' knowledge of clause at issue) (quoting *Little v. Amber Hotel Co.*, 202 Cal. App. 4th 280, 302 (2011), and in turn Restatement (Second) Torts § 766) (emphasis in original); *see also Trindade*, 2013 WL 3977034, at *15 (no interference without allegation of "knowledge of any specific contracts or details about the contracts").  CDK argues that Tekion intentionally interfered with its dealer MSAs,

FENWICK & WEST LLP
ATTORNEYS AT LAW

which, allegedly, prohibit dealers from giving third parties access to CDK's products.  CDK is unlikely to succeed on the merits of this claim.

First, CDK does not assert, let alone show, that Tekion knew the terms of specific dealer MSAs.  It asserts only that, "[a]s [an] industry member[]," Tekion should have known that "contracts governing access to a DMS are standard . . . ."  Motion at 18.  Not so.  Courts dismiss interference claims based on allegations of "generalized knowledge" that an entity "was a party to contracts."  *Trindade*, 2013 WL 3977034, at *15; *see also, e.g.*, *Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 935 (N.D. Cal. 2015) (dismissing where plaintiff did not allege facts showing that defendant knew of specific customer agreements).  Relying on *Axia Fin., LLC v. Mason McDuffie Mortg. Co.*, No. 23-03256, 2023 WL 7280443, at *11 (N.D. Cal. Sept. 20, 2023)), CDK argues that "constructive knowledge is enough."  Motion at 18.  But *Axia* made no such pronouncement, and its facts are not analogous.  In *Axia*, the court found that defendant knew or should have known about plaintiff's contracts because over 40 of plaintiff's employees, all of whom were parties to the contracts, had recently joined defendant's company.  *Id.* at *2.  There are no such allegations here.

CDK has kept the contents of its MSAs confidential, including by filing them under seal, as it did here and in its Georgia action against Asbury.  Mr. LaGreca, a CDK Senior Vice President, agreed that ███████████████████████  Newby Decl. Ex. 1 (LaGreca Tr. 134:10-15).  The only public information about the MSAs (before CDK brought its motion), moreover, suggested that dealers could make CDK Products available to "*employees **and agents** of Client* with a need-to-know."  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 565-66 (N.D. Ill. 2019) (quoting Section 6(D) of CDK's standard DMS contract) (emphasis in original).  CDK might have since eliminated those terms, *see* Dkt. 45-8 at § 4(b), but no one, including Tekion, could have known that, particularly after several states enacted laws that ensure greater dealer access to their data.  CDK argues that Tekion "currently know[s]" of the MSAs because, █
███████████████████████████████████████████████████████████
█████████  But by then, Tekion had ceased assisting dealers with data migrations, and a single message about a single MSA could hardly put Tekion on notice of other MSAs.  *See Winchester Mystery House, LLC v. Glob. Asylum, Inc.*, 210 Cal. App. 4th 579, 596 (2012) (affirming summary

FENWICK & WEST LLP
ATTORNEYS AT LAW

adjudication in favor of defendant, as defendant's receipt of a one-off email referencing plaintiff's contract could not establish defendant's knowledge of said contract). And because that dealer did not share credentials, Tekion could not have induced a breach of the MSA.

Second, even if Tekion had been aware of the MSA prohibitions, it offers insufficient evidence (if any) that Tekion intended to disrupt CDK's MSAs, or that it knew that its conduct was "certain or substantially certain" to result in interference with them. *Winchester*, 210 Cal. App. 4th at 596; *see also Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Ref. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1095 (N.D. Cal. 2020) (dismissing claim where alleged "acts on their face are not indicative of an intent or desire to interfere with another party's contract"). CDK lists six categories of alleged Tekion conduct that, it argues, illustrate Tekion's intent to induce breach. Motion at 18-19. But CDK makes no attempt to link the conduct to such intent.

For category (1), CDK argues that Tekion misinformed dealers that CDK would not assist with data conversions, citing a single paragraph from Mr. Bales' declaration. Motion at 18 (citing Declaration of Denton Bales, Dkt. 45-2 ("Bales Decl.") ¶ 16). The basis for this allegation is hearsay—Mr. Bales' version of what a dealer CFO told him that a Tekion employee allegedly said. What is more, that dealer denied Tekion and InDesign access to its credentials, Bales Decl. ¶¶ 10-16, meaning that, whatever a Tekion employee told the dealership, it did not result in a breach, dooming the claim. Further, "[a] person cannot incur liability for interfering with contractual or economic relations by giving truthful information to a third party." *See, e.g., Savage v. Pacific Gas & Elec. Co.*, 21 Cal. App. 4th 434, 437 (1993). And CDK admits that it has ███████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████ Newby Decl. Ex. 1 (LaGreca Tr. 75:2-6, 75:17-25, 76:5-20), Ex. 3 (Kiser Tr. 31:16-32:24, 33:20-36:5, 40:6-41:2, 52:4-18). And the Asbury group had to seek (and got) a preliminary injunction to get its data from CDK. *See* Newby Decl. Exs. 16-17. Thus, even if the alleged conduct occurred, Tekion shared *accurate* information, which cannot support its claim. *See Savage*, 21 Cal. App. 4th at 449-50.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    For category (6), CDK argues that Tekion suggested that dealers "not pay amounts owed

