VINEET BHATIA (*admitted pro hac vice*)
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*admitted pro hac vice*)
sraymond@susmangodfrey.com
ROBERT SAFI (*admitted pro hac vice*)
rsafi@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiff CDK Global, LLC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CDK GLOBAL, LLC, a Delaware limited liability company | Case No. 25-cv-01394-JSC |
| Plaintiff, | **CDK GLOBAL, LLC'S OPPOSITION TO INDESIGN DATA, LLC'S MOTION TO DISMISS** |
| vs. | |
| TEKION CORP., a Delaware corporation, and INDESIGN DATA, LLC, a Florida limited liability company, | Date        June 26, 2025<br>TIME:      10:00 a.m.<br>PLACE:   San Francisco Courthouse, Courtroom 8 – 19th Floor 450 Golden Gate Avenue, San Francisco, CA 94102 |
| Defendants. | |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED .......................................................................... 3

I.    FACTUAL BACKGROUND ........................................................................................... 3

    A.    CDK employs technological and contractual restrictions to secure its DMS. ......... 3

    B.    In December 2024, CDK learns that InDesign is colluding with Tekion to
        convince Dealerships to breach their contracts and give unauthorized access to
        CDK's DMS. ............................................................................................................. 4

    C.    InDesign knowingly violates statutes and contracts by deploying its "1DMS"
        software program to download large volumes of data from CDK's DMS. ............. 4

II.   LEGAL STANDARD ....................................................................................................... 5

III.  ARGUMENT .................................................................................................................... 6

    A.    CDK adequately pleads a claim under the Computer Fraud Abuse Act. ................. 6

        1.    InDesign intentionally accesses CDK's computer—the DMS. ................... 6

        2.    InDesign accesses CDK's DMS "without authorization." .......................... 7

        3.    InDesign's unauthorized access caused $5,000+ in damages or losses. ..... 13

    B.    CDK adequately pleads a claim under the California Comprehensive Computer
        Data Access and Fraud Act. .................................................................................... 13

    C.    CDK adequately pleads a claim under the Digital Millenium Copyright Act. ....... 14

        1.    The DMS is a "work protected" under the Copyright Act. ........................ 14

        2.    InDesign circumvents technological access controls. ................................ 16

        3.    InDesign traffics in technology that circumvents access controls. ............ 18

    D.    CDK adequately pleads a claim under the Stored Communications Act. .............. 19

    E.    CDK adequately pleads trade secrets claims under federal and state law. ............ 20

    F.    CDK adequately pleads InDesign tortiously interfered with its contracts. ............ 21

    G.    CDK adequately pleads InDesign violated California's UCL. .............................. 23

    H.    If the Court dismisses, CDK requests leave to replead. ........................................ 25

IV.   CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*321 Studios v. MGM Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) .................................................................... 17, 18

*Acculmage Diagnostics Corp. v. Terarecon, Inc.*,
  260 F. Supp. 2d 941 (N.D. Cal. 2003) ............................................................................ 20

*Actuate Corp. v. Internat'l Bus. Machines Corp.*,
  2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ............................................................. 16, 17

*ACW Flex Pack LLC v. Wrobel*,
  2023 WL 4762596 (N.D. Ill. 2023) ................................................................................. 19

*Agfa Corp. v. Richard*,
  2018 WL 3078585 (C.D. Cal. June 1, 2018) .................................................................. 22

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
  2017 WL 10526121 (C.D. Cal. Nov. 14, 2017) ............................................................. 24

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018) ........................................................................... 20

*Ass'n for Information Media and Equipment v. Regents of the Univ. of Calif.*,
  2012 WL 7683452 (C.D. Cal. Nov. 20, 2012) ............................................................... 18

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
  350 F.3d 640 (7th Cir. 2003) .................................................................................... 15, 16

*ATPAC, Inc. v. Aptitude Sols., Inc.*,
  2010 WL 1779901 (E.D. Cal. Apr. 29, 2010) ............................................................ 11, 12

*Axia Fin., LLC v. Mason McDuffie Mortg. Co.*,
  2023 WL 7280443 (N.D. Cal. Sept. 20, 2023) .............................................................. 22

*CDK Glob. LLC v. Brnovich*,
  16 F.4th 1266 (9th Cir. 2021) ..................................................................................... 9, 15

*CDK Glob. LLC v. Brnovich*,
  461 F. Supp. 3d 906 (D. Ariz. 2020) ............................................................................... 9

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) ............................................................................................... 25

*DirecTV, LLC v. E&E Enters. Glob., Inc.*,
  2017 WL 6888500 (C.D. Cal. Nov. 20, 2017) ............................................................... 23

*Domain Name Comm'n Ltd. v. DomainTools, LLC,*
　449 F. Supp. 3d 1024 (W.D. Wash. 2020) ................................................................ 9, 13

*Elevation Point 2 Inc. v. Gukasyan,*
　2022 WL 345647 (S.D. Cal. Feb. 3, 2022) ...................................................................... 7

*Epic Games, Inc. v. Apple, Inc.,*
　67 F.4th 946 (9th Cir. 2023) ......................................................................................... 24

*ESS Tech., Inc. v. PC-Tel, Inc.,*
　1999 WL 33520483 (N.D. Cal. Nov. 4, 1999) ............................................................... 24

*Facebook, Inc. v. Power Ventures, Inc.,*
　844 F.3d 1058 (9th Cir. 2016) ........................................................................... 1, 7, 8, 9

*Hinojos v. Kohl's Corp.,*
　718 F.3d 1098 (9th Cir. 2013) ....................................................................................... 24

*hiQ Labs, Inc. v. LinkedIn Corp.,*
　31 F.4th 1180 (9th Cir. 2022) ........................................................................................ 10

*Huynh v. Quora, Inc.,*
　508 F. Supp. 3d 633 (N.D. Cal. 2020) ........................................................................... 23

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
　362 F. Supp. 3d 558 (N.D. Ill. 2019) ............................................................................. 17

*In re Google Assistant Priv. Litig.,*
　546 F. Supp. 3d 945 (N.D. Cal. 2021) ........................................................................... 25

*In re Proxima Corp. Sec. Litig.,*
　1994 WL 374306 (S.D. Cal. May 3, 1994) ...................................................................... 7

*iSpot.tv, Inc. v. Teyfukova,*
　2023 WL 3602806 (C.D. Cal. May 22, 2023) ................................................................ 17

*Ixchel Pharma, LLC v. Biogen Inc.,*
　2018 WL 558781 (E.D. Cal. Jan. 25, 2018) ................................................................... 23

*KT Enters. LLC v. Comp360, LLC,*
　751 F. Supp. 3d 999 (C.D. Cal. 2023) ........................................................................... 24

*Larsen v. Trader Joe's Co.,*
　917 F. Supp. 2d 1019 (N.D. Cal. 2013) ........................................................................... 6

*LVRC Holdings LLC v. Brekka,*
　581 F.3d 1127 (9th Cir. 2009) ......................................................................................... 9

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
　519 F.3d 1025 (9th Cir. 2008) ......................................................................................... 5

*Mattel, Inc. v. MGA Entertainment, Inc.*,
   782 F. Supp. 2d 911 (C.D. Cal. 2011)...................................................................... 21

*McCoy v. Alphabet, Inc.*,
   2021 WL 405816 (N.D. Cal. Feb. 2, 2021)............................................................... 25

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010)................................................................................ 14, 15

*Microsoft Corp. v. EEE Bus. Inc.*,
   555 F. Supp. 2d 1051 (N.D. Cal. 2008) ..................................................................... 16

*Multiven, Inc. v. Cisco Sys., Inc.*,
   725 F. Supp. 2d 887 (N.D. Cal. 2010) .............................................................. 6, 8, 13

*Niantic, Inc. v. Global++*,
   2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ...................................................... 6, 11

*Pearl Invs., LLC v. Standard I/O, Inc.*,
   257 F. Supp. 2d 326 (D. Me. 2003) ........................................................................... 16

*Pellerin v. Honeywell Int'l, Inc.*,
   877 F. Supp. 2d 983 (S.D. Cal. 2012)........................................................................ 20

*Regal Art & Gifts, Inc. v. Fusion Prods., Ltd.*,
   2016 WL 454116 (N.D. Cal. Feb. 5, 2016)................................................................ 11

*Rockwell Collins, Inc. v. Wallace*,
   2017 WL 5502775 (C.D. Cal. Nov. 10, 2017)........................................................... 21

*Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*,
   2020 WL 12948055 (C.D. Cal. Dec. 29, 2020) ........................................................ 23

