VINEET BHATIA (*admitted pro hac vice*)
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*admitted pro hac vice*)
sraymond@susmangodfrey.com
ROBERT SAFI (*admitted pro hac vice*)
rsafi@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiff CDK Global, LLC*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CDK GLOBAL, LLC, a Delaware limited liability company | Case No. 25-cv-01394-JSC |
| Plaintiff, | **CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |
| vs. | |
| TEKION CORP., a Delaware corporation, and INDESIGN DATA, LLC, a Florida limited liability company, | Date      June 26, 2025<br>TIME:     10:00 a.m.<br>PLACE:   San Francisco Courthouse, Courtroom 8 - 19th Floor 450 Golden Gate Avenue, San Francisco, CA 94102 |
| Defendants. | |

## **TABLE OF CONTENTS**

I.      CDK's motion for a preliminary injunction is timely. ........................................................... 2

II.     CDK seeks a prohibitory preliminary injunction. ................................................................ 5

III.    CDK is likely to succeed on its Computer Fraud and Abuse Act (CFAA) and California Computer Data Access and Fraud Act (CDAFA) claims. ................................... 5

     A       Defendants' access to CDK's DMS is without authorization. ................................. 6

     B.      Defendants obtain CDK's information through unauthorized access. ..................... 9

IV.     CDK is likely to succeed on its Digital Millenium Copyright Claim (DMCA) claim. .............................................................................................................................. 10

     A.      The DMS is a "work protected" under the Copyright Act. .................................... 11

     B.      Defendants circumvent CDK's technological access controls. ............................. 12

     C.      CDK's technological access controls are not copyright misuse. .......................... 13

V.      CDK is likely to succeed on its tortious interference claim. ................................................ 14

     A.      Defendants know CDK's MSAs prohibit their conduct. ....................................... 14

     B.      Defendants' intentional acts induce breaches of CDK's MSAs. .......................... 16

     C.      Defendants' interference damages CDK. .............................................................. 18

     D.      Defendants lack a legitimate business interest to interfere with CDK's MSAs. .................................................................................................................... 19

VI.     CDK faces an immediate irreparable injury. ...................................................................... 22

     A.      Interference with property rights to control access is an irreparable harm. ........... 22

     B.      The data security threat CDK faces is real and imminent. .................................... 23

     C.      Interference with contractual relationships and goodwill is irreparable harm. .................................................................................................................... 24

VII.    The balance of equities supports granting a preliminary injunction. ................................. 25

VIII.   Conclusion ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Actuate Corp. v. In't Bus. Machines Corp.*,
    2010 WL 1340519 (N.D. Cal. Apr. 5, 2010*)* ........................................................ 12

*Adobe Sys. Inc. v. A&S Electronics, Inc.*,
    2015 WL 13022288 (N.D. Cal. Aug. 19, 2015) ...................................................... 13

*Apple Inc. v. Psystar Corp.*,
    658 F.3d 1150 (9th Cir. 2011) ......................................................................... 13, 14

*Arc of Cal. v. Douglas*,
    757 F.3d 975 (9th Cir. 2014) .................................................................................. 4

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
    350 F.3d 640 (7th Cir. 2003) ................................................................................ 13

*ATPAC, Inc. v. Aptitude Sols., Inc.*,
    2010 WL 1779901 (E.D. Cal. Apr. 29, 2010) ......................................................... 7

*Authenticom, Inc. v. CDK Glob., LLC*,
    2017 WL 3017048 (W.D. Wis. July 14, 2017) ...................................................... 24

*Authenticom, Inc. v. CDK Glob., LLC*,
    874 F.3d 1019 (7th Cir. 2017) .......................................................................... 1, 24

*Axia Fin., LLC v. Mason McDuffie Mortg. Co.*,
    2023 WL 7280443 (N.D. Cal. Sept. 20, 2023) ..................................................... 15

*Best Carpet Values, Inc. v. Google, LLC*,
    90 F.4th 962 (9th Cir. 2024) ................................................................................. 11

*Bull Mountain Sanitation, LLC. v. Allied Waste Servs. of N. Am., L.L.C.*,
    2020 WL 8812843 (D. Mont. July 17, 2020) ........................................................ 19

*Buxbom v. Smith*,
    145 P.2d 305 (Cal. 1944) ...................................................................................... 22

*CDK Glob. LLC v. Brnovich*,
    2020 WL 4260506 (D. Ariz. July 24, 2020) ......................................................... 24

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
    16 F. Supp. 3d 1141 (S.D. Cal. 2014) ................................................................... 19

*Craigslist Inc. v. 3Taps Inc.*,
    942 F. Supp. 2d 962 (N.D. Cal. 2013) .................................................................... 9

*D & R Distrib. Co. v. Chambers Corp.*,
    608 F. Supp. 1290 (E.D. Cal. 1984)................................................................. 22

*Disney Enters., Inc. v. Redbox Automated Retail, LLC*
    336 F. Supp. 3d 1146 (C.D. Cal. 2018)........................................................... 22

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017)............................................................................ 4

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022)............................................................................. 5

*F.T.C. v. Affordable Media*,
    179 F.3d 1228 (9th Cir. 1999).......................................................................... 23

*Facebook, Inc. v. Power Ventures, Inc.*,
    252 F. Supp. 3d 765 (N.D. Cal. 2017) ................................................... 4, 10, 22

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016).................................................................. 7, 9, 10

*Famous Birthdays, LLC v. SocialEdge, Inc.*,
    2022 WL 1592726 (C.D. Cal. Feb. 11, 2022)................................................. 4

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991).......................................................................................... 11

*Fla. Atl. Univ. Bd. of Trustees v. Parsont*,
    465 F. Supp. 3d 1279 (S.D. Fla. 2020) .......................................................... 24

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024)........................................................................... 5

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015)............................................................................ 5

*Gigacloud Tech., Inc. v. Linon Home Decor Prods., Inc.*,
    2024 WL 4766202 (C.D. Cal. Sept. 9, 2024).................................................. 4

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984)............................................................................ 19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017)............................................................................ 5

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022). ID Br. 23-24 ..................................... 20, 21, 22

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    362 F. Supp. 3d 477 (N.D. Ill. 2019) ................................................... 1, 15, 16

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 919 (N.D. Ill. 2023) ........................................................................ 1, 2, 24, 25

*iSpot.tv, Inc. v. Teyfukova*,
   2023 WL 3602806 (C.D. Cal. May 22, 2023) ............................................................ 13

*Ixchel Pharma, LLC v. Biogen Inc.*,
   2018 WL 558781 (E.D. Cal. Jan. 25, 2018) ............................................................... 18

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ..................................................................... 11, 12, 13

*Mediterranean Cuisine Franchising Co., LLC v. Karma Cap., Inc.*,
   2019 WL 4308777 (C.D. Cal. Apr. 4, 2019) ............................................................ 5, 6

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................... 19

*Morrow v. U.S. Parole Comm'n*,
   2012 WL 2877602 (C.D. Cal. Mar. 20, 2012) .......................................................... 23

*Multiven, Inc. v. Cisco Sys., Inc.*,
   725 F. Supp. 2d 887 (N.D. Cal. 2010) ..................................................................... 7

*New York v. Trump*,
   765 F. Supp. 3d 284 (S.D.N.Y. 2025) ...................................................................... 24

*Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*,
   2023 WL 2064201 (W.D.N.C. Feb. 16, 2023) .......................................................... 14

*Philips N. Am. LLC v. KPI Healthcare, Inc.*,
   2020 WL 2475094 (C.D. Cal. Apr. 15, 2020) .......................................................... 14

*Richardson v. La Rancherita*,
   98 Cal. App. 3d 73 (Ct. App. 1979) ........................................................................ 22

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
   2020 WL 12948055 (C.D. Cal. Dec. 29, 2020) ........................................................ 18

*Stern v. Weinstein*,
   2010 WL 11459791 (C.D. Cal. Jan. 6, 2010) .......................................................... 8

*Swipe & Bite, Inc. v. Chow*,
   147 F. Supp. 3d 924 (N.D. Cal. 2015) ..................................................................... 14

*Synopsys, Inc. v. InnoGrit, Corp.*,
   2019 WL 4848387 (N.D. Cal. Oct. 1, 2019) ........................................................... 12, 13

*Televisa v. Liberman Broad., Inc.*,
   2012 WL 12893444 (C.D. Cal. Dec. 6, 2012) .......................................................... 14

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
   315 F. Supp. 3d 1147 (C.D. Cal. 2018).................................................................. 12, 25

*Trindade v. Reach Media Grp., LLC*,
   2013 WL 3977034 (N.D. Cal. July 31, 2013) ............................................................. 14

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016).......................................................................... 6, 7, 8

*WalkMe Ltd. v. Whatfix, Inc.*,
   2024 WL 1221960 (N.D. Cal. Mar. 21, 2024) ................................................................ 7

*Watters v. Breja*,
   2024 WL 201356 (N.D. Cal. Jan. 18, 2024) ................................................................. 7

