UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CDK GLOBAL, LLC,

Plaintiff,

v.

TEKION CORP., et al.,

Defendants.

Case No.  25-cv-01394-JSC

**ORDER RE: CDK'S MOTION FOR PRELIMINARY INJUNCTION & INDESIGN'S MOTION TO DISMISS**

Re: Dkt. Nos. 45, 52

CDK Global, LLC ("CDK") sues Tekion Corp. ("Tekion") and InDesign Data, LLC ("InDesign") for illicitly entering its Dealer Management System (DMS) to extract CDK's proprietary data.  (Dkt. No. 1.)[1]  Now before the Court are CDK's motion for preliminary injunction and InDesign's motion to dismiss the complaint.  (Dkt. Nos. 45, 52.)  After careful consideration of the parties' briefing, and having had the benefit of oral argument on June 26, 2025, the Court DENIES CDK's motion for preliminary injunction and GRANTS in part and DENIES in part InDesign's motion to dismiss.

## BACKGROUND

### I.    Complaint Allegations

"CDK is the leading automotive retail software provider[,]" that serves dealerships in the automotive and trucking industry.  (Dkt. No. 1 ¶ 1.)  CDK's Dealer Management System ("DMS") "is a suite of powerful software tools that equip dealers with the solutions they need in one fully integrated platform."  (*Id.* ¶ 2-3.)  The  DMS "provides the infrastructure and intellectual property necessary for [CDK's automotive] ecosystem to function."  (*Id.* ¶ 24.)  "CDK's DMS and related

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

product platforms integrate multiple functions for the Dealerships, including consumer buying, targeted advertising and marketing, automotive sale and lease transactions, financing, and insurance," as well as "Dealerships' parts supply, service, and maintenance of vehicles."  (*Id.* ¶ 25.)

"As CDK's contracts with Dealerships and third parties make clear, the DMS is the sole and exclusive property of CDK."  (*Id.* ¶ 27.)  "CDK grants dealerships who purchase its DMS services a personal, non-transferable, license to use CDK's DMS in accordance with the terms and conditions of their agreement with CDK."  (*Id.* ¶ 28.)  "The Dealerships, through their access to the DMS, have access to highly sensitive, commercially valuable data belonging to consumers (*e.g.*, the car-buying public), OEMs ["original equipment manufacturers"],[2] other third parties, and CDK itself."  (*Id.* ¶ 33.)  Similarly, CDK's "trade secrets and proprietary information are embedded within the DMS."  (*Id.* ¶ 35.)

Given the sensitivity of much of this information, "CDK keeps its applications behind firewalls and demands access only through private networks."  (*Id.* ¶ 39.)  Thus, Dealerships use a virtual private network ("VPN") or a lease-line multiprotocol label switching network ("MPLS") to communicate between the dealership's network and CDK's network.  (*Id.* ¶ 38, 42.)  "By design, the CDK network only accepts electronic communications from devices (i.e., computer workstations) tied to internet protocol ('IP') addresses on the corresponding local Dealership network that have been authorized by CDK to access" CDK's DMS.  (*Id.* ¶ 43.)  Dealership employees "only ha[ve] access to the parts of the DMS necessary to perform their job functions."  (*Id.* ¶ 47.)  So, typically, employees lack "administrator-level privileges to access all DMS functions, create new DMS users, or access CDK's proprietary formulas, code, and similar confidential CDK data.  CDK requires Dealerships to designate a limited group of employees, qualified in information management and technology, to receive administrator-level access privileges."  (*Id.*)  And each employee accessing the DMS "must certify that she is a Dealership employee authorized to access the DMS."  (*Id.* ¶ 49.)

United States District Court
Northern District of California

---

[2] These include companies such as GM, Ford, Toyota, Subaru, Porsche, and Jaguar.  (*Id.* ¶ 29.)

"Dealerships are contractually prohibited from giving unauthorized third parties access to the DMS and the CDK Trade Secrets, including login credentials meant for use solely by Dealership employees." (*Id.* ¶ 50.) CDK and dealerships enter into a Master Services Agreement ("MSA") where each dealership agrees to only "use CDK's software for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any Products or Services, or any portion thereof, to any third party." (*Id.* ¶ 53.) Importantly, "CDK's standard MSA expressly prohibits the Dealership from supplying login credentials to third parties or otherwise granting third parties access to the DMS." (*Id.* ¶ 55.) But at the expiration of an MSA, dealerships sometimes seek to move to a different DMS provider, such as Tekion, which necessitates "transferring the Dealership's data to the new provider under the terms of the MSA." (*Id.* ¶ 62.) "Since April 2020, CDK has completed dozens of data conversions for Dealerships leaving CDL for Tekion and has likewise received from Tekion dozens of data conversions for customers joining CDK." (*Id.* ¶ 63.)

"In April 2024, CDK learned that Tekion had entered an engagement to provide 'Automotive Retail Cloud' services at four locations for one of CDK's Dealerships before the end of the year," but this dealership had already elected to renew its MSA with CDK through April 2025. (*Id.* ¶ 64-65.) So, "CDK wrote Tekion on April 2, 2024, advising of CDK's rights and the Dealership's obligations under the MSA," specifically noting Tekion was prohibited from accessing CDK's DMS and its trade secrets. (*Id.* ¶ 67-69.) Tekion acknowledged receipt of the letter on April 5, 2024, but at some point that same year, "Tekion began working hand-in-hand with InDesign to provide Dealerships software scripts and technical assistance to conduct mass data exports from the DMS." (*Id.* ¶ 70-71.) InDesign's product DMSConnect, also known as 1DMS, "is designed for InDesign to be able to access, scrape, and collect data from CDK's DMS without CDK's permission." (*Id.* ¶¶ 72-73.) InDesign and Tekion solicit dealerships conducting data transfers to Tekion to sign engagements with InDesign whereby "InDesign would be provided unauthorized access to the DMS in order to allow InDesign to install its data extraction software, '1DMS' on the Dealership's computers, which are connected by VPN or MPLS to CDK's servers containing the DMS." (*Id.* ¶ 75.) "Deploying 1DMS necessarily requires that

InDesign obtain information about CDK's systems and infrastructure, including elements involving confidential and proprietary forms, rules, structured tables, software code tools, and data compilations." (*Id.* ¶ 77.)

