Joshua Hafenbrack (*pro hac vice*)
jhafenbrack@winston.com
Benjamin Rudofsky (*pro hac vice*)
brudofsky@winston.com
Jade Briana Baker (*pro hac vice*)
jbbaker@winston.com
Sydney Hartman (*pro hac vice*)
shartman@winston.com
**WINSTON & STRAWN LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5017
Fax: (202) 282-5100

Jenifer E. Parsigian (SBN: 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California Street, 35th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Fax: (415) 591-1400

Bethany Ao (*pro hac vice*)
bao@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700

*Counsel for Defendant and Counter-Plaintiff*
*INDESIGN DATA, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| **CDK GLOBAL, LLC,** | **Case No. 3:25-cv-01394-JSC** |
| Plaintiff, | **INDESIGN DATA, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO THE AMENDED COMPLAINT AND AMENDED COUNTERCLAIMS FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | |
| **TEKION CORP., and** | |
| **INDESIGN DATA, LLC,** | |
| Defendants. | **JURY TRIAL DEMANDED** |
| **INDESIGN DATA, LLC,** | |
| Counter-Plaintiff, | |
| vs. | |
| **CDK GLOBAL, LLC,** | |
| Counter-Defendant. | |

Pursuant to Federal Rules of Civil Procedure 8(b), 15 and 13, and the Court's August 13, 2025 Order (Dkt. 95), InDesign Data, LLC, asserts the following Amended Answer, Affirmative Defenses, and Counterclaims to CDK's Complaint.

## INDESIGN'S ANSWER TO THE AMENDED COMPLAINT

### INTRODUCTION

1. InDesign denies the allegations in Paragraph 1.

2. InDesign admits that CDK is the dominant automotive retail software provider in the United States. InDesign admits that, as the dominant automotive retail software provider, CDK serves thousands of retail locations across North America. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 2 and therefore denies them.

3. InDesign admits that CDK's DMS is a suite of software tools that purport to equip dealers with solutions in one integrated platform. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 3 and therefore denies them.

4. The allegations in Paragraph 4 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

5. Paragraph 5 includes allegations concerning Tekion for which InDesign lacks knowledge or sufficient information to admit or deny them. To the extent the allegations pertain to InDesign, InDesign denies all allegations in Paragraph 5.

6. The allegations in Paragraph 6 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

7. Paragraph 7 includes allegations concerning Tekion for which InDesign lacks knowledge or sufficient information to admit or deny them. To the extent the allegations pertain to InDesign, InDesign admits that it provides independent data integration services for dealerships switching to a variety of DMS providers, including Tekion. InDesign denies the remaining allegations in Paragraph 7.

8. Paragraph 8 is vague and ambiguous, so InDesign cannot reasonably ascertain whether the allegations pertain to InDesign. To the extent they do, Paragraph 8 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 8.

## PARTIES

9.     InDesign admits the allegations in Paragraph 9.

10.     The allegations in Paragraph 10 concern Tekion.  InDesign lacks knowledge or sufficient

information to admit or deny them and therefore denies them.

11.     InDesign admits the allegations in paragraph 11

## JURISDICTION AND VENUE

12.     Paragraph 12 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the

allegations in Paragraph 12 and therefore denies them.

13.     Paragraph 13 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the

allegations in Paragraph 13 and therefore denies them.

14.     Paragraph 14 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the

allegations in Paragraph 14 and therefore denies them.

15.     Paragraph 15 asserts legal conclusions to which no response is required.  To the extent a

response is required, the allegations in Paragraph 15 concern Tekion.  InDesign lacks knowledge or

sufficient information to admit or deny them and therefore denies them.

16.     Paragraph 16 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign admits that its customers include California dealerships.   InDesign denies

the remaining allegations in Paragraph 16.

17.     Paragraph 17 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign denies the allegations in Paragraph 17.

18.     Paragraph 18 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign denies the allegations in Paragraph 18.

19.     Paragraph 19 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign denies the allegations in Paragraph 19.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
2                                                    Case No. 3:25-cv-01394-JSC

20.     Paragraph 20 asserts legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 20 concern Tekion.  InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

## FACTUAL ALLEGATIONS

### *CDK's Business and Services*

21.     InDesign admits that CDK has long been the dominant automotive retail software provider in the United States.  InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 21 and therefore denies them.

22.     InDesign admits that, as the dominant automotive retail software provider, CDK serves thousands of retail locations across North America.  InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 22 and therefore denies them.

23.     InDesign admits that CDK sells DMS and related products and services to dealerships.  InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 23 and therefore denies them.

24.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 24 and therefore denies them.

### *CDK's DMS*

25.     InDesign admits that CDK provides DMS and related products and services to dealerships.  InDesign admits that DMS software is necessary for any dealership's business.  InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 25 and therefore denies them.

26.     InDesign admits the allegations in Paragraph 26.

27.     InDesign admits the allegations in Paragraph 27.

28.     Paragraph 28 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 28 and therefore denies them.

29.     Paragraph 29 asserts legal conclusions to which no response is required.  Paragraph 29

includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny them. To the extent the allegations pertain to InDesign, InDesign denies the allegation that it does not have authorization to assist dealerships in accessing their dealership data stored on the CDK DMS. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 29 and therefore denies them.

30. InDesign admits the allegations in Paragraph 30.

31. InDesign admits that the retail automotive software industry is massive, with millions of transactions occurring every day, and billions of dollars in commerce occurring each year. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 31 and therefore denies them.

### The DMS Houses CDK's Intellectual Property,

### Sensitive Consumer Data, and Confidential Third-Party Information

32. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 32 and therefore denies them.

33. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 33 and therefore denies them.

34. InDesign admits that dealerships input their business data into the DMS database, including information provided to them by customers, OEMs, and third parties. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 34 and therefore denies them.

35. InDesign admits that dealerships store their data in the DMS database, including financial and accounting information, financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, and vehicle information. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 35 and therefore denies them.

36. Paragraph 36 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
4                                    Case No. 3:25-cv-01394-JSC

allegations in Paragraph 36 and therefore denies them.

37.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 37 and therefore denies them.

***CDK's Security Measures***

38.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 38 and therefore denies them.

39.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 39 and therefore denies them.

40.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 40 and therefore denies them.

41.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 41 and therefore denies them.

42.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 42 and therefore denies them.

43.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 43 and therefore denies them.

44.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 44 and therefore denies them.

45.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 45 and therefore denies them.

46.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 46 and therefore denies them.

47.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 47 and therefore denies them.

48.     InDesign admits that dealership employees use password-protected login credentials to access the DMS.  InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 48 and therefore denies them.

49. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 49 and therefore denies them.

50. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 50 and therefore denies them.

51. InDesign admits that CDK purports to contractually prohibit dealerships from granting third parties permission to access the dealer's own data on the DMS. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 51 and therefore denies them.

### *CDK–Dealership Master Services Agreements*

52. To the extent the allegations in Paragraph 52 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 52 and therefore denies them.

53. To the extent the allegations in Paragraph 53 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 53 and therefore denies them.

54. To the extent the allegations in Paragraph 54 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 54 and therefore denies them.

55. To the extent the allegations in Paragraph 55 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 55 and therefore denies them.

56. To the extent the allegations in Paragraph 56 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. Paragraph 56 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign admits that CDK purports to prohibit dealerships from granting third parties permission to access the dealer's own data on the DMS. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 55 and therefore denies them.

57. To the extent the allegations in Paragraph 57 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. Paragraph 57 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign admits that CDK purports to prohibit dealerships from granting third parties permission to access the dealer's own data on the DMS. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 56 and therefore denies them.

58. To the extent the allegations in Paragraph 58 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. Paragraph 58 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that it has accessed the DMS without proper consent. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 58 and therefore denies them.

59. To the extent the allegations in Paragraph 59 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 59 and therefore denies them.

60. To the extent the allegations in Paragraph 60 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 60 and therefore denies them.

61. To the extent the allegations in Paragraph 61 refer to Exhibit 1 to the Amended Complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 61 and therefore denies them.

62. Paragraph 62 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign. To the extent they do, InDesign denies the allegations in Paragraph 62.

63. InDesign admits that it is aware that CDK publicly announced an initiative known as "SecurityFirst" in 2015. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 63 and therefore denies them.

64. InDesign lacks sufficient information to form a belief as to the truth or falsity of the

allegations in Paragraph 64 and therefore denies them.

65. InDesign admits that its President, Dave Lampert, was deposed by CDK in 2019 in litigation involving Authenticom, Inc. To the extent the allegations in Paragraph 65 refer to the content of the deposition testimony of Mr. Lampert, the deposition transcript speaks for itself. InDesign denies the remaining allegations in Paragraph 65.

66. The allegations in Paragraph 66 concern Tekion. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 66 and therefore denies them.

### CDK Transfers Customer Data to Tekion and Other DMS Competitors

67. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 67 and therefore denies them.

68. The allegations in Paragraph 68 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

69. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 69 and therefore denies them.

### CDK Warns Tekion to Abide by the Law

70. The allegations in Paragraph 70 concern Tekion. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 70 and therefore denies them.

71. The allegations in Paragraph 71 concern Tekion. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 71 and therefore denies them.

72. The allegations in Paragraph 72 concern Tekion. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 72 and therefore denies them.

73. The allegations in Paragraph 73 concern Tekion. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 73 and therefore denies them.

74. The allegations in Paragraph 74 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

75. The allegations in Paragraph 75 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

76.     Paragraph 76 includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny and therefore denies them. To the extent the allegations pertain to InDesign, InDesign denies all allegations in Paragraph 76.

### *InDesign's Illegal Business Model*

77.     InDesign admits the allegations in Paragraph 77.

78.     InDesign denies the allegations in Paragraph 78.

79.     InDesign admits the allegations in Paragraph 79.

80.     InDesign admits that it is an independent data integrator and that it provides those services as an independent contractor rather than an employee of the dealership; InDesign denies any implication that it does not act as the dealer's agent when it provides data integration services at the dealer's direction. To the extent the allegations in Paragraph 80 quote from old InDesign promotional webpages, those webpages speak for themselves. InDesign admits that the quoted statements appeared on InDesign webpages, among other statements not quoted or referenced in Paragraph 80. InDesign denies the statement, in footnote 1 to Paragraph 80, that InDesign disabled public access to its website.

81.     InDesign denies the allegations in Paragraph 81.

82.     InDesign denies the allegations in Paragraph 82.

83.     InDesign denies the allegations in Paragraph 83.

84.     InDesign admits that it enters into a Document Conversion Agreement with dealerships that purchase its data integration services. To the extent the allegations in Paragraph 84 refer to Exhibit 2, the document speaks for itself. InDesign denies the remaining allegations in Paragraph 84.

85.     InDesign admits that it has stated on its website that it complies with federal law regarding safeguarding privacy of data. InDesign also admits that it has stated on its website that it "safely accesses DMS without installing code on DMS server." To the extent the allegations in Paragraph 85 refer to Exhibit 2, the document speaks for itself. InDesign denies the remaining allegations in Paragraph 85.

86.     InDesign denies the allegations in Paragraph 86.

87.     InDesign denies the allegations in Paragraph 87.

88.     InDesign denies the allegations in Paragraph 87.

*Defendants' Covert, Intentional, and Wrongful Hacking of CDK's DMS*

89. The allegations in Paragraph 89 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

*The November 1 Tekion Email*

90. The allegations in Paragraph 90 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

91. The allegations in Paragraph 91 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

92. The allegations in Paragraph 92 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

93. The allegations in Paragraph 93 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

94. The allegations in Paragraph 94 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

95. The allegations in Paragraph 95 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

96. The allegations in Paragraph 96 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

97. The allegations in Paragraph 97 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

98. The allegations in Paragraph 98 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

99. The allegations in Paragraph 99 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

100. The allegations in Paragraph 100 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

*The December 6 Cease and Desist Letter*

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
10                                              Case No. 3:25-cv-01394-JSC

101.     The allegations in Paragraph 101 concern Tekion.  InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

102.     The allegations in Paragraph 102 concern Tekion.  InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

103.     The allegations in Paragraph 103 concern Tekion.  To the extent the allegations pertain to InDesign, InDesign denies all allegations in Paragraph 103.

### The December 10 Tekion Call

104.     The allegations in Paragraph 104 concern Tekion.  InDesign lacks knowledge or sufficient information to admit or deny them, and therefore denies them.

### The December 13 Email Chain from InDesign and Tekion

105.     Paragraph 105 includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny them.  To the extent the allegations pertain to InDesign, InDesign denies the allegations in Paragraph 105.

106.     Paragraph 106 includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny them.  To the extent the allegations pertain to InDesign, InDesign denies the allegations in Paragraph 106.