2    under their MSAs," citing paragraph 30 (only) from the Bales declaration.  Motion at 19.  CDK's

3    only support is a single email from an InDesign employee, not from Tekion, to a dealer:

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    Dkt. 45-16 (emphasis added).  This is not an inducement of the customer not to pay amounts owed

7    to CDK.  ████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████████████

9    Moreover, by the time of this exchange the dealer had already decided to migrate from CDK to

10   Tekion.  Bales Decl. ¶ 10; Newby Decl. Ex. 6 (Bales Tr. 44:2-21).  And the customer ██████

11   ████████████████████  Newby Decl. Ex. 6 (Bales Tr. 56:15-19)

12   CDK's categories (2)–(5) relate to the nature of Tekion's assistance to dealers.  They are

13   technical details about how data would get from CDK to the dealer, and then from the dealer to

14   Tekion.  But CDK must present evidence that Tekion knew, e.g., that ████████████████████

15   ██████████████████████████████  Motion at 19, with the dealer's permission, was

16   "certain or substantially certain" to disrupt CDK's MSAs.  *Winchester*, 210 Cal. App. 4th at 596.

17   CDK fails to do that, particularly given Tekion's lack of knowledge about MSA terms and its

18   legitimate business interest in helping dealers that have already contracted to switch to Tekion's

19   DMS service.  *See, e.g., Nevada DeAnza*, 474 F. Supp. 3d at 1095 (no showing that defendant

20   "specifically wanted to interfere" with plaintiff's contract given insufficient evidence of intent

21   coupled with the presence of "alternative business explanations"); *Trujillo v. F.D.I.C., as Receiver

22   of Empire Nat. Bank.*, No. 87-5625, 1988 WL 235959, at *9 (C.D. Cal. Jan. 13, 1988) ("The facts

23   pleaded by a plaintiff must show an intent to do something which takes the defendant's acts beyond

24   those of a mere competitor securing business for himself"); *Vascular Imaging Professionals, Inc.

25   v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1011-12 (S.D. Cal. 2019) (allegations that defendant

26   tortiously interfered by "requesting that [a subsidiary] withhold software and services required

27   under the Maintenance Agreement and by conspiring in [the subsidiary's] alleged termination of

28

Fenwick & West LLP
Attorneys at Law

the Agreement and continued withdrawal of moneys from Plaintiffs [sic] accounts" was "devoid of any facts in support of" defendant's intent to interfere).

Even if Tekion's assistance was intended or substantially certain to interfere with CDK's contracts, Tekion's "legitimate business purpose" justified it. *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1274 (N.D. Cal. 2022). "Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties." *Id.* In *Meta*, the court held that, because BrandTotal was "acting deceptively and abusing Meta's platform," Meta was entitled to "enforce its rights . . . even if it knew that such conduct might interrupt [BrandTotal]'s contract" with a third party. *Id.* at 1274-76. Likewise, Tekion has its own contract with the dealer that includes a strict window for launching the dealer on Tekion's DMS; the dealer cannot operate without a functioning DMS during the transition period; when a launch date gets postponed because CDK delays data migration, the dealer risks being left without a DMS, Tekion's transition resources sit idle, and Tekion cannot begin providing its service (and obtain fees) under its own contract. Fox Decl. ¶¶ 13-14; Livingstone Decl.¶¶ 6, 10, 14. Tekion acts "within the realm of fair competition" to aid dealers in ensuring successful DMS conversions.[1] *Meta Platforms*, 605 F. Supp. 3d at 1274.