*Sanchez v. Nurture, Inc.*,
   626 F.Supp.3d 1107 (N.D. Cal. 2022) ...................................................................... 23

*Schmitt v. SN Servicing Corp.*,
   2021 WL 3493754 (N.D. Cal. Aug. 9, 2021)............................................................. 23

*SecureInfo Corp. v. Telos Corp.*,
   387 F. Supp. 2d 593 (E.D. Va. 2005)........................................................................ 12

*Silverlit Toys Manufactory Ltd. v. Rooftop Grp., USA, Inc.*,
   2010 WL 11509314 (C.D. Cal. Jan. 21, 2010) ......................................................... 24

*Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*,
   521 F. Supp. 3d 929 (S.D. Cal. 2021)........................................................................ 20

*Srigley v. Monterey Peninsula Yacht Club, Inc.*,
   748 F. Supp. 3d 801 (N.D. Cal. 2024) ....................................................................... 25

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011)................................................................... 10

*State Analysis, Inc. v. American Financial Services Assoc.*,
   621 F. Supp. 2d 309 (E.D. Va. 2009).......................................... 8, 11, 12

*Stern v. Weinstein*,
   2010 WL 11459791 (C.D. Cal. Jan. 6, 2010) ....................................... 9

*Synopsys, Inc. v. InnoGrit, Corp.*,
   2019 WL 4848387 (N.D. Cal. Oct. 1, 2019)................................... 2, 16

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
   315 F. Supp. 3d 1147 (C.D. Cal. 2018)............................ 11, 12, 14, 15

*TMX Funding, Inc. v. Impero Techs., Inc.*,
   2010 WL 2509979 (N.D. Cal. June 17, 2010) ..................................... 21

*Tradeshift, Inc. v. BuyerQuest, Inc.*,
   2020 WL 8920622 (N.D. Cal. May 20, 2020) ............................... 21, 22

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012)................................................................. 9

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016)........................................................... 7, 8

*Vendavo, Inc. v. Price f(x) AG*,
   2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) ................................... 20

*Watters v. Breja*,
   2024 WL 201356 (N.D. Cal. Jan. 18, 2024) ....................................... 8

*Weingand v. Harland Fin. Sols., Inc.*,
   2012 WL 2327660 (N.D. Cal. June 19, 2012) ................................... 13

**Statutes**

17 U.S.C. § 1201 .................................................................... 14, 16, 18

18 U.S.C § 1030 ............................................................................. 6, 13

18 U.S.C. § 2701 ................................................................................ 19

## **PRELIMINARY STATEMENT**

Defendants InDesign Data, LLC ("InDesign") and Tekion Corp. ("Tekion") are colluding to circumvent the technological controls Plaintiff CDK Global, LLC ("CDK") employs to protect its Dealer Management System ("DMS") and the confidentiality of sensitive data stored on that system. The DMS is a software platform and computer database that enables CDK's automotive and truck dealership customers (the "Dealerships") to operate retail stores. InDesign offers Dealerships a "1DMS" software product that allows InDesign to bypass CDK's private network restrictions and access CDK's DMS without authorization.

In December 2024, CDK first realized InDesign posed a significant threat to DMS security and CDK's business relationships. A concerned CDK Dealership customer forwarded CDK an email from InDesign marketing InDesign's so-called "data conversion" services for a price of $5,000. Compl. ¶¶ 94–96; Ex. 2. Dave Lampert—believed to be the Principal of InDesign—had emailed the Dealership touting: "We convert dealers to Tekion (data and docs)." *Id.* Lampert copied Tekion's Senior Manager of Implementation on the email. *Id.* ¶¶ 96, 100. This email spurred CDK's investigation into the scope of InDesign's unauthorized access to CDK's DMS and partnership with Tekion—one of CDK's competitor DMS providers. *Id.* ¶ 105. CDK initiated a digital forensic investigation to learn that InDesign has accessed CDK's DMS from multiple Dealership's Internet Protocol ("IP") addresses. *Id.* ¶¶ 105, 107. CDK's findings led to this lawsuit against Tekion and InDesign, which is well-pled and asserts valid causes of action.

The Court should deny InDesign's Motion to Dismiss (ECF No. 52) ("Motion" or "Mot.")—which tellingly Tekion has ***not*** joined—for six reasons:

***First***, CDK's Complaint states a valid claim that InDesign violated the Computer Fraud and Abuse Act (CFAA) and California Computer Data Access and Fraud Act (CDAFA) by using Dealerships' login credentials without CDK's authorization and running software scripts on CDK's computer servers. Compl. ¶¶ 28, 96, 107–109, 153. A "defendant can run afoul of the CFAA when he or she has no permission to access a computer . . . ." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). InDesign never had permission to access CDK's DMS. Compl. ¶¶ 28, 153.

**Second**, CDK's Complaint states a valid claim that InDesign has circumvented CDK's technological controls to access CDK's copyrighted material in contravention of the Digital Millennium Copyright Act (DMCA). InDesign does so by utilizing unauthorized password-protected credentials and bypassing the private, encrypted network between Dealerships' networks and CDK's data centers. Compl. ¶¶ 38–50, 96, 105–109. The vast majority of courts in this district have found that unauthorized use of passwords amounts to circumvention in violation of the DMCA. *See Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 4848387, at *8 (N.D. Cal. Oct. 1, 2019).

**Third**, CDK's Complaint states a valid claim that InDesign has violated the Stored Communications Act ("SCA") by acting without authorization to intentionally access communications that were not directed to or intended for CDK's Dealership customers. Compl. ¶¶ 28, 77, 96, 105–109, 153, 189–190, 192.

**Fourth**, CDK's Complaint states a valid claim that InDesign has misappropriated trade secrets within the scope of the Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA"). CDK's Complaint describes the improper methods by which InDesign acquired CDK's trade secrets and InDesign's disclosure of those secrets to Tekion— CDK's competitor. Compl. ¶¶ 101, 105, 109–112, 207–209. These facts go beyond allegations that InDesign has merely possessed CDK's trade secrets.

**Fifth**, CDK's Complaint states a valid claim for tortious interference by alleging that InDesign convinces CDK's Dealership customers to breach the terms of their contracts. CDK's standard Master Services Agreement ("MSA") prohibits Dealerships from giving third parties access to CDK's DMS, sharing password-protected user credentials, using third-party software on the system, and obtaining data conversion services without paying money owed to CDK. Compl. ¶¶ 51–59. InDesign is aware of these contractual restrictions—at least one Dealership has told InDesign that its practices "violate" the MSA terms. *Id.* ¶¶ 61, 99. Yet InDesign holds itself out as a "Plan B" for data extraction if a Dealership does not pay for services rendered by CDK and continues to use Dealerships' credentials to run its software on CDK's DMS. *Id.* ¶¶ 96, 100, 107– 108.  InDesign's conduct constitutes tortious interference.

**Sixth**, InDesign's misconduct described throughout the Complaint falls within the scope of

the unlawful and unfair prongs of California's Unfair Competition Law ("UCL"), and CDK has alleged an economic injury sufficient to establish standing under the UCL. Compl. ¶¶ 105–109, 128, 132, 134, 297.

## STATEMENT OF ISSUES TO BE DECIDED

Whether CDK's Complaint adequately states a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    FACTUAL BACKGROUND

### A.    CDK employs technological and contractual restrictions to secure its DMS.

CDK's Dealer Management System ("DMS") is a software tool that enables car and truck Dealerships to operate core aspects of their business—such as closing sale and lease transactions, financing, parts supply, and vehicle maintenance. Compl. ¶¶ 22, 25–26. The software that operates on a Dealership's computer terminal and at CDK data centers consists of original and distinct elements, including: CDK's source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience. *Id.* ¶ 32. In addition to CDK's proprietary data, CDK's DMS stores highly sensitive, commercially valuable data belonging to the car-buying public, car manufacturers, and other third parties. *Id.* ¶¶ 33, 34.

CDK employs security measures to protect the data on the DMS and its own proprietary information and trade secrets. *Id.* ¶¶ 37. First, CDK uses hardware and software components to create private connections between local Dealership networks and CDK's network. *Id.* ¶¶ 38–50. CDK's network only accepts communications from authorized, IP addresses. *Id.* ¶ 43. The pathway is fully encrypted, as are the communications made through the DMS. *Id.* ¶¶ 44, 45. CDK secures the DMS with username and password requirements and enables multi-factor authentication. *Id.* ¶¶ 47–50.