*WeRide Corp. v. Kun Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019) ..................................................................... 17

*Winchester Mystery House, LLC v. Glob. Asylum, Inc.*,
   210 Cal. App. 4th 579 (2012)............................................................................. 15

**Statutes**

A.R.S. § 28-4654(A) ..................................................................................... 21

17 U.S.C. § 102(a) ...................................................................................... 11

17 U.S.C. § 1201(b)(2)(A) ................................................................................ 12

**Other Authorities**

Orin S. Kerr, *Norms of Computer Trespass*, 116 COLUM. L. REV. 1143, 1178
   (2016) .................................................................................................. 7

CDK seeks to enjoin Tekion and InDesign (together, "Defendants") from accessing CDK's property and interfering with CDK's contracts with its Dealership customers. To avoid the injunction, Defendants claim a preliminary injunction (PI) would "stifle" or "harm" competition in the DMS market. TK Br. 25; ID Br. 25.[1] But this position ignores Defendants' own cited case holding that "***CDK's unilateral decision to block third parties from accessing its DMS would be lawful***," *In re Dealer Mgmt. Sys. Antitrust Litig.* ("*Dealer Mgmt. II*"), 680 F. Supp. 3d 919, 980 (N.D. Ill. 2023), and caselaw that "***[e]ven monopolists are almost never required to assist their competitors***," *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017); *see also In re Dealer Mgmt. Sys. Antitrust Litig.* ("*Dealer Mgmt. I*"), 362 F. Supp. 3d 477, 498 (N.D. Ill. 2019) ("[T]here is no antitrust duty to deal in selling services to competitors in the retail market." (cleaned up)).[2] Fair competition does not require CDK to assist Tekion in converting CDK's Dealership customers, or to grant Defendants unfettered access to the data in its systems.

Defendants' assertion that CDK's refusal to provide them direct access to CDK's DMS would reduce Dealerships' choice in DMS providers or increase prices as part of the "balance of equites" is also counterfactual. Dealerships frequently switch DMS providers and CDK assists Dealerships in migrating their DMS data. LaGreca Supp. ¶ 33. Besides an isolated event in 2024, Tekion identifies ***no instance*** when CDK delayed a Dealership's "go-live" date on Tekion's DMS. CDK always has provided Dealerships data migration services ***for free***, *id.*, meaning Dealerships do not need to pay InDesign $5,000 for data migration. *See* Ex. 19 § 1a.

Defendants' Opposition to the PI—like Tekion's antitrust complaint against CDK—seeks to turn this commercial dispute between competitors (CDK and Tekion) into an antitrust case. In the antitrust case, Tekion wrongly claims that CDK's refusal to migrate data from CDK's DMS on Tekion's preferred timeline is anticompetitive. Access to a competitor's computer system or the timetable for data transfer is not something the antitrust laws are designed to protect. CDK may

---

[1] CDK refers to (a) CDK's exhibits as "Ex."; (b) Tekion's exhibits as "TK Ex."; (c) InDesign's Exhibits as "ID Ex."; (d) Tekion's Opposition Brief as "TK Br."; (e) InDesign's Opposition Brief as "ID Br."; and (f) declarations by the declarant's last name, including the Supplemental Declaration of David LaGreca submitted with this Reply brief as "LaGreca Supp."

[2] All emphases added throughout this brief unless otherwise indicated.

legally, per its negotiated customer contracts, keep Defendants out of its computer system. As the PI briefing shows, injunctive relief is appropriate.

## I.    CDK's motion for a preliminary injunction is timely.

Within a week of completing its investigation into the scope of Defendants' unauthorized access, CDK filed its PI motion. Defendants argue CDK "delayed" in seeking interim relief. TK Br. 20-21; ID Br. 8-9. The parties' entire course of dealing demonstrates CDK has not delayed because, until late 2024, CDK reasonably believed Defendants were not accessing its DMS:

| | |
|---|---|
| 2016-2017 | CDK disables 49 DMS user accounts associated with InDesign. Some accounts disabled in 2016 included information that identified InDesign. By 2017, these clues had disappeared, precluding CDK's ability to identify whether InDesign made further unauthorized access. LaGreca Supp. ¶¶ 3-6. |
| May-June 2019 | CDK sends a letter alerting Tekion that its use of Dealership user credentials and software scripts to access CDK's DMS is "unauthorized." Ex. 5. In subsequent letters, CDK never consents to Tekion's access. *See* TK Exs. 8-10. CDK disables Tekion accounts and believes Tekion ceased its access. LaGreca Supp. ¶¶ 15, 18. |
| June 2019 | CDK deposes InDesign in *Dealer Mgmt.*, and InDesign testifies about CDK's efforts to block InDesign's access and CDK's cease-and-desist letter. Ex. 33 at 183:9-19, 191:5-9, 192:1-13, 227:23-228:6; Ex. 32 (30(b)(6) Topic No. 9). Before that deposition, InDesign (1) knows CDK has indicated another data integrator's (Authenticom) DMS access is unauthorized and disabled Authenticom user accounts, Ex. 31 at 126:6-127:24, 152:17-20, and (2) discussed with Authenticom developing a solution to CDK's blocking efforts, *id.* at 154:17-25. |
| 2020 | Tekion launches its DMS. Livingstone ¶ 4. |
| Apr. 2021 | ███████████████████████████████████████████████████████████. Fox ¶ 11. Unbeknownst to CDK at the time, ████████████████████████████████████████. Ex. 29 at 19:22-20:20. |
| Feb. 2023 | CDK disables more than 300 user accounts associated with Tekion. LaGreca Supp. |

| | |
|---|---|
| | ¶ 19. ███████████████████████████████████████ ███████ Ex. 29 at 28:15-25. ████████████████████ ████████████████████████████. *Id.* at 29:17-30:18; Ex. 28 at 158:18-161:7; LaGreca Supp. ¶ 20. |
| 2023-2024 | ███████████████████████████████████████████ ██████████████████. LaGreca Supp. ¶ 20; Ex. 28 at 61:23-62:6. |
| Apr. 2024 | After CDK customer Asbury Automotive Group ("Asbury") announces a project with Tekion, CDK provides a written reminder to Tekion that its access to CDK's DMS is unauthorized. TK Ex. 11. Tekion did not access or use Asbury's CDK DMS account. Fox ¶ 28. |
| June 2024 | In response to a ransomware attack, CDK ████████████████████ ███████████████████████████████████████. LaGreca ¶ 76; LaGreca Supp. ¶ 21.  Tekion's James Livingstone testified ████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████. Ex. 28 at 75:5-17; 83:19-84:24; 133:10-134:3. |
| 11/1/2024 | A Dealership sends CDK an email indicating Tekion is attempting to access CDK's DMS through the Dealership's IP address by using a Meraki VPN device. Bales ¶¶ 7-8; Ex. 8. CDK investigates Tekion's unauthorized access. LaGreca ¶¶ 57-68. |
| 12/6/2024 | CDK sends Tekion another cease-and-desist letter. Ex 3. |
| Dec. 2024 | For the first time, ████████████████████████████. Ex. 31 at 28:22-29:10, 104:17:20. Before that, █████████████████ ████████████████████████████. *Id.* Tekion also ████████████ ████████████████. Ex. 28 at 121:19-122:1; 123:25-124:25. InDesign knows █████████ ██████████████████████████████████████████ CDK's DMS. Ex. 31 at 165:12-18, 166:20-167:5. |

| 12/17/2024 | CDK discovers Defendants' collusion. Bales ¶¶ 7-8; Ex. 9. CDK expands its investigation into InDesign's conduct. LaGreca ¶¶ 64-66. CDK realizes accounts associated with InDesign have "mail.1dms.com" email addresses in the user profiles. LaGreca Supp. ¶¶ 7-10. |
|---|---|
| Feb. 2025 | CDK files suit and serves Defendants with a cease-and-desist letter. LaGreca ¶ 70. |
| 3/6/2025 | CDK completes its forensic investigation. Swaminathan ¶ 12. |
| 3/13/2025 | CDK files a Motion for Preliminary Injunction. ECF No. 45. |
| After 3/13/2025 | Tekion continues to ███████████████████████████████████████████████████████████████████████████████████████. Ex. 31 at 167:6-17; 168:17-19. User accounts continue to be created for InDesign's use. LaGreca Supp. ¶¶ 11, 37. |

This timeline confirms that CDK did not unreasonably delay. In *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017), the Ninth Circuit held that a "delay in seeking an injunction was reasonable" based on movants' decision to sue after a "cautious investigation," once defendant became a "real threat" and admitted its intent to continue its conduct "unless enjoined." Here, CDK only sued after its investigation revealed that Defendants posed a "real threat," and their conduct demonstrated they would not stop "unless enjoined." LaGreca ¶¶ 57-70.[3]

Even if there were delay, it "is but a single factor to consider in evaluating irreparable injury; 'courts are loath to withhold relief solely on that ground.'" *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). Absent a PI, nothing stops Defendants from continuing to access CDK's DMS—and their past conduct proves that they will. Defendants' ongoing misconduct supports the requested interim relief. *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 783

---

[3] Most of Defendants' cited cases are readily distinguishable because they involved ***no*** investigation into the scope of alleged misconduct. In the other cases, the plaintiff delayed after finishing its investigation. *See Famous Birthdays, LLC v. SocialEdge, Inc.*, 2022 WL 1592726, at *4 (C.D. Cal. Feb. 11, 2022) (waiting "five months to file this Motion after its apparent investigation"); *Gigacloud Tech., Inc. v. Linon Home Decor Prods., Inc.*, 2024 WL 4766202, at *4 (C.D. Cal. Sept. 9, 2024) (delaying "nearly six months after hiring a forensics expert…."). Here, CDK moved for a PI within a week of completing its investigation.