In November 2024, CDK began an investigation into Tekion's conduct after it received a forwarded email conversation from one of its customer dealerships. (*Id.* ¶ 78-80.) In the underlying email chain, a Tekion employee claimed he was tasked with "gaining access to the CDK system," and said he would ship the dealership a VPN endpoint device which "would allow Tekion to build a 'tunnel' from its network to the Dealership network." (*Id.* ¶ 81.) The Tekion employee then requested the dealership "provide login credentials for the DMS" and explained that, once the VPN device was installed, "Tekion would be able to extract data from the DMS." (*Id.*) CDK thereafter began an investigation where it discovered Tekion would "create user accounts and run software scripts that download information from the DMS to Tekion's virtual desktops." (*Id.* ¶ 83-85.) CDK then "disabled the [Tekion] user credentials to prevent further unauthorized access." (*Id.* ¶ 86.) Since November 1, 2024, "CDK has disabled dozens of Tekion user credentials." (*Id.* ¶¶ 87-89.) CDK sent Tekion a cease-and-desist letter on December 6, 2024, regarding this activity, but "Tekion persisted in using a multitude of methods to gain unauthorized access to the DMS and computer systems." (*Id.* ¶¶ 90-92.)

On December 10, 2024, CDK was informed by another dealership Tekion had contacted it to perform the same process to extract its data from the CDK DMS. (*Id.* ¶¶ 93-94.) And again, on December 17, 2024, the same dealership forwarded another email chain from Tekion and InDesign where both Defendants "were attempting to persuade the Dealership to covertly allow Defendants to latch onto the DMS to extract data." (*Id.* ¶¶ 94-97.) Specifically, after the dealership expressed its MSA had a designated process for data transfer, InDesign responded "If for any reason they're not able to [approve data transfer], or they don't give you AR Approval, then we can be your Plan B." (*Id.* ¶¶ 99-100.) "Each time that Defendants access the DMS through a Dealership computer, they access and use valuable pieces of CDK's intellectual property," creating copies of CDK's DMS program code, page layouts, graphics, text, organization, and displays in their computers' temporary memory. (*Id.* ¶¶ 110-11.)

4

**II.    Procedural Background**

CDK sues Tekion and InDesign for:

(1) Violation of the Computer Fraud and Abuse Act (CFAA) 18 U.S.C. § 1030;

(2) Violation of the Digital Millenium Copyright Act (DMCA) 17 U.S.C. § 1201;

(3) Violation of the Stored Communications Act (SCA) 18 U.S.C. § 2701;

(4) Misappropriation of trade secrets under 18 U.S.C. § 1836;

(5) Violation of California's Comprehensive Computer Data Access and Fraud Act (DAFA);

(6) Misappropriation of trade secrets under California Civil Code § 3426;

(7) Tortious Interference with existing business relations under California law;

(8) Unfair business practices under the Unfair Competition Law ("UCL").

(*Id.*)  CDK seeks injunctive relief and damages against both Defendants.

Tekion sued CDK in December 2024 for alleged antitrust violations.  *Tekion v. CDK*, No. 24-cv-08879 (Dkt. No. 1).  On February 10, 2025, CDK moved to dismiss Tekion's complaint under Federal Rule of Civil Procedure 12(b)(6), and instituted the present action against both Tekion and InDesign.  The Court then related both cases.  (Dkt. No. 19.)  CDK moved for a preliminary injunction in this case and at the same time moved to dismiss the complaint against it in the related case.  (Dkt. No. 45); *Tekion v. CDK.*, No. 24-cv-08879 (Dkt. No. 23).  InDesign subsequently filed a motion for summary dismissal of CDK's motion for preliminary injunction and to expedite briefing, which the Court denied.  (Dkt. Nos. 46, 47, 51.)  The Court extended the briefing schedule for CDK's motion for preliminary injunction after the parties stipulated to do so. (Dkt. No. 49.)

Now pending before the Court is CDK's motion to preliminarily enjoin Defendants' access to dealer data on its proprietary DMS (Dkt. No. 45), and InDesign's motion to dismiss CDK's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 52.)

//

//

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANALYSIS**

**I.    Motion for Preliminary Injunction**

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021) (emphasis in original); *see also Atwood v. Shinn*, 36 F.4th 901, 903 (9th Cir. 2022) (holding the movant must make a "clear showing" it is entitled to preliminary injunctive relief) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium)).

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted).

The Court need not consider all the *Winter* factors here because the irreparable harm requirement disposes of the motion.

**A.  Tekion**

In its preliminary injunction opposition, Tekion represented that upon receipt of CDK's December 2024 cease and desist letter it stopped accessing CDK's DMS through dealership-provided credentials—precisely the conduct CDK seeks to preliminarily enjoin.  (Dkt. No. 65-1 at ¶ 27 ("Tekion received a cease-and-desist letter dated December 6, 2024, from CDK's attorneys demanding that Tekion cease using dealership accounts to access and export data for migration to Tekion, which I understand CDK has included as an exhibit to its preliminary injunction motion. Dkt. 45-10. Upon receiving this correspondence, Tekion stopped providing data access assistance to dealers by using dealership-provided credentials as described in Sections IV and V, above. Tekion has not resumed this activity.").)  At the June 26, 2025 hearing, Tekion confirmed it will not access CDK's DMS by using dealership-provided credentials—upon penalty of contempt—

6

United States District Court
Northern District of California

1    until further order of this Court.  So, as to Tekion, the need for injunctive relief is moot and there

2    is no risk of irreparable harm.