107.     The December 13, 2024, email chain speaks for itself.  To the extent a response is required, InDesign admits that a representative on the Support Team sent an email to a dealership on December 13, 2024, which included the quoted statements, among other statements not referenced or quoted in Paragraph 107.  InDesign otherwise denies the allegations in Paragraph 107, including the allegation that InDesign solicited the dealership.

108.     The December 13, 2024, email chain speaks for itself.  To the extent a response is required, InDesign admits that the email included a link to a template of the InDesign Document Conversion Agreement and that the email asked the dealer to sign the Agreement.

109.     InDesign admits that the Document Conversion Agreement that InDesign sent to the dealership contained the standard provisions that InDesign includes in its agreements with dealers.

110.     The December 13, 2024, email chain speaks for itself.  To the extent a response is required,

InDesign admits that it received an email from a dealership with the quoted statements, among other statements not referenced or quoted in Paragraph 110.

111. The December 13, 2024, email chain speaks for itself. To the extent a response is required, InDesign admits that Mr. Lampert made the quoted statement in the email chain, among other statements not referenced or quoted in Paragraph 111.

112. The December 13, 2024, email chain speaks for itself. To the extent a response is required, InDesign lacks knowledge or sufficient information to admit or deny the allegations in Paragraph 112 and therefore denies them.

113. InDesign denies the allegations in Paragraph 113.

114. The allegations in Paragraph 114 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

115. InDesign admits that InDesign provides data integration services for dealerships converting from the CDK DMS to the Tekion DMS and other DMS providers. InDesign denies that Tekion has "directed" InDesign to provide data integration services; InDesign contracts with the dealer to provide those data integration services on the dealer's behalf. To the extent the remaining allegations in Paragraph 115 pertain to InDesign, InDesign denies the allegations in Paragraph 115.

116. Paragraph 116 asserts legal conclusions to which no response is required. Paragraph 104 includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them. To the extent the allegations pertain to InDesign, InDesign denies the allegations in Paragraph 116.

***CDK's Investigation Reveals Hacking by Defendants, Separately and in Concert***

117. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 117 and therefore denies them.

118. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 118 and therefore denies them.

119. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 119 and therefore denies them.

120.    InDesign admits that, when dealerships set up credentials to use InDesign's software, the dealers may create the account with the "@mail.1dms.com" email domain.  InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 120 and therefore denies them.

121.    InDesign denies the allegations in Paragraph 121.

122.    Paragraph 122 includes allegations concerning Tekion for which InDesign lacks knowledge or sufficient information to admit or deny them, and therefore InDesign denies them.  InDesign admits that, when dealerships set up credentials to use InDesign's software, the dealers may create the account with the "@mail.1dms.com" email domain.  InDesign admits that it provides dealership customers with software that dealers can use to extract the dealer data that they input into the DMS database.  InDesign denies all remaining allegations in Paragraph 122.

123.    Paragraph 123 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 123.

124.    Paragraph 124 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 124.

125.    Paragraph 125 includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.  To the extent the allegations pertain to InDesign, InDesign denies the allegations in Paragraph 125.

### *The February 11 Cease and Desist Letter*

126.    To the extent the allegations in Paragraph 126 refer to Exhibit 4 to the Amended Complaint, that document speaks for itself.  To the extent a response is required, InDesign admits that CDK sent a cease-and-desist letter to InDesign after filing its original complaint, and that CDK purports that InDesign's software accessed its DMS without authorization.

127.    To the extent the allegations in Paragraph 126 refer to Exhibit 4 to the Amended Complaint, that document speaks for itself.

128.     InDesign denies the allegations in Paragraph 128.

### Tekion and InDesign's Interfere with CDK's Dealership Contracts

129.     Paragraph 129 includes allegations concerning Tekion to which InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.  To the extent the allegations pertain to InDesign, InDesign admits that it has been operating its same business model since at least 2019 and denies the remaining allegations in Paragraph 129.

130.     InDesign denies that it accesses the CDK DMS.  InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 130 and therefore denies them.

131.     Paragraph 131 includes allegations concerning Tekion for which InDesign lacks knowledge or sufficient information to admit or deny them, and therefore InDesign denies them.  To the extent the allegations pertain to InDesign, InDesign denies that it has ever provided misinformation to any dealership regarding CDK's business practices

132.     Paragraph 132 includes allegations concerning Tekion for which InDesign lacks knowledge or sufficient information to admit or deny them, and therefore InDesign denies them.  To the extent the allegations pertain to InDesign, InDesign denies all allegations in Paragraph 132.

133.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 133 and therefore denies them.

134.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 134 and therefore denies them.

135.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 135 and therefore denies them.

136.     InDesign admits that its software has accessed the CDK DMS through dealer-authorized credentials after February 11, 2025.  InDesign denies the remaining allegations in Paragraph 136.

137.     Paragraph 37 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 137 and therefore denies them.

### Security Threats, Compromised Data Integrity, and System Degradation

138.   Paragraph 138 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 138.

139.   InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 139 and therefore denies them.

140.   InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 140 and therefore denies them.

141.   InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 141 and therefore denies them.

142.   InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 142 and therefore denies them.

143.   Paragraph 143 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 143.

144.   Paragraph 144 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 144.

145.   Paragraph 145 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 145.

146.   Paragraph 146 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign denies all allegations in Paragraph 146.

147.   Paragraph 147 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign.  To the extent that they do, InDesign admits that InDesign's software uses "Dealership-issued login credentials" to access dealer data stored on the DMS database. InDesign otherwise denies all allegations in Paragraph 147.

148. The allegations in Paragraph 148 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

149. InDesign admits that it has both "pulled" dealer data from the DMS and "pushed" dealer data to the DMS. InDesign denies the remaining allegations in Paragraph 149.

150. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 150 and therefore denies them.

151. InDesign denies all allegations in Paragraph 151.

152. InDesign denies all allegations in Paragraph 152.

### *Burdens on CDK to Thwart Tekion's and InDesign's Ever-Evolving Methods*

153. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 153 and therefore denies them.

154. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 154 and therefore denies them.

155. InDesign denies that it uses fake user account names to evade detection. InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 155 and therefore denies them.

156. The allegations in Paragraph 156 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

157. The allegations in Paragraph 157 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them. To the extent that the allegations in this paragraph concern InDesign, InDesign denies all allegations in Paragraph 157.

158. InDesign admits that dealers have used its software to access the CDK DMS through dealer-authorized credentials after February 11, 2025. InDesign denies the remaining allegations in Paragraph 158.

159. InDesign admits that dealers have used its software to access the CDK DMS through dealer-authorized credentials after February 11, 2025. InDesign denies the remaining allegations in Paragraph 159.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
16
Case No. 3:25-cv-01394-JSC

160. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 160 and therefore denies them.

161. Paragraph 161 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign. To the extent that they do, InDesign denies all allegations in Paragraph 161.

162. Paragraph 162 is so vague and ambiguous that InDesign cannot reasonably ascertain whether the allegations pertain to InDesign. The allegations in Paragraph 162 have been rendered moot by the Court's order denying CDK's motion for a preliminary injunction against InDesign. To the extent a response is required, InDesign denies all allegations in Paragraph 162.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### Count I – Computer Fraud and Abuse Act – 18 U.S.C. § 1030

163. InDesign repeats and re-alleges all of its answers above as if set forth fully herein.

164. Paragraph 164 asserts legal conclusions to which no response is required.

165. Paragraph 165 asserts legal conclusions to which no response is required.

166. Paragraph 166 asserts legal conclusions to which no response is required.

167. Paragraph 167 asserts legal conclusions to which no response is required.

168. Paragraph 168 asserts legal conclusions to which no response is required.

169. Paragraph 169 asserts legal conclusions to which no response is required.

170. Paragraph 170 asserts legal conclusions to which no response is required.

171. Paragraph 171 asserts legal conclusions to which no response is required.

172. Paragraph 172 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 144 and therefore denies them.

173. Paragraph 173 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 173 and therefore denies them.

174. Paragraph 174 asserts legal conclusions to which no response is required. To the extent a

response is required, InDesign denies all allegations in Paragraph 174.

175.     Paragraph 175 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies all allegations in Paragraph 175.

176.     Paragraph 176 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies all allegations in Paragraph 176.

177.     Paragraph 177 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies all allegations in Paragraph 177.

178.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 178 and therefore denies them. Paragraph 178 also asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies all allegations in Paragraph 178.

179.     Paragraph 179 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies all allegations in Paragraph 179.

180.     InDesign denies the allegations in Paragraph 180.

181.     InDesign denies the allegations in Paragraph 181.

182.     InDesign denies the allegations in Paragraph 182.

183.     InDesign denies the allegations in Paragraph 183.

184.     InDesign denies the allegations in Paragraph 184.

185.     InDesign denies the allegations in Paragraph 185.

186.     InDesign denies the allegations in Paragraph 186.

187.     InDesign denies the allegations in Paragraph 187.

188.     The allegations in Paragraph 188 concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

189.     InDesign denies the allegations in Paragraph 189.

190.     Paragraph 190 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 190.

191.     Paragraph 191 asserts legal conclusions to which no response is required. The allegations

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
18                                    Case No. 3:25-cv-01394-JSC

in Paragraph 191 also have been rendered moot by the Court's order denying CDK's motion for a preliminary injunction against InDesign. To the extent a response is required, InDesign denies the allegations in Paragraph 191.

192. Paragraph 192 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 192.

193. Paragraph 193 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that CDK is entitled to any other form of relief, including the relief requested in Paragraph 193.

194. InDesign denies that CDK is entitled to any form of relief, including the relief requested in Paragraph 194.

## Count II – Digital Millenium Copyright Act – 17 U.S.C. § 1201

(Tekion §§ 1201(a)(1), 1201(a)(2), 1201(b)(1);

InDesign §§ 1201(a)(1), § 1201(a)(2)(C), 1201(b)(1)(C))

195. InDesign repeats and re-alleges all of its answers above as if set forth fully herein.

196. Paragraph 196 asserts legal conclusions to which no response is required.

197. Paragraph 197 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks knowledge or sufficient information to admit or deny them and so denies them.

198. Paragraph 198 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks knowledge or sufficient information to admit or deny them and so denies them.

199. InDesign denies the allegations in Paragraph 199.

200. InDesign denies the allegations in Paragraph 200.

201. InDesign denies the allegations in Paragraph 201.

202. InDesign denies the allegations in Paragraph 202.

203. InDesign denies the allegations in Paragraph 203.

204. InDesign denies the allegations in Paragraph 204.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
19                                    Case No. 3:25-cv-01394-JSC

205. Paragraph 205 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 205.

206. Paragraph 206 asserts legal conclusions to which no response is required. To the extent a response is required, these allegations concern Tekion. InDesign lacks knowledge or sufficient information to admit or deny them and therefore denies them.

207. InDesign denies the allegations in Paragraph 207.

208. Paragraph 208 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that CDK is entitled to any other form of relief, including the relief requested in Paragraph 208.

209. Paragraph 209 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 209.

210. InDesign denies the allegations in Paragraph 210.

211. Paragraph 211 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that CDK is entitled to any other form of relief and denies the allegations in Paragraph 211.

212. Paragraph 212 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that CDK is entitled to any form of relief, including the relief requested in Paragraph 212.

213. InDesign denies that CDK is entitled to any other form of relief, including the relief requested in Paragraph 213.

## Count III – Defend Trade Secrets Act (18 U.S.C. § 1836)

### (All Defendants)

214. InDesign repeats and re-alleges all of its answers above as if set forth fully herein.

215. Paragraph 215 asserts legal conclusions to which no response is required.

216. Paragraph 216 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 216 and therefore denies them.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
20                                                          Case No. 3:25-cv-01394-JSC

217. Paragraph 217 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 217 and therefore denies them.

218. Paragraph 218 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 218 and therefore denies them.

219. Paragraph 219 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 219 and therefore denies them.

220. Paragraph 220 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 220.

221. InDesign denies the allegations in Paragraph 221.

222. InDesign denies the allegations in Paragraph 222.

223. InDesign denies the allegations in Paragraph 223.

224. Paragraph 224 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 224.

225. InDesign denies the allegations in Paragraph 225.

226. Paragraph 226 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that CDK is entitled to any other form of relief, including the relief requested in Paragraph 226.

227. Paragraph 227 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that CDK is entitled to any other form of relief, including the relief requested in Paragraph 227.