Third, CDK fails to show damage resulting from the alleged MSA breach. CDK claims that it has lost both goodwill and revenue due to Tekion's actions. For lost revenue, CDK argues that Tekion's ███████████████ in aid of a conversion induced a breach by dealer ████████ that cost CDK millions. Motion at 9; LaGreca Decl. ¶¶ 80-83. CDK relies entirely on the LaGreca declaration. *Id.* But at deposition, ████████████████████████████████████████

████████████████████████████████████████████████

---

[1] CDK relies on *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013), a case that the developer of the online role-playing game "World of Warcraft" brought against a company whose sole purpose was to sell "bots" and "hacks" that allowed players to cheat, in violation of publicly available terms of use, and ruining the game for other players. Here, CDK seeks to impose liability on Tekion for assisting dealers in obtaining their own data, so that the dealers could continue to operate their legitimate businesses.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    ███████████████████████████████████████████ Newby Decl. Ex. 1

2    (LaGreca Tr. 108:5-110:22, 165:21-166:7).  CDK's only support for loss of goodwill is the

3    allegedly disparaging email from *InDesign* (discussed above), in which InDesign offers ██████

4    ███████████████████████████████████████████████████████ Motion at

5    24-25.  There is nothing remotely disparaging about the message, and, as shown above, that

6    customer did not use InDesign's services and had already decided to switch to Tekion.

7        Finally, CDK does not explain how Tekion's alleged, non-controversial conduct caused any

8    dealers to, e.g., "refus[e] to pay CDK money owed under the MSA."  Motion at 19.  The dealers

9    that Tekion assisted had already decided to leave CDK for Tekion at the time of Tekion's alleged

10   interference—that is why Tekion was helping them.  As the example of ███████████████

11   shows, dealers ultimately decided whether to provide Tekion or InDesign their DMS credentials,

12   or whether to wait for CDK to migrate their data.  Accordingly, no act of Tekion's caused the

13   breach of an MSA.  *See, e.g., Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1157

14   (S.D. Cal. 2014) (no intentional interference where plaintiffs failed to identify "why [defendant],

15   rather than other forces, was the cause of said breach(es)"); *Bull Mountain Sanitation, LLC v. Allied*

16   *Waste Servs. Of N. Am., LLC*, No. 18-147, 2020 WL 8812843, at *6 (D. Mont. July 17, 2020) (no

17   damages where any alleged harm was "the result of [party's] own failure . . . not because of the

18   actions of Defendants").

19   **II.    CDK CANNOT SHOW IRREPARABLE HARM.**

20       **A.    CDK's Years of Delay Defeats Its Claim of Irreparable Harm**

21        "A delay in seeking a preliminary injunction is a factor to be considered in weighing the

22   propriety of relief."  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)

23   (reversing grant of preliminary injunction).  That is because a preliminary injunction must be based

24   on "an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights[,] a

25   plaintiff demonstrates the lack of need for speedy action …."  *Id.* (quoting *Gillette Co. v. Ed Pinaud,*

26   *Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959) and collecting cases).

27       CDK first complained to Tekion about its alleged access to dealer CDK DMS accounts in

28   May 2019, pointing then to the ████████████████████████████████████████ that

Mr. Swaminathan identified in his March 2025 declaration in connection with later activity. Newby Decl. Exs. 7-9; Swaminathan Decl. ¶ 17 (Table 2). Tekion refuted CDK's allegations in June 2019, and CDK took no further action. Newby Decl. ¶ 11, Ex. 10. In April 2024 CDK again alleged, erroneously, that Tekion was interfering with its contract with a dealer that ultimately had to sue CDK to get access to its data. Fox Decl. ¶ 28; *see also* Ex. 11. Despite this history, CDK waited until February 2025 to sue Tekion, and then it delayed another month to file this motion. CDK's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). "Delays in requesting an injunction, whether for months or years, tend to negate a claim of irreparable harm." *Famous Birthdays, LLC v. SocialEdge, Inc.*, No. 21-9562, 2022 WL 1592726, at *4 (C.D. Cal. Feb. 11, 2022) (quoting *Hansen Bev. Co. v. N2G Dist., Inc.*, No. 08-1613, 2008 WL 5427602, at *6 (S.D. Cal. Dec. 30, 2008)); *see also Protech Diamond Tools v. Liao*, No. C 08-3684, 2009 WL 1626587, at *6 (N.D. Cal. June 5, 2009) (two-year delay in bringing suit foreclosed showing of irreparable harm where allegedly infringing conduct had been occurring "continually and without interruption for years, without any legal action being taken by [p]laintiff"). Delay of even a few months undercuts a claim of irreparable harm. *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (affirming denial of preliminary injunction under copyright laws, where plaintiff waited five months after offending video was uploaded to YouTube); *see also Gigacloud Tech., Inc. v. Linon Home Décor Prods., Inc.*, No. 24-4308, 2024 WL 4766202, at *4 (C.D. Cal. Sept. 9, 2024) (no irreparable harm where there is a five month delay between cease-and desist letter and suit).