Second, CDK requires its Dealership customers to enter a Master Services Agreement ("MSA") that imposes contractual access restrictions. *Id.* ¶ 51. The standard MSA prohibits Dealerships from sharing login credentials with third parties, running third-party software on the DMS without CDK's permission, or sharing CDK's Products or Services (including "screen displays") with third parties. *Id.* ¶¶ 52–60. Dealerships cannot use third-party software on CDK's

DMS outside of sanctioned integration methods. *Id*. ¶ 50. CDK requires Dealerships to restrict DMS access to employees on a "need-to-know" basis determined by each employee's job function. *Id*. ¶¶ 47, 49, 50, 58. When logging on, a person must certify that she is a Dealership employee authorized to access the DMS. *Id.* ¶ 49.

> **B.**    **In December 2024, CDK learns that InDesign is colluding with Tekion to convince Dealerships to breach their contracts and give unauthorized access to CDK's DMS.**

In December 2024, CDK discovered that InDesign was contacting CDK's Dealership customers to induce them to breach their MSAs. Compl. ¶¶ 94–96. A Dealership forwarded CDK an email chain that revealed InDesign was colluding with CDK's competitor—Tekion—to extract data from CDK's DMS. *Id.* That email chain exposed InDesign's practices: (1) InDesign "convert[s] dealers to Tekion (data and docs);" (2) by "installing [InDesign's] automation software;" and (3) extracting "all the data and docs" from CDK's DMS provided that the Dealership has "creat[ed] a CDK user" credential for InDesign. *Id*. ¶ 96. The Dealership rejected the request for access and explained "***We certainly will not be giving you a login as it violates our MSA***." *Id*. ¶ 99. When that Dealership refused its services, InDesign switched tack and stated: if CDK does not "give you AR [accounts receivable] approval"—which would only happen if the Dealership did not honor its payment obligations for services rendered—then InDesign "can be your Plan B." *Id*. ¶ 100. This exchange caused CDK to investigate who InDesign is, what its business entails, and how frequently InDesign is accessing CDK's DMS on Tekion's behalf. DMS. *Id.* ¶ 105.

> **C.**    **InDesign knowingly violates statutes and contracts by deploying its "1DMS" software program to download large volumes of data from CDK's DMS.**

InDesign's business model revolves around technology to circumvent a DMS provider's private network access restrictions. Compl. ¶ 73. InDesign sells a software program called "1DMS" that enables InDesign to scrape and collect data through a "bidirectional data pipeline to the DMS." *Id.* ¶¶ 72–74. This software gives InDesign access to "every part of the DMS that [a Dealership's] application demands." *Id.* ¶ 74. InDesign has used 1DMS to access CDK's DMS for the purpose of extracting data for Dealerships converting to Tekion's DMS. *Id.* ¶¶ 107, 109. InDesign's "data conversion" services cost Dealerships at least $5,000. *Id.* ¶ 75; Ex. 2 ("Data Conversion

Agreement") § 1a. When a Dealership does not use InDesign's services, CDK can facilitate DMS data conversion to Tekion's system at no cost to the Dealership so long as the Dealership is in good standing under the terms of its MSA. *Id.* ¶¶ 62–63.

InDesign needs to bypass and avoid private network restrictions in order to access CDK's DMS. For that reason, InDesign demands that Dealerships create fictitious, password-protected login credentials specifically for InDesign's use. Compl. ¶¶ 75, 96, 108, 237. Armed with a fake user account, InDesign subverts CDK's private network restrictions to access CDK's DMS under cover of a Dealership's IP address. *Id.* ¶¶ 43, 73–75. Once inside the system, InDesign can download large volumes of data stored on the DMS. *Id.* ¶ 105. Deploying 1DMS necessarily requires that InDesign obtain information about CDK's systems and infrastructure, including elements that make up CDK's trade secrets. *Id.* ¶ 77. InDesign has used 1DMS to access CDK's DMS from multiple Dealerships' IP addresses. *Id.* ¶¶ 105, 107. Each time InDesign accesses CDK's DMS, it obtains valuable pieces of intellectual property—including the distinctive look of CDK's DMS, the experience of navigating CDK's DMS, CDK's trade secrets, and data that does not belong to the Dealerships. *Id.* ¶¶ 110, 112.

InDesign knows that CDK does not allow its 1DMS software to run on CDK's DMS. Compl. ¶¶ 61, 237. InDesign has never had a license to use CDK's DMS, and it knows that Dealerships cannot provide access without breaching the terms of their MSAs. *Id.* ¶¶ 28, 61, 236, 238. At least one Dealership told InDesign that providing access would violate MSA terms. *Id.* ¶ 99. Because its conduct is unauthorized, InDesign seeks indemnification from Dealerships for "Dealer's granting to InDesign any unauthorized access to the Existing DMS." *Id.* ¶¶ 75, 98. Through its "Document Conversion Agreement" with Dealerships, InDesign disclaims liability in the event that 1DMS violates "law, regulation or industry best practice." *Id.* ¶ 76.

## II.    LEGAL STANDARD

On a Rule 12(b)(6) motion, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The "question presented is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence

in support of the claim." *Larsen v. Trader Joe's Co.*, 917 F. Supp. 2d 1019, 1022 (N.D. Cal. 2013).

## III. ARGUMENT

### A. CDK adequately pleads a claim under the Computer Fraud Abuse Act.

To state a claim under the CFAA, CDK must allege that InDesign "(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access," and that InDesign "(3) thereby obtained information (4) from any protected computer ..., and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Niantic, Inc. v. Global++*, 2019 WL 8333451, at *6 (N.D. Cal. Sept. 26, 2019) (cleaned up). InDesign does not dispute the sufficiency of CDK's allegations on elements (3) and (4), and focuses its argument on elements (1), (2) and (5). InDesign's legally meritless arguments for dismissal of the CFAA claim raise numerous factual questions concerning its own knowledge, intent, and conduct that cannot be resolved as a matter of law without discovery.

#### 1. InDesign intentionally accesses CDK's computer—the DMS.

CDK's Complaint adequately alleges that InDesign has intentionally accessed CDK's computer. InDesign does not dispute that CDK's DMS is a "computer" within the meaning of the CFAA—*i.e.*, it is a "data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." 18 U.S.C § 1030(e)(1); Compl. ¶¶ 34, 38–46. InDesign accesses that computer using its 1DMS software. Compl. ¶¶ 72–73, 96, 107–109.

InDesign's conduct is intentional. In *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892–94 (N.D. Cal. 2010), the court applied the "ordinary, contemporary, common meaning" of "knowingly" and "intentionally" and granted summary judgment in favor of Cisco because there was "no genuine issue of material fact that [Cisco's former employee] acted with the requisite mental state for liability under the CFAA when he accessed Cisco's network" using a current employee's password-protected user credentials. As in *Multiven*, InDesign logs onto CDK's computer network using another person's authorized user credentials, Compl. ¶ 96, and CKD has pled sufficient facts that this conduct demonstrates the "requisite mental state" for liability under the CFAA.

### 2.    InDesign accesses CDK's DMS "without authorization."

Under the CFAA, a person's access is "without authorization" when "he or she has no permission to access a computer or when such permission has been revoked explicitly." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016). InDesign has never had a license or CDK's authorization to access CDK's DMS, and InDesign was made aware that CDK had not and would not authorize its access to its DMS. Compl. ¶¶ 28, 57, 61, 153. These facts support a "'common sense' inference" that InDesign acted "without authorization." *See Elevation Point 2 Inc. v. Gukasyan*, 2022 WL 345647, at *5 (S.D. Cal. Feb. 3, 2022) (denying motion to dismiss CFAA claim where "allegations support a 'common sense' inference that [plaintiff] rescinded permission for Gukasyan to access the computer"). The full scope of InDesign's knowledge about its lack of authorization is uniquely within InDesign's possession. CDK is entitled to discovery on that point. *See In re Proxima Corp. Sec. Litig.*, 1994 WL 374306, at *6 (S.D. Cal. May 3, 1994) ("Whether the requisite scienter exists is an issue for determination by the trier of fact and not one for resolution on a motion to dismiss.").

None of InDesign's arguments demonstrates that CDK failed to plead the "without authorization" element of a CFAA claim.

***First***, InDesign argues its conduct is "authorized" if InDesign has the "express authorization of dealers." Mot. at 6. That is not the law. In *United States v. Nosal*, 844 F.3d 1024, 1030 (9th Cir. 2016) ("*Nosal II*")—which InDesign cites at Mot. 7 n.5—the Ninth Circuit held that when an outsider uses valid, password-protected login credentials without permission from the company, that conduct violates the CFAA.