CDK's Reply in Support of Motion for Preliminary Injunction
Case No.: 25-cv-01394

(N.D. Cal. 2017) (granting injunction where access after revocation "suggest[s] that Defendants may continue to access Facebook's servers unless they are strongly deterred").

## II.    CDK seeks a prohibitory preliminary injunction.

InDesign wrongly argues that CDK seeks a mandatory injunction. "A mandatory injunction 'orders a responsible party to take action'," whereas a "prohibitory injunction prohibits a party from taking action and 'preserves the status quo pending a determination of the action on the merits.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024). The "status quo" means the "status quo ante litem"—*i.e.*, "the last uncontested status which preceded the pending controversy." *Id.* Mandatory injunctions are "subject to a higher standard than prohibitory injunctions." *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).

CDK seeks an injunction stopping Defendants' access to CDK's DMS. This would preserve the "status quo ante litem," *i.e.*, where CDK securely facilitates data migrations to Tekion. LaGreca ¶¶ 48-56. InDesign contends that the injunction CDK seeks is mandatory because "InDesign has been using dealer-provided credentials to access DMSs (including the CDK DMS) since 2013." ID Br. 7-8. But CDK never authorized InDesign's conduct, has disabled InDesign accounts, and only recently learned the scope of InDesign's access. LaGreca ¶ 47; LaGreca Supp. ¶¶ 7-13. CDK requests an order to ***stop*** InDesign from querying its system and thus the injunction is prohibitory.[4]

## III.    CDK is likely to succeed on its Computer Fraud and Abuse Act (CFAA) and California Computer Data Access and Fraud Act (CDAFA) claims.

Defendants do not dispute three elements of CDK's unauthorized computer access claims: (1) they "intentionally accessed" CDK's DMS; (2) CDK's DMS is a "protected computer;" and (3) CDK suffered a loss of "at least $5,000 in value." *See* Mot. 11-14; TK. Br. 7-11; ID Br. 14-17.[5]

---

[4] These facts distinguish InDesign's cases where the plaintiff either sought to enforce the parties' contracts pre-termination or sought an order requiring a party to take action. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (injunction "required Google to take affirmative action—to remove (and to keep removing) [a film] from YouTube…"); *Doe v. Snyder*, 28 F.4th 103, 106 (9th Cir. 2022) (two teenagers sought a PI requiring the state to pay for surgeries); *Mediterranean Cuisine Franchising Co., LLC v. Karma Cap., Inc.*, 2019 WL 4308777, at *3 (C.D. Cal. Apr. 4, 2019) ("last, uncontested status" was up until plaintiffs cancelled franchise agreements).

[5] InDesign incorrectly states that "[a]ll CDK's alleged losses occurred *before* CDK sent its cease-

Instead, they argue Dealerships had authority to override CDK's access restrictions, and Defendants did not obtain CDK's information through their access. Neither argument has merit.

### A.    Defendants' access to CDK's DMS is without authorization.

CDK has never authorized Defendants' access to CDK's DMS. LaGreca ¶ 47. Rather than authorize **Defendants'** direct access to CDK's servers, CDK facilitates the conversion process for **Dealerships** migrating DMS providers. *Id.* ¶¶ 48-56; Ex. 28 at 61:23-63:10, 72:17-75:17, 97:2-20.

Defendants know they lack authorization. CDK's May 2019, April 2024, and December 2024 letters establish that Tekion's access is "strictly prohibited" and "unauthorized." Ex. 3; Ex. 5; TK Ex. 11; Ex. 29 at 40:6-23. And CDK has disabled hundreds of Tekion accounts. LaGreca ¶¶ 61, 92; LaGreca Supp. ¶¶ 18-19; Ex. 28 at 103:4-104:14; Ex. 29 at 12:4-22, 33:7-9. Moreover, in 2019 CDK deposed InDesign in litigation where a key issue was that Authenticom—a data integrator, like InDesign—lacked authorization to access a DMS. Ex. 33 at 183:9-19, 191:5-9, 192:1-13, 227:23-228:6. In that deposition, InDesign testified about CDK's efforts to block InDesign's access, InDesign's discussion with Authenticom to overcome CDK's blocking efforts, and InDesign's receipt of cease-and-desist letters. Ex. 31 at 126:6-127:24, 152:17-20, 154:17-25. CDK also sent InDesign a cease-and-desist letter in February 2025. Ex. 6.

Defendants argue that Dealerships may authorize their access to CDK's computer system. TK Br. 8-9; ID Br. 15-17.[6] That is not the law—which CDK explained in its Opposition to InDesign's Motion to Dismiss. *See* ECF 69 ("MTD Opposition") at 7-13. In *United States v. Nosal*, 844 F.3d 1024, 1030, 1036 (9th Cir. 2016) ("*Nosal II*"), the Ninth Circuit held that an insider, such as a current employee or licensee, has no power to authorize outsiders' access to a protected computer. A contrary ruling would lead to illogical results:

> [A]n employee could undermine the company's ability to control access to its own computers by willy nilly giving out passwords to anyone outside the company—

---

and-desist letter to InDesign" on February 11, 2025. ID Br. 15. As of March 13, 2025, CDK had incurred at least $36,750 in losses, LaGreca ¶ 91, and those incurred costs have increased since then. *See* LaGreca Supp. ¶ 35.

[6] InDesign argues that "CDK is not likely to succeed on its CFAA claim because … CDK has not alleged a plausible CFAA claim in its complaint." ID Br. 14. InDesign is wrong for the reasons explained in CDK's MTD Opposition. *See* ECF 69 at 6-13.

former employees whose access had been revoked, competitors, industrious hackers or bank robbers who find it less risky and more convenient to access accounts via the Internet rather than through armed robbery.

*Id.* at 1037. Only CDK has the authority to grant access to its DMS, and Dealerships cannot "willy nilly" override CDK's decisions. District courts agree. *See, e.g.*, *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010) (granting summary judgment that defendant acted "without authorization" under the CFAA because current employee's provision of login and password "did not constitute a valid authorization").[7] Defendants ignore *Multiven*.

Defendants argue access is authorized "when the agent has the accountholder's permission and uses the valid credentials." TK Br. 8; *see* ID Br. 14-17 (similar). But Defendants' cited cases offer no support. In *Watters v. Breja*, 2024 WL 201356, at *3 (N.D. Cal. Jan. 18, 2024), plaintiff failed to state a CFAA claim when defendant used ***his own*** credentials in a way that "violated AmEx's terms of service." In *WalkMe Ltd. v. Whatfix, Inc.*, 2024 WL 1221960, at *5 (N.D. Cal. Mar. 21, 2024), the court never analyzed the meaning of "without authorization" and dismissed allegations "that Whatfix's use of the credentials was not allowed under the customers' contracts or authorized in anyway" as insufficient to establish an "exceeds authorized access" theory of liability. And in *ATPAC, Inc. v. Aptitude Sols., Inc.*, 2010 WL 1779901, at *6 (E.D. Cal. Apr. 29, 2010), the court dismissed the CFAA claim, but noted if the defendant engages in "subterfuge— ***like using user names and passwords that do not belong to it***—to gain access to plaintiff's protected materials on plaintiff's own website, computers, or servers" that can violate the CFAA.[8]

Tekion also misstates facts. Tekion asserts CDK "does not dispute that Tekion accessed

---

[7] Tekion points to *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016), as proof that "consent" from users "might initially" authorize access. TK Br. 8. But whether social media users can authorize access to Facebook's public website says nothing about a Dealership licensee's authority to grant access to CDK's private computer system.

[8] Defendants also cite an essay for the proposition that sharing usernames and passwords with agents is acceptable. Orin S. Kerr, *Norms of Computer Trespass*, 116 COLUM. L. REV. 1143, 1178 (2016). TK Br. 8; ID Br. 16. But that writing recognizes there should be limits on conferring access: "If computer owner A can confer access rights to account holder B, an unlimited power of B to confer access rights to C, D, and E would nullify A's judgment to confer access rights to only account holder B." *Id.* at 1180. The author thus reinforces that an individual user should not be permitted to "undermine the company's ability to control access to its own computers." *Nosal II*, 844 F.3d at 1037.