3        **B.  InDesign**

4        CDK has not made a "clear showing" that it will be irreparably harmed by continuation of

5    the status quo as to InDesign because it has been aware of precisely how InDesign operates since

6    at least June 2019 and has not identified a single instance of harm from InDesign's long-time

7    operations.

8        A "long delay before seeking a preliminary injunction implies a lack of urgency and

9    irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)

10   (citing *Lydo Ents. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984); *GTE Corp. v.*

11   *Williams*, 731 F.2d 676, 678-79 (10th Cir. 1984)).  CDK has been  aware of InDesign's activities

12   since at least 2016 (Dkt No. 72-4 ¶¶ 3-4), and in June 2019 deposed InDesign's CEO who testified

13   to the exact same practices CDK now seeks to enjoin six years later.  (Dkt. No. 46-3 at 9-13.)  So,

14   CDK did not act diligently to enjoin InDesign's activities after it discovered them.  Indeed, CDK

15   did not send a cease and desist letter or even raise any concern with InDesign about its activities

16   until it filed its present motion.  (Dkt. Nos. 73-1 ¶¶ 3-14; 62-2 ¶ 48 ("In all those years, CDK

17   never contacted us, or raised any concerns, about InDesign's dealer-authorized access

18   methods.").)[3]  CDK does not dispute that "[o]n February 11, 2025—the day after CDK filed its

19   lawsuit against InDesign—CDK sent InDesign a cease-and-desist letter" for the first time.  (Dkt.

20   No. 62-2 ¶ 51; *see also* Dkt. No. 73-1 ¶ 37 (Mr. LaGreca attesting to the same).)

21       CDK's reliance on *Disney Ents., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), for

22   the proposition its investigation was a proper basis for delaying legal action is unpersuasive.

23   There, in July 2015 the defendant notified the studios of its services, indicating it was in beta-

24   testing, and the defendant began its service in earnest in August 2015.  *Id.* at 854.  The studios that

25   _____

26   [3] There is a factual dispute about whether CDK ever disabled InDesign dealer-created credentials,
     as CDK's CEO attests it has since 2016 disabled InDesign accounts (Dkt. No. 73-1 ¶¶ 4-8), while
27   InDesign claims "[p]rior to roughly April 14, 2025, CDK has never cut off or disabled InDesign's
     dealer-authorized access credentials." (Dkt. No. 62-2 ¶ 50.)  Regardless, CDK admits it for years
28   knew of InDesign's activities regarding the CDK DMS and it did not demand InDesign stop or
     take any legal action against InDesign.

believed the defendant was infringing their copyright filed suit eleven months later, *id.* at 855, after a "cautious investigation of [the defendant]" and "only after [the defendant] expanded from beta-testing into a real threat, and [the defendant's] admission that 'it intends to continue to stream [the Studios'] works and add other future releases, unless enjoined.'" *Id.* at 866.  Here, CDK has been aware of InDesign's exact conduct since it deposed InDesign's CEO six years ago, and CDK even contends it had disabled InDesign accounts long before then.  And although CDK responds it moved for an injunction soon after conducting its investigation, it does not explain why it delayed its investigation of InDesign for all those years.  Further, while CDK in reply argues that it "only recently learned the scope of InDesign's access," as support it cites Mr. LaGreca's declarations, but the declarations do not supply any investigatory justification for its years-long delay.  (Dkt. No. 73 at 11 (citing Dkt. Nos. 45-1 ¶¶ 47; 73-1 ¶¶ 7-13).)  CDK also argues InDesign's continued access results in increased likelihood of security breaches, but it identifies no data breach resulting from InDesign's access to the DMS, even though its has been engaging in such conduct for more than a decade.

So, CDK has failed to make a "clear showing" that it will be irreparably harmed by the maintenance of the years-long status quo as to InDesign.

*         *         *

Accordingly, CDK's motion for preliminary injunction is DENIED.

## II.    Motion to Dismiss

InDesign moves to dismiss each of CDK's claims against it.  (Dkt. No. 52.)

### A.  CFAA Claim (Claim 1)

The Computer Fraud and Abuse Act "prohibits acts of computer trespass by those who are not authorized users or who exceed authorized use. It creates criminal and civil liability for whoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065-66 (9th Cir. 2016) (cleaned up).  "In other words, it is an anti-hacking statute." *Watters v. Breja*, No. 23-cv-03183-HSG, 2024 WL 201356, at *2 (N.D. Cal. Jan. 18, 2024).

While the complaint cites several CFAA provisions (Dkt. No. 1 at ¶¶ 137-145.), CDK's opposition argues it states a claim under 18 U.S.C. § 1030(a)(2).  (Dkt. No. 69 at 12 (relying on *Niantic, Inc. v. Global++*, No. 19-CV-03425-JST, 2019 WL 8333451, at *6 (N.D. Cal. Sept. 26, 2019) for the elements of its CFFA claim, where *Niantic* addressed an (a)(2) claim).  To state a CFAA claim under section 1030(a)(2),  a plaintiff must allege facts plausibly supporting an inference the defendant "'(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that [it] (3) thereby obtained information (4) from any protected computer ..., and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value.'"  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).  In analyzing whether conduct runs afoul of the CFAA, courts "look to whether the conduct at issue is analogous to 'breaking and entering.'"  *hiQ Labs, Inc. v. LinkedIn Corp*., 31 F.4th 1180, 1197 (9th Cir. 2022) (citing H.R. Rep. No. 98-894, at 20).

The crux of InDesign's argument is that it always had and has the dealers' permission to access dealer-owned data within CDK's DMS.  So, the claim fails because (1) InDesign had authorization to access the DMS, and (2) InDesign's access was not analogous to breaking-and-entering.  Separately, InDesign finally argues CDK did not suffer financial loss.