228. InDesign denies that CDK is entitled to any form of relief, including the relief requested in Paragraph 228.

### Count IV – The California Comprehensive Computer Data Access and Fraud Act

(All Defendants)

229.    InDesign repeats and re-alleges all of its answers above as if set forth fully herein.

230.    Paragraph 230 asserts legal conclusions to which no response is required.

231.    Paragraph 231 asserts legal conclusions to which no response is required.

232.    Paragraph 232 asserts legal conclusions to which no response is required.

233.    Paragraph 233 asserts legal conclusions to which no response is required.

234.    Paragraph 234 asserts legal conclusions to which no response is required.

235.    Paragraph 235 asserts legal conclusions to which no response is required.

236.    Paragraph 236 asserts legal conclusions to which no response is required.

237.    Paragraph 237 asserts legal conclusions to which no response is required.

238.    Paragraph 238 asserts legal conclusions to which no response is required.

239.    Paragraph 239 asserts legal conclusions to which no response is required.

240.    Paragraph 240 asserts legal conclusions to which no response is required.

241.    Paragraph 241 asserts legal conclusions to which no response is required.

242.    Paragraph 242 asserts legal conclusions to which no response is required.

243.    Paragraph 243 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or the falsity of the allegations in Paragraph 243 and therefore denies them.

244.    Paragraph 244 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or the falsity of the allegations in Paragraph 244 and therefore denies them.

245.    Paragraph 245 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or the falsity of the allegations in Paragraph 245 and therefore denies them.

246.    Paragraph 246 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or the falsity of the allegations in Paragraph 246 and therefore denies them.

247.    Paragraph 247 asserts legal conclusions to which no response is required.  To the extent a

response is required, InDesign lacks sufficient information to form a belief as to the truth or the falsity of the allegations in Paragraph 247 and therefore denies them.

248. Paragraph 248 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 248 and therefore denies them.

249. InDesign denies the allegations in Paragraph 249.

250. Paragraph 250 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 250.

251. InDesign denies the allegations in Paragraph 251.

252. InDesign denies the allegations in Paragraph 252.

253. Paragraph 239 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 253.

254. InDesign denies the allegations in Paragraph 254.

255. Paragraph 255 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 255.

256. InDesign denies the allegations in Paragraph 256.

257. InDesign denies the allegations in Paragraph 257. InDesign's dealer contracts speak for themselves.

258. Paragraph 258 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 258.

259. InDesign denies the allegations in Paragraph 259.

260. InDesign denies the allegations in Paragraph 260.

261. Paragraph 261 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 261.

262. Paragraph 262 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 262 and therefore denies them.

263.     InDesign denies the allegations in Paragraph 263.

264.     Paragraph 264 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 264.

265.     Paragraph 265 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 265.

266.     Paragraph 266 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies that CDK is entitled to any form of relief, including the relief requested in Paragraph 266.

267.     Paragraph 267 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies that CDK is entitled to any form of relief, including the relief requested in Paragraph 267.

### Count V – California Uniform Trade Secrets Act

(All Defendants)

268.     InDesign repeats and realleges all if its answers above as if set forth fully herein.

269.     Paragraph 269 asserts legal conclusions to which no response is required.

270.     Paragraph 270 asserts legal conclusions to which no response is required.

271.     Paragraph 271 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 271 and therefore denies them.

272.     InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 272 and therefore denies them.

273.     Paragraph 273 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 273 and therefore denies them.

274.     Paragraph 274 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 274.

275.     Paragraph 275 asserts legal conclusions to which no response is required.  To the extent a

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
24                                          Case No. 3:25-cv-01394-JSC

response is required, InDesign denies the allegations in Paragraph 275.

276. Paragraph 276 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 276.

277. Paragraph 277 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 277.

278. Paragraph 278 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 278.

279. Paragraph 279 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 279.

280. Paragraph 280 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 228066.

281. InDesign denies that CDK is entitled to relief and denies each of the requests for relief in Paragraph 281.

### Count VI – Tortious Interference with Existing Business Relations

(All Defendants)

282. InDesign repeats and realleges all if its answers above as if set forth fully herein.

283. InDesign admits the allegations in Paragraph 283.

284. InDesign admits that CDK has service contracts with dealerships, including at dealerships located in California. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 284 and therefore denies them.

285. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 285 and therefore denies them.

286. Paragraph 286 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 286.

287. To the extent the allegations in Paragraph 287 refer to Exhibit 1 to the complaint, that document speaks for itself. InDesign otherwise lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 287 and therefore denies them.

288. To the extent the allegations in Paragraph 288 refer to Exhibit 1 to the complaint, that document speaks for itself. Paragraph 288 otherwise asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 288 and therefore denies them.

289. To the extent the allegations in Paragraph 289 refer to Exhibit 1 to the complaint, that document speaks for itself. Paragraph 289 otherwise asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 289 and therefore denies them.

290. Paragraph 290 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies that the contractual provision cited in Paragraph 290 protects against unauthorized access to sensitive and proprietary data maintained in the DMS. InDesign otherwise lacks sufficient information form a belief as to the truth or falsity of the allegations in Paragraph 290 and therefore denies them.

291. Paragraph 291 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information form a belief as to the truth or falsity of the allegations in Paragraph 291 and therefore denies them.

292. Paragraph 292 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 292.

293. To the extent the allegations in Paragraph 293 refer to Exhibit 1 to the complaint, that document speaks for itself. Paragraph 293 otherwise asserts legal conclusions to which no response is required. To the extent a response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 293 and therefore denies them.

294. InDesign lacks sufficient information to form a belief as to the truth or falsity of the allegations in Paragraph 294 and therefore denies them.

295. InDesign denies the allegations in Paragraph 295.

296. Paragraph 296 asserts legal conclusions to which no response is required. To the extent a response is required, InDesign denies the allegations in Paragraph 296.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
26                                                    Case No. 3:25-cv-01394-JSC

297.     Paragraph 297 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 297.

298.     Paragraph 298 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 298.

299.     Paragraph 299 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 299.

300.     Paragraph 300 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 300.

301.     Paragraph 301 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 301.

302.     Paragraph 302 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 302.

303.     InDesign denies that CDK is entitled to relief and denies each of the requests for relief in Paragraph 303.

### Count VII – Unfair, Unlawful, or Fraudulent Actions

(All Defendants)

304.     InDesign repeats and realleges all of its answers above as if set forth fully herein.

305.     Paragraph 305 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 305.

306.     Paragraph 306 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 306.

307.     InDesign denies the allegations in Paragraph 307.

308.     Paragraph 308 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 308.

309.     Paragraph 309 asserts legal conclusions to which no response is required.  To the extent a response is required, InDesign denies the allegations in Paragraph 309.

310.     Paragraph 310 asserts legal conclusions to which no response is required.  To the extent a

1 response is required, InDesign denies the allegations in Paragraph 310.

2      311.    Paragraph 311 asserts legal conclusions to which no response is required. To the extent a

3 response is required, InDesign lacks sufficient information to form a belief as to the truth or falsity of the

4 allegations in Paragraph 311 and therefore denies them.

5      312.    Paragraph 312 asserts legal conclusions to which no response is required and that are moot

6 in light of the Court's order denying CDK's motion for a preliminary injunction against InDesign. To the

7 extent a response is required, InDesign denies the allegations in Paragraph 312.

8      313.    InDesign denies that CDK is entitled to any form of relief, including the relief requested in

9 Paragraph 313.

## DEMAND FOR JURY TRIAL

10

11      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, InDesign respectfully requests a

12 jury trial on all issues so triable, including, without limitation, CDK's claims and InDesign's defenses to

13 those claims.

## INDESIGN'S AFFIRMATIVE DEFENSES

14

15      As separate and distinct affirmative defenses to all claims and causes of actions alleged in the

16 Complaint, InDesign alleges as follows:

### First Affirmative Defense

17

### (Failure to State a Claim)

18

19      Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to sufficiently state a

20 claim upon which relief may be granted.

### Second Affirmative Defense

21

### (Unclean Hands)

22

23      Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands, which

24 demands that a plaintiff act equitably and in good faith in the matter for which it seeks a remedy. As

25 Plaintiff's allegations are in furtherance of its unlawful scheme to eliminate competition, Plaintiff is

26 barred from seeking relief. Moreover, to the extent that Plaintiff seeks to contend that InDesign engaged

27 in unlawful activity by allegedly performing the same or similar acts as Plaintiff, within the same nexus

28

of common customers and common sources of data or classes of software, its claims are barred because such conduct infects its claims and renders pursuing this action inequitable.

### Third Affirmative Defense

### (Waiver/Estoppel)

Plaintiff's claims are barred, in whole or in part, because Plaintiff, by virtue of its own conduct, has waived and/or is estopped from asserting any of the claims upon which it seeks relief.

### Fourth Affirmative Defense

### (Statute of Limitations)

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations.

### Fifth Affirmative Defense

### (Authorization)

Plaintiff's claims are barred, in whole or in part, because InDesign's access, if any, was authorized at all relevant times.

### Sixth Affirmative Defense

### (Lack of Knowledge, Intent, or Willfulness)

Plaintiff's claims are barred, in whole or in part, because InDesign lacked the requisite knowledge, intent, or willfulness when allegedly engaging in the conduct described in the Complaint.

### Seventh Affirmative Defense

### (Good Faith)

Plaintiff's claims are barred, in whole or in part, because InDesign's actions were at all times conducted in good faith, motivated by legitimate business reasons, and in compliance with all applicable laws.

### Eighth Affirmative Defense

### (Failure to Identify Valid Trade Secrets)

Plaintiff's trade secret misappropriation claims are barred, in whole or in part, because Plaintiff has failed to identify and describe any valid trade secrets with sufficient particularity.

### Ninth Affirmative Defense

**(Alleged Trade Secrets Known or Readily Ascertainable)**

Plaintiff's trade secret misappropriation claims are barred, in whole or in part, because Plaintiff's alleged trade secrets are known or readily ascertainable by the relevant industry and/or persons who could obtain economic value, if any, from their information.

## Tenth Affirmative Defense

### (Independent Derivation)

To the extent that independent derivation is deemed an affirmative defense rather than an element on which Plaintiff bears the burden of proof (and InDesign contends that the latter applies), Plaintiff is barred from claiming trade secret misappropriation as to any items of information that it independently derived within the meaning of that defense.

## Eleventh Affirmative Defense

### (Damages Speculative)

Plaintiff's claims are barred, in whole or in part, because Plaintiff's alleged damages and injury, if any, are purely speculative and impossible to prove or allocate with reasonable certainty.

## Twelfth Affirmative Defense

### (Fault Attributable to Others)

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff suffered an injury or incurred any damages as alleged in the Complaint, which InDesign denies, such injury or damages were caused and brought about by the acts, conduct, or omissions of individuals or entities other than InDesign. As such, any recovery should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

## Thirteenth Affirmative Defense

### (Failure to Mitigate)

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to mitigate its alleged damages. Alternatively, any damages sustained by Plaintiff, which InDesign denies, must be reduced by the amount that such damages would have been reduced had Plaintiff exercised reasonable diligence in mitigating its damages.

**Fourteenth Affirmative Defense**

**(Unjust Enrichment)**

Plaintiff's claims are barred, in whole or in part, because if Plaintiff recovers any damages or other relief from InDesign, it would be unjustly enriched.

**Fifteenth Affirmative Defense**

**(Laches)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches, as Plaintiff waited an unreasonably long time to file this lawsuit, and Defendants' ability to defend the lawsuit has been prejudiced as a result.

**Sixteenth Affirmative Defense**

**(Acquiescence)**

Plaintiff's claims are barred, in whole or in part, because Plaintiff acquiesced to some or all of the actions alleged in the Complaint.

**Seventeenth Affirmative Defense**

**(Injunctive Relief)**

Plaintiff's claims for injunctive relief are barred, in whole or in part, because Plaintiff has failed to state facts sufficient to provide a legal or factual basis to award injunctive relief, and Plaintiff has adequate remedies at law.

**Eighteenth Affirmative Defense**

**(No Punitive Damages)**

Plaintiff's claims for punitive damages are barred, in whole or in part, because Plaintiff cannot make the legal showing required to recover punitive damages.

**Nineteenth Affirmative Defense**

**(Attorneys' Fees Improper)**

Plaintiff's claims for attorneys' fees are barred, in whole or in part, because Plaintiff fails to state a cause of action or set forth facts sufficient to support a claim for attorneys' fees.

**Twentieth Affirmative Defense**

**(Privilege of Competition)**

Plaintiff's claims are barred, in whole or in part, because the privilege of competition and other privileges available under state law bar Plaintiff from pursuing its claims for relief.

**Twenty-First Affirmative Defense**

**(Public Policy)**

Plaintiff's claims are barred, in whole or in part, because its acts are in violation of public policy.

**Twenty-Second Affirmative Defense**

**(Copyright Misuse and Abuse)**

Plaintiff's claims are barred, in whole or in part, because they are barred by the doctrines of copyright misuse and abuse.