Knowing that it has come to the Court too late for a preliminary injunction, CDK tries to obscure the timeline, arguing that the parties had an "established course of dealing" until "Tekion broke the status quo" in "late 2024." Motion at 1, 3. That is not true. Tekion and CDK negotiated an agreement in 2021, ███████████████████████████████████████ ███ Fox Decl. ¶ 11, Ex. A. The only established courses of dealing were that of Tekion and third-party integrators like InDesign, in helping dealers export their data through their own CDK accounts. CDK's delay in seeking relief for years defeats their claim of irreparable harm.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**B.      CDK Fails To Show A Threat of Harm.**

**1.      CDK Presents Purely Speculative Cybersecurity Risks**

CDK relies on the testimony of Ed Stroz, a cybersecurity expert, to argue that Tekion and InDesign's access to dealer CDK DMS accounts increases the risk that a malicious actor could infiltrate CDK's systems.  But Mr. Stroz acknowledged in his deposition that ███████████████████
███████████████████████████████████████████████████████████████████████  Newby Decl. Ex. 2 (Stroz Tr. 63:23-64:8, 69:24-71:17, 83:22-84:16, 86:10-86:14, 88:23-89:5, 96:4-96:16).  In fact, Mr. Stroz ████████
█████████████████████████████████████████████████████████████████████████ (Stroz Tr. 32:12-32:19, 34:6-34:19, 88:23-89:5).  He simply ███████████████████████████████
████████████████████████████████████████████████  *Id.* (Stroz Tr. 60:15-61:1).
Mr. Stroz's primary point was that ████████████████████████████████████████████████
█████████████████████.  Declaration of Edward Stroz, Dkt. 45-6 ("Stroz Decl.") ¶¶ 80-89.  But ████████████████████████████████████████████████████████████████████████████
████████████████████████████████  Newby Decl. Ex. 2 (Stroz Tr. 61:18-62:6).  And he confirmed that ████████████████████████████████████████████████████████████████████
█████.  *Id.* (Stroz Tr. 62:7-13).  Mr. Stroz's opinions of hypothetical harms do not establish a threat of irreparable injury.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (district court abused its discretion in granting preliminary injunctive relief).  A party seeking an injunction "must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Id.* (citing *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980)); *accord Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016).  It is therefore no surprise that CDK has failed with this same argument before.  In *In re Dealer Mgmt. Sys. Antitrust Litig.*, as here, CDK relied on Mr. Stroz to argue that it faced heightened security risks when third parties accessed dealer DMS accounts with the dealers'

FENWICK & WEST LLP
ATTORNEYS AT LAW

authorization.  680 F. Supp. 3d 1011, 1022-23 (N.D. Ill. 2023).  And just as he does here ████

████████████████████████████████████████████ Newby Decl. Ex. 2 (Stroz

Tr. 70:18-21), Mr. Stroz pointed to unrelated security incidents, failing to connect them to DMS

access by third parties, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d at 1022-23.  Also

as here, Mr. Stroz opined that "[h]ostile third-party access to DMSs poses a security risk to the

confidentiality, integrity, and availability of DMS data and the underlying systems" but "presented

no evidence that the Dealers' alleged contract breaches actually caused those increased risks." *Id.*

at 1023.  Granting summary judgment to the dealerships, the court found "CDK has not sufficiently

linked the irreparable harm it claims to face with the conduct it seeks to enjoin." *Id.*  The Court

should reach the same conclusion here.

CDK's argument that Tekion could access CDK's source code and reverse engineer

confidential algorithms and information is also speculative, and CDK presents no evidence that it

has happened or even that there is a threat of it happening.  Mr. LaGreca's declaration, like Mr.

Stroz's, describes only what Tekion might be able to do through a dealer DMS account, but he

offers no evidence that Tekion has in fact done anything other than extract dealer data.  And in his

deposition, Mr. LaGreca████████████████████████████████████████████████████████

████████████████████████████████████████████ Newby Decl. Ex. 1 (LaGreca

Tr.  63:7-22).    Nor  was  he ████████████████████████████████████████

████████████████████████████████████████ *Id.* (LaGreca  Tr.  104:24-

105:6).  He also ████████████████████████████████████████████████████

████ *Id.* (LaGreca Tr. 173:15-18).  Mr. LaGreca's speculation cannot support injunctive (or any)

relief.  CDK's declarant Mr. Kiser, who has been in sales at CDK since 1999, testified that no dealer

has ever told him about any security problems caused by the extraction of data to an onsite ████

████████████████████ Newby Decl. Ex. 3 (Kiser Tr. 61:17-62:5).