The Ninth Circuit affirmed defendant Nosal's conviction and concluded access was "without authorization" when former employees used the password-protected credentials of a current employee to access the database of Korn/Ferry. *Id.* at 1038. The Ninth Circuit reasoned that the current employee "had no authority from Korn/Ferry to provide her password to former employees whose computer access had been revoked," when revocation established that the former employees were "outsiders." *Id.* at 1030, 1036. The Ninth Circuit noted that a contrary ruling would lead to illogical results:

[A]n employee could undermine the company's ability to control access to its own computers by willy nilly giving out passwords to anyone outside the company—former employees whose access had been revoked, competitors, industrious hackers or bank robbers who find it less risky and more convenient to access accounts via the Internet rather than through armed robbery.

*Id.* at 1037. Only CDK has the authority to grant access to its DMS computer systems and a Dealership customer cannot "willy nilly" override CDK's decisions by "giving out passwords" to InDesign. District courts agree and have found defendants can be liable for unauthorized use of valid login credentials. *See, e.g.*, *Multiven*, 725 F. Supp. 2d at 892 (finding "no genuine issue of material fact that [defendant] accessed secure areas of the Cisco server without authorization" because current employee's provision of login and password "did not constitute a valid authorization"); *State Analysis, Inc. v. American Financial Services Assoc.*, 621 F. Supp. 2d 309 (E.D. Va. 2009) (denying motion to dismiss where complaint alleged defendant "accessed StateScape's website using usernames and passwords that did not belong to it").

**Second**, InDesign argues its third-party use of Dealerships' "valid-created login credentials" negates CFAA liability because those credentials are not "false." Mot. at 6. But InDesign's case, *Watters v. Breja*, 2024 WL 201356, at *3 (N.D. Cal. Jan. 18, 2024), does not support that conclusion. In *Watters*, the plaintiff alleged defendant used ***his own credentials*** to access American Express and Chase's banking websites to commit fraud, and these allegations, alone, could not state a CFAA violation. *Id.* Here, Dealerships have created login credentials—which should be used only by Dealership employees—for InDesign's use. Compl. ¶¶ 28, 47, 49, 96, 108. *Watters* says nothing about whether credentials created by a Dealership at the urging of InDesign are "valid" or "false" as a matter of law.  In any event, CDK alleges that InDesign "instructed the Dealerships to … create fictitious login credentials, and misrepresent to—and conceal from—CDK the true purpose of the fictitious login credentials." Compl. ¶ 237.

**Third**, InDesign argues that CDK must have expressly rescinded InDesign's "permission to access the DMS that dealers granted to InDesign." Mot. at 7. InDesign's focus on whether CDK revoked authorization ignores CDK's allegations that InDesign ***never had authorization*** to access CDK's DMS in the first place. Compl. ¶¶ 28, 57, 61, 153. In *Power Ventures*, 844 F.3d at 1067, the Ninth Circuit explained the general rule that a "defendant can run afoul of the CFAA when he

or she has no permission to access a computer *or* when such permission has been revoked explicitly." *Id*. at 1067 (all emphasis in this brief is added). InDesign asserts "the computer owner's affirmative, express revocation of authorization is necessary but not sufficient for CFAA liability to attach." Mot. at 8 n.6. InDesign has it backwards. Under *Power Ventures*, an affirmative, express revocation of authorization can establish "without authorization"—but it is not necessary.

None of InDesign's cited authorities requires CDK to allege an express revocation of InDesign's access in order to adequately plead a CFAA claim. Most of InDesign's cases considered whether undisputed insiders, such as a current employee or licensee, acted "without authorization." *See United States v. Nosal,* 676 F.3d 854, 864 (9th Cir. 2012) ("*Nosal I*") (current employees "had permission to access the company database and obtain the information contained within"); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133–35 (9th Cir. 2009) (employee did not access a computer "without authorization" in violation the CFAA, when he emailed documents from his work computer to himself and to his wife while he was still an employee); *Stern v. Weinstein*, 2010 WL 11459791, at *1 (C.D. Cal. Jan. 6, 2010) ("Since Robert is alleged to have had authorization to access the [Consumer Attorneys Association of Los Angeles]  listserv at all relevant times, and this authorization was never affirmatively rescinded, he may not be held liable under *Brekka*'s construction of the CFAA."); *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027–28 (W.D. Wash. 2020) (plaintiff had granted defendant a "limited license" to access its servers until "permission was revoked on June 6, 2018"). Unlike the defendants in those cases, InDesign is an outsider who was never authorized to access CDK's DMS to begin with. Compl. ¶¶ 28, 57, 61, 153.[1]

Only two of InDesign's cases involve outsiders—and neither provides that CDK must plead an express revocation of InDesign's authorization (if any). InDesign relies on *Power Ventures*, 844 F.3d at 1067, to argue it had "implied permission" because InDesign "reasonably could have thought" consent from Dealerships authorized its use of CDK's DMS. Mot. at 7. But *Power*

---

[1] InDesign also cites *CDK Glob. LLC v. Brnovich*, 461 F. Supp. 3d 906, 915–16 (D. Ariz. 2020), which considered whether state statutes can "explicitly authorize[] access" to a DMS. *See* Mot. at 9. *Brnovich* thus suggests that access to CDK's DMS is not automatically authorized.

*Ventures*, 844 F.3d at 1067, was a decision on **summary judgment**. Whether InDesign reasonably could have thought it had permission to access CDK's DMS is a quintessential question of fact that cannot be resolved on a motion to dismiss.

The other "outsider" case InDesign cites is inapposite. In *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1197–98 (9th Cir. 2022), the Ninth Circuit considered whether hiQ's scraping of "[p]ublic LinkedIn profiles, available to anyone with an Internet connection" violated the CFAA. The court found a CFAA violation was unlikely because when a case involves "computers for which access is open to the general public and permission is not required," then "the concept of 'without authorization' is inapt." By contrast, CDK's DMS is a private computer server that requires a license to access. Compl. ¶¶ 28, 37–49, 51.

Regardless, CDK alleges sufficient facts establishing that InDesign could **not** have reasonably believed it had implied authority to access CDK's DMS: (1) logging onto the DMS requires a certification that the user "is a Dealership employee authorized to access the DMS"—which put InDesign on notice its access was unauthorized, Compl. ¶ 49; (2) at least one Dealership explicitly told InDesign that it "certainly will not be giving you a login as it violates our MSA," *id.* ¶ 99; and (3) InDesign sought indemnification from Dealerships for "the Dealer's granting to InDesign **any unauthorized access to the Existing DMS**," *id.* ¶¶ 75, 98.

Without authority or citation, InDesign asserts "a standard business term like an indemnification—which is commonplace in service contracts—cannot establish the intent required for criminal computer hacking." Mot. at 8 n.7. To the extent InDesign suggests that an indemnity **specifically geared toward unauthorized access of a DMS** is "commonplace," its say-so provides no basis to grant the Motion. The essence of CDK's allegation—that such an indemnity reflects InDesign's understanding that its access was unauthorized—is plausible. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

InDesign asks the Court to consider other facts not alleged in CDK's Complaint that, in InDesign's view, demonstrate it reasonably believed it had authorization to access CDK's DMS.

*See, e.g.*, Mot. at 8 ("CDK's own subsidiaries engaged in the same dealer-authorized access ….").
These unalleged facts cannot be considered on InDesign's Motion. *Regal Art & Gifts, Inc. v. Fusion
Prods., Ltd.*, 2016 WL 454116, at *5 (N.D. Cal. Feb. 5, 2016) ("Facts not contained in the operative
complaint, however, cannot be considered on a motion to dismiss.").

    **Fourth**, InDesign argues its access of CDK's DMS is not "without authorization" because
InDesign's conduct is not "'analogous to breaking and entering'" and stems from "a purported
contract breach by the dealers that authorized InDesign's access." Mot. at 9–10. CDK does allege
conduct analogous to breaking and entering: InDesign has deployed Dealership login credentials
that it has no right to use, run software scripts on CDK's DMS, and scraped data from CDK's
DMS—all without permission from CDK. Compl. ¶¶ 71, 75, 77, 95–96, 105–112. Courts routinely
hold that similar conduct violates the CFAA. *See, e.g.*, *Niantic*, 2019 WL 8333451, at *6 (denying
motion to dismiss CFAA claim where the complaint alleged that "Defendants and their customers
access Niantic's computers, servers, and networks when using [software programs] to play
Niantic's games"); *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1169, 1172
(C.D. Cal. 2018) (noting "courts in the Ninth Circuit have repeatedly recognized violations of the
CFAA **without characterizing the violations as hacking**" and finding allegations that software
"bots" purchased tickets from a website stated a CFAA claim).

    The fact that InDesign's access breaches the Dealerships' license agreements does not
negate CFAA liability. InDesign's cited case proves the point. In *ATPAC, Inc. v. Aptitude Sols.,
Inc.*, 2010 WL 1779901, at *2 (E.D. Cal. Apr. 29, 2010), which InDesign cites at Mot. 11, plaintiff
alleged that its software licensee and its competitor, Aptitude, violated the CFAA when the licensee
"provided Aptitude with 'full and unfettered access' to ***the server located in [licensee's] offices***."
The court granted Aptitude's motion to dismiss the CFAA claim because the complaint "***did not
allege that Aptitude accessed plaintiff's computers or servers***, or that such access would ***require
an access code or password that [licensee] wrongfully provided Aptitude***." In other words, there
could be no CFAA liability because the complaint failed to allege that Aptitude accessed the
plaintiff's password-protected, private computer system. In reaching this conclusion, the *ATPAC*
court analyzed *State Analysis*, 621 F. Supp. 2d 309, which held that defendant "***acted 'without***

*authorization'* when it accessed plaintiff's website and obtained proprietary material **with the user names and passwords given to it by one of plaintiff's clients**." *ATPAC*, 2010 WL 1779901, at *5. Although the *ATPAC* court held the facts at issue were not similar to *State Analysis*, the court noted *State Analysis* is good law and applies "in situations where the third-party defendant uses **subterfuge—like using user names and passwords that do not belong to it**—to gain access to plaintiff's protected materials on plaintiff's own website, computers, or servers." *Id.* at *6.[2]

CDK's Complaint is much closer to *State Analysis* than *ATPAC*. In *State Analysis*, the court refused to dismiss a CFAA claim when the plaintiff alleged that its competitor accessed plaintiff's computer "using usernames and passwords that did not belong to it" and held that the competitor "**may not hide behind purported 'authorization' granted to it by [the licensee],** particularly given that [the competitor], a former client of [plaintiff] that employed [plaintiff's] former marketing director, **was presumably familiar with the terms of [plaintiff's] agreement and with the scope of authority granted to licensees**." 621 F. Supp. 2d at 316. Here, InDesign uses "subterfuge"— "fictitious login credentials," Compl. ¶ 237—to access CDK's DMS, knowing that CDK's agreements prohibit Dealerships from providing InDesign access, *id.* ¶¶ 61, 151.

**Finally**, InDesign asks the Court to dismiss the CFAA claim due to "policy considerations" and "the rule of lenity." Mot. at 10. At least one district court has rejected InDesign's policy concerns. In *Ticketmaster*, 315 F. Supp. 3d at 1171, the court denied a motion to dismiss CFAA claims against companies that used fake email addresses and automated software to buy tickets from the Ticketmaster website. The court explained that these entities were not "ordinary Internet users" but rather a "sophisticated multi-entity business operation" whose "business model is built on a scheme to evade" terms-of-service "policies for profit." *Id.* InDesign also is not an ordinary Internet user. Its business model is to create software that extracts data from private computer systems using fictious login credentials. Compl. ¶¶ 72–77, 96, 108, 237. This conduct is not

---

[2] *State Analysis* expressly rejected the holding in InDesign's other cited case, *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 609 (E.D. Va. 2005). *State Analysis* distinguished *SecureInfo* and concluded "even if [the licensee] granted [plaintiff's competitor] KSE permission to access [plaintiff's] database, KSE still may have acted 'without authorization' if its access was not authorized by [plaintiff] StateScape." 621 F. Supp. 2d at 316 n.2.

analogous to using a friend's account. And InDesign ignores that, under CDK's well-pled Complaint, InDesign's culpability arises because InDesign is an outsider who had no reason to believe it was an innocent, authorized user in the first place. Compl. ¶¶ 28, 57, 61, 153. These alleged facts demonstrate CDK is entitled to discovery into what InDesign knew about its unauthorized access and when. *See Weingand v. Harland Fin. Sols., Inc.*, 2012 WL 2327660, at *3 (N.D. Cal. June 19, 2012) (noting "the exact nature and scope of Plaintiff's authorization [under the CFAA] as a factual matter (verbal, physical, or otherwise), is not properly before the Court based on the pleadings alone").

### 3. InDesign's unauthorized access caused $5,000+ in damages or losses.

To bring a private right of action under the CFAA, CDK must allege $5,000 in damages or loss in a one-year period "by reason of a violation" of the CFAA. *See* 18 U.S.C § 1030(g); *id.* § 1030(c)(4)(A)(i)(I). CDK alleges that InDesign's violations of the CFAA have caused substantial damage and losses to CDK that exceed $5,000, including but not limited to the cost of investigating and responding to InDesign's actions. Compl. ¶¶ 105, 107, 128–129, 162–163. InDesign argues that CDK's alleged losses are "not cognizable under the statute" because they occurred before "CDK sent its cease-and-desist letter to InDesign." Mot. at 11. InDesign cites *Domain Name*, 449 F. Supp. 3d at 1030, in support of its argument, but in that case the defendant had a "limited license" to access plaintiff's computer until "permission was revoked on June 6, 2018." *Id.* at 1027–1028. By contrast, InDesign never had the authority to access CDK's DMS. Compl. ¶¶ 28, 57, 61, 153. The loss CDK sustained before filing this complaint is thus sufficient to satisfy the loss element of the CFAA claim.[3]

### B. CDK adequately pleads a claim under the California Comprehensive Computer Data Access and Fraud Act.

For the same reasons that CDK adequately pleads a CFAA claim, CDK's CDAFA claim is also adequately pled. *Multiven*, 725 F. Supp. 2d at 895 ("[T]he necessary elements of Section 502

---

[3] InDesign misreads CDK's Complaint, which does not seek CFAA "damages for consequential business losses" related to the "release" of information. Mot. at 11. CDK alleges damages due not only to the cost of investigating and responding to InDesign's unauthorized access, but also "diverted customers, revenue lost, harm to CDK's business reputation." Compl. ¶ 162.

do not differ materially from the necessary elements of the CFAA . . . .").

**C.    CDK adequately pleads a claim under the Digital Millenium Copyright Act.**

The DMCA prohibits "'circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]'" and "trafficking in technology that circumvents a technological measure that 'effectively controls access' to a copyrighted work." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 942 (9th Cir. 2010) (quoting 17 U.S.C. §§ 1201(a)(1)(A), 1201(a)(2)). CDK adequately alleges (1) the DMS is a work protected under the Copyright Act; (2) InDesign circumvents CDK's technological access controls; and (3) InDesign traffics in technology that circumvents CDK's technological access controls.[4]

**1.    The DMS is a "work protected" under the Copyright Act.**

InDesign has improperly accessed CDK's DMS software program, which is a "work protected" under the Copyright Act. Software includes three distinct "elements," all of which are protectable: (1) the "software's literal elements," such as source code; (2) the software's "individual non-literal elements," such as the discrete visual components; and (3) the software's "dynamic non-literal elements," such as the real-time experience and operation of the software. *See MDY*, 629 F.3d at 942–43. CDK's DMS software code contains literal elements (source code that runs on both the Dealership's network and CDK's data centers); individual non-literal elements (*e.g.*, the DMS's distinctive screen layouts, graphical content, text, organization, and display of information); and dynamic non-literal elements (*e.g.*, the real-time experience of navigating the DMS terminal and the services it offers). Compl. ¶¶ 25–26, 31–32, 38. These features are CDK's original creations, *id.* ¶ 32, and thus protectable. With its 1DMS software program, InDesign accesses the literal and non-literal elements of CDK's software designed for licensees. Compl. ¶¶ 28, 32, 75, 77.

*Ticketmaster*, 315 F. Supp. 3d 1147 is instructive. There the court denied a motion to dismiss a DMCA claim against defendants who ran software programs ("bots") across Ticketmaster's live entertainment sales website. *Id.* at 1166–67. The court explained that the

---

[4] The DMCA also "prohibits trafficking in technology that circumvents a technological measure that 'effectively protects' a copyright owner's right." *MDY*, 629 F.3d 928 at 942 (quoting 17 U.S.C. § 1201(b)(1)). InDesign does not directly challenge the adequacy of CDK's pleadings with respect to liability under 17 U.S.C. § 1201(b)(1).

website contained software (1) "literal elements," such as the "computer code for the website," (2) "individual non-literal elements," such as "logos, images, fonts," (3) "dynamic non-literal elements," such as "respond[ing] to the user's input by generating a unique presentation of content and information for each user" and held "[e]ach of these elements is a work of authorship, which gets copyright protection, as long as it contains the required modicum of originality." *Id.* at 1160. In that case, when the defendant's software bots gained access to Ticketmaster's "ticket confirmation pages and data," they accessed "pages and data [that] are dynamic non-literal content and literal content, respectively, both of which . . . are protected by Ticketmaster's copyrights." Here, InDesign accesses at least the non-literal elements of CDK's software—the pages and data that make up CDK's terminal program. Compl. ¶¶ 73–74, 77. InDesign's assertion that "CDK fails to allege even a single instance in which InDesign accessed . . . anything other than (non-copyrightable) dealer data on the CDK DMS," Mot. at 15, ignores these allegations.

Citing *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1278 (9th Cir. 2021), InDesign argues "the Ninth Circuit rejected CDK's argument that dealer-authorized independent integrators ***violate CDK's copyright*** by using CDK's own software, within the CDK system, to access dealer data on the DMS." Mot. at 14–15. But InDesign misunderstands the DMCA. In *MDY*, 629 F.3d at 952, the Ninth Circuit considered "whether certain provisions of § 1201 prohibit circumvention of access controls ***when access does not constitute copyright infringement***" and concluded the DMCA "created a distinct anti-circumvention right under § 1201 ***without an infringement nexus requirement***." CDK does not need to plead a copyright violation in order to state a DMCA claim.

InDesign's characterization of *Brnovich* is also inaccurate. The Ninth Circuit did not hold that the DMS software is ***not*** copyrighted material. In *Brnovich*, the issue was whether a state statute interferes with CDK's rights under the Copyright Act. 16 F.4th at 1274–79. If anything, when considering whether "causing a DMS provider to copy its software on its own server … would constitute fair use," the Ninth Circuit acknowledged the DMS software could be considered CDK's "own copyrighted work." *Id.* at 1276.[5]

---

[5] InDesign's other cited authority supports that CDK's software is protectable. In *Assessment Techs.*

## 2. InDesign circumvents technological access controls.

CDK effectively controls access to its DMS software program by creating a private, encrypted network between the Dealerships' IT environment and CDK's data centers, Compl. ¶¶ 38–39, 41–42, 44–46; restricting DMS access to the Dealerships' IP addresses, *id.* ¶ 43; and requiring password-protected user credentials to connect to the DMS software, *id.* ¶ 47. This password-protected, private network is a "technological measure that effectively controls access" to the literal and non-literal elements of CDK's software. 17 U.S.C. § 1201(a)(1). In *Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 350 (D. Me. 2003), the court held plaintiff's encrypted, password-protected private network, "squarely fits the definition of 'a technological protection measure put in place by a copyright owner to control access to a copyrighted work'" because it is "the 'electronic equivalent' of a locked door." CDK has likewise locked the door.

InDesign circumvents these effective access controls when it (1) uses unauthorized, fictitious password-protected login credentials created specifically for InDesign's use, and (2) deploys software to bypass the private network restrictions through the Dealerships' IP addresses. Compl. ¶¶ 96, 105–109, 237. The DMCA defines the term to "circumvent protection afforded by a technological measure" to mean "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." 17 U.S.C. § 1201(b)(2)(A). "The majority of the courts in this district have found that a defendant's unauthorized use of license keys or passwords … constitutes circumvention under Section 1201(a)(1)." *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 4848387, at *8 (N.D. Cal. Oct. 1, 2019) (Koh, J.) (collecting cases); *see also Actuate Corp. v. Internat'l Bus. Machines Corp.*, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ("[U]nauthorized distribution of passwords and usernames avoids and bypasses a technological measure in violation of sections 1201(a)(2) and (b)(1)."); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) ("By distributing a [license key] without authorization, [defendant] effectively circumvented [plaintiff's] technological measure to control access to a copyrighted work in

---

*of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 641–42 (7th Cir. 2003), the Seventh Circuit held plaintiff "has a valid copyright" in its "computer program, called 'Market Drive'" that organized raw data. *Id.* at 642–43. In other respects, *Assessment Techs.* is inapposite because it did not involve a DMCA claim and or allegations that defendant accessed the "Market Drive" software.

violation of the DCMA."); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) ("[W]hile [defendant's] software does use the authorized key to access the DVD, it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological measure].").

InDesign ignores the weight of authority that does not go its way and instead relies on a line of nonbinding cases. *See* Mot. at 13–14 (citing cases). In *Acuate*, 2010 WL 1340519, at *9, Judge Spero analyzed out-of-jurisdiction cases, rejected that a password is different than "other types of code that might be used for decryption," and concluded unauthorized use of credentials amounts to "avoiding" or "bypassing" an access control in violation of the DMCA. InDesign offers no justification to depart from the majority view in this jurisdiction.

But even if InDesign were correct that CDK must allege something more than unauthorized use of credentials, *see* Mot. at 14, CDK's complaint meets that standard. CDK has established an encrypted, private network tunnel that limits DMS access to authorized IP addresses and Dealership employees' credentials. Compl. ¶¶ 37–49. InDesign avoids and bypasses these private network restrictions by having Dealerships create—and recreate after disablement—false credentials for its use. *Id.* ¶¶ 74–75, 96, 108, 129, 237. Once loaded onto a Dealership's IT environment, 1DMS enables InDesign to access the DMS software running on CDK's servers under cover of the Dealership's IP address. *Id.* ¶¶ 74–75, 96, 105, 107, 110, 126. These facts distinguish *iSpot.tv, Inc. v. Teyfukova*, 2023 WL 3602806, at *7 (C.D. Cal. May 22, 2023), InDesign's principal authority. In *iSpot*, the only technological measure designed to control access was the password requirement, and the defendant could use her login credentials—originally created for her use—to access her former employer's database from any IP address. *Id.* at *3 (discussing IP addresses in "Culver City" and also the "zip code where [defendant] resides"). By contrast, CDK employs at least two layers of technological access control measures that InDesign has bypassed.[6]

---

[6] InDesign cites *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 571 (N.D. Ill. 2019), which held that "an automated program to bypass" CAPTCHA access controls could violate the CFAA. Mot. at 14. Here, 1DMS is an "automated program" to bypass IP address restrictions.

1

### 3. InDesign traffics in technology that circumvents access controls.

2

CDK's Complaint also alleges that InDesign violated the trafficking prong of the DMCA:

3

InDesign (1) traffics in (2) a technology or part thereof (3) that "is marketed . . . for use in

4

circumventing" technological access controls that protect (4) a copyrighted work. 17 U.S.C.

5

§ 1201(a)(2)(C).

6

The first two elements are met because InDesign "traffics in a technology or part thereof"—

7

it sells the "1DMS" software program. Compl. ¶¶ 72–74; Ex. 2. The last element is met because

8

the DMS software is copyrighted work. *Id.* ¶ 32; *see supra* at 14–15. CDK also pleads the third

9

element: 1DMS is "marketed . . . for use in circumventing" access controls. InDesign markets the

10

1DMS software as "the ultimate bidirectional data pipeline to the DMS" able to access "every part

11

of the DMS that your application demands." *Id.* ¶ 74. InDesign solicits Dealerships to adopt its

12

"conversion process" that includes "installing [InDesign's] automation software," which then

13

allows InDesign to access CDK's DMS to "extract all the data and docs before your CDK service

14

ends." *Id.* ¶ 96. InDesign thus markets 1DMS for use in its own circumvention of private network

15

restrictions.

16

InDesign focuses on liability under 17 U.S.C. § 1201(a)(2)(A), which prohibits trafficking

17

in technology "primarily designed or produced for the purpose of circumventing" access controls

18

and overlooks that CDK pleads a DMCA violation under 17 U.S.C. § 1201(a)(2)(C). Its argument

19

that 1DMS has a "commercially significant purpose" beyond circumventing technological access

20

controls because 1DMS can be used "on other DMSs," Mot. at 16, is thus not dispositive of whether

21

CDK has stated a DMCA trafficking claim. In any event, whether 1DMS has a "commercially

22

significant purpose" other than circumvention is a question of fact for the jury and does not warrant

23

dismissal of CDK's claim. *See 321 Studios*, 307 F. Supp. 2d at 1098 ("[I]t is impossible for this

24

Court to determine on summary judgment whether [defendant's] product has only limited

25

commercially significant purposes other than circumvention, as this is a question of fact for a jury

26

to decide….").[7]

27

28

---

[7] InDesign relies on *Ass'n for Information Media and Equipment v. Regents of the Univ. of Calif.*,

**D.    CDK adequately pleads a claim under the Stored Communications Act.**

The SCA requires CDK to plead that InDesign (1) "intentionally accesse[d] without authorization a facility through which an electronic communication service is provided"; and (2) through this access obtained an "electronic communication." 18 U.S.C. § 2701(a). CDK alleges the DMS is a "facility" within the meaning of the SCA and that InDesign intentionally accessed the DMS and obtained electronic communications. Compl. ¶¶ 105, 107, 110, 112, 187, 189–190. InDesign does not dispute the sufficiency of these allegations.

The parties also agree that "without authorization" has the same meaning under the CFAA and SCA. *See* Mot. at 17. For the same reasons that InDesign acted "without authorization" in violation of the CFAA, it has also violated the SCA. *See supra* at 7–13.

The SCA does differ from the CFAA in that the SCA excepts from liability "conduct authorized ... by a user of that service with respect to a communication of or intended for that user." 18 U.S.C. § 2701(c)(2). InDesign argues this exception warrants dismissal of CDK's SCA claim because Dealerships are "users" who have "authorized" InDesign's access to the DMS and communications "of or intended" for the Dealerships. Mot. at 17. This argument contradicts CDK's allegations that InDesign's data-scraping queries access files containing CDK or third-party proprietary data that are not "of or intended for" the user. Compl. ¶¶ 110, 112. In *ACW Flex Pack LLC v. Wrobel*, 2023 WL 4762596, at *12 (N.D. Ill. 2023), the court explained that a user "could not authorize [defendant's] unlimited access under [the SCA] because at least some of the communications that [defendant] accessed were not 'of or intended'" for the user. The court denied a motion to dismiss the SCA claim because whether the user "authored" the documents defendant accessed "or was the intended recipient" was a question of fact "reserved for a later day." *Id.* Here, CDK's Complaint does not allege that all communications InDesign accesses are "of or intended for" the Dealerships. *ACW* thus instructs that InDesign's SCA defense cannot be decided on a motion to dismiss.

---

2012 WL 7683452, at *9 (C.D. Cal. Nov. 20, 2012) where the court granted a motion to dismiss a trafficking DMCA claim because the complaint failed to allege that defendants "manufactured, imported, or offered **to the public** any technology." It is undisputed that InDesign sells its 1DMS software "to the public"—*i.e.*, Dealerships. *See* Compl. ¶¶ 72–74; Ex. 2.

E.    **CDK adequately pleads trade secrets claims under federal and state law.**

"To state a claim for trade secret misappropriation under the DTSA and the CUTSA, a plaintiff must allege that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018). Under both statutes, "'misappropriation' means either (1) the '[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or (2) the '[d]isclosure or use of a trade secret of another without express or implied consent.'" *Alta Devices*, 343 F. Supp. 3d at 877.

The "CDK Trade Secrets" include CDK-owned forms, algorithms, calculations, business rules, structured tables, software code, tools, market data, and data compilations contained within the DMS. Compl. ¶ 35. InDesign has acquired the CDK Trade Secrets "by improper means." It has bypassed CDK's access controls to scrape voluminous amounts of data from CDK's DMS—including CDK's trade secrets. *Id.* ¶ 110, 209. InDesign then "disclosed" those trade secrets to Tekion—one of CDK's competitors. *Id.* ¶¶ 71, 94–96, 101, 105, 109–110, 112, 207. Tekion and InDesign utilize the trade secrets to further their businesses to CDK's detriment. *Id.* ¶¶ 208, 210. For example, InDesign uses CDK's trade secrets when deploying its 1DMS software. *Id.* ¶ 77.

These facts go beyond allegations that InDesign has merely "possessed CDK's trade secrets." Mot. at 18. The Complaint alleges that InDesign uses the CDK Trade Secrets to run its software and shares trade secrets with Tekion—a CDK competitor—which distinguishes this case from InDesign's cited authorities. Compl. ¶¶ 77, 102, 110, 207–209; *see Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 966 (S.D. Cal. 2021) (holding allegations that defendant "knew or should have known the information" was a trade secret and "improperly used and/or disclosed" the alleged trade secrets were conclusory); *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (granting motion to dismiss because complaint did not "sufficiently delineate timelines of the alleged acts of misappropriation and use of purported trade secrets"); *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012) (finding failure to establish "any circumstantial evidence" of misappropriation); *Acculmage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 951 (N.D. Cal. 2003) (finding no allegations that

defendant "acquired, possessed, disclosed or used" trade secrets).[8] Courts routinely find allegations similar to CDK's are sufficient to plead a misappropriation of trade secrets claim. *See Rockwell Collins, Inc. v. Wallace*, 2017 WL 5502775, at *3 (C.D. Cal. Nov. 10, 2017) (holding allegations that defendant's "downloads were 'unauthorized' because of specific company policies and because the company never gave him permission to download the information" were sufficient "to survive a motion to dismiss"); *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 2509979, at *4 (N.D. Cal. June 17, 2010) (denying motion to dismiss based on allegation that "Defendants used confidential and proprietary information to obtain unauthorized access to Teledex servers and computer networks and copied, misappropriated, removed, overwrote, removed [*sic*], and erased confidential, proprietary and trade secret information as recently as January 1, 2010").

**F.    CDK adequately pleads InDesign tortiously interfered with its contracts.**

"To state a claim for intentional interference with contractual relations, a plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship, (4) actual breach or disruption of the contractual relationship, and (5) resulting damage." *Tradeshift, Inc. v. BuyerQuest, Inc.*, 2020 WL 8920622, at *4 (N.D. Cal. May 20, 2020). CDK adequately alleges each element.

*First*, CDK requires all Dealerships to execute a "Master Services Agreement" (MSA), which prohibits Dealerships from making the DMS available to third parties and requires Dealerships to pay all money owed under the contract in the event of early termination. Compl. ¶¶ 51–60; Ex. 1 (Standard MSA) §§ 4(b), 4(d), 8.J, 10.

*Second*, InDesign knew that MSA terms prohibited Dealerships from giving InDesign access to CDK's DMS and obligated Dealerships to pay accounts receivable before data conversion. While the identity of CDK's customers is confidential, the MSA terms are not. *See* Ex. 1 (Standard MSA). InDesign knows of these terms—including because it seeks indemnification

---

[8] InDesign's other cited authority turned on failure to adequately plead the trade secrets themselves. *See Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 968 (C.D. Cal. 2011). Because InDesign does not challenge the adequacy of CDK's description of its trade secrets, *Mattel* is not dispositive.

for unauthorized DMS access from Dealerships. Compl. ¶¶ 75, 98. At least one Dealership informed InDesign that providing user credentials and running the 1DMS software would violate the MSA. *Id.* ¶ 99. These facts demonstrate InDesign's knowledge. *See Axia Fin., LLC v. Mason McDuffie Mortg. Co.*, 2023 WL 7280443, at *11 (N.D. Cal. Sept. 20, 2023) (finding likelihood of success on the merits of tortious interference claim where "Defendant knew or should have known . . . of Plaintiff's contracts with former employees"). InDesign's assertion there are "no facts showing how and why InDesign would have seen or known about the specific terms of CDK's confidential contracts," Mot. at 20, improperly contradicts these allegations.

**Third**, InDesign's conduct was designed to induce Dealerships to breach their MSAs. These intentional acts include: (1) soliciting Dealerships to provide access to CDK's DMS, Compl. ¶¶ 74, 95–96; (2) instructing Dealerships to provide InDesign user credentials or create user credentials specifically for InDesign's use, *id.* ¶¶ 75, 96, 108; (3) designing software scripts that enter and extract data from CDK's DMS, *id.* ¶ 73–75, 105, 107, 109; and (4) suggesting that CDK is withholding accounts receivable approval from Dealerships to withhold data, *id.* ¶ 100, all of which are breaches of the Dealerships' MSAs with CDK. Through this conduct, InDesign intended to cause Dealerships to breach their MSAs so that the Dealerships would not use CDK's data conversion services and instead pay InDesign $5,000. Compl. ¶¶ 62–63, 97; Ex. 2 § 1a. These facts demonstrate that InDesign intentionally induced Dealerships' breaches. *See Tradeshift, Inc. v. BuyerQuest, Inc.*, 2020 WL 8920622, at *4 (N.D. Cal. May 20, 2020) (allegations that defendant "disparaged [plaintiff's] software and performance 'in order to secure a direct contract with [client] for itself'" were "intentional acts" to induce breach).

**Fourth**, each instance of "1DMS" activity on CDK's DMS is a breach. InDesign cites one Dealership that "did not use InDesign's services." Mot. at 21. That's a red herring. CDK points to InDesign's direct access, 1DMS activity, and data extraction across multiple Dealership locations. Compl. ¶¶ 105–109. These facts distinguish *Agfa Corp. v. Richard*, 2018 WL 3078585, at *4 (C.D. Cal. June 1, 2018), Mot. at 21, where the complaint lacked allegations that "the solicitation of customers resulted in any actual disruption." CDK has pointed to numerous "disruptions."

**Fifth**, CDK sufficiently alleges damage resulting from InDesign's actions, including lost

revenue and the cost of investigating and responding to InDesign's conduct. Compl. ¶¶ 105–109, 128, 285. InDesign does not dispute the sufficiency of these allegations.

InDesign's cases do not support dismissal of CDK's tortious interference claim. Mot at 20–21. In *DirecTV, LLC v. E&E Enters. Glob., Inc.*, 2017 WL 6888500, at *5 (C.D. Cal. Nov. 20, 2017), the plaintiff failed to allege which contract terms the third-party breached as a result of DirecTV's conduct—not individual instances of breach. CDK has identified the specific terms of the MSA that InDesign has induced Dealerships to breach. Compl. ¶¶ 52–60. In *Ixchel Pharma, LLC v. Biogen Inc.*, 2018 WL 558781, at *2 (E.D. Cal. Jan. 25, 2018), plaintiff alleged a third party breached a contract's 60-day notice period but did not plead any facts supporting that defendant told or caused that third party to terminate early. And in *Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *5 (C.D. Cal. Dec. 29, 2020), the court granted a motion for summary judgment based on "***no evidence*** to support a finding that" the defendants knew breach would result from their conduct. The court said nothing about the adequacy of ***pleadings*** to state a tortious interference claim. These cases fail to demonstrate that CDK's allegations are insufficient to warrant discovery on the scope of InDesign's knowledge and behind-the-scenes interference with CDK's contractual relationships.

### G.    CDK adequately pleads InDesign violated California's UCL.

"The UCL prohibits business practices that are unlawful, unfair, or fraudulent." *Sanchez v. Nurture, Inc.*, 626 F.Supp.3d 1107, 1114 (N.D. Cal. 2022). InDesign engages in unlawful and unfair business practices. Compl. ¶¶ 292–297. Neither of InDesign's arguments support dismissal. Mot. at 21–24.

***First***, CDK has standing under the UCL. "To establish standing under the UCL, a plaintiff's claim must specifically involve lost money or property." *Schmitt v. SN Servicing Corp.*, 2021 WL 3493754, at *8 (N.D. Cal. Aug. 9, 2021). In *Schmitt*, which InDesign cites at Mot. 22, the court explained that "payments toward enhanced credit monitoring that arise from a data breach and that are not reimbursed [] constitute economic injury, sufficient to confer UCL standing." *Id.* at *8; *see also Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 661 (N.D. Cal. 2020) (same). CDK has invested resources and money in investigating and stopping InDesign's conduct, which is an economic

injury. Compl. ¶¶ 105–109, 128, 132, 134, 297. InDesign's assertion that CDK failed to allege "any cognizable economic injury" overlooks these allegations. Mot. at 22.[9]

InDesign's argument that UCL standing always requires alleged "injury to competition" has no support in the law. Mot. at 21. InDesign's principal authority, *Silverlit Toys Manufactory Ltd. v. Rooftop Grp., USA, Inc.*, 2010 WL 11509314, at *1 (C.D. Cal. Jan. 21, 2010), did not address UCL standing. In *Silverlit*, the court **denied** a motion to dismiss and simply noted that if a plaintiff brings "a claim of unfair competition between **direct competitors**" then "conduct is 'unfair' pursuant to [the UCL] if it has some 'actual or threatened impact on competition.'" *Id.* at *7. InDesign does not compete with CDK in providing DMS services, and CDK does not need to allege facts supporting an injury to competition in order to state a UCL claim against InDesign.

InDesign's other cited cases involved UCL theories based on alleged antitrust or false advertising claims. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1001 (9th Cir. 2023) (affirming that "Epic is a games-distribution competitor of Apple—triggering the competitor test" which asks "whether the defendant's conduct 'threatens an incipient violation of an antitrust law'"); *ESS Tech., Inc. v. PC-Tel, Inc.*, 1999 WL 33520483, at *3 (N.D. Cal. Nov. 4, 1999) (finding failure to state UCL claim because "plaintiff fails to adequately set forth a violation of antitrust law"); *KT Enters. LLC v. Comp360, LLC*, 751 F. Supp. 3d 999, 1005 (C.D. Cal. 2023) (addressing "standing for UCL or [False Advertising Law] claims sounding in fraud"); *Allergan USA Inc. v. Imprimis Pharms., Inc.*, 2017 WL 10526121, at *13 (C.D. Cal. Nov. 14, 2017) (noting "loss of market share and sales due to the defendant's misleading advertising" was sufficient for UCL standing). Because CDK does not allege that InDesign is its direct competitor or has violated antitrust and false advertising laws, CDK does not need to allege general harm to competition to state a UCL claim.

**Second**, CDK adequately pleads unfair competition under the unlawful and unfair prongs of the UCL.

---

[9] InDesign knows that "lost money or property" to establish UCL standing need not be substantial because the case cited on page 22 of its Motion says so. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013) (reversing dismissal of UCL claim and noting "the quantum of lost money or property necessary to show standing" need only be enough to show "injury in fact").

<u>Unlawful conduct</u>. The 'unlawful' prong of the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999*)*. "Virtually any state, federal or local law can serve as the predicate for an action under section 17200." *In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 973 (N.D. Cal. 2021). Because CDK has adequately alleged InDesign's violations of multiple state and federal statutes, *see supra* at 6–21, CDK has pled a UCL claim under the "unlawful" prong.

<u>Unfair conduct</u>. To determine if conduct is "unfair" under the UCL, courts apply a "balancing test" weighing "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Google Assistant*, 546 F. Supp. 3d at 975. InDesign causes serious harms—including (i) costs of investigating and blocking InDesign's activities, (ii) data errors, (iii) slowed DMS performance, and (iv) cybersecurity risks. Compl. ¶¶ 105–110, 113, 118–128, 132. InDesign attempts to counterbalance these harms through the fact, not alleged in the Complaint, that "InDesign is a lower-cost rival." Mot. at 22. That fact is disputed. Regardless, whether the utility of InDesign's data scraping conduct outweighs CDK's harm cannot be decided on InDesign's Motion. *See Google Assistant*, 546 F. Supp. 3d at 975 ("At the motion to dismiss stage, the Court cannot say that the benefits from Google Assistant's unauthorized recordings necessarily outweighs the harms from such recordings."); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *10 (N.D. Cal. Feb. 2, 2021) ("At the motion to dismiss stage, the Court cannot say that the benefits from collecting that information to develop new products, features, and technologies for the benefit of the users and the public necessarily outweighs the harm.").

<u>Fraudulent conduct</u>. CDK does not allege a UCL claim under the "fraudulent" prong.

**H.**    **If the Court dismisses, CDK requests leave to replead.**

If the Court finds any claims do not satisfy the pleading requirements, CDK respectfully requests the opportunity to replead. *Srigley v. Monterey Peninsula Yacht Club, Inc.*, 748 F. Supp. 3d 801, 803 (N.D. Cal. 2024) ("Courts in this Circuit apply Rule 15 'with extreme liberality.'").

**IV.    CONCLUSION**

CDK respectfully requests that the Court deny InDesign's Motion to Dismiss.

Dated: May 21, 2025

**SUSMAN GODFREY L.L.P.**

By: */s/ Vineet Bhatia*

VINEET BHATIA (*admitted pro hac vice*)
SHAWN RAYMOND (*admitted pro hac vice*)
ROBERT SAFI (*admitted pro hac vice*)
KATHERINE ROSE JAMES (*admitted pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street
Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

JESSE-JUSTIN CUEVAS (SBN 307611)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
jcuevas@susmangodfrey.com

AMY B. GREGORY (*admitted pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West
50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
agregory@susmangodfrey.com

*Attorneys for Plaintiff CDK Global, LLC*