CDK's DMS only with dealers' valid CDK credentials." TK Br. 8. But the credentials used by Tekion are not "valid" because the Dealership created them solely for Tekion's—not Dealership employees'—use, and usernames alone do not identify who is accessing the system. LaGreca ¶ 61; Garcia ¶¶ 13, 20-23; Ex. 28 at 68:2-11. Tekion then suggests no evidence exists that "Tekion tricked dealers into divulging credentials." TK Br. 8. Not true. Tekion attempted to "trick" Dealerships into providing credentials by ***misinforming*** them that CDK will not assist in data conversion. Bales ¶ 16; LaGreca ¶¶ 48-56; *see* Ex. 28 at 61:23-62:6, 75:5-17, 83:19-84:24, 133:10-134:3 (Livingstone testifying that ███████████████████████); *see also infra* at 16, 18-19.

CDK's cease-and-desist letters and disablement of accounts resolve any doubts about whether Defendants' access to CDK's DMS is "without authorization." *See* Mot. 13 (citing cases). Defendants' efforts to retreat from these facts and law goes nowhere.

<u>First</u>, Defendants cite *Stern v. Weinstein*, 2010 WL 11459791, at *2 (C.D. Cal. Jan. 6, 2010), for the proposition that a defendant acts "without authorization" only after receiving notice of "affirmative conduct terminating authorization." TK Br. 9; ID Br. 14. CDK's May 2019 letter to Tekion states that "inducing CDK dealership customers to create and provide DMS login credentials for Tekion's use" is "***conduct [] strictly prohibited***" and "***unauthorized access***." Ex. 5. Tekion's James Fox agreed ██████████████████████████. Ex. 29 at 40:6-41:6. CDK sent additional cease-and-desist letters, including in February 2025, to both Defendants. Exs. 3, 6. CDK has disabled user accounts associated with Tekion (in 2019, 2023-2024) and InDesign (in 2016-2017, 2025). Ex. 28 at 103:4-104:14; Ex. 29 at 33:7-9; LaGreca Supp. ¶¶ 4, 14, 18-20. These facts rebut InDesign's assertion that "CDK never objected" to its conduct. ID Br. 14. What more "affirmative conduct" would establish "without authorization"? Defendants do not say.[9]

<u>Second</u>, Tekion baldly claims "CDK's 'disabling' of some accounts was not an express revocation of authorization of Tekion's provision of assistance to all dealers." TK Br.at 10. There is no legal support for Tekion's suggestion that disabling access at one Dealership was insufficient

---

[9] InDesign says "[n]otably, in April 2024 and December 2024, CDK sent cease-and-desist letters to Tekion—but not to InDesign." ID Br. 14-15. But CDK did not know the scope of InDesign's unauthorized access until completing its investigation in March 2025. LaGreca Supp. ¶¶ 3-13.

notice as to other Dealerships. Courts routinely find that blocking access from a single point of ingress is sufficient to show denial of authorization to an entire computer system. *See, e.g.*, *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 969 (N.D. Cal. 2013) ("Craigslist specifically denied authorization to use the website 'for any purposes' . . . and also used technological measures to block access from IP addresses.").

<u>Third</u>, Tekion speculates that CDK needed to block Tekion's IP address to negate authorization. TK Br. 10. But Tekion accesses CDK's DMS through Dealerships' IP addresses. LaGreca ¶ 57. CDK cannot block a Dealership's IP address without disrupting service to that Dealership, which is why CDK disabled user accounts. LaGreca Supp. ¶ 36.

<u>Finally</u>, in tacit acknowledgement that CDK revoked any prior authorization (to be clear, there was no valid prior authorization), Tekion avers that it stopped accessing CDK's DMS "once CDK sent its cease-and-desist letter on December 6." TK Br. 10. The record tells a different story. One week after CDK's letter, InDesign emailed a Dealership—copying Tekion—for the purpose of obtaining unauthorized access to CDK's DMS in order to "convert dealers to Tekion." *See* Bales ¶¶ 20-31; Ex. 9. Tekion claims this is "a single email." TK Br. 10. But InDesign's President David Lampert testified that ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. Ex. 31 at 165:12-18, 166:20-167:18. Prior to December 2024, InDesign extracted only documents from CDK's related "DSDA" system—not DMS data. *Id.* at 28:22-29:10, 104:17:20. Lampert's under oath admission refutes Tekion's assertion that it "does not direct or control InDesign's activities." TK Br. 10. Tekion's "enlisting of a third party to aid in access will not excuse liability." *Facebook*, 844 F.3d at 1067.

### B.    Defendants obtain CDK's information through unauthorized access.

Defendants do not deny the key facts demonstrating they have obtained CDK's information. *See* TK Br. 10-11; ID Br. 16-17. ██████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████. Fox ¶¶ 21-23. To ████████████████████████████████

██████████. Ex. 29 at 111:23-112:15, 186:25-187:13. Tekion offers no evidence rebutting that it has accessed CDK's DMS organizational structure and information in order to create software scripts that query CDK's system. *See* LaGreca ¶¶ 87-88; Garcia ¶ 14; Swaminathan ¶ 10.

InDesign does not deny that it has executed thousands of function calls to analyze CDK's database structures and identify field names. Swaminathan ¶ 11, 32, 39-40, 43, 46; Ex. 31 at 106:25-107:23. InDesign's President admits that InDesign "sees what a dealership employee" sees: CDK's screens. Lampert ¶ 42. Those expressions of CDK's software and DMS structure are CDK's information that should be available only to authorized licensees. InDesign argues that *Facebook* is distinguishable because defendants accessed "Facebook's data." ID Br. 16. But defendants there accessed a website the same way that a user would: they "caused a message to be transmitted to the user's friends within the Facebook system" and used Facebook's feature to "generate[] an e-mail message to an external account from the user to friends." *Facebook*, 844 F.3d at 1063. Here, InDesign accesses CDK's DMS the same way a user does, thus obtaining CDK's information.

Defendants claim that because they have not "pull[ed]" or "reverse-engineered" CDK's proprietary forms or IP, they have not obtained CDK's information. TK Br. 11; Lampert ¶ 41. This point is not dispositive because the statutory violations are not limited to obtaining trade secrets or all proprietary information. CDK already has shown Defendants have accessed some of CDK's information and is thus likely to succeed on its computer access claims. [10]

## IV.    CDK is likely to succeed on its Digital Millenium Copyright Claim (DMCA) claim.

Defendants have violated the DMCA by circumventing CDK's technological access controls—password/username requirements and private encrypted network—to access its DMS software. Mot. 14-17. Tekion argues CDK's DMS software is not protected under the Copyright Act (tellingly, an argument InDesign did *not* make). TK Br. 11-12. Defendants claim that they have not circumvented access controls and that the copyright misuse doctrine negates liability. TK Br.

---

[10] Tekion mischaracterizes that CDK's declarants "admitted that Tekion could not access any data other than dealer data." TK Br. 11. These witnesses testified that Tekion has the same *access* as authorized Dealerships; they said nothing about the entire scope of "information" Tekion can obtain through that access. TK Ex. 2 at 71:18-25, 76:21-77:5, TK Ex. 4 at 51:22-52:3.

12-15; ID Br. 17-21. Ninth Circuit precedent says otherwise and supports CDK's DMCA claim.

### A.    The DMS is a "work protected" under the Copyright Act.

"[F]ederal copyright law extends to 'works of authorship' beyond those works enumerated in 17 U.S.C. § 102(a)," and a "computer software's 'dynamic non-literal elements' (users' real-time experience) [can be] subject to copyright protection." *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 971 (9th Cir. 2024). While a copyrighted work must be original, the Supreme Court has explained that "original" "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). CDK's DMS meets that standard: it is a product of CDK's R&D investment, built on CDK's original source code, and features a creative, distinctive layout. LaGreca ¶¶ 3, 14-16.

Defendants do not contest that CDK's DMS is an original creation with a distinctive look and feel. Instead, Tekion argues CDK's "tabs labeled e.g., 'Vehicle Detail Information'" lack the "'creative spark' required for copyright." TK Br. 11-12. But the expression of CDK's software, not the name of "tabs," receive copyright protection. When a user opens a "tab" or "account" on CDK's DMS, she has access to a user interface that is CDK's original creation—which Tekion's witness confirmed. LaGreca ¶¶ 14-26; Ex. 29 at 109:10-110:7 (███████████████████████████ ██████████████████). "Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying." *Feist*, 499 U.S. at 345. Tekion does not (and cannot) suggest that CDK copied elements of its software program, and cites no law holding that original software lacked copyright protection.[11]

Tekion thus incorrectly concludes there is "no evidence that Tekion accessed copyrighted works." TK Br. 12. Through its automated scripts, Tekion accesses the look, feel, contents, and organization of CDK's DMS—which is the "real-time experience" of using CDK's software. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 942-43 (9th Cir. 2010); LaGreca ¶¶ 87-88. Nothing in the DMCA requires that a human "access" the copyrighted work, and courts routinely hold use

---

[11] Contrary to Tekion's characterization, TK Br. 11-12, CDK is not claiming that data compilations and "functions of CDK's proprietary software" are the "works protected" in CDK's DMCA claim.

of automated software programs can violate the DMCA. *See, e.g.*, *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1166-67 (C.D. Cal. 2018). [12]

**B.    Defendants circumvent CDK's technological access controls.**

One "circumvent[s] protection afforded by a technological measure" under the DMCA by "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." 17 U.S.C. § 1201(b)(2)(A). CDK controls access to its DMS software program by: (1) creating a private, encrypted network between the Dealerships' IT environment and CDK's data centers, LaGreca ¶¶ 30-32; (2) ███████████████████████████████, *id.* ¶¶ 33-34; and (3) requiring password-protected credentials, *id.* ¶¶ 35-37.

Defendants "avoid" and "bypass" these controls by: (1) deploying unauthorized password-protected credentials associated with fake names, Swaminathan ¶¶ 13-26; Ex. 31 at 42:9-20; (2) ████████████████████████████████, Garcia ¶¶ 20-23; and (3) for Tekion, ████████████████████████████████, Garcia ¶¶ 15-19; Ex. 27 at 29:24-32:20, 38:23-39:15, 40:3-41:18, 51:12-52:13, 53:5-55:23.

Defendants argue that unauthorized use of usernames and passwords is not "circumvention" under the DMCA. TK Br. 13. As CDK has explained, the weight of authority in this jurisdiction disagrees. *See* Mot. at 17; MTD Opposition at 16-17. In *Actuate Corp. v. In't Bus. Machines Corp.*, 2010 WL 1340519, at *9 (N.D. Cal. Apr. 5, 2010*)*, Judge Spero analyzed cases adopting the minority view, rejected that a password is different than "other types of code that might be used for decryption," and concluded unauthorized use of credentials amounts to "avoiding" or "bypassing" an access control. And Judge Koh explained in *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 4848387, at *8 (N.D. Cal. Oct. 1, 2019), that the "majority" of courts in this jurisdiction hold unauthorized use of license keys or passwords is "circumvention" under the DMCA.

Defendants say *InnoGrit* is distinguishable because, unlike the defendant there, they access CDK's DMS using "CDK-authorized dealer network devices and IP addresses." TK Br. 14; *see* ID

---

[12] Tekion's assertion that it never "accessed CDK's source code" and "did not download or export" elements of CDK's software is inapposite. TK Br. 12. The DMCA prohibits accessing copyrighted material and requires no proof of copying. *MDY*, 629 F.3d at 952.

Br. 18-19. But *InnoGrit* recognizes that using passwords can be "circumvention" if there are "additional actions taken on the part of the defendants" to manipulate the identity of the entity using those credentials. 2019 WL 484387, at *9. Here, both Defendants' "additional actions" include using credentials associated with fake names that obscure the identity of who is accessing CDK's system. Swaminathan ¶¶ 13-26. Indeed, InDesign ██████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████" Ex. 31 at 40:2-42:20. Tekion also (1) directs Dealerships to ████████████████████████████████, Garcia ¶ 13; LaGreca Supp. ¶¶ 22; (2) creates new usernames after CDK disables accounts, Garcia ¶ 23; LaGreca ¶ 61; and (3) ████████████████████████████ ███████████████████████. Garcia ¶¶ 15-19; Ex. 27 at 29:24-32:20, 38:23-39:15, 40:3-41:18, 51:12-52:13, 53:5-55:23.[13]

### C.    CDK's technological access controls are not copyright misuse.

Defendants next argue that restricting access to the copyrighted components of CDK's DMS software is "copyright misuse." TK Br. 14-15; ID Br. 19-21. "Copyright misuse is an equitable defense to ***copyright infringement***, the contours of which are still being defined." *MDY*, 629 F.3d at 941. Tekion mischaracterizes *MDY* as recognizing "litigants could abuse the DMCA's anti-circumvention provisions to achieve unlawfully anticompetitive ends." TK Br. 15. In reality, *MDY* noted that "the Federal Circuit was concerned that, without an infringement nexus requirement, [the DMCA] would allow copyright owners to deny all access to the public," but found this concern "***overstated***." *MDY*, 629 F.3d at 951. Defendants ***cite no caselaw*** finding the copyright misuse doctrine bars a DMCA claim.[14]

---

[13] The in-Circuit cases that Defendants cite, *see* TK Br. 13, ID Br. 18-19, are distinguishable for lack of "additional actions." *See iSpot.tv, Inc. v. Teyfukova*, 2023 WL 3602806, at *7 (C.D. Cal. May 22, 2023) (defendant used credentials issued by former employer); *Adobe Sys. Inc. v. A&S Electronics, Inc.,* 2015 WL 13022288, *8 (N.D. Cal. Aug. 19, 2015) (defendant trafficked in "serial license keys originated from Adobe").

[14] None of Defendants cited cases held the copyright misuse doctrine bars a DMCA claim. *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1155 (9th Cir. 2011) (holding "licensing agreements were thus appropriately used to prevent infringement and control use of the copyrighted material"); *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 641, 645, 647 (7th Cir. 2003)

---

Even if the copyright misuse defense were applicable, CDK's conduct falls outside its scope. In *Apple*, the Ninth Circuit affirmed the district court's finding that "Apple's requirement that licensees of Mac OS X run their copies only on Apple computers" was not copyright misuse because, *inter alia*, the licensing agreement "***did not prevent others from developing their own computer or operating systems***." 658 F.3d at 1154-55. Because CDK's access controls do not prevent others from developing their own DMS software, there is no copyright misuse.

## V.    CDK is likely to succeed on its tortious interference claim.

CDK has shown Tekion intentionally interfered with the Master Services Agreements (MSAs) between CDK and at least ███ Dealerships. *See* Mot. 17-20. Defendants concede the validity of CDK's contracts but argue they: (1) had no knowledge about MSA terms; (2) lacked intent to induce breach; (3) did not cause damage; and (4) had a "legitimate business purpose" to access CDK's DMS. TK Br. 15-20; ID Br. 21-24. Each argument fails.

### A.    Defendants know CDK's MSAs prohibit their conduct.

Defendants received actual notice that their conduct violates CDK's MSAs. In May 2019, April 2024, and December 2024, CDK sent Tekion cease-and-desist letters citing specific provisions of the MSAs. Exs. 3, 5; TK Ex. 11; Ex. 29 at 157:16-158:13, 161:9-163:9. A Dealership told Defendants that sharing login credentials would violate the terms of CDK's MSA. Ex. 9. And both Defendants received a cease-and-desist letter in February 2025. Ex. 6. Moreover, there is circumstantial evidence of Defendants' knowledge.[15]

---

(plaintiff did not allege the defendant accessed its copyrighted material in violation of the DMCA); *Philips N. Am. LLC v. KPI Healthcare, Inc.*, 2020 WL 2475094, at *3-4 (C.D. Cal. Apr. 15, 2020) (dismissing counterclaim alleging misuse of "copyrights and/or DMCA rights"); *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 WL 2064201, at *14 (W.D.N.C. Feb. 16, 2023) (granting summary judgment in favor of plaintiff on DMCA claim where defendants "us[ed] software they developed to bypass Plaintiff's security").

[15] These facts distinguish Defendants' cited cases in which there was no evidence that the defendant knew about the third party to the contract or the contract terms. *Televisa v. Liberman Broad., Inc.*, 2012 WL 12893444, at *1 (C.D. Cal. Dec. 6, 2012) ("no evidence that Defendants knew of the exclusivity clause prior to the breach"); *Trindade v. Reach Media Grp., LLC*, 2013 WL 3977034, at *15 (N.D. Cal. July 31, 2013) (failure to allege knowledge of "specific contracts or details about the contracts"); *Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 935 (N.D. Cal. 2015) (no evidence

---

Tekion knows about CDK's MSAs because it employs former CDK salespersons—including at least one employee contacting Dealerships to gain unauthorized access. Bales ¶ 12-14. Tekion's James Fox ████████████████████████████████████████████. Ex. 29 at 177:16-24; *see also id.* at 175:23-177:1 (████████████████████████████████ ████████████████). In *Axia Fin., LLC v. Mason McDuffie Mortg. Co.,* 2023 WL 7280443, at *11 (N.D. Cal. Sept. 20, 2023), evidence that plaintiff's former employees had recently joined defendant's company, including "two higher ranking employees," supported a finding that defendant knew contracts existed. Tekion's assertion that the facts here "are not analogous" to *Axia* ignores this evidence. TK Br. 16.

InDesign knows about CDK's MSAs because in 2019 it sat for a deposition involving claims that a data integrator, among other things, violated CDK's contracts with Dealerships. Ex. 31 at 126:8-127:11. And when InDesign accesses CDK's DMS, it seeks indemnification from Dealerships for "Dealer's granting to InDesign any unauthorized access to the Existing DMS." Ex. 19 § 5 (Conversion Agrmt.). This indemnification clause—geared toward unauthorized access of a DMS—demonstrates InDesign's knowledge that CDK's contracts prohibit its access.

Defendants claim that a January 2019 district court order demonstrates their lack of knowledge that CDK's MSA prohibits their access. TK Br. 16; ID Br. 21. They are wrong. In *Dealer Mgmt. I,* 362 F. Supp. 3d at 570, 573, 575, the district court denied data-integrator Authenticom's motion to dismiss CDK's CFAA, DMCA, and tortious interference claims. The court quoted two relevant provisions of CDK's standard MSA: (1) Dealerships must keep "CDK Products" confidential, including "to any person other than employees ***and agents*** of" the Dealership; and (2) "third party [sic] software" is prohibited "except as otherwise permitted by [the] agreement." *Id.* at 564. The court rejected that Authenticom could access CDK's DMS as an "agent" of the Dealership and noted "the facts alleged suggest the contrary is true," including

---

that defendant knew "of the agreements with these specific customers"); *Winchester Mystery House, LLC v. Glob. Asylum, Inc.,* 210 Cal. App. 4th 579, 597 (2012) (plaintiff's emails and letters to defendant "did not mention either a contract with a third party or identify an economic or prospective economic relationship between plaintiff and a third party").

because Authenticom held itself out as an "independent contractor." *Id.* at 566-68. Here, Defendants suggest that they knew of the 2019 version of CDK's MSAs, but believe they act as a Dealership's "agent" when accessing CDK's DMS. TK Br. 16; ID Br. 21. But Defendants have offered no evidence or argument proving that they serve as Dealerships' agents. InDesign ████ ████████████████████████████████████████████. Ex. 31 at 90:3-10. If anything, the public citation to CDK's MSA in *Dealer Mgmt. I* put Defendants on notice that CDK's MSAs limited DMS access to Dealership "employees and agents"—which Defendants are not.

### B.    Defendants' intentional acts induce breaches of CDK's MSAs.

Defendants have induced Dealerships to breach their MSAs with CDK by: (1) misrepresenting that CDK is withholding Dealership data; (2) suggesting to Dealerships that they can avoid paying money owed to CDK by using their services; and (3) instructing Dealerships to install VPN devices, create and share user credentials, and run software scripts designed to extract data. *See* Mot. 18-19. Defendants do not meaningfully dispute these facts, instead arguing they did not ***intend*** to induce breach. Defendants' claim defies credulity.

<u>First</u>, Tekion's James Livingstone misrepresented to ████████████████ ("████████") that CDK is not allowing its customers to access their own data, which is why Tekion was advising customers to do it preemptively. Bales ¶ 16. Tekion tries to discount this evidence as "hearsay." TK Br. 17. But Livingstone admitted that he told ████████ that "████ ████████████████████████████████████████████." Ex. 28 at 102:2-5. Livingstone's statement was not true. Except for an isolated incident related to the attempted ransomware attack on CDK in June 2024, ***Tekion's witnesses cannot point to a specific instance when CDK delayed a launch date on Tekion's DMS***. Ex. 28 at 72:17-75:17, 133:10-134:3; Ex. 29 at 67:17-70:6, 76:17-77:13, 79:11-83:25, 85:15-87:10, 89:18-93:8, 96:19-22, 102:8-21.[16] Tekion's assertion that Livingstone was sharing "accurate information," TK Br. 17, is false.

<u>Second</u>, Defendants held themselves out as "Plan B" if ████████ did not receive "AR

---

[16] Tekion's Livingstone identified one isolated event when CDK did not promptly migrate data while CDK was dealing with a cybersecurity event, but even in that case the Dealership received its data to launch on Tekion's DMS. Ex. 28 at 75:5-17.

Approval" from CDK. Bales ¶ 30; Ex. 9. The only reason a Dealership would not receive accounts receivable approval is if the Dealership breached the MSA's requirement to pay for services rendered. Tekion asks the court to infer that this communication was "not an inducement of the customer not to pay amounts owed to CDK." TK Br. 18. But Tekion's James Fox testified ███████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████." Ex. 29 at 29:17-30:8. A more plausible inference is that this message was a nudge-and-a-wink for ████████ to not pay money owed for services rendered and instead pay InDesign $5,000. *See* Ex. 19 § 1a.

Tekion also argues that ████████ refusal to give in to its tactics "doom[s]" the tortious interference claim. TK Br. 17. Not so. Defendants have accessed CDK's DMS from at least the ███ Dealerships examined by CDK's forensic expert, Swaminathan ¶ 8, and undoubtedly many more than that. Each instance evidences a breach, including what happened at ████████ ████ ("████████"): As a result of Defendants' interference, ████████ walked away from its MSA with CDK without paying CDK for DMS services rendered and remaining obligations equal to over ████████.[17] LaGreca ¶ 84. The full scope of Defendants' communications with Dealerships—and how often they have misinformed Dealerships about CDK—will come to light in discovery. For now, Defendants' communications with ████████ support a likelihood of success on the merits of CDK's tortious interference claim. *See WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 848-49 (N.D. Cal. 2019) (a party seeking a PI "is not required to prove its case").

<u>Third</u>, Defendants have provided Dealerships with the means to enable their unauthorized access including: (1) in Tekion's case, establishing a VPN connection to CDK's private network; (2) using fictitious user accounts and ████████████████████████████████████████; and (3) running software scripts on CDK's DMS. Mot. 18-19. InDesign denies that it "████ ████████████████████████████," ID Br. 22, but CDK's audit logs show that ████████████████

---

[17] Tekion mischaracterizes David LaGreca's deposition testimony to suggest ████████ may have breached for reasons unrelated to Tekion. TK Br. 19-20. But Tekion does not contest that it accessed CDK's DMS through ████████ IP address and that ████████ refused to pay CDK money owed. These facts support an inference that Tekion induced ████████ breach.

1    ██████████. LaGreca Supp. ¶¶ 12-13.

2         Tekion claims it did not know its "software scripts that enter and extract data from the CDK

3    network" were "'certain or substantially certain' to disrupt CDK's MSAs." TK Br. 18. But since at

4    least 2019, Tekion has known that CDK's MSA restricts sharing credentials and deploying third-

5    party software without CDK's consent. *See supra* at 6.

6         InDesign responds to proof of its intentional conduct by claiming it never "told dealerships

7    to terminate or breach their contracts with CDK." ID Br. 22. But an express instruction to breach

8    is not required to state a tortious interference claim. In InDesign's cited cases, there was no evidence

9    of or allegations related to ***any*** intentional acts. *See Ixchel Pharma, LLC v. Biogen Inc.*, 2018 WL

10   558781, at *2 (E.D. Cal. Jan. 25, 2018) (plaintiff alleged third party breached contract's 60-day

11   notice period but pleaded no facts supporting that defendant told or caused that third party to

12   terminate early); *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL 12948055,

13   at *5 (C.D. Cal. Dec. 29, 2020) (granting summary judgment based on "no evidence to support a

14   finding that" the defendants knew breach would result from their conduct). Neither case shows that

15   expressly instructing a Dealership to breach is a prerequisite for tortious interference.

16        **C.    Defendants' interference damages CDK.**

17        Defendants' interference has damaged CDK's goodwill by misinforming Dealerships that

18   CDK is "██████████" and withholding data, Bales ¶ 16; Ex. 28 at 101:24-102:6. It also has

19   undermined CDK's business model by enabling Dealerships to avoid payment obligations owed

20   under the MSA. *See* Mot. 19-20, 23-25. Defendants argue these harms are nonexistent or

21   speculative. TK Br. 20; ID Br. 12-13. Their position is willfully blind to facts in the record.

22        Tekion argues it never harmed CDK's goodwill because "CDK's only support for loss of

23   goodwill" is InDesign's email to ██████████. TK Br. 20. This ignores that Tekion's Senior

24   Manager James Livingstone made disparaging, unfounded remarks to ██████████. Bales ¶ 16;

25   Ex. 28 at 101:24-102:6. InDesign similarly says that its email to ██████████ was not damaging to

26   CDK's goodwill because offering to be "a dealership's 'Plan B' if CDK did not transfer that

27   dealership's data to its new DMS provider" is not disparaging. ID Br. 12-13. InDesign's

28   communication is of the same ilk as Tekion's: InDesign told Dealerships that CDK was not

cooperating in data transfers. Because that statement is false, it is disparagement.

Defendants also conclude that CDK suffers no damage because the Dealerships "had already decided to leave CDK for Tekion." TK Br. 20; *see also* ID Br. 12 ("Regardless, the dealerships at issue have already decided to stop using the CDK DMS … there is no goodwill left to protect."). That Dealerships switch DMS providers (which CDK does nothing to stop) is not what harms CDK. Rather, the damage stems from early MSA terminations without paying CDK for services that it has already rendered while Defendants misinform Dealerships that CDK does not cooperate with data migrations, as in the case of ███████. *See* LaGreca ¶¶ 80-84. These facts go far beyond the conclusory allegations that were insufficient to state a tortious interference claim in Defendants' cited cases. *See Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1157 (S.D. Cal. 2014) (plaintiff failed to allege "what acts Macy's purportedly undertook to induce third parties to breach their contracts with Plaintiffs"); *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (district court's finding that "Goldie's would lose goodwill and 'untold' customers" was "not based on any factual allegations").[18]

### D.    Defendants lack a legitimate business interest to interfere with CDK's MSAs.

Defendants' fallback position is that their interference is justified due to a "legitimate business purpose." Neither Defendant has one.

Tekion claims its third-party access is justified because of: (1) a "strict window for launching the dealer on Tekion's DMS"; (2) a Dealership's need for a "functioning DMS during the transition period;" (3) the potential for a "launch date" to be "postponed because CDK delays data migration;" and (4) Tekion's need to collect fees. TK Br. 19. But Tekion's witnesses identified only one delay, which was a result of the attempted ransomware attack on CDK in June 2024. Ex. 28 at 83:19-84:24. This fact puts this case outside Tekion's cited authority, *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1275 (N.D. Cal. 2022), in which "contemporary

---

[18] Tekion's other cited authority is distinguishable because there was clear evidence that ***plaintiff's*** "inability to service its customers for a five-month period in 2015 was the result of its own failure to obtain the necessary certification, not because of the actions of Defendants." *Bull Mountain Sanitation, LLC. v. Allied Waste Servs. of N. Am., L.L.C.*, 2020 WL 8812843, at *6 (D. Mont. July 17, 2020). Tekion points to no CDK actions causing customers not to pay money owed.

documentation" showed "that Meta believed BrandTotal was acting deceptively and abusing Meta's platform." Tekion's made-for-litigation argument is that CDK is standing in the way of data conversions. But its own witnesses have admitted CDK has cooperated in converting Dealerships to Tekion's DMS. Ex. 28 at 61:23-62:6. And despite declaring that CDK has "restricted, delayed, or denied" Dealerships' access to data on "numerous occasions," Tekion's James Fox could not identify *any specific instances when this happened*. Ex. 29 at 67:17-68:15, 69:13-70:6, 76:17-77:13. Fox could not even identify who told him about the purported "numerous" occasions when CDK impeded data migration. *Id.* at 90:23-93:8, 96:19-22, 102:11-21. Tekion's entire story about its "legitimate business interest" is hearsay based on a single employee's unsubstantiated say-so.[19]

Both episodes that prompted CDK's investigation undercut Tekion's "legitimate business interest." <u>First</u>, Tekion asked ██████████████ to create CDK user accounts for Tekion's use before the Dealership had even requested its data from CDK. CDK exported the first data set to Tekion in December 2024 and completed the export in mid-January 2025, several weeks ahead of the Dealership's contract termination with CDK. Ex. 22 at 76:22-78:15. Tekion's attempted interference with that Dealership was completely unjustified. <u>Second</u>, Tekion again suggested that ████████████ allow Tekion and/or InDesign to extract data from CDK's DMS before the Dealership had even requested its data from CDK. Ex. 28 at 109:5-13. ████████████ rebuffed the effort to induce breach and relied on CDK to export the data, which CDK completed timely allowing the Dealership to launch with Tekion on time and without a hitch. *See id.* at 96:23-98:19.

InDesign argues it has a legitimate business interest based on the balancing test articulated in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1192 (9th Cir. 2022). ID Br. 23-24. Under *hiQ*, a business interest may justify interference with contracts if "the means of interference involve no more than recognized trade practices." 31 F.4th at 1193. "Recognized trade practices include such

---

[19] Just as Dealerships switch from CDK to Tekion, they also switch from Tekion to CDK. On more than one such occasion, Tekion has delayed making the Dealership's data available to CDK, citing the fact that the data transfer had not been internally approved by Tekion. LaGreca Supp. ¶ 33 n.2. This is consistent with Tekion's standard license agreement, which, similar to CDK's standard MSA, provides that dealerships must satisfy financial obligations for the remainder of the contract term before Tekion will help dealerships migrate their data to another DMS provider. *See* Ex. 28 at 36:8–42:7 (discussing Ex. 30 (Tekion MSA) §§ 12.3, 12.4, 5.3).

activities as 'advertising,' 'price-cutting,' and 'hiring' the employees of another for use in the hirer's business." *Id.* (rejecting that LinkedIn's blocking a third-party from its public website is "similar to trade practices previously recognized as acceptable justifications for contract interference"). InDesign asserts its conduct is a "recognized trade practice" because companies have deployed "data integration services" for "decades." ID Br. 23. InDesign's assertion that the ***duration*** of its interference means it is "justified" has no support. InDesign's unauthorized access to CDK's DMS for the purpose of migrating DMS data is not "similar to" advertising, price-cutting, and hiring employees—recognized trade practices—and InDesign's defense therefore fails.

In any event, InDesign's talk of "data integration services" is a red herring. "Data integration services" is a term of art that refers to software tools that integrate with DMS software to help Dealerships in daily operations. LaGreca Supp. ¶¶ 26, 31. CDK enables third-party data integration services to access its DMS through its Fortellis platform. *Id.* ¶¶ 27-30. ███████████

███████████████████████████████████████████████████████

████████████████████. *See* Ex. 31 at 14:10-18, 85:20-86:7.

InDesign similarly fails to satisfy` the other factors in the *hiQ* balancing test. These considerations include whether the conduct is "within the realm of fair competition" and "whether the business interest is pretextual or asserted in good faith." *hiQ*, 31 F.4th at 1193. InDesign argues that its data migrations "promote[] competition" and "offer an innovative and affordably priced service that can help dealerships succeed." ID Br. 23-24. But ***CDK migrates DMS data for free***. LaGreca Supp. ¶ 33. Dealerships do not need InDesign's "low-cost" service of $5,000 to switch DMS providers. *See* Ex. 28 at 85:5-87:8, 148:3-10 (Tekion's Livingstone explaining ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████).

InDesign says the Dealer Data Laws show its conduct constitutes fair competition. ID Br. 23. Those laws, enacted in a few states, require a DMS provider to make an application programming interface (API) for third-party software developers to integrate with the DMS. *See, e.g.*, A.R.S. § 28-4654(A). InDesign has admitted CDK does just that. Ex. 31 at 125:13-126:7; *see also* LaGreca Supp. ¶¶ 27-30. No principles of "fair competition" require CDK to tolerate

InDesign's surreptitious, unauthorized access to CDK's DMS without a secure API connection.

In short, Defendants' interests in their own profits are not "legitimate business interests." *See hiQ*, 31 F.4th at 1192 ("[I]nterference with an existing contract is not justified simply because a competitor 'seeks to further his own economic advantage at the expense of another.'").[20]

## VI.    CDK faces an immediate irreparable injury.

Without a PI, CDK faces (1) continued hostile access to its proprietary DMS; (2) an increased cybersecurity risk; and (3) damage to contractual relationships and goodwill. Mot. 20-25. Defendants argue these harms are speculative or can be remedied with monetary damages, ignoring the caselaw saying otherwise.

### A.    Interference with property rights to control access is an irreparable harm.

"Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm" because this access interferes with a company's "right to control access to its own computers." *Facebook*, 252 F. Supp. 3d at 782; *see also* Mot. 20-21. Faced with this reality, Tekion declares that it "stopped accessing dealer accounts in December 2024," TK Br. 24, and InDesign points out that CDK once again "blocked InDesign's credentials" in April 2025. ID Br. 11. Given Defendants' past responses to CDK's cease-and-desist letters and account disablement, *see supra* at 2-4, CDK can expect Defendants to resume direct access to CDK's DMS absent a PI. Indeed, as a stopgap, Tekion has asked InDesign to exfiltrate data (in addition to the documents that InDesign had been exporting before). InDesign has stated that it will not stop unless enjoined by this Court. *See* Ex. 31 at 31:23-34:14.

In *Disney Enters., Inc. v. Redbox Automated Retail, LLC*, the court granted a PI because defendant's "voluntary decision not to sell certain [infringing products] up to this point in time does not demonstrate a lack of irreparable harm." 336 F. Supp. 3d 1146, 1158 (C.D. Cal. 2018); *see also*

---

[20] InDesign's cases are not instructive. ID Br. 23-24; *see Buxbom v. Smith*, 145 P.2d 305, 311 (Cal. 1944) (defendants' "deceptive dealings" were "***outside the ordinary course of competition***"); *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 82 (Ct. App. 1979) (defendants' "predominant motive of terminating the existing lease" was not in good faith); *D & R Distrib. Co. v. Chambers Corp.*, 608 F. Supp. 1290, 1294 (E.D. Cal. 1984) (no evidence defendant "misrepresent[ed] … the capabilities and intentions of [plaintiff] as a prospective distributor" and caused economic harm).

*F.T.C. v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999) ("[A]n action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to their old ways.").

Even if CDK faced no other harm (it does), the Court can grant a PI solely based on Defendants' interference with CDK's property rights in violation of the CFAA (*see supra* at 5-10).

**B.      The data security threat CDK faces is real and imminent.**

Defendants' unauthorized access of CDK's DMS threatens public disclosure of sensitive data stored on CDK's servers. *See* Mot. 21-23. Defendants do not dispute that access to CDK's DMS increases the "attack surface" and makes a data breach more likely. TK Br. 22. Tekion's James Fox admitted ███████████████████████████████████████. Ex. 29 at 186:7-24. Fox also conceded ████████████████████████████████████████████████████████████. *Id.* at 130:16-131:18. Tekion's CTO has cautioned against the risk of password-sharing and cited the Dealerships as an "attack vector" for hacking. *See* Stroz ¶ 79. And InDesign's David Lampert admitted using a Dealership's ████████████████████████ could be problematic "if anything were to be questionable in terms of security." Ex. 33 at 88:6-89:8. Defendants attempt to downplay the threat CDK faces with two arguments. Neither carries the day.

<u>First</u>, Tekion claims that because "thousands of third parties (e.g., dealers) already have access to CDK's DMS," there is no harm for Tekion to have access, too. TK Br. 22. The idea that any third party can access CDK's DMS because many Dealerships do is nonsense. That's like saying a bank doesn't need security measures because many people withdraw money from the bank. CDK can manage its cybersecurity risk vis-à-vis authorized Dealerships, including with technological and contractual safeguards. LaGreca ¶¶ 28-47. It cannot do the same for Tekion.

<u>Second</u>, Defendants argue that CDK's cybersecurity risk is "speculative." TK Br. 22; ID Br. 10. But the law does not require CDK to experience a cybersecurity event before obtaining interim relief from the Court. "The purpose of a preliminary injunction is to allow a plaintiff to come to court to stop imminent, irreparable harm before such harm occurs." *Morrow v. U.S. Parole Comm'n*, 2012 WL 2877602, at *1 (C.D. Cal. Mar. 20, 2012).

None of Defendants' cited cases demonstrate that CDK's increased cybersecurity risk is too speculative to warrant interim relief. *See* TK BR. 22-23; ID Br. 10-11. In *Dealer Mgmt. II*, the court at summary judgment found CDK's expert did not link the plaintiff Dealerships' "issuing login credentials to data integrators" to a security breach, but that case involved a different legal standard and different conduct. 680 F. Supp. 3d at 1023. Here, CDK's expert analyzed not only sharing credentials but also installing Meraki VPN devices and virtual machines. Stroz ¶¶ 72-97.

In *CDK Glob. LLC v. Brnovich*, 2020 WL 4260506, at *5 (D. Ariz. July 24, 2020), the court found certain state statutes did not threaten CDK's data security because the DMS providers "could still fulfill their data-security obligations while complying with the statute's mandate … through an API . . . ." The court did not hold that InDesign's unrestricted access using login credentials intended for the Dealership—rather than a CDK-approved API—poses no cybersecurity risk.

And in *Authenticom, Inc. v. CDK Glob., LLC*, 2017 WL 3017048, at *9 (W.D. Wis. July 14, 2017), the court found the "most important" factor weighing against a finding of cybersecurity harm was that ***Reynolds***, a different DMS provider, "allows many exceptions to its 'no hostile integration' policy." Significantly, the Seventh Circuit vacated the district court's order allowing Authenticom to access DMSs because the order "forcing [CDK and Reynolds] to do business with Authenticom on terms to which they did not agree" was inconsistent with Supreme Court refusal-to-deal precedent. *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017).

In any event, when considering interim relief, courts have found third-party access to a computer system increases the risk of "***disclosure of sensitive and confidential information***." *New York v. Trump*, 765 F. Supp. 3d 284, 286 (S.D.N.Y. 2025); *see also Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020) (CFAA violation threatened irreparable injury because it undermined the university's ability to protect "students' proprietary information."). InDesign fails to distinguish these cases, *see* ID Br. 11, which support that loss of control over access creates an imminent cybersecurity risk. The harm is not speculative: Defendants' current conduct makes a data breach more likely than CDK's risk tolerance allows.

**C.    Interference with contractual relationships and goodwill is irreparable harm.**

Damage to goodwill and contractual relationships is a harm that monetary damages cannot

remedy, and courts have cited these injuries in granting PIs based on DMCA and tortious interferences claims. *See* Mot. 23-25. Tekion says—without citation—that any "damage to CDK's goodwill is due to CDK's mistreatment of its own customers." TK Br. 24. InDesign likewise claims that CDK holds "dealer's data hostage" until dealers pay "monopolistic data ransoms." ID Br. 12 n.9. The record is clear that: (1) CDK has cooperated with Tekion on DMS data conversions, Ex. 28 at 61:23-63:10, 72:17-75:17, 97:2-20; and (2) CDK offers DMS data conversion services *for free*. LaGreca Supp. ¶¶ 33. When Defendants mispresent these facts to induce MSA breaches, that damages CDK's goodwill. *See supra* at 18-19. And Defendants' access to CDK's copyrighted software undermines CDK's relationships with licensees and devalues CDK's investment in data security. LaGreca ¶¶ 71-86. These are intangible injuries and thus are irreparable harms.

**VII.    The balance of equities supports granting a preliminary injunction.**

If the court grants the PI, then CDK will continue to assist Dealerships in CDK-to-Tekion DMS data conversions *for free*. LaGreca Supp. ¶¶ 33. This refutes Defendants' assertions that a PI is against the public interest. *See* TK Br. 25; ID Br. 25. The private equities also support injunctive relief. Tekion argues the private equities favors its access to CDK's DMS because Dealerships need DMS data "months" in advance of a Tekion "go-live" date. TK Br. 25. But its witness admitted that there have been few to no issues in CDK controlled migrations. Ex. 28 at 61:23-63:10, 72:17-75:17, 97:2-20. Tekion's preference to obtain data on a specific timeline is an insufficient interest to justify interference.[21] InDesign argues that injunctive relief would "pose an existential threat" to its business. ID Br. 24. This argument fails because a company has no right to profit on unauthorized access to a private computer system. *Cf. Ticketmaster*, 315 F. Supp. 3d at 1171 (finding defendants' business "built on a scheme to evade" terms-of-service "policies for profit" in violation of the CFAA was "anything but innocuous"); *Dealer Mgmt. II*, 680 F. Supp. 3d at 980 ("CDK's unilateral decision to block third parties from accessing its DMS would be lawful…").

**VIII.   Conclusion**

The Court should grant CDK's motion for a preliminary junction.

---

[21] InDesign's President David Lampert testified Tekion ████████████████████████████████
████████████████████████████ Tekion claims it needs. Ex. 29 at 49:7-18; Ex. 31 at 70:7-16.

Dated: May 29, 2025                    **SUSMAN GODFREY L.L.P.**

                                       By: */s/ Vineet Bhatia*

                                       VINEET BHATIA (*Admitted Pro Hac Vice*)
                                       vbhatia@susmangodfrey.com
                                       SHAWN RAYMOND (*Admitted Pro Hac Vice*)
                                       sraymond@susmangodfrey.com
                                       ROBERT SAFI (*Admitted Pro Hac Vice*)
                                       rsafi@susmangodfrey.com
                                       KATHERINE JAMES (*Admitted Pro Hac Vice*)
                                       rjames@susmangodfrey.com
                                       SUSMAN GODFREY L.L.P.
                                       1000 Louisiana, Suite 5100
                                       Houston, TX 77002
                                       Telephone: (713) 651-9366
                                       Facsimile: (713) 654-6666

                                       JESSE-JUSTIN CUEVAS (SBN 307611)
                                       jcuevas@susmangodfrey.com
                                       SUSMAN GODFREY L.L.P.
                                       1900 Avenue of the Stars, Suite 1400
                                       Los Angeles, CA 90067
                                       Telephone: (310) 789-3100
                                       Facsimile: (310) 789-3150

                                       AMY GREGORY (*Admitted Pro Hac Vice*)
                                       agregory@susmangodfrey.com
                                       SUSMAN GODFREY L.L.P.
                                       One Manhattan West, 50th Floor
                                       New York, New York 100001
                                       Telephone: (212) 336-8330
                                       Facsimile: (212) 336-8340

                                       DANIEL R. SAEEDI (*Admitted Pro Hac Vice*)
                                       daniel.saeedi@BlankRome.com
                                       RACHEL SCHALLER (*Admitted Pro Hac Vice*)
                                       rachel.schaller@blankrome.com
                                       BLANK ROME LLP
                                       444 West Lake Street, Suite 1650
                                       Chicago, Illinois 60606
                                       Telephone: (312) 776-2600
                                       Facsimile: (312) 776-2601

                                       *Attorneys for Plaintiff CDK Global, LLC*