### i.  Intentional access without authorization

The "pivotal CFAA question here" is whether, as alleged in the complaint, InDesign's access of CDK's DMS using Dealer credentials "was 'without authorization' within the meaning of the CFAA and thus a violation of the statute."  *hiQ Labs*, 31 F.4th at 1195 (quoting 18 U.S.C. § 1030(a)(2)).  "[W]ithout authorization" means "accessing a protected computer without permission."  *United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016) ("*Nosal II*") overruled *in part on other grounds by Lagos v. United States*, 584 U.S. 577 (2018).  Exceeding authorized access means "obtaining access with authorization but then using that access improperly."  *Musacchio v. United States*, 577 U.S. 237, 240 (2016).  So, "'without authorization' would apply to *outside* hackers (individuals who have no authorized access to the computer at all) and 'exceeds authorization access' would apply to *inside* hackers (individuals whose initial access to a computer is authorized but who access unauthorized information or files)."  *Nosal II*, 844 F.3d at 1034.

1    (citation omitted).  And though the CFAA is a criminal statute, 18 U.S.C. § 1030(g) provides a

2    private right of action for "[a]ny person who suffers damage or loss by reason of a violation" of

3    the CFAA.

4         Here, drawing all reasonable inferences in CDK's favor, it has plausibly alleged InDesign

5    accessed CDK's DMS without authorization.  It limits DMS access through private networks and

6    only accepts electronic communications from computer workstations tied to IP addresses on

7    dealership networks specifically authorized by CDK.  As InDesign is not a dealer to which CDK

8    authorized private network access tied to InDesign's IP address, the complaint supports an

9    inference InDesign intentional accessed CDK's DMS "without authorization."

10         And the allegations also plausibly support an inference "the conduct at issue is analogous

11   to 'breaking and entering.'"  *hiQ Labs*, 31 F.4th at 1197 (quoting H.R. Rep. No. 98-894, at 20).

12   "The legislative history of section 1030 thus makes clear that the prohibition on unauthorized

13   access is properly understood to apply only to private information—information delineated as

14   private through use of a permission requirement of some sort."  *Id*.  So, the breaking-and-entering

15   inquiry involves determining whether the computer system accessed was "one which no one could

16   access without authorization."  *Id.* at 1199 (citing *Nosal II*, 844 F.3d at 1038).  *See, e.g.*, *Watters*,

17   2024 WL 201356 at *3 (holding a person who accessed "a public, unrestricted webpage" did not

18   commit conduct analogous to breaking and entering).  CDK plausibly alleges the DMS was not

19   publicly accessible as dealers required a VPN and valid login credentials, and even all login

20   credentials were not granted administrator-level privileges and "required [employees] to complete

21   multi-factor authentication to confirm their identity."  (Dkt. No. 1 ¶ 47.)

22         InDesign responds that the complaint itself alleges the dealerships voluntarily shared their

23   authorized access with InDesign so its access of CDK's DMS was "with authorization." *See CDK*

24   *Global, LLC v. Brnovich*, 461 F. Supp. 3d 906, 915 (D. Ariz. 2020) (noting the CFAA "does not

25   limit how access might be authorized").  For purposes of this motion, the Court assumes the

26   dealerships' voluntary sharing of their access, without more, means InDesign's access was

27   authorized.  *See hiQ Labs*, 31 F.4th at 1200 (holding the rule of lenity applies given the court

28   "must interpret the statute consistently, whether [it] encounter[s] its application in a criminal or

United States District Court
Northern District of California

noncriminal context") (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)).  The complaint still supports a plausible inference InDesign accessed CDK's computers without authorization at least after December 2024.  In December 2024, a dealership advised InDesign that dealerships could not validly grant it authorization to access CDK's DMS, since such actions were expressly prohibited by the dealerships' MSA with CDK.  (*Id.* ¶¶ 94-97; *see also* ¶ 50 ("Dealerships are contractually prohibited from giving unauthorized third parties access to the DMS and the CDK Trade Secrets, including login credentials meant for use solely by Dealership employees.").)  And InDesign continued (and continues) to access CDK's DMS after the dealer notified it that CDK prohibited such access. (*Id.*)  Because CDK alleges InDesign accessed its DMS, scraped and downloaded proprietary and copyrighted material from the same, and did so all while knowing CDK prohibited dealers from sharing their DMS access with unauthorized third parties, it plausibly alleges InDesign's "unauthorized access."

InDesign's cited cases do not persuade the Court otherwise, at least at this early stage in the litigation.  In *WalkMe Ltd. v. Whatfix, Inc.*, the plaintiff similarly alleged the defendant "used customer credentials to access the [plaintiff's] platform, which [the plaintiff] alleges was 'expressly prohibited under the terms of [its] agreements with its customers.'"  *WalkMe Ltd. v. Whatfix, Inc.*, No. 23-cv-03991-JSW, 2024 WL 1221960, at *5 (N.D. Cal. Mar. 21, 2024).  The court held such allegations were insufficient to state a claim because "[t]he phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions.'"  *Id.* (quoting *United States v. Nosal*, 676 F.3d 854, 864 (9th Cir. 2012) ("Nosal I")).  But CDK's claim is not that InDesign exceeded authorized access, it is that the dealerships could not authorize InDesign's access and InDesign knew that fact as of December 2024—so after that date no access at all was authorized.  Further, *WalkMe* did not indicate that the defendant knew that the plaintiff's customers' contracts with the plaintiff prohibited the customer from authorizing access to third parties.

Similarly, in *AtPac, Inc. v. Aptitude Solutions, Inc.*, 730 F.Supp.2d 1174 (E.D. Cal. 2010), the court concluded that the plaintiff's licensee's sharing of access with the defendant meant that the defendant did not act "without authorization," but expressly noted the defendant was not on

United States District Court
Northern District of California

United States District Court
Northern District of California

1    notice of the terms of the license that prohibited the sharing of access. *Id.* at 1082. Again, here, in

2    contrast, CDK alleges InDesign knew as of December 2024 that dealerships were contractually

3    prohibited from sharing their CDK credentials with InDesign. So, drawing all reasonable

4    inferences in CDK's favor, the allegations plausibly support an inference InDesign's continued

5    intrusion into the DMS after that point was "without authorization."

6           InDesign next argues that to state a CFAA claim, CDK must affirmatively revoke

7    InDesign's dealership-authorized access and that such affirmative act—the cease and desist letter

8    to InDesign—did not occur until after the complaint was filed and therefore the claim, as currently

9    pled, fails. As support InDesign relies on *Power Ventures*, 844 F.3d at 1067. There, Facebook, a

10   social media platform where users were required to have password-protected accounts to make

11   website posts, sued the defendant, a company whose business model involved obtaining user

12   permission to access and post on those users' Facebook accounts. *Id.* at 1062-63. When

13   Facebook became aware of the defendant's activities, it immediately sent a cease-and-desist letter

14   and subsequently sued under various state and federal laws, including under the CFAA. *Id.* In

15   upholding the lower court's grant of summary judgment in favor of Facebook, the Ninth Circuit

16   held "after receiving the cease-and-desist letter from Facebook, Power intentionally accessed

17   Facebook's computers knowing that it was not authorized to do so, making Power liable under the

18   CFAA." *Id.* at 1069. Specifically, "[p]ermission from the users alone was not sufficient to

19   constitute authorization after Facebook issued the cease and desist letter." *Id.* at 1068. Relevant

20   to InDesign's argument, the court also held the defendant's initial access prior to the cease and

21   desist letter did not violate the CFAA because it "reasonably could have thought that consent

22   from *Facebook users* to share the promotion was permission for [the defendant] to

23   access *Facebook's* computers." *Id.* at 1067.

24          *Powers* does not mandate dismissal. First, *Powers* was on review of summary judgment in

25   the plaintiff's favor; so, when the court recited what the defendant "could have thought," it was

26   applying the summary judgment standard that all reasonable inferences had to be drawn in the

27   non-moving party's favor. *See id.* at 1064 (holding the court assumed all facts in favor of the non-

28   moving party in reference to a different claim). Here, on InDesign's motion to dismiss, all

United States District Court
Northern District of California

1  reasonable inferences must to be drawn in CDK's favor.  Under that standard, the allegations

2  support an inference that at least by December 2024, when a dealer affirmatively told InDesign

3  that its form agreement with CDK did not permit it to share its access to CDK's DMS, InDesign

4  knew that it did not have permission to access CDK's DMS.  Second, the *Powers* court recited all

5  of the evidence supporting the conclusion that at least by the cease-and-desist letter, there was no

6  genuine dispute that the defendant did not have authorization to access Facebook's computers.

7  *Powers* in no way suggests a cease-and-desist letter is required to support an inference access is

8  not authorized.  Third, while *Powers* cited *Nosal I* for the proposition that "a violation of the terms

9  of use of a website—without more—cannot establish liability under the CFAA," *id.* at 1067, it did

10 not hold that a third party acts "with authorization" when it obtains access to a VPN-protected

11 computer system from an entity it knows does not have permission to provide it with access.

12                          **ii.   Cognizable harm or financial loss**

13         The final CFAA element is "loss to one or more persons during any one-year period

14 aggregating at least $5,000 in value."  *Brekka*, 581 F.3d at 1132.  "Loss" means "any reasonable

15 cost to any victim, including the cost of responding to an offense, conducting a damage

16 assessment, and restoring the data, program, system, or information to its condition prior to the

17 offense."  18 U.S.C. § 1030(e)(11).  Here, CDK plausibly alleges loss in the form of its

18 investigation and response to InDesign's conduct.  InDesign does not contest CDK's loss prior to

19 the issuance of the cease-and-desist letter; instead, InDesign argues the only conduct that is

20 potentially cognizable under the statute is that which occurred after the letter.  As explained above,

21 the Court disagrees.  Additionally, at the pleading stage, the Court must draw reasonable

22 inferences in CDK's favor, and, in so doing, CDK plausibly alleges loss of at least $5,000.

23                              *      *      *

24         So, because CDK plausibly alleges a claim under the CFAA, InDesign's motion to dismiss

25 this claim is DENIED.

26                          **B.  CCDAFA Claim (Count 5)**

27         InDesign's only argument for dismissal of CDK's claim under California's analogue

28 computer-hacking statute, the Comprehensive Data Access and Fraud Act ("CCDAFA"), is that

1    CDK fails to allege a claim under the federal CFAA.  Having held CDK plausibly alleges its

2    CFAA claim, InDesign's motion to dismiss this claim is likewise DENIED.

3                    **C.  DMCA Claim (Count 2)**

4           Congress enacted the DMCA, 17 U.S.C. § 1201, to "mitigate the problems presented by

5    copyright enforcement in the digital age."  *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928,

6    942 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and*

7    *superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011) (citation

8    omitted).  The DMCA "create[s] two distinct types of claims."  *Id.* at 944.  "First, § 1201(a)

9    prohibits the circumvention of any technological measure that effectively controls access to a

10   protected work and grants copyright owners the right to enforce that prohibition."  *Id.*  "Second,

11   and in contrast to § 1201(a), § 1201(b)(1) prohibits trafficking in technologies that circumvent

12   technological measures that effectively protect "a right of a copyright owner."  *Id.*  CDK purports

13   to bring both claims. (Dkt. No. 1 ¶ 177).

14          To state a claim under these provisions a plaintiff "must allege that (i) the work at issue

15   was protected under the Copyright Act, (ii) the copyrighted work was protected by a

16   'technological measure,' and (iii) the technological measure was 'circumvented' in order to obtain

17   access to the copyrighted work."  *iSpot.tv, Inc. v. Teyfukova*, No. 21-cv-06815-MEMF (MARx),

18   2023 WL 3602806, at *4 (C.D. Cal. May 22, 2023) (citing 17 U.S.C. § 1201(a)(1)(A); *MDY*

19   *Indus.*, 629 F.3d at 944).

20                    **i.  Copyrighted work**

21          InDesign first argues CDK's claim fails the first element because the Ninth Circuit's 2021

22   decision in *Brnovich* held that  CDK "[does] not hold a copyright in the data itself, which consists

23   of facts about dealers' customers and business operations."  *CDK Glob. LLC v. Brnovich*, 16 F.4th

24   1266, 1278 (9th Cir. 2021).[4]  But CDK does not allege that the *dealer data* itself is the protected

25   copyright material; instead, it alleges CDK's systems and infrastructure are copyright protected.

26   CDK "owns valid copyrights over its proprietary DMS system" and InDesign's 1DMS allows it to

27

28   _____
     [4] In *Brnovich*, CDK sued to enjoin enforcement of Arizona's Dealer Law which granted rights to
     dealerships to access their data on CDK's DMS.  *Id.* at 1272-73.

United States District Court
Northern District of California

1    "obtain information about CDK's systems and infrastructure, including elements involving

2    confidential and proprietary forms, rules, structured tables, software code, tools, and data

3    compilations."  (Dkt. No. 1 ¶¶ 77, 169.)  So, CDK plausibly alleges access to its copyrighted

4    work.

5                    **ii.   Circumvention of a technological measure**

6            Circumvention under the DMCA "means to descramble a scrambled work, to decrypt an

7    encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological

8    measure, without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(A).  InDesign

9    argues that because it uses dealer credentials to log into the DMS, its 1DMS software does not

10   circumvent CDK's technological measures.

11           Drawing reasonable inferences from the allegations in CDK's favor, CDK's password

12   protected database is a technological measure.  For the most part, its applications are behind a

13   firewall and only allow private network access.  (Dkt. No. 1 ¶ 39.)  CDK deploys specialized

14   hardware at the dealerships to secure the connections between the dealers and CDK's network.

15   (*Id.* a¶ 41.)  CDK's system only accepts communications from the dealers' IP address that CDK

16   has previously authorized.  (*Id.* ¶ 43.)  And the communications between the dealers and CDK are

17   all encrypted.  (*Id.* at  ¶¶ 44-45.)

18           And CDK also plausibly alleges that technological measures to ensure dealer-only access

19   to CDK's DMS were "avoided" or "bypassed" by InDesign's use of the dealers' credentials to

20   create an InDesign log in.  (*Id.*  ¶¶ 74-75, 96.)  *See, e.g.*, *Actuate Corp. v. Int'l Bus. Machns.*

21   *Corp.*, 2010 WL 1340519 *9 (N.D. Cal. April. 5, 2010) (holding "unauthorized distribution of

22   passwords and usernames avoids and bypasses a technological measure in violation of sections

23   1201(a)(2) and (b)(1)"); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal.

24   2008) (holding a license holder violated the statute by "distributing a[n] [access key] without

25   authorization," because, in doing so, it "effectively circumvented [plaintiff's] technological

26   measure to control access to a copyrighted work in violation of the DCMA."); *321 Studios v.*

27   *MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) ("However, while [the

28   defendant's] software does use the authorized key to access the DVD, it does not have authority to

United States District Court
Northern District of California

15

1    use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological

2    measure].”); *see also Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-cv-02082-LHK, 2019 WL

3    4848387, at *8 (N.D. Cal. Oct. 1, 2019) (collecting cases) (“[t]he majority of the courts in this

4    district have found that a defendant’s unauthorized use of license keys or passwords, as [the

5    defendant] has alleged, constitutes circumvention under Section 1201(a)(1).”).  Drawing all

6    reasonable inferences in CDK’s favor, using the dealers’ credentials to create InDesign’s own log-

7    in to access CDK’s system “avoided” or “bypassed” CDK’s technological measures to ensure

8    dealer-only access.

9        The cases InDesign cites do not persuade the Court otherwise.  In *iSpot.tv*, for example, the

10    defendant used a username and password to access the plaintiff’s system after having ended her

11    employment with the entity that gave her credentials to access the plaintiff’s system.  *iSpot.tv*,

12    2023 WL 3602806 at *5.  The court held the defendant “individually used the credentials in the

13    technological manner by which she was authorized to do so—albeit without authorization,” so she

14    did not circumvent the plaintiff’s technological measures.  *Id.*  But more than mere unauthorized

15    use of an originally lawfully-obtained password is alleged here: CDK implemented certain

16    technological measures—such as permitting electronic communications only with CDK

17    authorized dealer-networks—that were “avoided’ or “bypassed” by InDesign using the dealers’

18    network and credentials to access CDK’s system.  *Adobe Sys. Inc. v. A&S Elecs. Inc.*, 15-cv-2288-

19    SBA, 2015 WL 13022288 (N.D. Cal. Aug. 19, 2015) and *Egilman v. Keller & Hackman, LLP*, 401

20    F. Supp. 2d 105 (D.D.C. 2005) are distinguishable for the same reasons.  None of these cases

21    involve a defendant “getting around” a plaintiff’s technological measure of restricting access to its

22    copyrighted material to approved IP networks.

23        Accordingly, InDesign’s actions, as alleged in the complaint and drawing reasonable

24    inferences in CDK’s favor, plausibly constitute circumvention of a technological measure.

25                **iii.    Primarily designed to circumvent technological measures**

26        InDesign argues CDK does not plead a claim under § 1201(a)(2)(A) which forbids a

27    person from trafficking in a product “primarily designed” to circumvent technological measures.

28    (Dkt. No. 52 at 25.)  But in opposition, CDK does not argue it plausibly alleges a claim under §

United States District Court
Northern District of California

1201(a)(2)(A), though its complaint refers to all three subsections of § 1201(a)(2). (*Compare* Dkt. No. 1 ¶ 168; *with* Dkt. No. 69 at 24.) So, CDK concedes it does not plead a claim under § 1201(a)(2)(A). Instead, it argues it pleads liability under § 1201(a)(2)(C) which does not require the software be "primarily designed" for that purpose, but only to be marketed for that purpose.

CDK alleges facts that plausibly support an inference of a § 1201(a)(2)(C) violation. CDK alleges InDesign's "business model appears to revolve around designing technology to circumvent the security and access protocols established by CDK to protect its intellectual property and confidential information." (Dkt. No. 1 ¶ 73.) And InDesign markets to users that its 1DMS software allows users to "access 'every part of the DMS that your application demands,' including sales, service, parts, accounting, and customer resource management, 'to mention a few.'" (*Id.* ¶ 74.) Further, InDesign sent solicitation emails from its "Support Team" that stated "'We convert dealers to Tekion (data and docs). I've already got your 2 dealerships in my system with Tekion ID numbers,'" through a process that includes "installing our automation software" and then "creating a CDK user so we can extract all the data and docs before your CDK service ends." (*Id.* ¶ 96.) In all, these allegations sufficiently allege InDesign "marketed" itself and its 1DMS "for use in circumventing a technological measure that effectively controls access to a work protected." 17 U.S.C. § 1201(a)(2)(C).

InDesign counters that because the 1DMS itself does not circumvent the password and IP protections, a "marketing" violation is inadequately pled. But § 1201(a)(2) applies to a person who traffics in "any technology, product, *service*, device, component, or part thereof." 17 U.S.C. § 1201(a)(2) (emphasis added). Further, the 1DMS, as alleged, functions to circumvent the IP address requirements of the CDK DMS by functioning on dealership computers. So, CDK plausibly alleges a violation of § 1201(a)(2)(C). And InDesign does not separately address the 1201(b)(1) claim.

*     *     *

As CDK plausibly alleges its DMCA claim, InDesign's motion to dismiss this claim is DENIED.

//

17

United States District Court
Northern District of California

**D. SCA Claim (Claim 3)**

The SCA prohibits unauthorized access to information and is "nearly identical to the CFAA." *hiQ Labs*, 31 F.4th at 1199-1200 (*comparing* 18 U.S.C. § 2701(a) *with* 18 U.S.C. § 1030(a)(2)(C)). So, the two provisions are interpreted "*pari passu*." *Id.* (quoting *Northcross v. Bd. Of Educ. Of Memphis City Schs.*, 412 U.S. 427, 428 (1973)). Unlike the CFAA, however, the SCA provides an exception to liability "with respect to conduct authorized -- ... by a user of that service with respect to a communication of or intended for that user." 18 U.S.C. § 2701(c). CDK does not argue dealerships are not users as defined by the statute; instead, it argues the exception does not apply to InDesign because the dealerships could not authorize access to data not intended for the dealers. But CDK does not allege facts that plausibly support an inference InDesign's access ever exceeded the dealerships' intended access. The complaint's conclusory allegation that InDesign's access was "in excess of any Dealership's authorization to the DMS" (Dkt. No. 1 ¶ 190), is not sufficient.

Accordingly, CDK's SCA claim against InDesign is DISMISSED with leave to amend.

**E. Trade Secrets Claims under DTSA (Claim 4) and CUTSA (Claim 6)**

To state a claim under either the DTSA or CUTSA, a plaintiff must allege "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018). Under both statutes, misappropriation means "either (1) the '[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or (2) the '[d]isclosure or use of a trade secret of another without express or implied consent.'" *Id.* at 877 (quoting 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)). InDesign seeks to dismiss both trade secrets claims on the grounds CDK does not allege InDesign misappropriated CDK's trade secrets.

CDK plausibly alleges, when drawing reasonable inferences in its favor, that InDesign accessed CDK's trade secrets and disclosed them to Tekion without CDK's express or implied consent. InDesign's 1DMS software "is designed for InDesign to be able to access, scrape, and collect data from CDK's DMS without CDK's permission." (Dkt. No. 1 ¶ 73.) "Deploying

18

1DMS necessarily requires that InDesign obtain information about CDK's systems and infrastructure, including elements involving confidential and proprietary forms, rules, structured tables, software code, tools, and data compilations." (*Id.*¶ 77.) InDesign worked with Tekion by "providing Dealerships automated script software for the purpose of extracting data for conversion to Tekion." (*Id.* ¶ 109.) And accounts with the email domain "@mail.1dms.com"—InDesign's 1DMS accounts—used queries "to retrieve all data from a particular source for an entire month," extracting this data, and converting it to Tekion. (*Id.* ¶¶ 107-109.) So, drawing reasonable inferences in CDK's favor, the complaint alleges "disclosure or use of the trade secret without consent." *7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 997 (N.D. Cal. 2024) (citing 18 U.S.C. § 1839(5)(A)-(B); Cal. Civ. Code § 3426.1(b)).

InDesign's challenge to CDK's use of "Defendants" throughout the complaint fails because CDK alleges Tekion and InDesign both accessed its trade secrets through their data-scraping methods. Indeed, while CDK uses the plural "Defendants" in parts of its complaint its allegations laying out each actor's conduct, taken together with allegations where Defendants are grouped, gives each Defendant notice of what role each played in the alleged harm. *Cf. Sebastian Brown Prods., LLC v. Muzooka, Inc.*, 143 F. Supp. 3d 1026, 1037 (N.D. Cal. 2015) (cleaned up) ("As a general rule, when a pleading fails to allege what role each Defendant played in the alleged harm, this makes it exceedingly difficult, if not impossible, for individual Defendants to respond to Plaintiffs' allegations."); (*see* Dkt No. 1 ¶¶ 72-77; 99-102; 105-112; 124.) So, InDesign has "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

Accordingly, InDesign's motion to dismiss the trade secrets claims is DENIED.

### F. Tortious Interference Claim (Claim 7)

To state a claim under California's intentional interference with contractual relations, a plaintiff must allege "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship, (4) actual breach or disruption of the contractual relationship, and (5) resulting damage." *Tradeshift, Inc. v. BuyerQuest, Inc.*, No. 20-

United States District Court
Northern District of California

1    cv-01294-RS, 2020 WL 8920622, at *4 (N.D. Cal. May 20, 2020) (citing *Reeves v. Hanlon*, 33

2    Cal. 4th 1140, 1148 (2004)). "To establish the claim, the plaintiff need not prove that a defendant

3    acted with the primary purpose of disrupting the contract, but must show the defendant's

4    knowledge that the interference was certain or substantially certain to occur as a result of his or

5    her action." *Reeves*, 33 Cal. 4th at 1148. InDesign argues CDK fails to allege intent (3) and

6    actual breach (4). (Dkt. No. 52 at 29.)

7         The complaint does not plausibly allege intent and actual breach. The complaint alleges

8    InDesign, since at least December 2024, was aware CDK had agreements with dealerships that

9    prohibited its unauthorized access of CDK's DMS. (Dkt. No. 1 ¶¶ 99-102.) But CDK only

10   alleges InDesign *attempted* to induce the breach of the contract between it and a dealership. (*Id.*

11   ¶¶ 99-102.) It does not allege InDesign acted intentionally to induce breach of any particular

12   contract after it became aware that CDK did not permit dealers to share their credentials. So,

13   while CDK alleges InDesign had knowledge of the operative master services agreement provision,

14   it does not allege InDesign then subsequently "induce[d] a breach or disruption of the contractual

15   relationship" between CDK and any particular dealership. *Tradeshift, Inc.*, 2020 WL 8920622, at

16   *4 (citing *Reeves*, 33 Cal. 4th at 1148). Accordingly, CDK has failed to "specify the [] contracts

17   at issue, [and] adequately allege how" InDesign's conduct "led to the disruption of these [MSAs]."

18   *DirecTV, LLC v. E&E Enters. Glob., Inc.*, No. 17-cv-06110-DDP-PLA, 2017 WL 6888500, at *5

19   (C.D. Cal. Nov. 20, 2017).

20        So, InDesign's motion to dismiss the tortious interference with existing business relation

21   claim is GRANTED with leave to amend.

22              **G. UCL Claim (Claim 8)**

23        CDK's final claim is brought under California's Unfair Competition Law ("UCL"), Cal.

24   Business & Professions Code §§ 17200 *et seq*. The UCL defines unfair competition as "any

25   unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

26              **i. "Unfair" practice**

27        In a case arising from a "'claim of unfair competition between direct competitors,' conduct

28   is 'unfair' pursuant to Section 17200 if it has some 'actual or threatened impact on competition,'"

so, a plaintiff must "allege harm to competition, not harm to an individual competitor." *Silverlit Toys Manufactory Ltd. v. Rooftop Grp., USA, Inc.*, No. 08-cv-07631-CBM (PJWx), 2010 WL 11509314, at *7 (C.D. Cal. Jan. 21, 2010) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187-88 (1999)). CDK expressly alleges it is in direct competition with InDesign. (Dkt. No. 1 ¶ 208 ("Defendants' wrongful access to the DMS allowed them to access, copy and use the CDK Trade Secrets to further their businesses in direct competition with CDK, and to wrongfully divert CDK's business model and Dealership clients.") So, to state an "unfair" prong UCL claim CDK must plausibly allege harm "to competition, not harm to an individual competitor." *Silverlit Toys*, 2010 WL 11509314, at *7 (citing *Cel- Tech*, 20 Cal. 4th at 188-191).

CDK does not plausibly allege harm to competition. Indeed, it opposes dismissal on the grounds it "does not allege that InDesign is its direct competitor or has violated antitrust and false advertising laws, [so] CDK does not need to allege general harm to competition to state a UCL claim." (Dkt. No. 69 at 30.) But CDK does allege it is in direct competition with InDesign. (Dkt. No. 1 ¶ 208.) And the *Cel-Tech* court did not limit the harm to competition test to cases involving the antitrust or false advertising laws. To the contrary, it held the test applies "[w]hen a plaintiff [] claims to have suffered injury from a direct competitor[]." *Cel-Tech*, 20 Cal. 4th 186. Since CDK alleges the parties are direct competitors, it is required to allege harm to competition. And since CDK has not alleged any harm to competition, but instead only alleges harm to itself and its business, CDK fails to plausibly allege an UCL unfair prong violation.

### ii.  "Unlawful" Business Practice

CDK does not allege a UCL violation based on fraud, but it does allege a UCL violation based on InDesign's "unlawful" activity. And while CDK's allegations against InDesign do not pass the direct-competitor test, the California Supreme Court cautioned in *Cel-Tech*, "[n]othing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or "unlawful" business practices or 'unfair, deceptive, untrue or misleading advertising.'" *Id.* at 187 n.12. As the Court concludes above that CDK has plausibly alleged violations under the CFAA, DAFA, and the DMCA, so CDK plausibly alleges

an "unlawful" prong UCL claim. *See Scott v. Cintas Corp.*, No. 23-cv-05764-JSC, 2024 WL 3304793, at *7 (N.D. Cal. July 3, 2024) ("Because Plaintiff states a claim for the predicate violations, Plaintiff also states a claim under the UCL").

So, InDesign's motion to dismiss this claim is GRANTED insofar as CDK brings an unfair prong claim, but DENIED as to the "unlawful" prong.

### CONCLUSION

Because CDK has not shown it will suffer irreparable harm, preliminary injunction is not warranted, and CDK's motion is therefore DENIED.  Further, for the reasons stated above, InDesign's motion to dismiss is GRANTED on its SCA, tortious interference with business relations, and UCL unfair prong claims with leave to amend.  InDesign's motion to dismiss is otherwise DENIED.  An amended complaint, if any, must be filed by August 7, 2025.  The amended complaint should identify the statutory subsections under which each claim is brought.

This Order disposes of Docket Nos. 45 and 52.

**IT IS SO ORDERED.**

Dated: July 15, 2025

JACQUELINE SCOTT CORLEY
United States District Judge