**Twenty-Third Affirmative Defense**

**(Fair Use)**

Plaintiff's claims are barred, in whole or in part, because InDesign's conduct constituted fair use.

**Twenty-Fourth Affirmative Defense**

**(Implied License)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of implied license.

**Twenty-Fifth Affirmative Defense**

**(Illegality)**

Plaintiff's claims are barred, in whole or in part, because their claims, if countenanced, would enforce conduct that the antitrust laws forbid.

**Twenty-Sixth Affirmative Defense**

**(No Damages)**

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damages or injury.

**Twenty-Seventh Affirmative Defense**

**(Statutory Safe Harbor)**

Plaintiff's claims are barred, in whole or in part, because Defendant is immune from liability

pursuant to 17 U.S.C. § 512.

**Twenty-Eighth Affirmative Defense**

**(Statutory Exemption)**

Plaintiff's claims are barred, in whole or in part, because Defendant is immune from liability pursuant to 17 U.S.C. § 1201(f).

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

InDesign does not presently know all facts concerning CDK's conduct and claims and thus lacks a sufficient basis to form a belief as to whether it may have additional, as yet unstated, defenses. InDesign accordingly reserves the right to assert additional defenses in the event that discovery or investigation reveals that they would be appropriate.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
33                                          Case No. 3:25-cv-01394-JSC

## INDESIGN'S AMENDED COUNTERCLAIMS

### INTRODUCTION

1. Counter-Plaintiff InDesign Data, LLC ("InDesign") brings these counterclaims to remedy long-running anticompetitive conduct by Defendant CDK Global, LLC ("CDK"), the nation's dominant technology company in the retail automotive industry.  CDK has violated federal antitrust law by abusing its market power, and using exclusionary acts, to acquire and then maintain a monopoly in the market for "data integration services" at automobile dealerships in the United States.  By usurping control over dealer data that does not belong to CDK, CDK has thwarted competition from innovative, independent data integration providers such as InDesign—allowing CDK to derail the competitive process, raise prices on consumers, harm competition, and push InDesign's business to the brink of extinction.  CDK's conduct violates Section 1 and Section 2 of the Sherman Act and California's Unfair Competition Law, and it must be stopped.

2. Automobile dealerships generate large amounts of valuable business data in their day-to-day operations, including customer contact information and leads, vehicle and parts inventories, sales records, car repair orders, and much more.  Dealerships input and store all that information on Dealer Management Systems ("DMSs"), which is the enterprise software and database that franchised dealerships use to run their business operations.  It is widely recognized in the industry that dealers, not the DMS company, own the data they input into the DMS database.

3. Dealerships cannot operate their businesses without efficient access to their data.  For example, dealerships rely on many different types of software applications that help them optimize essential services, such as inventory management, customer relations, and car repairs in the "service lane" (where customers go for services like maintenance checkups, car repairs, and oil changes).  Those vendors, in turn, cannot provide services to the dealer without access to the dealer's data on the DMS.  Dealers therefore need an efficient and reliable method for accessing their data on the DMS and transferring that data to the dealer's business partners.

4. Dealers have long relied on "data integration" providers to automate the process of accessing the data on the DMS and securely transferring that data to authorized business partners.

For many years, dealers enjoyed an array of competitive options when selecting such a data integration service. Dealers could purchase data integration services from their DMS provider, or they could select an "independent" data integrator that is not affiliated with their DMS company. To use independent data integrators, dealers authorize their access and then usually provide the integrator's software with login credentials to access dealer data on the DMS database.

5. Plaintiff InDesign is such an independent data integrator. Independent data integrators were highly popular among dealers and others in the retail automotive industry, because they offered innovative and high-quality data services, tailored to the dealer's needs, at low prices.

6. Defendant CDK has long been the dominant DMS provider in the United States. For many years, CDK repeatedly and publicly endorsed the core principle that dealers own their data and the DMS company has no business dictating who can access that data. As CDK's former CEO told the *Automotive News* publication back in 2007, "We really believe the dealer owns the data. . . . I don't know how you [as a DMS company] can ever make the opinion that the data is yours to govern and to preclude others from having access to when in fact it's really the data belonging to the dealer." CDK even put that principle into practice—when it suited its purposes. CDK acquired two independent data integrators and, for many years, was among the leading independent data integration providers for dealers using other (non-CDK) DMSs.

7. In recent years, however, CDK has done an about-face and undertaken a series of blatantly anticompetitive actions to block competition from independent data integrators (i.e. data integration service providers who were not affiliated with a DMS provider) and monopolize the market for data integration services among dealers that use the CDK DMS. In so doing, they have not only taxed their customers on access to their own data, but they have also further entrenched their dominant position as the leading DMS provider.

8. Starting in late 2013, CDK began conspiring with its largest DMS rival, Reynolds & Reynolds, to thwart competition from independent data integrators, so that CDK and Reynolds could each monopolize data integration services on their respective DMSs. The two DMS giants agreed to help each other "close" their systems to competition from independent data integrators, while

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
2                                           Case No. 3:25-cv-01394-JSC

minimizing the blowback from dealers that greatly value controlling access to their own data. The conspiracy worked: CDK and Reynolds drove virtually every independent integrator out of business, after which they both promptly imposed massive price increases for their own "certified" data integration services ("3PA" for CDK, "RCI" for Reynolds).

9. CDK faced an antitrust MDL in federal court in Chicago ("Antitrust MDL"), which resulted in evidence of conspiracy that was so strong that CDK recently settled the last antitrust class actions against it for $630 million. Multiple state legislatures also intervened to enact "Dealer Data Laws" to prevent CDK from engaging in "cyber ransom" by blocking dealers' ability to control access to their own data.

10. Within the last four years, CDK has engaged in continuing exclusionary conduct to maintain the monopoly over data integration services that it acquired through its conspiracy with Reynolds. Among other things, CDK has imposed anticompetitive contractual restraints on dealers (tying) and their authorized software vendors (exclusive dealing), which effectively preclude them from working with independent data integrators. CDK also has taken a variety of contract enforcement actions—aimed at dealers, InDesign, and other independent integrators, and industry participants—to protect its data integration monopoly through conduct that is not competition on the merits. Collectively, CDK's restraints and actions foreclose independent data integrators such as InDesign from providing their services to dealers that use the CDK DMS, enabling CDK to exclude competition and maintain its monopoly.

11. CDK's monopoly has inflicted severe and ongoing harm on competition and consumers. By excluding competitors such as InDesign, CDK has deprived dealers of competitive choice in the Dealer Data Integration Market; reduced quality and innovation; and enabled CDK to charge dealers and their software vendors greatly inflated prices. What's more, CDK's exclusionary conduct to control access to dealer data has harmed competition in adjacent markets, including the DMS Market (where CDK has used its control over dealer data to raise switching costs and insulate its market power) and in the market for dealership software applications (where CDK has used its

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
3                                    Case No. 3:25-cv-01394-JSC

control over dealer data to give its own applications a competitive advantage and undermine rival applications).

12.     CDK's exclusionary conduct also has greatly damaged InDesign—costing it millions of dollars in lost revenue—and now threatens to drive InDesign out of business entirely.

13.     InDesign brings these counterclaims to recover damages and seek permanent injunctive relief to redress and prevent CDK's unlawful, unfair, and anticompetitive conduct.

## THE PARTIES

14.     Plaintiff InDesign Data, LLC is a limited liability company organized under the laws of the State of Florida, with its principal place of business located at 175 SW 7th Street, Unit 2010, Miami, Florida 33130.  InDesign was founded in 2013 and is a technology company that provides data integration services to automobile dealerships and software vendors across the United States.

15.     Defendant CDK Global, LLC, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business and corporate headquarters located at 11809 Domain Drive, Suite 200, Austin, Texas 78758.  CDK is the nation's dominant DMS provider.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1337(a) (antitrust), and 15 U.S.C. §§ 15 (antitrust).  The Court has supplemental jurisdiction over InDesign's state-law claims under 28 U.S.C. § 1367.  The Court has subject matter jurisdiction over InDesign's compulsory counterclaims under Federal Rule of Civil Procedure 13(a) because InDesign's claims arose out of the transaction or occurrence that is the subject matter of CDK's claims and does not require adding another party over whom the Court cannot acquire jurisdiction.

17.     The Court has personal jurisdiction over CDK.  First, CDK invoked the jurisdiction of this Court by filing its complaint in this District against Tekion Corporation and InDesign, *see* DE1, and consented to this Court's jurisdiction by defending against Tekion's antitrust suit without raising any personal jurisdiction objection, *Tekion Corp. v. CDK Global, LLC*, 3:24-cv-08879-JSC (N.D.

Cal. Dec. 9, 2024). Second, InDesign's cause of action arises out of and relates to CDK's significant contacts with California. CDK has many dealership clients in California, which is the largest market in the nation for automobile dealerships, and CDK has directed much of the anticompetitive conduct described throughout this complaint at dealerships and software vendors located and operating in California. CDK's anticompetitive conduct has prevented InDesign from gaining customers and serving dealership clients in California. Third, CDK has engaged in continuous and systematic business in California, where CDK has offices, employees, and generates many millions of dollars of revenue. CDK has purposefully availed itself of the privilege of doing business in California through the widespread promotion, sales, marketing, and distribution of its products and services in California.

18.     Venue is proper under 15 U.S.C. § 22 and under 28 U.S.C. § 1391. CDK conducts substantial business in this District and is currently litigating related claims against Tekion and InDesign in this District.

## FACTUAL ALLEGATIONS

### I.  Dealer Data and InDesign's Business

### A.  Dealer Data and Data Integrators

19.     There are roughly 18,000 franchised new-car dealerships in the United States. Franchised dealerships use a DMS to manage their daily operations and automate key business functions, such as inventory management, accounting, and payroll, among many others.

20.     Importantly, the DMS also includes a large database. Dealership employees input and store the vast amounts of data that they generate in their daily business in that DMS database. Dealer data includes customer information and leads, vehicle inventory, parts and repair orders, financing records, sales records, accounting information, and more. The data that dealers store on the DMS is the lifeblood of today's dealership business; without access to that data, no dealership can conduct its day-to-day operations.

21.     Dealers own the data they input and store on the DMS.  Indeed, CDK's standard DMS contract explicitly states that "[a]ny information created and input by [the dealer] into the" DMS "shall remain the exclusive and confidential property of [the dealer]."

22.     Dealerships need access to their data on the DMS for a variety of business purposes. For example, a typical dealership works with 15 or more software application vendors, separate and apart from the DMS.  Those software vendors are essential to operating a successful car dealership today.  As a few examples, dealers typically use software applications (separate from the DMS) to manage their customer relationships; track their vehicle and parts inventories; operate their website; and make the "service lane"—where customers go for car repairs, service checkups, and oil changes—more efficient and seamless.

23.     For dealers to take advantage of those software applications, they need efficient, automated access to their data on the DMS database.

24.     Historically, dealerships had many options when choosing a data integration service. Dealers could use data integration services offered by their DMS provider, such as CDK or Reynolds.  Dealers also could use data integration services offered by a variety of independent data integration companies (i.e., data integrators that are not affiliated with any particular DMS). Independent data integration competitors included InDesign, Authenticom, Digital Motorworks, Integralink, Superior Integrated Solutions, Stone Eagle, SelectQu, and ProQuotes, among others. Many dealers preferred working with independent data integrators, because they offered dealers more control over their data, better-quality services, and lower prices.

25.     For many years, CDK repeatedly recognized that dealers own the data they store on the DMS and should control who has access to that data, including dealer-authorized independent data integrators.  To cite just a few examples:

- In 2006, CDK's VP for Marketing told a leading and widely read trade publication, *Automotive News*: "We don't tell the dealer, if someone wants to access their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data.  If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do."

- CDK CEO Steve Anenen told *Automotive News* in 2007: "I think we've stated pretty emphatically, we really believe the dealer owns the data. . . . I don't know how you

[as a DMS company] can ever make the opinion that the data is yours to govern and to preclude others from having access to when it when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?"

- A CDK "NewsFlash" in 2008 said: "Our view is that it is the dealers' data to share with other companies as they see fit, as long as they acknowledge the risks . . . [CDK] has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."

- In a July 2013 press release, CDK reiterated that it "has always understood that dealerships own their own data and enjoy having choices on how to best share and utilize that data with others."

- And in April 2016, CDK VP Mark Hnilicka wrote in an internal email: "Do not get me wrong—I am all for security—but we have ALWAYS told the dealer their data was theirs—not ours."

26. CDK itself acquired two of the largest data integrators in the market, Digital Motorworks (in 2002) and Integralink (in 2010) and operated them under the name "DMI." For many years, CDK thus offered data integration services on other DMSs, such as the Reynolds DMS, through its DMI business unit.

**B. InDesign's Innovative Data Integration Business**

27. Founded in 2013, InDesign is an independent data integration provider.

28. Dealers contract with InDesign to use InDesign's software, which automates the data integration process for them. InDesign's software extracts dealer data from the DMS database (or inputs dealer data into the DMS database) the same as a dealer employee could manually, but InDesign's software automates the keystrokes and mouse clicks that dealer employees would otherwise have to perform many times every day.

29. Since 2013, InDesign has offered its "DMSconnect" data integration service to dealerships and their chosen software vendors. When a dealership uses DMSconnect, it expressly authorizes InDesign's software to access the dealer's data on the DMS, including by providing login credentials so that the software can access the dealer data on the DMS. The software then extracts and sends the specified data to the dealer's chosen business partners, such as a software application provider (or "vendor") or another DMS provider.

30.     InDesign also offers "bi-directional" data functionality through DMSconnect, which allows dealers to not only extract but also input their data into the DMS database through automated means.  Bi-directional data integration is important for many categories of modern software applications.  For example, when a customer comes to the dealership's "service lane" for a car repair, a service lane application needs to both "pull" data from the DMS (i.e., pull information showing the relevant parts available at the dealership) and "push" data onto the DMS (i.e., enter the new customer's repair order into the system).

31.     InDesign's DMSconnect is a high-quality, low-cost service.  For example, InDesign provides dealer's authorized vendors with near real-time data, whereas CDK's "certified" data integration service has much greater lag time.  InDesign also provides dealers with various data types that CDK does not provide, such as scanned and archived documents (including parts invoices, sales records, car repair orders, and numerous other documents related to the dealer's daily operations).

32.     InDesign also charges an affordable price for its DMSconnect service that is far lower than what CDK charges.  InDesign typically charges between $25 and $100 per month for each dealership location (or "rooftop") where it pulls or pushes dealer data to or from the DMS database—a fraction of what CDK can charge for the same services.

33.     InDesign's standard data integration business largely has been stymied by CDK's anticompetitive conduct, described further below.

34.     As a scrappy competitor, InDesign has tried to adapt and survive in the marketplace by offering different varieties of data integration services.  In 2017, InDesign developed a data integration service called "TotalKnockOut" that specifically serves dealerships that are switching DMS providers.  Switching DMSs is costly and difficult, as described further below.  InDesign's TotalKnockOut service makes the switching process smoother and easier for the dealership, by extracting the dealer's data from the current DMS and transferring it over to the new DMS.  InDesign's TotalKnockOut service has proven popular with many dealerships switching from the CDK DMS to other DMSs, such as Tekion and Dealertrack.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
8                                                    Case No. 3:25-cv-01394-JSC

35. InDesign is also developing an innovative new service called DMSbackups, which InDesign developed in response to the ransomware attack on CDK in June 2024 that paralyzed dealerships across the country. InDesign's DMSbackups extracts the dealer's historical data and stores it on a separate hard drive owned by the dealer; the software then adds daily backups of new dealer data on an ongoing basis to the hard drive. If a DMS experiences an outage, as CDK's DMS did in 2024, the dealer can use DMSbackups to automatically access its data from the hard drive, so that the dealership's business operations are not hobbled for days or weeks at a time.

36. When InDesign provides any of its data integration services, it does so with the dealer's express authorization.

37. InDesign's software is given only minimal permission to access the dealer data approved by the dealership, and can only access the same data that a dealership employee can access. InDesign's software does not access unapproved data or any of CDK's proprietary information (such as computer code or algorithms). InDesign's software does not access or receive Social Security or credit card numbers.

38. InDesign offers dealers a secure service that features robust security protocols and protections.

39. InDesign's software securely transmits the dealer's data to InDesign's DMSconnect servers, which operate in secure data centers in the United States that feature around-the-clock video surveillance and world class security.

40. DMSconnect usually transmits dealer data to the authorized dealer vendor within one second of receiving it, and then immediately deletes that data from InDesign's servers. The dealer data that InDesign transfers are encrypted at rest and doubly-encrypted during transmission, following the strictest security guidelines.

41. Since its founding in 2013, InDesign has never experienced any data breach.

## II. CDK's Exclusionary Conduct

### A. CDK long espouses and exploits its "open" stance in the DMS marketplace

42.     As noted, for most of CDK's existence, CDK supported dealers' right to control their own data and to use independent data integrators if they chose.

43.     CDK did not adopt this position out of pure benevolence.  Rather, CDK's "open" stance toward dealer-controlled data access gave it a competitive advantage over its largest DMS rival, Reynolds.  Specifically, from roughly 2006 to 2013, Reynolds tried (without success) to "close" its DMS to competition from independent integrators, so that Reynolds could raise prices for its own "certified" data integration service (called RCI).

44.     When Reynolds tried to block competition from independent integrators, CDK seized the opportunity to differentiate itself from Reynolds by marketing its dealer-friendly approach—both through public statements supporting the dealer's right to control access to their data (*see supra* ¶ 25) and by targeting Reynolds dealer customers that were angry about Reynolds's attempt to block dealers' ability to authorize and use independent integrators.  Indeed, CDK even joined a high-profile industry trade group called "Open Secure Access" that advocated for dealers' right to authorize access to dealer data, against the backdrop of Reynolds's early efforts to squash competition from independent data integrators.

45.     CDK's "open" stance worked.  CDK gained substantial market share from Reynolds and, more than 15 years ago, surpassed Reynolds as the nation's #1 DMS provider—a dominant market position that CDK has held ever since.

### B. Beginning in 2013, CDK changed tactics and conspired with Reynolds

46.     By 2013, however, CDK decided to change tactics and conspire with Reynolds to block competition from independent data integrators.  The evidence of conspiracy—which was extensively litigated in the Antitrust MDL, although virtually all of CDK's internal documents remain under seal—is stark.  (The founder and CEO of CDK's co-conspirator Reynolds, Bob Brockman, systematically and intentionally destroyed evidence related to the conspiracy).

47.     In August 2013, Reynolds unleashed a major blocking campaign to prevent Reynolds dealers from working with independent integrators (including CDK's DMI) and force them to use the higher-priced Reynolds RCI service instead.  At first, CDK set up a "war room" to place competitive pressure on Reynolds by marketing CDK's DMS to dissatisfied Reynolds dealer customers (who were up in arms over the blocking) and lobbying Original Equipment Manufacturers ("OEMs") that benefited from using independent data integrators, including CDK's DMI service.

48.     Instead of continuing that campaign of competitive pressure though, CDK quickly turned to conspiring with Reynolds to divide up the market.  Throughout August 2013 and September 2013, however, top executives at CDK and Reynolds engaged in constant, near-daily phone calls and in-person meetings to begin to coordinate their strategies with respect to independent integrators.  Participants in those phone calls included CDK executives Howard Garner, Ron Workman, and Steve French, and Reynolds executives Bob Schaefer and Mr. Brockman. Those sessions culminated in an in-person meeting, between Mr. Gardner and Mr. Schaefer, at CDK's Columbus, Ohio, office on September 27, 2013.

49.     The companies emerged from those calls and the September 2013 meeting with an agreement:  CDK and Reynolds would align their market messages on "data security"—with CDK agreeing to no longer criticize Reynolds's stance against "data security" in the marketplace—and help each other eliminate competition from independent data integrators on their respective DMSs.

50.     Simultaneously with its agreement with Reynolds (in the fall of 2013), CDK began internally investigating the possibility of "closing" its DMS from competition by independent data integrators.  And in 2014, for the first time, CDK began pursuing a marketing strategy of attacking independent integrators in the marketplace—labeling them a "security" threat.

51.     CDK and Reynolds worked toward formal written agreements, which they finalized in February 2015, to implement the parties' commitment to close their respective DMSs to dealer-authorized independent data integrators.  Indeed, in January 2015, shortly before reaching the final agreement, Mr. Gardner's internal notes from a team strategy meeting stated clearly: "We have an agreement. *We are locking down our DMS.*" (emphasis added).

52.     In the February 2015 agreements, CDK and Reynolds agreed to, *inter alia*, a "contractual restriction of access" under a section entitled "Prohibition on DMS Access." CDK and Reynolds mutually agreed to not "sell, transfer or assign" any "technology, business process, or other such knowledge" about how to integrate with the other's DMS and that they would take no other steps "to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without the other party's written consent." The "contractual restriction of access" never expires.

53.     Days after the February 2015 written agreements, CDK began putting into works efforts to block competition from independent data integrators. Five days after the 2015 agreements were executed, Malcolm Thorne—CDK's Chief Global Strategy Office—instructed CDK's R&D team to begin developing methods to "secure the platform," CDK's code for excluding independent data integrators. He instructed, "GET THIS GOING IMMEDIATELY."

54.     Following the February 2015 written agreements, both CDK and Reynolds took coordinated actions to block competition from independent data integrators. After the agreement, Reynolds promptly unveiled new "security" measures to foreclose access by independent data integrators and sent cease and desist letters to certain independent data integrators (including InDesign). CDK followed suit by unveiling its so-called "SecurityFirst" initiative in the summer of 2015—which used data security rhetoric as a pretext for signaling CDK's intention to block competition from independent data integrators. In 2016, CDK for the first time began to use technological measures to block access by certain independent data integrators, violating the company's longstanding pledge not to usurp control over dealer data.

55.     A year after their February 2015 written agreements, CDK and Reynolds threw a one-year anniversary party, complete with a cake, to celebrate the success of their agreement.

56.     In April 2016, a top CDK executive, Vice President of Product Management, Daniel McCray, admitted the agreement between CDK and Reynolds to foreclose competition from independent integrators to the president and founder of Authenticom, Steve Cottrell. Mr. Cottrell took detailed notes of the conversation the morning after it took place. Mr. McCray told Mr.

Cottrell, among other things, that, "Most of the major DMS companies have agreed to only source data from each other and effectively 'Lock you and the other third parties out.'" Mr. McCray's comments echoed earlier, similar admissions from Reynolds's top data integration executive, Mr. Shaefer.

57. CDK and Reynolds's joint conduct wiped out effective competition from independent data integrators, allowing CDK and Reynolds each to monopolize the market for data integration services on their respective DMSs. By 2017, CDK dealers effectively had just one option for purchasing automated data integration services—CDK own's "3PA" data integration service (which CDK has since pivoted to "Fortellis").

58. CDK and Reynolds needed to work together because dealers greatly value controlling access to their own data and having the choice to use lower-cost independent data integrators. For example, former CDK data integration executive Kevin Witt observed in an email to other CDK executives that precluding dealers from working with independent data integrators was "primarily a BUSINESS issue" for CDK, because "dealers and OEMs and the whole ecosystem of applications and services that they depend on *LOVE* hostile third-party integration."

59. So long as CDK faced competition from independent data integrators, CDK knew that it could not raise prices for CDK's own data integration service.

60. After blocking competition from independent data integrators in 2016, CDK raised its data integration prices dramatically. Software vendors that had been paying independent data integrators less than $100 per dealership for data integration services suddenly had no choice but to pay CDK $700 or more for the same or inferior services (and then pass all or most of that cost down to the dealers that choose and authorize the integrator).

61. Notably, CDK also sells many software applications separately and apart from the CDK DMS. As just one example, in 2018, CDK acquired ELEAD, one of the leading customer relationships management applications at auto dealerships, for $500 million. CDK's internal documents show that CDK wanted to gain control over access to dealer data so that CDK could "tilt the tables" in favor of its own software applications. CDK has done this by denying competing

software applications key data functionality, while granting that same functionality to CDK's own applications.

62.     In a similar vein, CDK has been concerned that as software applications innovate and add new features, they will take over functions traditionally performed by the DMS and "disintermediate" the DMS at dealerships, thereby undermining the value of CDK's DMS.  CDK has used its control over dealer data to prevent that disintermediation from happening, thereby thwarting software applications from becoming a competitive threat CDK's dominant DMS.

## C.  The Antitrust MDL and the State Dealer Data Laws

63.     CDK's conspiracy with Reynolds was extensively litigated in the Antitrust MDL, in which Authenticom, software vendors, and dealerships sued CDK under federal antitrust law. Following years of discovery, the MDL Court held that the conspiracy evidence described above was sufficient to survive summary judgment and go to the jury.

64.     CDK settled all the cases against it in the Antitrust MDL, including paying a recent, publicly announced settlement of $630 million on the eve of a jury trial in the Western District of Wisconsin.

65.     Meanwhile, several state legislatures—e.g., Arizona, Oregon, North Carolina, and Montana—passed "Dealer Data Laws" designed to prohibit CDK's attempts to control (and tax) access to dealer data.  The Arizona Dealer Data Law, for example, prohibits CDK (or any other DMS provider) from engaging in "cyber ransom," prohibiting CDK from "tak[ing] any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use" data the dealer stored in its DMS, or to impose charges "beyond any direct costs incurred" for database access.  *See* Ariz. Rev. Stat. §§ 28-4651(5), 28-4653(A)(3).

66.     Apart from CDK and Reynolds, no other DMS company in the United States has sought to usurp control over access to dealer data.  On the contrary, all other DMS providers respect the dealer's right to control access to their own data (as CDK once did), including the dealer's right to use and authorize independent data integrators.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
14                                          Case No. 3:25-cv-01394-JSC

### III. CDK's Continued Unlawful Conduct

67. As shown above, CDK acquired its monopoly over data integration services through a conspiracy with its key DMS rival, Reynolds. CDK has since engaged in continuing conduct to maintain that monopoly through a series of overt, exclusionary acts within the last four years that have harmed competition and InDesign.

68. ***Dealer contracts***: CDK uses its market power in the DMS Market to coerce an agreement from dealers to exclusively use CDK's data integration services—not those of independent data integrators—as a condition of licensing CDK's DMS.

69. Notably, for decades, CDK's contracts expressly allowed dealers to authorize independent integrators to access the data on the DMS as the dealer's agent. However, in recent years, CDK began changing its contracts to strip out the "agent" provision, so that only dealership employees—not independent integrators—can access dealer data on the DMS using standard login credentials. Upon information and belief, CDK stripped out the dealer's right of "agent" access for the purpose of shoring up its monopoly against competition or potential competition from independent data integrators.

70. Specifically, as a condition of licensing CDK's dominant DMS service, CDK requires dealers to agree not to work with independent data integrators to retrieve their own data from their own DMS. Specifically, CDK's Master Services Agreement states: "CLIENT IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS THE PRODUCTS AND SERVICES EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT," and, "Client acknowledges and agrees that CDK, in order to better secure and protect such Client Data from unauthorized access and use, may prohibit or restrict any third party access to Client's CDK DMS unless: (i) such third party has been granted approved access in, and remains in compliance with its applicable obligations to CDK."

71. CDK's contractual restraints on dealers prevent them from authorizing and using independent integrators, even though many dealers would prefer to use independent integrators as a lower-cost and higher-quality alternative to CDK's own data integration services.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
15
Case No. 3:25-cv-01394-JSC

72.     CDK's coercion scheme works because dealers *both* license the DMS in the DMS Market *and* make the key economic decision on what data integrator is authorized to access their data (and hence provide data integration services) in the Dealer Data Integration Market. Dealers are thus the relevant economic decisionmaker both when selecting a DMS provider and when selecting a data integration service. If dealers were not the economic decisionmaker with respect to both services, CDK's coercion would not succeed, as it has, in foreclosing competition from independent integrators.

73.     Although software vendors usually pay data integration providers directly, software vendors cannot make the decision to use an independent data integrator such as InDesign. Only the dealer can do that, because the data integrator needs dealer permission (and dealer-created login credentials) to access the dealer's data. Moreover, data integration costs are passed down to dealers, in full or in part, and dealers sometimes pay data integration providers directly. For example, InDesign directly bills dealers that use InDesign's TotalKnockOut data integration service when converting from the CDK DMS to the Tekion DMS.

74.     Every time CDK has entered into a new DMS contract within the last four years (or renewed an existing DMS contract), it has required dealers to agree to forgo using or authorizing independent data integrators as a condition of licensing the CDK DMS.

75.     **Vendor contracts**: CDK also has maintained its monopoly through the contracts that it has entered into or renewed with software vendors that purchase data integration services through CDK's 3PA (or, more recently, Fortellis) data integration program.

76.     CDK's vendor contracts contain an exclusive dealing provision that requires vendors to agree that once they use CDK for data integration services at a single CDK dealership, they must use only CDK's data integration services at *every* CDK dealership. What is more, CDK's exclusive dealing provision in CDK's 3PA agreements lasts forever—so that once a vendor joins the 3PA program, they are permanently barred by contract from using an independent data integrator to access dealer data on any CDK DMS.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
16                          Case No. 3:25-cv-01394-JSC

77.     Because there are now hundreds of vendors in CDK's data integration program—including the largest vendors in the nation—these exclusive dealing provisions foreclose competing and potentially competing independent data integrators from a huge swath of the market. InDesign, for example, has largely been consigned to a small slice of the market consisting of providing data integration services to startup and smaller vendors that have never purchased data integration services from CDK and thus are not bound by the exclusive dealing provisions.

78.     CDK's 3PA vendor contracts also include a price secrecy provision that prohibits vendors from discussing or disclosing the prices that CDK charges for data integration services.

79.     ***Contract enforcement***: CDK also has engaged in a series of contract enforcement actions, within the last four years, to block independent integrators and maintain its monopoly over data integration services.

80.     As noted, CDK has now eliminated the dealer's longstanding right to authorize agents to access the dealer's data. CDK in recent years also has used its market power to force dealers and vendors to accept arbitration provisions in their contracts with CDK, which prevent them from challenging CDK's antitrust violations in federal court or as part of a class action. On information and belief, CDK's forced individual arbitration has the purpose and effect of insulating CDK's monopoly in the Dealer Data Integration Market.

81.     CDK has repeatedly taken contract enforcement actions to block dealers from accessing their own data. On information and belief, CDK has threatened dealers and warned them that using independent integrators would constitute a contract violation. For example, the Asbury Automotive Group, a large dealership group with 157 locations nationwide, was recently forced to sue CDK in Georgia state court to gain access to Asbury's own dealer data.

82.     In 2024, CDK sent cease and desist letters to Authenticom and Tekion for purportedly gaining dealer-authorized access to dealer data on the DMS. On information and belief, CDK's letter to Authenticom was intended as a warning shot to prevent Authenticom from trying to compete in the Dealer Data Integration Market.

83. On February 10, 2025, CDK filed its lawsuit against InDesign, which expressly seeks to prevent InDesign from providing the dealer-authorized integration services that InDesign has offered to dealers and software vendors since 2013. If successful, CDK's lawsuit would eliminate InDesign entirely from the Dealer Data Integration Market.

84. On February 11, 2025, the day after CDK filed its lawsuit, CDK sent InDesign a cease and desist letter taking the view that InDesign's longstanding dealer-authorized access methods are prohibited by CDK's contractual restraints on dealers (as described above). CDK's letter effectively demanded that InDesign stop competing in the Dealer Data Integration Market entirely, because InDesign cannot perform data integration services without authorization and credentials provided by the dealer. CDK's cease and desist letter is therefore another overt act to foreclose competition from InDesign.

85. Two months later, on roughly April 15, 2025, CDK began using technological blocking measures to disable the login credentials that CDK dealers had created to use with InDesign's software to access their own data. CDK's blocking has thwarted the ability of dealers that use the CDK DMS to use InDesign's data integration services. CDK is thus taking affirmative steps to interfere with consumers' ability to use rival providers through conduct (i.e., technological blocking) that is not competition on the merits.

## IV. Relevant Product Markets

86. There are two relevant product markets in this action: (A) the DMS Market; and (B) the Dealer Data Integration Market.

### A. The DMS Market

#### i. The DMS Market is a relevant product market

87. There is a relevant market for DMSs sold to franchised automobile dealerships in the United States.

88. As noted, franchised dealerships use a DMS to manage their daily operations. The DMS is essential enterprise software that automates key business functions and provides a database that stores the dealer's data. As the FTC said in blocking CDK's attempt to acquire its DMS

competitor Auto/Mate (and recognizing the existence of the DMS Market), "The DMS is a mission-critical business software that serves as the backbone of the dealer's information technology systems."

89.     There are no reasonable substitutes for a DMS, which is why every franchised auto dealership (including small, family-owned dealerships) in the United States uses one.

90.     A dealer only uses one DMS at a time.  It would be functionally and economically impractical for a dealership to operate on two separate DMS platforms.

91.     The DMS Market is comprised of the providers that sell and market DMS services to automobile dealerships in the United States.  Competitors in this market include CDK, Reynolds & Reynolds, Tekion, Dealertrack, Auto/Mate, and DealerBuilt.

92.     Dealerships pay high prices to license DMS software and use the DMS database.  The DMS is often the second-largest dealership expense, behind only employee salaries.  At large dealership groups, annual DMS fees can easily run into the millions of dollars.

93.     The relevant geographic market for the DMS Market is the United States.  DMS providers design, market, and sell DMSs specifically for United States auto dealerships.  DMSs also need OEM certifications to operate, and many OEMs require a United States-specific certification.

ii.     **CDK has a monopoly and durable and substantial market power in the DMS Market**

94.     For well over a decade, CDK has been the leading DMS provider in the United States and has enjoyed substantial, durable market power in the DMS Market.

95.     CDK has an approximately 60 percent share of the DMS Market, by revenue, in the United States.

96.     CDK's market share among the largest and most sophisticated enterprise dealership groups is substantially higher.  For example, five of the six publicly traded auto dealership groups (AutoNation, Lithia Motors, Group 1 Automotive, and Asbury Automotive) use the CDK DMS.

97.     As described in more detail below, CDK's market power in the DMS Market is protected by high barriers to entry, long-term contracts, significant switching costs, and CDK's own exclusionary conduct.

98.     CDK therefore has monopoly power or, at minimum, substantial market power in the DMS Market.

99.     CDK's longstanding market power in the DMS Market is supported by direct evidence.

100.    As described *infra* ¶¶ 134–37, CDK has successfully imposed anticompetitive terms and actions on dealers without losing (and while in fact increasing) its market share in the DMS Market.  Among other things, CDK has demonstrated its market power in the DMS Market by forcing dealers to accept the ban on independent integrators and to instead use CDK's higher-priced data integration services without any offsetting reduction in the DMS licensing fees that CDK charges to dealers.

101.    On information and belief, CDK has for many years maintained durably high profit margins, exceeding 40 percent, for its DMS business.

### iii.    CDK's market power in the DMS Market is enhanced by high barriers to entry

102.    CDK's substantial market power is protected and enhanced by high barriers to entry and substantial switching costs in the DMS Market.

103.    ***First***, it is difficult and expensive to build and launch a DMS.  Building a DMS can require hundreds of millions of dollars, if not more, in upfront investment.  And before a nascent DMS company can sign up dealer customers, the DMS provider also must obtain certifications from OEMs such as Ford and Honda, which can take years to acquire.  New entrants in the DMS Market have been few and far between.

104.    ***Second***, CDK enters into long-term DMS contracts with dealers, which are usually at least five years in length and can be even longer (i.e., 72 to 80 months).  Other major DMS providers also enter into long-term DMS contracts with dealers.  Accordingly, in any particular year, more than 80 percent of dealerships are not eligible to switch DMS providers because they are subject to long-term contractual commitments—leaving only a fraction of the market up for grabs for new and existing competitors.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
20                                    Case No. 3:25-cv-01394-JSC

105. Further, CDK enforces large liquidated damages penalties (that can exceed $1 million) on any dealership that tries to leave its contract early, which further prevents dealerships from shopping around before their long-term contracts expire.

106. *Third*, even when dealerships reach the end of their contract term and have the option to switch DMS providers, few do so because switching DMSs is so costly and disruptive.

107. Because switching DMSs changes nearly every process and function that dealership employees use to do their jobs, dealerships typically spend a year or more testing the new system, preparing for the new system, and training employees to use the new system (at considerable expense and operational disruption).

108. For example, Reynolds has warned dealers that switching DMSs can take three or more years and cause an average per-store profit decline of nearly 50 percent because of the disruption and lost productivity.

109. Dealerships have likened switching to a heart transplant, knee replacement, or learning to speak a new language. Even large and sophisticated dealerships (such as Hendrick Automotive Group, one of the largest dealership groups in the country) have abandoned changing DMSs midway through the switching process because it is too painful.

110. *Fourth*, CDK has entrenched its position as the dominant provider of DMS by holding dealer data hostage to raise the costs of switching DMSs. When dealers try to switch from the CDK DMS to another DMS, CDK will refuse to release that data, or will wait to do so until the 11th hour and not unless the dealerships pay CDK exorbitant fees. Indeed, CDK's practice of holding dealer data hostage, to deter dealers from switching DMSs, is precisely why many dealerships have turned to InDesign's TotalKnockOut service—a service that CDK is now trying to remove from the market and destroy entirely.

111. Because of CDK's entrenched market dominance and the high switching costs described above, CDK's average dealer tenure, on information and belief, has exceeded 20 years.

112. Large and well-capitalized technology companies have tried and failed to enter or expand in the DMS Market. For example, in 2007, Microsoft spent billions of dollars to try to enter

the DMS Market but abandoned the effort within a few years.  Similarly, a large and well-known automotive software provider, Dominion Enterprises, abandoned its effort to launch a new DMS product (called DMX).  (Indeed, InDesign had entered into an agreement with Dominion Enterprises to provide its TotalKnockOut data integration service to dealerships switching to the DMX system, but that opportunity never came to fruition because Dominion abandoned DMX before it ever got off the ground).

**B.  The Dealer Data Integration Market**

    **i.  The Dealer Data Integration Market is a relevant market**

113.    There is a relevant antitrust market for data integration services among dealers that use the CDK DMS ("Dealer Data Integration Market").

114.    The Dealer Data Integration Market is comprised of the firms that automate the process of extracting dealer data from the CDK DMS—including CDK's own in-house data integration service providers—format that data, and provide it to the dealer's chosen business partners.

115.    Dealerships cannot operate their businesses without access to the data on the DMS. Dealers rely on data integration providers to facilitate access to their data.  For example, software vendors need automated access to the data stored on the DMS to provide critical services to dealerships.

116.    Data integration services provided on other, non-CDK DMS platforms are not a substitute for data integration services with respect to dealers that use the CDK DMS.  Dealers that use the CDK DMS only store their operational data in the CDK DMS database, so they must use data integration that can access their data on that DMS.  Similarly, vendors and OEMs with dealership clients that use the CDK DMS need data integration services to access dealer data on the CDK DMS and cannot use data integration services available for other DMSs for that purpose.

117.    Data integration services for CDK's DMS are likewise necessary for competition in the DMS market.  Dealerships cannot abandon their core operating data built up over years of tenure

using a DMS.  Without the ability to move that data from the CDK DMS, dealers can become locked in to CDK's platform and unable to switch to competing DMS providers.

118.    At one time, dealers that use the CDK DMS had many options in the Dealer Data Integration Market.  Dealers could choose to receive data integration directly from CDK, through CDK's so-called "certified" data integration programs.  Or historically, those dealers and their chosen software vendors could use one of many independent data integration providers.  *See supra* ¶ 4.

119.    Today, because of CDK's continuing anticompetitive conduct, CDK's data integration service is the only option left.  Just two independent data integration providers—InDesign and Authenticom—remain in the automotive industry, and CDK has largely prevented dealers and their authorized software vendors from obtaining automated data integration from them.

120.    There are no reasonable substitutes for automated data integration services.  Without automated data integration services, dealership employees would have to constantly perform data entry and extraction tasks throughout the day.  Manual extraction methods impose an enormous logistical burden on dealership employees; cannot provide the "real-time" data integration many applications need; and are highly prone to human error, such as when employees assigned to perform data extraction tasks call in sick or miss a required data extraction or data field.  As one veteran dealership IT director has testified:

> "Here's the thing about manual:  Manual doesn't work," citing an example of a software vendor that works with 50 dealership locations: "He's got to find 50 people, one in each store, to manually run a report, grab the data, and then transmit it . . . These people can't have a day off.  They can't make a mistake, can't have a vacation. It doesn't work unless you can automate the process."

121.    Indeed, dealerships and their vendors pay CDK exorbitant data integration fees, rather than turning to manual data methods, precisely because manual data extraction is not a reasonable substitute for automated data integration.

122.    There is widespread industry recognition that there is a market for data integration services, including by CDK itself (which has competed in this market both with respect to its own DMS and with respect to other DMSs through its DMI business unit).  Dealers, their software

vendors, and OEMs see independent data integrators as a reasonable (and often preferable) substitute to the higher-priced data integration services offered by CDK.

123. The relevant geographic market for Dealer Data Integration Market is the United States, as this market consists of providing data integration services to dealerships that use the CDK DMS in the United States.

### ii. CDK has a monopoly in the Dealer Data Integration Market

124. Because CDK has eliminated competition from independent data integrators through a horizontal conspiracy with Reynolds, as described further below, it acquired a 100 percent (or near 100 percent) market share in the Dealer Data Integration Market.

125. CDK today continues to maintain a 100 percent (or near 100 percent) monopoly in the Dealer Data Integration Market. Indeed, at a recent deposition, CDK SVP David LaGreca testified that there are no competitors to CDK's data integration service.

126. CDK's monopoly over the Dealer Data Integration Market is shown by direct evidence.

127. CDK has successfully excluded independent integrators from competing in the Dealer Data Integration Market for many years. Pursuant to their conspiracy, CDK and Reynolds forced almost all independent integrators out of the market entirely. CDK has marginalized the two remaining competitors (InDesign and Authenticom) and prevented new independent integrators from entering the market, even though there is tremendous demand among dealerships, vendors, and OEMs for independent data integration services.

128. After CDK eliminated competition from independent data integrators, CDK successfully imposed massive price increases for its data integration services and has maintained prices far above competitive levels for many years now. As one vendor (Dominion Enterprises) testified, "whenever [CDK] wanted to increase prices, they could. And they did"—increasing "prices dramatically for no increase in functionality."

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
24                                    Case No. 3:25-cv-01394-JSC

129.    If CDK lacked monopoly power in the Dealer Data Integration Market, CDK could not have excluded competition and imposed and then maintained supracompetitive prices in that market—particularly for as long as it has.

130.    CDK also has maintained enormous profit margins with respect to its data integration business that, on information and belief, far exceed 50 percent, as CDK has excluded the competition that would otherwise force CDK's profits down closer to marginal cost.

131.    Competition in the DMS market does not constrain CDK's ability to exclude competition and maintain supracompetitive prices in the Dealer Data Integration Market, because CDK is the longstanding dominant DMS provider and has monopoly power or, at minimum, substantial market power in the DMS Market.

132.    Moreover, dealers that use the CDK DMS face substantial switching costs and have limited ability to conduct lifecycle pricing.  These switching and information costs are not needed to provide CDK with market power in the DMS Market—because CDK already has monopoly power or, at minimum, substantial market power in the DMS Market—but they further insulate and strengthen CDK's demonstrated power to exploit dealers in the Dealer Data Integration Market.

133.    *Switching costs*: Because dealers are locked into long-term contracts and switching DMSs is enormously disruptive, few dealers will even attempt to switch DMSs.  *See supra* ¶¶ 106–109.  Accordingly, CDK can comfortably impose a 5 percent price increase for data integration services without risking so many dealers switching DMSs as to make the price increase unprofitable. Indeed, CDK has profitably imposed price increases much greater than 5 percent without losing its dominant position in the DMS Market.

134.    *Information costs*: Moreover, it is difficult for dealerships to accurately forecast how much they will pay for CDK's data integration fees.  CDK's integration fees are variable, not set beforehand, and not disclosed or estimated by CDK in CDK's DMS contracts with dealers.  CDK charges software vendors CDK's data integration fees in the first instance (and those fees are then passed down to the dealer, in full or in substantial part, and are usually not broken out separately but rather are folded within the overall software license cost).  And CDK has imposed price-secrecy

provisions on software vendors that prevent those vendors from disclosing to dealers how much CDK has charged them for data integration.

135.  _No general awareness_: A substantial percentage of CDK dealers were not aware of CDK's data integration restrictions until after they first decided to license the CDK DMS.  After many years of championing competition in the Dealer Data Integration Market, CDK only began blocking competition from independent integrators in 2016 following its conspiracy with Reynolds (_see supra_ ¶ 54) and did not start to remove dealers' contractual rights to authorize the access of independent data integrators, as their agents, until 2018 and thereafter.  Because the average dealership has been with CDK for well over a decade, most of CDK's dealership customers first made the decision to use the CDK DMS long before CDK began interpreting and changing its DMS contracts to prohibit competition from independent integrators.  Indeed, CDK marketed its DMS to dealer customers with the promise that they could control their data and authorize third-party integrators to access their DMS database.

**V.  CDK's continuing monopolization has harmed competition and InDesign**

136.  CDK's anticompetitive conduct has severely harmed competition and consumers in myriad ways.

137.  **_First_**, CDK's overt actions to maintain its monopoly have fundamentally destroyed the competitive process and deprived dealerships and software vendors of competitive choice.  Dealers that for many years could choose between a variety of different data integration providers now have just one choice, CDK's data integration service.  Dealers and other market participants are thus being deprived of the benefits of competition in the Dealer Data Integration Market, including competition that lowers prices and spurs firms to innovate and improve quality.

138.  **_Second_**, by excluding competition from independent integrators, CDK has been able to impose and maintain supracompetitive prices.  CDK's prices remain elevated far above competitive levels.  Following its conspiracy with Reynolds, CDK raised its data integration prices by 200 percent or more, virtually overnight, with no corresponding improvements in quality.

Dealers and their chosen software vendors today continue to pay CDK data integration fees that far exceed what they would pay in a competitive market.

139. Some of the largest application providers in need of data integration services are the car manufacturers, or OEMs, themselves. OEMs like Ford, General Motors, and Volkswagen need access to dealer data in order to help manage car and parts inventory, process warranty claims and recall notices, apply rebate and special promotions to car sales, and assist dealers with marketing and lead generation. These manufacturers rely on fair-market-priced data integration services to access dealer data, which is essential to the functioning of the entire automobile industry. CDK's conduct has prevented OEMs from using independent integrators and forced them to purchase CDK's data integration services at greatly inflated prices.

140. *Third*, CDK's monopoly over the Dealer Data Integration Market has degraded the quality of data integration services and software services available to dealerships. Independent integrators were a consistent source of innovation, including by rolling out features that gave dealers greater control over their data and that improved the data functionality available to dealers and their software vendors. CDK's monopoly has deprived consumers of those high-quality options.

141. By removing the competitive threat that independent data integrators posed, CDK's exclusionary conduct has severely dampened CDK's own incentives to invest in improving quality and building new data integration features. Existing and potential data integration competitors likewise have lower incentives to invest because they cannot effectively market their services to CDK dealerships. Indeed, virtually every independent data integrator has left the market entirely for this reason.

142. Moreover, many small and startup vendors cannot afford CDK's exorbitant data integration costs—which can exceed the cost of the software application itself. On information and belief, CDK has refused to even "certify" smaller vendors in CDK's data integration program unless they will meet a revenue threshold. Accordingly, CDK's monopoly has forced small and up-and-coming vendors out of the market, and prevented similar vendors from entering the market, to the detriment of dealerships across the country.

143. **Fourth**, CDK has used its monopoly over the Dealer Data Integration Market to harm competition in related, adjacent markets. CDK exploits its control over dealer data to make it more difficult for dealers to switch DMSs, which impedes competition in the DMS Market and enhances CDK's market power and dominant position in that market and the Dealer Data Integration Market. Similarly, CDK has used its control over dealer data to deny software vendors important functionality, in order to "tilt the table" in favor of CDK's own non-DMS software applications and to prevent software vendors from taking over functions that traditionally have been performed by CDK's DMS.

144. CDK's continuing anticompetitive conduct also has greatly harmed InDesign.

145. CDK's continuing exclusionary conduct has cost InDesign many millions of dollars in lost profits. Because InDesign offers an innovative data integration service that in many respects is superior to CDK's data integration service (*see supra* ¶ 31), many dealers and software vendors would choose InDesign's service if CDK did not maintain they were contractually prohibited from doing so. Indeed, dealerships and software vendors have told InDesign they would work with InDesign but for CDK's anticompetitive restrictions. InDesign has been unable to attract new customers because it cannot reliably access dealer data on the CDK DMS, which, as noted above, is the dominant DMS in the United States.

146. CDK's continuing exclusionary conduct has also greatly damaged InDesign's enterprise value. InDesign's business would have a much higher valuation in the marketplace but for CDK's contractual restraints that prevent dealerships and software vendors from using InDesign's services.

147. CDK's recent efforts to block the login credentials that dealers create for InDesign has likewise harmed InDesign and prevented InDesign from fulfilling its contractual obligations to its dealer and vendor customers.

148. When CDK began disabling accounts that dealers created for InDesign in April 2025, CDK knew that InDesign had contracts with those dealers to provide data integration services.

Indeed, CDK cited and quoted from InDesign's dealer contracts two months earlier in CDK's February 10, 2025, complaint against Tekion and InDesign.

149.   CDK's interference has prevented InDesign from fulfilling its contractual obligations to dealers and vendors, because InDesign cannot provide any of its data integration services without functioning, dealer-created login credentials.  CDK's intentional interference has prevented InDesign from fulfilling its contractual obligations to many dealerships, including Boshears Ford; Dale Benton Auto Group; Integrity Automotive Holdings 4; Kayser Auto Group; Nissan of Everett; Bickford Ford; GS Motors; Indigo Auto Group; Kelsey Chevrolet; Larson Automotive Group; Schofield Honda; the D'Arcy dealership group; the El Cajon dealership group; Krause Family Ford of Woodstock; and others.  Likewise, CDK's intentional interference has prevented InDesign from fulfilling contractual obligations to dealer-authorized software vendors, with examples including One on One Consulting (a software company offering customized management reporting for dealers) and 3WEE (which offers automated consumer lifecycle management software to improve dealer performance).

## VI.  CDK has acted with the intent to monopolize and not for any procompetitive reason

150.   CDK has engaged in its long-running campaign to exclude independent data integrators such as InDesign with the purpose and intent of monopolizing the Dealer Data Integration Market.

151.   CDK acquired its monopoly in the Dealer Data Integration Market by conspiring with its closest competitor, demonstrating its anticompetitive intent.  CDK's actions were motivated by the promise of windfall profits, not security concerns: CDK wanted to block competition from independent integrators so it could drastically raise prices for its own data integration service.   CDK then did just that and has engaged in continuing exclusionary conduct to maintain its monopoly and foreclose competitors like InDesign in order to protect CDK's inflated data integration prices.

152.   CDK's stated security rationale for blocking competition from independent integrators is pretextual.  When CDK rolled out its "SecurityFirst' initiative, CDK's top security officials admitted behind the scenes that the security rhetoric was based on marketing spin rather than

legitimate security efforts.  As just one example, CDK's Global Security Officer Josh Sowers criticized CDK's SecurityFirst initiative—noting "our security sucks and is nowhere near best practices" and explaining that CDK "[h]ad no security strategy and Yet we want to talk security to sell products."

153.  CDK's security claims are otherwise unjustified and meritless.  Dealers care greatly about data security—since they own the data at issue—and have no incentive to grant insecure parties access to their data.  In decades of practice, no independent integrator has ever caused a data breach or security incident on the CDK DMS (or any other DMS).  For its part, InDesign employs strong security protections and has never had a data breach of any kind.  And every other DMS provider in the market permits dealers to control access to their data, without experiencing any security issues associated with dealer-authorized access to dealer data.

154.  Even if CDK's security claims were legitimate (and they are not), there are easily available less-restrictive means short of monopolizing the Dealer Data Integration Market.  The state Dealer Data Laws provide a blueprint for putting dealers in control of their data while protecting the security of dealer data.  Other DMS companies (apart from CDK and Reynolds) also facilitate secure access by dealer-authorized independent data integrators through low-cost APIs.

## FIRST CAUSE OF ACTION

### (Monopoly Maintenance Under 15 U.S.C § 2)

155.  InDesign repeats and realleges the preceding paragraphs.

156.  CDK has unlawfully monopolized and maintained a monopoly in the Dealer Data Integration Market in violation of Section 2 of the Sherman Act.  15 U.S.C § 2.

157.  In the primary DMS Market, CDK is the dominant provider and has monopoly power or, at minimum, substantial market power.  In the Dealer Data Integration Market, whether characterized as a submarket or a single brand aftermarket, CDK has a complete monopoly and has demonstrated its durable monopoly power by excluding competition and raising and maintaining prices far above competitive levels for a sustained period.

158.	CDK acquired its monopoly over the Dealer Data Integration Market through a conspiracy with Reynolds and has maintained that monopoly through overt and exclusionary acts, including by coercing dealers to forgo using independent data integrators; imposing exclusive dealing requirements on software vendors; and engaging in contract enforcement actions, that are not competition on the merits, designed to deter and impede competition by independent data integrators.

159.	CDK's monopoly maintenance has severely harmed competition and consumers, including by allowing CDK to impose and sustain supracompetitive prices; eliminate competitive choice; and degrade quality and innovation.  CDK's conduct has no countervailing procompetitive business justification.

160.	CDK's exclusionary conduct has harmed InDesign, including by causing InDesign to lose millions of dollars in lost profits and jeopardizing the existence of InDesign's business.

## SECOND CAUSE OF ACTION

### (Tying Under 15 U.S.C. § 1)

161.	InDesign repeats and realleges the preceding paragraphs.

162.	CDK has imposed an unlawful tying arrangement on dealerships, in violation of Section 1 of the Sherman Act.  15 U.S.C. § 1.

163.	In the DMS Market (tying market), CDK is the dominant provider with monopoly power or, at minimum, substantial market power.  CDK has used its market power in the DMS Market to foreclose competition in the Dealer Data Integration Market (the tied market).

164.	DMS and data integration services are separate products.  DMS and data integration services have entirely different product features and characteristics; they are sold separately by different suppliers; and they have different demand curves.

165.	CDK uses its market power in the DMS Market to coerce dealers to forgo using independent data integrators.  CDK will only license its dominant DMS to dealers on the condition that those dealers agree not to authorize and use independent data integrators.  CDK's forced tying arrangement forecloses independent data integrators from competing in the Dealer Data Integration

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
31	Case No. 3:25-cv-01394-JSC

Market, because independent data integrators cannot provide automated data integration services without dealer authorization.

166.    CDK's tying arrangement has entirely foreclosed competition in the tied market, allowing CDK to monopolize that market and impose sustained, supracompetitive prices; deprive dealerships of competitive choice; and degrade quality and innovation.  CDK's conduct has no countervailing procompetitive business justification.

167.    CDK's tying arrangement also has harmed InDesign because it prevents InDesign from effectively competing in the Dealer Data Integration Market, depriving it of millions of dollars of profits and jeopardizing the existence of its business.

168.    CDK's conduct has had a substantial effect on interstate commerce in the tied market.

## THIRD CAUSE OF ACTION

### (Exclusive Dealing Under 15 U.S.C. § 2)

169.    InDesign repeats and realleges the preceding paragraphs.

170.    CDK has entered into contracts with software vendors that contain exclusive dealing provisions, which unreasonably restrain trade in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.

171.    Following CDK's conspiracy with Reynolds, CDK began to insert exclusive dealing requirements in its data integration contracts with software vendors, which provide that vendors cannot obtain data from dealers using the CDK DMS from any data integrator except for CDK.

172.    CDK was able to impose these exclusive dealing provisions as a result of its market power in the DMS Market and the Dealer Data Integration Market.

173.    CDK's exclusive dealing requirements unreasonably restrain competition.  The requirements foreclose independent integrators from competing in a substantial portion of the Dealer Data Integration Market and have enabled CDK to charge and maintain supracompetitive prices for data integration services.  CDK's exclusive dealing requirements have no countervailing procompetitive business justification.

174. CDK's exclusive dealing requirements also have harmed InDesign because it has effectively foreclosed InDesign from competing in the Dealer Data Integration Market, depriving it of millions of dollars of profits and jeopardizing the existence of its business.

## FOURTH CAUSE OF ACTION

### (California UCL, § 17200, et seq.)

175. InDesign repeats and realleges the preceding paragraphs.

176. CDK's actions described above constitute unlawful, unfair, or fraudulent acts or practices in the conduct of a business, in violation of California's Business and Professions Code Section 17200, et seq., ("California's Unfair Competition Law" or "UCL"), including actions forbidden by other laws.

177. CDK's business practices are unlawful because they constitute unlawful monopolization under 15 U.S.C. § 2, unlawful tying under 15 U.S.C. § 1, and unlawful exclusive dealing under 15 U.S.C. § 2.

178. CDK's business practices are unfair because they are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to competition, consumers, and InDesign. Through exclusionary conduct, CDK has destroyed competition in the Dealer Data Integration Market and deprived dealers of the choice to use higher-quality and lower-cost providers such as InDesign in that market.

179. CDK's conduct threatens an incipient violation of antitrust laws and violates the policy or spirit of antitrust laws, such that its effects are comparable to or the same as a violation of antitrust law, and CDK's anticompetitive conduct otherwise significantly threatens or harms competition generally within the Dealer Data Integration Market.

180. As a direct and proximate result of CDK's conduct, InDesign has been substantially injured, as it has been effectively foreclosed from competing in the Dealer Data Integration Market, depriving it of millions of dollars of profits and jeopardizing the existence of its business.

181. InDesign is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the market for data integration services.

# FIFTH CAUSE OF ACTION

## (Tortious Interference with Existing Business Relations)

182. InDesign repeats and realleges the preceding paragraphs.

183. InDesign has contracts with dealerships and dealer-selected software vendors, in which InDesign has agreed to provide data integration services.

184. CDK at all relevant times has known that InDesign has contracts with dealers and vendors to provide data integration services. Indeed, CDK quoted InDesign's contracts in its February 10, 2025, complaint against Tekion and InDesign.

185. By blocking InDesign's dealer-created login credentials, CDK intentionally interfered with InDesign's contracts with dealerships and third-party vendors. Without functioning login credentials, InDesign cannot provide data integration services at dealerships that use the CDK DMS. CDK's intentional actions to disable those credentials have therefore prevented InDesign from fulfilling its contractual obligations to its clients.

186. CDK's actions have caused actual breach of InDesign's contracts with dealerships and third-party vendors. InDesign has been unable to perform its contractual obligations with respect to dealers that use the CDK DMS since CDK began disabling the login credentials that dealers create for InDesign in April 2025.

187. CDK's actions have proximately caused substantial damages and losses to InDesign. The damages include lost revenue from unfulfilled service contracts and costs due to InDesign's inability to fulfill its contractual agreements. Further, InDesign has suffered harm to its goodwill and business relationships with its customers due to CDK's actions preventing InDesign from providing its clients with the agreed-upon data integration services.

188. InDesign is entitled to permanent injunctive relief to prevent CDK from tortiously interfering with its service contracts.

## PRAYER FOR RELIEF

WHEREFORE, InDesign requests that the Court:

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
34
Case No. 3:25-cv-01394-JSC

(a)      Decree that the conduct alleged herein is an illegal monopoly in violation of Section 2 of the Sherman Act;

(b)      Decree that the conduct alleged herein is an illegal restraint of trade in violation of Section 1 of the Sherman Act;

(c)      Decree that the conduct alleged herein constitutes unfair competition under the California UCL;

(d)      Decree that the conduct alleged herein constitutes tortious interference with existing business relations under California common law;

(e)      Decree that when accessing the CDK DMS using dealer-provided login credentials, InDesign does not unlawfully access CDK's computer system, misappropriate CDK's trade secrets, or misappropriate CDK's copyrights in violation of federal law.

(f)      Permanently enjoin the enforcement of the anticompetitive contractual provisions in CDK's contracts with automotive dealerships and vendors, including, but not limited to, those provisions that ban dealers and vendors from contracting with independent data integrators;

(g)      Order all necessary permanent injunctive relief to restore competition and unfetter the Dealer Data Integration Market from CDK's unlawful conduct;

(h)      Award InDesign damages for all damages arising from CDK's unlawful restraints of trade as alleged herein, as provided under the Sherman Act and California Unfair Competition Law;

(i)      Award InDesign treble damages as caused by the restraints alleged herein, as provided by law, and that judgment in favor of InDesign be entered against CDK in that amount;

(j)      Award InDesign its reasonable costs and expenses incurred in this action, including reasonable attorneys' fees and similar costs, as provided by law; and

(k)      Any such further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

189.    Counter-Plaintiff InDesign hereby demands a trial by jury on all issues so triable.

InDesign's Answer and Affirmative
Defenses to Amended Complaint and Amended Counterclaims
35         Case No. 3:25-cv-01394-JSC

Dated:  August 28, 2025                          **WINSTON & STRAWN LLP**


By: /s/ Joshua Hafenbrack
       Joshua Hafenbrack (*pro hac vice*)
       jhafenbrack@winston.com
       Benjamin Rudofsky (*pro hac vice*)
       brudofsky@winston.com
       Jade Briana Baker (*pro hac vice*)
       jbbaker@winston.com
       Sydney Hartman (*pro hac vice*)
       shartman@winston.com
       **WINSTON & STRAWN LLP**
       1901 L Street NW
       Washington, DC 20036-3506
       Telephone: (202) 282-5017
       Fax: (202) 282-5100

       Jeanifer E. Parsigian (SBN: 289001)
       jparsigian@winston.com
       **WINSTON & STRAWN LLP**
       101 California Street, 35th Floor
       San Francisco, CA 94111
       Telephone: (415) 591-1000
       Facsimile: (415) 591-1400

       Bethany Ao (*pro hac vice*)
       bao@winston.com
       **WINSTON & STRAWN LLP**
       35 West Wacker Drive
       Chicago, IL 60601
       Telephone: (312) 558-5600
       Fax: (312) 558-5700

       *Counsel for Defendant and Counter-Plaintiff*
       *INDESIGN DATA, LLC*

**CERTIFICATE OF SERVICE**

I certify that on August 28, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: August 28, 2025

*/s/ Joshua Hafenbrack*
Joshua Hafenbrack

Counsel for InDesign Data, LLC