## 2.    Tekion's Access to Dealer DMS Accounts Does Not, on Its Own, Establish a Threat of Irreparable Harm

Recognizing the lack of evidence of an actual, specific threat, CDK argues that Tekion's

ongoing access itself threatens irreparable injury.  Motion at 20-21.  Given CDK's lack of evidence

that Tekion's access has ever compromised CDK's DMS, ongoing access would not be a threat, but, in any event, Tekion stopped accessing dealer accounts in December 2024. Fox Decl. ¶ 27. (Tekion of course disputes that its access was ever unauthorized under the CFAA.) Thus, there is no threat even under CDK's incorrect, unsupported theory. In addition, the only injury that CDK alleges in this regard is "loss" from its "investigation" into Tekion's conduct. Motion at 14. CDK does not even claim any damage—that is, "any impairment to the integrity or availability of data, a program, a system, or information," 18 U.S.C. § 1030(e)(8)—from alleged CFAA violations.

"In the DMCA context, irreparable harm may be established by evidence that circumvention is undermining the copyright owner's negotiating position" and "damaging goodwill with licensees." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074 (S.D. Cal. 2019). But CDK presents no such evidence. In all cases, dealers had decided to convert (or try) Tekion's DMS before they gave Tekion permission to access their accounts. CDK relies on inapposite cases involving decrypting access controls to copyrighted media (*Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017)), or using counterfeit license keys to software (*AzurEngine Techs.,* 401 F. Supp. 3d at 1074) so that defendants or others can use pirated content. Tekion does not use dealer accounts to pirate CDK's DMS, only to help the dealers export their own data. Any damage to CDK's goodwill is due to CDK's mistreatment of its own customers, such as by holding dealer data hostage to prevent conversions and restricting dealers from using (lower cost) data integration services provided by companies that predate Tekion's existence.

Finally, if CDK did prevail on the merits of any of its claims, damages would provide adequate relief. Courts will "not grant a preliminary injunction unless there is 'no adequate legal remedy' for the harm toward which it is directed." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024). If the Court finds that unlawful Tekion conduct resulted in lost contract payments for CDK, money damages would fully compensate CDK.

## III.    THE EQUITIES AND PUBLIC INTEREST FAVOR TEKION, NOT CDK

CDK fails to provide any concrete reason why either the balance of equities or the public interest would favor the injunction it seeks, presumably because they do not. CDK relies on broad pronouncements that the public interest is served by "enforcement of statutes" (but perhaps not of

dealer data access laws) or "by parties' performing as promised under their contracts."  Motion at 25 (citations omitted).  That is not evidence and does not tilt the equities or public interest in CDK's at all.  There is no public interest in allowing an incumbent like CDK to erect arbitrary roadblocks that prevent dealer access to their own data so that the dealers stay with CDK.  An injunction would only further stifle competition in the DMS market and threaten the ability of a data integration service provider like InDesign, which has served the automotive retail industry for over a decade (and with CDK's full knowledge of its activities), to continue its operations.

The private equities also decidedly favor denying CDK's injunction.  Migrating dealerships need months to move their data into a new DMS.  Livingstone Decl. ¶ 6.  A single CDK employee speculates that synthetic data is a substitute for the real thing when training dealer employees on a new DMS, Garcia Decl. ¶¶ 27-28, at deposition he estimated ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████  Newby Decl. Ex. 4 (Garcia Tr. 21:22-22:2, 27:9-12).  And data/DMS validation requires a dealer's actual data.  Livingstone Decl. ¶¶ 6, 10.  For that reason, the use of synthetic data for training and validation is not a standard industry practice.  *Id.*  And although CDK claims that Tekion can migrate data with CDK's cooperation, it is CDK's lack of cooperation that requires Tekion to get involved.

CDK also fails to offer any evidence that Tekion and InDesign's conduct has burdened CDK's overall system resources, as it argues.  Motion at 21-22.  To the contrary, Mr. LaGreca testified that ████████████████████████████████████████████████ ████████████████████████████  Newby Decl. Ex. 1 (LaGreca Tr. 112:5-25).  In sum, a balancing of both the private and public equities weigh heavily against issuing an injunction.

## CONCLUSION

For the reasons stated above, the Court should deny CDK's motions and decline to enter any injunction in this matter.

Fenwick & West LLP
Attorneys at Law

1    Dated:  May 1, 2025                     FENWICK & WEST LLP

2

3                                            By:   /s/ Tyler G. Newby
                                                   Tyler G. Newby
4
                                             Attorneys for Defendant
5                                            TEKION CORP.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW