ATTACHMENT 1

Joshua Hafenbrack (*pro hac vice*)
jhafenbrack@winston.com
Jade Briana Baker (*pro hac vice*)
jbbaker@winston.com
Sydney Hartman (*pro hac vice*)
shartman@winston.com
**WINSTON & STRAWN LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5017
Fax: (202) 282-5100

Jenifer E. Parsigian (SBN: 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California Street, 35th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Fax: (415) 591-1400

Bethany Ao (*pro hac vice*)
bao@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700

*Counsel for Defendant INDESIGN DATA, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| **CDK GLOBAL, LLC,** | **Case No. 25-CV-01394-JSC** |
| Plaintiff, | **DEFENDANT INDESIGN DATA, LLC'S OPPOSITION TO PLAINTIFF CDK GLOBAL, LLC'S MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| **TEKION CORP.**, a Delaware corporation, and **INDESIGN DATA, LLC**, a Florida limited liability company, | Date: June 26, 2025<br>Time: 10:00 a.m.<br>Judge: Hon. Jacqueline Scott Corley<br>Courtroom 8, 19th Floor |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

A.    Dealer data and the DMS ...................................................................................... 2

B.    InDesign is an innovative independent data integrator .......................................... 4

C.    CDK pays massive settlements to resolve antitrust claims .................................... 4

D.    CDK's security and performance arguments are unsubstantiated .......................... 6

E.    CDK belatedly blocks InDesign's dealer-authorized access .................................. 7

ARGUMENT ..................................................................................................................... 7

I.    CDK CANNOT SHOW IRREPARABLE HARM ................................................ 8

A.    CDK's seven-year delay forecloses its showing of irreparable harm .................... 8

B.    CDK's speculative security claims cannot support a finding of irreparable harm ................... 10

C.    CDK's claimed harm from InDesign can be remedied through monetary damages ................. 11

II.    CDK CANNOT SUCCEED ON THE MERITS ................................................. 13

1.    CDK is not likely to succeed on its CFAA claim ................................................. 14

2.    CDK is not likely to succeed on its DMCA claim ............................................... 17

B.    CDK's DMCA claim constitutes copyright misuse .............................................. 19

1.    Tortious Interference .......................................................................................... 21

III.    THE PUBLIC INTEREST AND EQUITIES FAVOR INDESIGN ...................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ..................................................19

*A&M Recs., Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) .............................................................19

*Actuate Corp. v. Int'l Bus. Machs. Corp.*,
    2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) .........................................18

*Admor HVAC Prods., Inc. v. Lessary*,
    2019 WL 2518105 (D. Haw. June 18, 2019)..........................................24

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...............................................................8

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985) .............................................................12

*Apple Inc. v. Psystar Corp.*,
    658 F.3d 1150 (9th Cir. 2011) .............................................................19

*Assessment Tech. of Wisc. v. WIREdata*,
    350 F.3d 640 (7th Cir. 2003) ...............................................................20

*Authenticom, Inc. v. CDK Glob., LLC*,
    2017 WL 3017048 (W.D. Wis. July 14, 2017).....................................3, 10

*Authenticom, Inc. v. CDK Glob., LLC*,
    874 F.3d 1019 (7th Cir. 2017) ............................................................4, 5

*Authenticom, Inc. v. CDK, LLC*,
    Case No. 3:17-cv-00318 (W.D. Wis. June 16, 2017) ...........................10

*Axia Fin., LLC v. Mason McDuffie Mortg. Co.*,
    2023 WL 7280443 (N.D. Cal. Sept. 20, 2023) ....................................21

*Bayer v. Neiman Marcus Grp., Inc.*,
    861 F.3d 853 (9th Cir. 2017) ...............................................................10

*Bird-B-Gone, Inc. v. Bird Barrier Am., Inc.*,
    2013 WL 11730662 (C.D. Cal. Mar. 20, 2013)....................................24

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
    28 F. Supp. 3d 1006 (C.D. Cal. 2013) ...........................................22, 23

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) .........................................................9, 10

*Buxbom v. Smith*,
   23 Cal. 2d 535 (1944) .........................................................23

*CDK Glob. LLC v. Brnovich*,
   2020 WL 4260506 (D. Ariz. July 24, 2020) .........................................................10

*CDK Glob. LLC v. Brnovich*,
   461 F. Supp. 3d 906 (D. Ariz. 2020) .........................................................15

*CDK Glob. LLC v. Brnovich*,
   16 F.4th 1266 (9th Cir. 2021) .........................................................20

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .........................................................11

*D & R Distrib. Co. v. Chambers Corp., Inc.*,
   608 F. Supp. 1290 (E.D. Cal. 1984) .........................................................23

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) .........................................................3

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 558 (N.D. Ill. 2019) .........................................................18

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 919 (N.D. Ill. 2023) .........................................................2, 3, 5, 21

*Delacruz v. State Bar of Cal.*,
   2018 WL 3077750 (N.D. Cal. Mar. 12, 2018) .........................................................9

*Doe v. Fed. Dist. Ct.*,
   467 F. App'x 725 (9th Cir. 2012) .........................................................15

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) .........................................................8

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
   449 F. Supp. 3d 1024 (W.D. Wash. 2020) .........................................................14, 15

*EF Cultural Travel BV v. Zefer Corp.*,
   318 F.3d 58 (1st Cir. 2003) .........................................................17

*Egilman v. Keller & Heckman, LLP*,
   401 F. Supp. 2d 105 (D.D.C. 2005) .........................................................18

*Elko, Inc. v. Peters*,
   2022 WL 256975 (D. Nev. Jan. 27, 2022) .........................................................24, 25

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007) ....................................................................10

*Facebook, Inc. v. Power Ventures*,
  844 F.3d 1058 (9th Cir. 2016) ...................................................................16

*Facebook, Inc. v. Power Ventures, Inc.*,
  2013 WL 5372341 (N.D. Cal. Sept. 25, 2013) ..........................................16

*Famous Birthdays, LLC v. SocialEdge, Inc.*,
  2022 WL 1592726 (C.D. Cal. Feb. 11, 2022)...............................................9

*Fla. Atl. Univ. Bd. of Trs. v. Parsont*,
  465 F. Supp. 3d 1279 (S.D. Fla. 2020) ......................................................11

*fuboTV Inc. v. Walt Disney Co.*,
  745 F. Supp. 3d 109 (S.D.N.Y. 2024)........................................................13

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ...............................................................7, 8, 9

*Gigacloud Tech., Inc. v. Linon Home Décor Prods., Inc.*,
  2024 WL 4766202 (C.D. Cal. Sept. 9, 2024) ...............................................9

*Goldie's Bookstore, Inc. v. Super. Ct. of the State of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ................................................................11, 12

*Good Meat Project v. GOOD Meat, Inc.*,
  716 F. Supp. 3d 783 (N.D. Cal. 2024) .........................................................9

*hiQ Labs v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) .......................................11, 13, 16, 17, 22

*IDX Sys. Corp. v. Epic Sys. Corp.*,
  285 F.3d 581 (7th Cir. 2002) ........................................................................6

*Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*,
  307 F. Supp. 2d 521 (S.D.N.Y. 2004)........................................................18

*iSpot.TV, Inc. v. Teyfukova*,
  2023 WL 3602806 (C.D. Cal. May 22, 2023) .......................................17, 18

*Ixchel Pharma, LLC v. Biogen Inc.*,
  2018 WL 558781 (E.D. Cal. Jan. 25, 2018) ...............................................22

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) .....................................................13, 15, 16, 17

*Lydo Enters., Inc. v. City of Las Vegas*,
  745 F.2d 1211 ...............................................................................................8

*Mary Ferrell Found., Inc. v. Biden*,
   2024 WL 4880527 (9th Cir. Nov. 25, 2024)..................................................................8

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ...............................................................................18, 19

*Mediterranean Cuisine Franchising Co. v. Karma Cap., Inc.*,
   2019 WL 4308777 (C.D. Cal. Apr. 4, 2019) .................................................................8

*Microsoft Corp. v. EEE Bus. Inc.*,
   555 F. Supp. 2d 1051 (N.D. Cal. 2004) ......................................................................18

*N.D. ex rel. parents acting as guardians ad litem v. Haw. Dep't of Educ.*,
   600 F.3d 1104 (9th Cir. 2010) .....................................................................................7

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ...................................................................................20

*Navistar, Inc. v. New Balt. Garage, Inc.*,
   2012 WL 4338816 (N.D. Ill. Sept. 10, 2012) ............................................................18

*NCWC Inc. v. CarGuard Admin. Inc.*,
   635 F. Supp. 3d 815 (D. Ariz. 2022) ....................................................................20, 21

*New York v. Trump*,
   2025 WL 435411 (S.D.N.Y. Feb. 8, 2025)..................................................................11

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
   2018 WL 4904918 (N.D. Cal. Oct. 9, 2018).................................................................15

*O'Neal v. City of Seattle*,
   66 F.3d 1064 (9th Cir. 1995) ................................................................................10, 11

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
   762 F.2d 1374 (9th Cir. 1985) .....................................................................................8

*Pearl Invs., LLC v. Standard I/O, Inc.*,
   257 F. Supp. 2d 326 (D. Me. 2003) ...........................................................................19

*Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*,
   2023 WL 2064201 (W.D.N.C. Feb. 16, 2023) ............................................................20

*Philips N. Am. LLC v. KPI Healthcare, Inc.*,
   2020 WL 2475094 (C.D. Cal. Apr. 15, 2020) .............................................................19

*Power v. Connectweb Techs., Inc.*,
   740 F. Supp. 3d 39 (D. Mass. 2024) ...........................................................................18

*Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997) ...............................................................................19, 20

*Protech Diamond Tools v. Liao,*
  2009 WL 1626587 (N.D. Cal. June 8, 2009) ......................................................9

*Qc Mfg., Inc. v. Solatube Int'l, Inc.,*
  2021 WL 4963380 (C.D. Cal. Sept. 10, 2021) ..................................................12

*Qualcomm Inc. v. Compal Elecs., Inc.,*
  283 F. Supp. 3d 905 (S.D. Cal. 2017).............................................................25

*Richardson v. La Rancherita,*
  98 Cal. App. 3d 73 (1979) ............................................................................23

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC,*
  2020 WL 12948055 (C.D. Cal. Dec. 29, 2020) ...........................................21, 22

*Sandvig v. Barr,*
  451 F. Supp. 3d 73 (D.D.C. 2020) ..................................................................16

*Sass v. Roblox Corp.,*
  2025 WL 1135092 (N.D. Cal. Apr. 16, 2025) ...................................................15

*Servicenow, Inc. v. Stonebranch, Inc.,*
  2013 WL 6731977 (N.D. Cal. Dec. 20, 2013) ....................................................8

*Splunk Inc. v. Cribl, Inc.,*
  2024 WL 2701628 (N.D. Cal. May 24, 2024) ...................................................19

*Starbucks v. McKinney,*
  602 U.S. 339 (2024)................................................................................13, 24

*Stern v. Weinstein,*
  2010 WL 11459791 (C.D. Cal. Jan. 6, 2010) ...................................................14

*Synopsys, Inc. v. InnoGrit Corp.,*
  2019 WL 4848387 (N.D. Cal. Oct. 1, 2019).....................................................18

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.,*
  315 F. Supp. 3d 1147 (C.D. Cal. 2018) ...........................................................19

*United States v. Nosal,*
  844 F.3d 1024 (9th Cir. 2016) ........................................................................16

*WalkMe Ltd. v. Whatfix, Inc.,*
  2024 WL 1221960 (N.D. Cal. Mar. 21, 2024).....................................................15

*Watters v. Breja,*
  2024 WL 201356 (N.D. Cal. Jan. 18, 2024) .....................................................14

*Weiss v. Perez,*
  602 F. Supp. 3d 1279 (N.D. Cal. 2022) ............................................................14

*Wensel v. Gonzales,*
  2009 WL 347628 (E.D. Cal. Feb. 11, 2009)....................................................23

*Williams v. Univ. Med. Ctr. of S. Nev.,*
  688 F. Supp. 2d 1134 (D. Nev. 2010) ...........................................................21

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)....................................................................................7, 13, 24

*United States v. Cal. Dep't of Corr. & Rehab.,*
  737 F. Supp. 3d 977 (E.D. Cal. 2024)..............................................................13

**Statutes**

17 U.S.C. § 1201(a)(1)(A) ...............................................................................17

17 U.S.C. § 1201(a)(3)(A) ...............................................................................17

18 U.S.C. § 1030(a)(2)......................................................................................13

18 U.S.C. § 1030(a)(2)(C).................................................................................15

18 U.S.C. § 1030(c)(4)(A)(i)(I) ........................................................................14

18 U.S.C § 1030(g) ...........................................................................................14

A.R.S. § 28-4651 .................................................................................................5

A.R.S. § 28-4652 .................................................................................................5

A.R.S. § 28-4653 .................................................................................................5

A.R.S. § 28-4654 .................................................................................................5

A.R.S. § 28-4655 .................................................................................................5

G.S. § 20-305.7 ....................................................................................................6

Mont. Code Ann. § 30-11-701 ...........................................................................5

Mont. Code Ann. § 30-11-718 ...........................................................................5

Mont. Code Ann. § 30-11-719 ...........................................................................5

O.R.S. § 650.123 .................................................................................................6

**Other Authorities**

H.R. Rep. No. 98-894, reprinted in 1984 U.S.C.C.A.N. 3689...........................17

Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1178 (2016) .................16

**INTRODUCTION**

CDK's motion for a preliminary injunction against InDesign Data should be denied. *See* Dkt. 45. CDK cannot establish any of the prerequisites required for the extraordinary relief of a preliminary injunction, particularly because CDK has known for many years that dealers provide InDesign with login credentials to the CDK Dealer Management System (or "DMS") and authorize InDesign to access dealer data in the DMS. CDK has been litigating the same unauthorized-access theories under the CFAA and DMCA it raises here since 2018. It has never sought preliminary injunctive relief to stop dealer-authorized access to the DMS. Nor has it ever succeeded on its claims. CDK, thus, has no credible claim of irreparable harm, nor has it established a likelihood of success on its legal claims against InDesign. At bottom, CDK is seeking once again to abuse its market power—this time to drive out InDesign and perpetuate its iron grip on access to the dealer data that is the lifeblood of auto dealerships in the United States.

InDesign is one of the few remaining "independent data integrators" serving auto dealerships in the United States. Since 2013, InDesign has used dealer-created login credentials to access data owned by dealers and that dealers store on the DMS, without a word of objection from CDK. CDK is the nation's dominant DMS provider, which has sought to eliminate competition from independent data integrators over the past decade. Indeed, CDK's anticompetitive actions resulted in eye-popping settlements stemming from a recently concluded antitrust Multi-District Litigation (MDL) and action from state legislatures to enact "Dealer Data Laws" to try to protect dealerships from CDK's monopolistic practices of charging dealers exorbitant fees for access to their own data.

CDK—which is trying to disrupt the status quo, not preserve it, by preventing InDesign from operating as it has for 13 years—has not met any of the elements required for the extraordinary relief of a preliminary injunction.

*First*, CDK cannot show irreparable harm. CDK has known about InDesign's dealer-authorized access methods, which it now belatedly asserts pose an emergency, for **years**. Indeed, CDK deposed InDesign's CEO in 2019 about the very business practices that, six years later, CDK claims threaten it with irreparable harm. CDK's years-long delay unequivocally belies its claims of irreparable harm. What's more, CDK's argument that InDesign poses a theoretical security risk (the same argument CDK

has been recycling in federal courts for eight years) has no factual support. InDesign offers a secure service, that dealers trust, and has never experienced any data breach.

**Second**, none of CDK's asserted claims are likely to succeed. CDK's claim under the Computer Fraud and Abuse Act ("CFAA") is not likely to succeed. InDesign's use of valid dealer-provided login credentials to access the dealer's own data bears no resemblance to the "breaking and entering" required to support a CFAA claim. InDesign always has the dealer's authorization to access the dealer's data; the CFAA requires nothing more. Regardless, CDK has not even pled a cognizable CFAA claim because it never objected to InDesign's access prior to filing suit. CDK's claim under the Digital Millenium Copyright Act ("DMCA") likewise fails because InDesign has not engaged in any "circumvention." Rather, it is undisputed that InDesign has only ever accessed CDK's DMS using legitimate login credentials created by the dealer. CDK's invocation of the DMCA is also blatant copyright misuse, because CDK is trying to leverage its copyright over alleged proprietary elements of the DMS to control access to dealer data that is owned by the dealer, not CDK. Finally, CDK's tortious interference claim fails because InDesign has never acted with the required knowledge and purpose of disrupting CDK's contracts; instead, InDesign has operated the same good-faith business for 13 years that offers dealers an innovative, low-cost data solution.

**Third**, the balance of equities and public interest cut sharply against CDK. CDK's motion, if successful, poses an existential threat to InDesign's business. CDK, meanwhile, has not proven that it faces any imminent or concrete harm if the status quo prevails and InDesign can continue doing business as it has since 2013. CDK's motion also would severely harm the overriding public interest in preserving competition by threatening to wipe out one of the last independent data integrators.

## BACKGROUND

### A.    Dealer data and the DMS

CDK is the dominant DMS provider in the United States. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 941, 959 (N.D. Ill. 2023) ("*MDL Summary Judgment Op.*"). A DMS is enterprise software that the roughly 18,000 franchised new-car dealerships in the United States use to run their daily operations. *Id.* Importantly, a DMS includes a large database, where dealers input and store their business data, including information about their customers, vehicle inventory, parts inventory,

1    finance and accounting records, and much more.

2         The dealer—not CDK—owns the data that the dealer collects and stores on the DMS.

3    Declaration of Dave Lampert, ¶ 5 (hereinafter "Lampert Decl."); InDesign's Motion for Summary

4    Dismissal of CDK's Motion for Preliminary Injunction (Dkt. 46); Ex. 1, Deposition of David LaGreca at

5    52:14–16 (hereinafter "LaGreca Tr."); Dkt. 45-8 (CDK Master Services Agreement) at 3 (CDK contract

6    providing that "[a]ny information created and input by Client into the" DMS "shall remain the exclusive

7    and confidential property of Client."). For decades, CDK publicly recognized that dealers own and

8    should control access to their data on the DMS. As just one example, CDK's former CEO Steve Anenen

9    said as far back as 2007:

10         "I think we've stated pretty emphatically, we really believe the dealer owns the data. . . . I
11         don't know how you [as a DMS company] can ever make the opinion that the data is
           yours to govern and to preclude others from having access to when it when in fact it's
12         really the data belonging to the dealer. As long as they grant permission, how would you
           ever go against that wish?"

13    Ex. 2, Stroz Deposition Exhibit 7.

14         In the long-running litigation over CDK's anticompetitive practices, courts have uniformly

15    recognized that dealers own their data. *See, e.g., In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp.

16    3d 931, 940 (N.D. Ill. 2018) ("Dealers 'own' their data in the DMSs"); *Authenticom, Inc. v. CDK Glob.,*

17    *LLC*, 2017 WL 3017048, at *1 (W.D. Wis. July 14, 2017), *vacated on other grounds*, 874 F.3d 1019

18    (7th Cir. 2017) ("*Authenticom PI Order*") ("The data itself belongs to the dealer.").

19         The dealer's data is extremely valuable to their business. LaGreca Tr. 46:3–8. Dealers rely on

20    software applications for customer relations, inventory and parts management, and service lane

21    operations, to name a few. Lampert Decl., ¶ 6. To use those services, dealers need affordable and

22    efficient access to their data. Dealers work with "data integration" companies for this purpose; data

23    integrators specialize in automating the process of retrieving the dealer's data from the DMS and routing

24    it to the dealer's chosen business partners. *MDL Summary Judgment Op.*, 680 F. Supp. 3d at 942;

25    Lampert Decl., ¶ 9.

26         Historically, dealers enjoyed many competitive options when picking a data integration service.

27    Dealers could purchase data integration services directly from their DMS company, such as CDK or

28    Reynolds & Reynolds. Or dealers could purchase data integration services from many different

1    "independent" data integration providers that served dealers across different DMS types. Lampert Decl.,

2    ¶ 8. Indeed, CDK acquired and until recent years operated two of the largest independent data providers

3    in the market—which employed the same dealer-authorized access methods used by InDesign.[1] As

4    CDK's SVP Mr. LaGreca testified at his deposition, he did not believe CDK was doing anything illegal

5    or wrong when CDK provided independent data integration services through its own subsidiaries.

6    LaGreca Tr. 133:2–12.

7       **B.    InDesign is an innovative independent data integrator**

8       Since 2013, InDesign has been an independent data integrator. Lampert Decl., ¶ 8. Dealers

9    expressly authorize InDesign to assist the dealers in retrieving their own data from the DMS, including

10   CDK's DMS. The dealer installs InDesign's software on a dealership-owned personal computer. *Id.* ¶

11   13.[2] The dealer then creates DMS login credentials for InDesign, which InDesign's software uses to

12   extract dealer data just as a dealership employee would (except InDesign automates the process, saving

13   dealership employees from having to perform laborious data entry and extraction tasks throughout the

14   day). *Id.* ¶¶ 21–22. Throughout its 13-year history, InDesign has always used this industry standard

15   dealer-authorized method for accessing dealer data on the DMS. *Id.* ¶ 29.

16      InDesign offers dealerships innovative and low-cost data integration services. For example,

17   InDesign provides dealers with near real-time data feeds and quality features that CDK does not offer.

18   Lampert Decl., ¶ 30. InDesign's data integration services are also much less expensive than CDK's.

19   InDesign charges $25 to $100 a month (on a per vendor, per dealership basis), *id.* ¶ 31, CDK can charge

20   $700 or more a month, *Authenticom PI Order*, 874 F.3d at 1023.

21      **C.    CDK pays massive settlements to resolve antitrust claims**

22      In 2017 and 2018, a group of plaintiffs—including dealerships, software vendors, and another

23   independent data integrator, Authenticom—sued CDK for antitrust violations. Those cases were

24   eventually consolidated in an MDL in federal court in Chicago. *In re Dealer Mgmt. Sys. Antitrust Lit.*,

25
26   [1] *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1022 (7th Cir. 2017) ("CDK also had two
     subsidiaries, Digital Motorworks and IntegraLink, which operated in the same way as Authenticom. An
27   interested dealer would provide its log-in credentials to the integrator, which would then be able to pull
     data from the dealer's management system and provide it to an app vendor.").

28   [2] InDesign does not place or install any software or code on the CDK DMS. Lampert Decl., ¶ 27.

1   MDL No. 2817, 18-cv-864 (N.D. Ill.). The MDL plaintiffs alleged that CDK monopolized the market

2   for data integration services by conspiring with the second-largest DMS provider, Reynolds &

3   Reynolds, to block competition from independent data integrators. *See generally MDL Summary*

4   *Judgment Op.*, 680 F. Supp. 3d at 949–58 (describing conspiracy evidence). Although most of the

5   documents produced in the MDL remain under seal, even the few public documents show that CDK

6   knew it needed to eliminate competition from independent data integrators to raise its own prices.[3] After

7   excluding lower-cost data integration rivals from the market, CDK and Reynolds imposed "whopping"

8   price increases. *Authenticom*, 874 F.3d at 1023.

9       In June 2018, during the MDL proceedings, CDK subpoenaed InDesign for its business records

10  and a Rule 30(b)(6) deposition. Dkt. 46-2 (June 1, 2018). CDK then deposed InDesign's co-founder and

11  president, Dave Lampert, in June 2019. Dkt. 46-3 (June 15, 2019). In response to CDK's questions at

12  that deposition, Mr. Lampert testified at length about how InDesign's software operates and that

13  InDesign accesses the DMS using login credentials provided by the dealer—the same access methods

14  that InDesign has used since 2013. Lampert Decl., ¶ 51.

15      In the antitrust MDL, CDK asserted as counterclaims the same legal theories at issue in its

16  motion for a preliminary injunction in this Court—namely, that dealer-authorized access to the DMS

17  violates the CFAA and DMCA, among other claims. Ex. 5, *In re Dealer Mgmt. Sys. Antitrust Lit.*, No.

18  1:18-cv-00868, Dkt. 263, at 155–170 (N.D. Ill. June 23, 2018). Notwithstanding those counterclaims,

19  CDK paid huge settlements to resolve the antitrust cases before they could go to a jury, including recent

20  publicly reported settlements of $630 million and $100 million.

21      Meanwhile, a number of state legislatures passed laws to protect dealerships against CDK's

22  anticompetitive conduct in blocking (and imposing massive taxes on) dealers' access to their own data.

23  A.R.S. § 28-4651, -4652, -4653, -4654, -4655 (Arizona); Mont. Code Ann. §§ 30-11-701, -718, -719

24

25  [3] For example, former CDK data integration executive Kevin Witt observed in an email that locking out
    independent integration was "primarily a BUSINESS issue" for CDK because "dealers and OEMs and

26  the whole ecosystem of applications and services that they depend on *LOVE* hostile third-party
    integration." Ex. 3, *In re Dealer Management Systems Antitrust Litig.*, Case No. 1:18-cv-00864, Dkt.

27  1094, at 20 (N.D. Ill. July 29, 2020); *see also* Ex. 4, Stroz Deposition Exhibit 8, DealerVault
    Competitive Analysis (Oct. 28, 2016) (CDK "competitive analysis" of Authenticom's "DealerVault"

28  data integration service noting the "extremely strong demand" for such services).

(Montana); O.R.S. § 650.123 (Oregon); G.S. § 20-305.7 (North Carolina).

### D.    CDK's security and performance arguments are unsubstantiated

*Data security*: InDesign uses secure methods to transfer the dealer's data from the DMS to the dealer's chosen business partners. Lampert Decl., ¶ 37. In its 13-year history, InDesign has never experienced a data breach. Lampert Decl., ¶ 38. CDK's witnesses could not identify even a single security incident related to InDesign on the CDK DMS (or anywhere else). *See, e.g.*, Ex. 6, Deposition of Edward Stroz (hereinafter, "Stroz Tr.") at 96:24–97:1; LaGreca Tr. 137:22–24. Indeed, CDK's witnesses testified that no dealer-authorized independent integrator has ever caused a data breach or security incident on the CDK DMS. LaGreca Tr. 141:4–7.

*System performance*: Similarly, CDK's witnesses said they could not identify even a single example in which InDesign's dealer-authorized access impaired the performance of the CDK DMS at any dealership. LaGreca Tr. 141:17–142:4; Stroz Tr. 125:7–126:7. Nor did CDK make any attempt to evaluate the burden that InDesign's access places on the DMS, or to evaluate any such burden in light of the tens of thousands of dealership employees that use the system every day. Ex. 7, Deposition of Vaidhyanathan Swaminathan (hereinafter "Swaminathan Tr.") at 113:9–20.

CDK also has produced no evidence that InDesign has ever caused data corruption or data errors on the CDK DMS. LaGreca Tr. 145:4–8. Indeed, InDesign today largely "pulls" data from that dealers have already entered onto the DMS, which poses no data corruption risk. Lampert Decl., ¶ 25; LaGreca Tr. 144:21–145:3.

*Proprietary information*: Because InDesign accesses dealership data exactly as an employee would, InDesign does not access or extract any proprietary information belonging to CDK. Lampert Decl., ¶¶ 41–42. CDK's witnesses could identify no instance in which InDesign has ever extracted CDK's proprietary information from the DMS. LaGreca Tr. 158:14–17 (Q: "Have you identified, Mr. LaGreca, any instance in which InDesign exported anything other than dealer data?" Mr. LaGreca: "I cannot."); *id.* at 157:25–158:4 (Q: "Is it your testimony, Mr. LaGreca, that InDesign has accessed CDK's trade secrets at any particular dealership?" Mr. LaGreca: "No."); Stroz Tr. 91:5–12; Stroz Tr.

1  61:18–62:6.[4]

2  **E.    CDK belatedly blocks InDesign's dealer-authorized access**

3  CDK has never objected to InDesign's dealer-authorized access methods in InDesign's 13-year

4  history, including in the six years since Mr. Lampert testified at length explaining InDesign's DMS

5  access methodology. Lampert Decl., ¶¶ 51–53; LaGreca Tr. 121:17–23. While CDK sent letters to

6  Tekion in 2024, CDK never sent any such correspondence to InDesign before filing its lawsuit. Lampert

7  Decl., ¶ 53; LaGreca Tr. 121:24–122:2. CDK then waited two more months and, around April 14, 2025,

8  began to disable the credentials that dealers created for InDesign. *Id.* ¶ 54.

9  Because CDK is the dominant DMS provider in the United States, the majority of InDesign's

10  data integration business comes from working with dealers that use the CDK DMS. *Id.* ¶ 57. As Mr.

11  Lampert said in his declaration, if CDK can prevent InDesign from accessing dealer data on the CDK

12  DMS, it would place the survival of InDesign's business in serious jeopardy. *Id.* ¶ 58.

13  **ARGUMENT**

14  A preliminary injunction is "an extraordinary remedy never granted as of right." *Garcia v.*

15  *Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quoting *Winter v. Nat. Res. Def. Council*,

16  *Inc.*, 555 U.S. 7, 24 (2008)). CDK must show it is: (1) "likely to succeed on the merits"; (2) "likely to

17  suffer irreparable harm in the absence of preliminary relief; (3) "that the balance of equities tips in

18  [CDK's] favor"; and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

19  As an initial matter, CDK's motion seeks a mandatory preliminary that is subject to a higher

20  standard, because CDK is seeking to disrupt the status quo, not preserve it. "A prohibitory injunction

21  maintains the status quo whereas a mandatory injunction 'goes well beyond simply maintaining the

22  status quo *pendente lite* [and] is particularly disfavored.'" *N.D. ex rel. parents acting as guardians ad*

23  *litem v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010). "The status quo means the last,

24  uncontested status which preceded the pending controversy." *Id.*

25  Here, CDK is seeking a mandatory injunction because its motion, if granted, would disrupt the

26

27  ___
[4] InDesign only sees the data and computer screens dealership employees across the country see every day when they log in to the DMS; such "readily observable material" is not proprietary to CDK. *IDX Sys.*
28  *Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002); Lampert Decl., ¶¶ 37–38.

longstanding, uncontested status quo. InDesign has been using dealer-provided credentials to access DMSs (including the CDK DMS) since 2013. Lampert Decl., ¶ 47. CDK never objected to InDesign's dealer-authorized access methods before filing its lawsuit. CDK's motion therefore seeks to upend the "last, uncontested status which preceded the pending controversy," *Haw. Dep't of Educ.*, 600 F.3d at 1112 n. 6, and would prevent InDesign from serving its CDK dealer customers in the manner it has without incident or complaint since 2013. *See also Mediterranean Cuisine Franchising Co. v. Karma Cap., Inc.*, 2019 WL 4308777, at *3 (C.D. Cal. Apr. 4, 2019) (denying a mandatory injunction because it would "drastically alter the status quo *pendente lite*").

Because CDK seeks to disrupt the longstanding status quo, it must show that "the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia*, 786 F.3d at 740; *see also Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). As shown below, CDK cannot establish any of the four *Winter* factors, much less that the law and facts clearly favor its position.

## I.     CDK CANNOT SHOW IRREPARABLE HARM

Irreparable harm is the *sine qua non* of a motion for a preliminary injunction. "[P]laintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). CDK cannot establish irreparable harm for at least three reasons: (**A**) CDK waited at least six years to seek legal action blocking InDesign's dealer-authorized access to the DMS, undercutting any claim that it now faces an emergency; (**B**) CDK's security arguments are entirely speculative; and (**C**) CDK's purported business harm can be remedied through monetary damages.

### A.     CDK's seven-year delay forecloses its showing of irreparable harm

CDK cannot show irreparable harm because CDK's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Courts consistently hold that plaintiffs cannot establish irreparable harm when they knew about the allegedly wrongful conduct for years and sat on their rights. *See, e.g., Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984 ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the

plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.").[5]

CDK's years-long delay in seeking court relief from InDesign's longstanding business practices forecloses any showing of irreparable harm. CDK has been (unsuccessfully) litigating these same unauthorized-access theories under the CFAA and DMCA since 2018—and never sought preliminary injunctive relief to stop InDesign's (or any other data integrator's) dealer-authorized access to the DMS. *See supra* at 7.[6] Even worse, CDK subpoenaed InDesign in 2018 and then deposed InDesign's CEO Dave Lampert in 2019. At that deposition, Mr. Lampert testified at length about the dealer-authorized access practices that CDK now belatedly challenges. *See supra* at 5, 7; Dkt. 46-3. In the six years since CDK deposed Mr. Lampert, CDK never even followed up about InDesign's access methods—much less took legal action—even though InDesign used dealer credentials to access the CDK DMS throughout that period. Lampert Decl., ¶ 51; Dkt. 46-3; *see Protech Diamond Tools v. Liao*, 2009 WL 1626587, at *6 (N.D. Cal. June 8, 2009) (two-year delay in bringing suit foreclosed a showing of irreparable harm because "the allegedly infringing conduct ha[d] been occurring continually and without interruption for years, without any legal action being taken by [p]laintiff"); *Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 804 (N.D. Cal. 2024) (16-month delay in bringing suit "undercuts any finding of imminent harm").

Even a months-long delay can doom a claim of irreparable harm. *Garcia*, 786 F.3d at 746 (several-month delay); *Gigacloud Tech., Inc. v. Linon Home Décor Prods., Inc.*, 2024 WL 4766202, at *4 (C.D. Cal. Sept. 9, 2024) (five-month delay). CDK's at minimum **six-year delay** in seeking legal action to block InDesign's dealer-authorized access unequivocally "shows that there is no immediate harm" justifying extraordinary relief from this Court. *Delacruz v. State Bar of Cal.*, 2018 WL 3077750, at *16 (N.D. Cal. Mar. 12, 2018); *see also, e.g., Famous Birthdays, LLC v. SocialEdge, Inc.*, 2022 WL 1592726, at *4 (C.D. Cal. Feb. 11, 2022) (similar).

---

[5] *See also, e.g., Servicenow, Inc. v. Stonebranch, Inc.*, 2013 WL 6731977, at *4 (N.D. Cal. Dec. 20, 2013) ("[T]he delay in bringing suit . . . does undermine any inference that continued use by [the defendant] will give rise to any irreparable harm."); *Mary Ferrell Found., Inc., v. Biden*, 2024 WL 4880527, at *4 (9th Cir. Nov. 25, 2024) (holding multiple-year delay foreclosed showing of irreparable harm; the plaintiff "did not act in a manner that would elicit 'emergency relief'").

[6] Nor has CDK ever sued any dealer for authorizing the access of independent integrators. LaGreca Tr. 123:10–17.

**B.    CDK's speculative security claims cannot support a finding of irreparable harm**

**1.**    CDK's primary argument for irreparable harm—that InDesign poses a security risk—is speculative and unsupported by the evidence. "[S]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction . . . a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016).

InDesign uses secure data transfer protocols, Lampert Decl., ¶¶ 35–37, which CDK has not evaluated and makes no attempt to show are insufficient. *Id.* ¶ 35; LaGreca Tr. 138:22–25. InDesign has never had a data breach. Lampert Decl., ¶ 38. CDK's witnesses could not identify a single security issue or data breach linked to InDesign's dealer-authorized access over InDesign's 13 years in business. LaGreca Tr. 141:4–7; Stroz Tr. 96:9–16; Swaminathan Tr. 113:21–114:6. Indeed, no independent integrator has ever caused a security breach on the CDK DMS. *See supra* 6.

Since 2017, CDK has been recycling the same argument that independent data integrators pose a theoretical security risk.[7] And every court that has considered those arguments has rejected them as unsupported by the evidence.[8] Eight years into litigating this defense, CDK still cannot muster any facts to support its security rhetoric. *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm.").

What is more, CDK has now taken matters into own hands—rather than waiting for this Court's determination of its preliminary injunction motion—and blocked dealers from working with InDesign.

[7] *See* Ex. 8, *Authenticom, Inc. v. CDK, LLC*, Case No. 3:17-cv-00318, Dkt. 113 (W.D. Wis. June 16, 2017) (declaration of CDK security expert Eric Rosenbach, mirroring Mr. Stroz's security arguments); Ex. 9, *Reynolds and Reynolds v. Brnovich et al.*, Case No. 2:19-cv-04849, Dkt. 20-1 at 9 (D. Ariz. Aug. 23, 2019) (declaration of CDK security expert Dean Crutchfield, mirroring Mr. Stroz's security arguments).

[8] *Authenticom PI Order*, 2017 WL 3017048, at *8 (rejecting CDK and Reynolds's security arguments following a three-day evidentiary hearing featuring 15 witnesses); *id.* (no evidence that Authenticom takes proprietary data); *id.* (no evidence that "Authenticom has ever experienced a security breach or facilitated a security breach of either defendant's DMS"); *id.* (no evidence independent integrator access is less secure than "manual access by dealer employees"); *see also CDK Global LLC, et al. v. Brnovich, et al.*, 2020 WL 4260506, at *6 (D. Ariz. July 24, 2020) (rejecting CDK security arguments following a two-day evidentiary hearing featuring multiple witnesses); *id.* (CDK and Reynolds "have not pointed to a single instance of a data breach by a third-party integrator"); *id.* (CDKs' claimed "history of data corruption and performance degradation caused by unauthorized third-party access . . . is not substantiated by [CDK and Reynolds's] evidence").

*See* Lampert Decl., ¶ 54. Beginning around April 14, 2025, CDK began, for the first time, to disable the login credentials that dealers create for InDesign. *Id.*; LaGreca Tr. 120:14–19. Now that CDK has blocked InDesign's credentials, its security arguments are moot because "[a] request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017); *O'Neal v. City of Seattle*, 66 F.3d 1064, 1066 (9th Cir. 1995) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

2.      The out-of-circuit cases CDK cites on irreparable harm (at 22) are easily distinguishable. *New York v. Trump*, 2025 WL 435411, at *1 (S.D.N.Y. Feb. 8, 2025), involved a TRO motion to prevent access by Elon Musk's DOGE to Treasury payment systems, which store the banking information of millions of Americans. The court issued a same-day restraining order with minimal analysis. *Id.* at *1. And in *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279 (S.D. Fla. 2020) a mass marketer used student email credentials to "send mass-marketing emails to unwitting and unwilling FAU students," exposing the university to liability for "its failure to protect students' proprietary information." *Id.* at 1296–97. The facts here are far afield from those cases. InDesign only accesses the dealer's own data with the dealer's authorization, Lampert Decl., ¶ 16, and does not access or extract any CDK proprietary information, *see supra* 6–7. Nor does InDesign access or extract sensitive categories of data such as Social Security numbers or credit card information. Lampert Decl., ¶ 40; LaGreca Tr. 139:8–18.

**C.      CDK's claimed harm from InDesign can be remedied through monetary damages**

CDK has not documented any harm from InDesign's access to the CDK DMS. *See supra* 6–7. But even if CDK had experienced some harm, it is harm that could be remedied through monetary damages and so is not irreparable. And CDK's claim that it will lose customer goodwill from InDesign's data integration services is based on flawed reasoning and lacks any basis in the record.

***First***, CDK's claimed financial losses—e.g., from lost data integration business to InDesign— are not irreparable because they are compensable through monetary damages. "[M]onetary injury is not normally considered irreparable." *hiQ Labs v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quotation omitted). CDK's argument (at 19) that InDesign's competing data integration business has

1   caused it "lost revenue" and "millions in monetary damages" are classic economic injuries that are not

2   irreparable because they can be compensated through monetary damages if CDK prevails on its claims.

3   *See e.g.*, *Goldie's Bookstore, Inc. v. Supr. Ct. of the State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984)

4   ("Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief is

5   available.").

6          **Second**, CDK's claim that InDesign will cause CDK to lose customer goodwill is entirely

7   speculative and unsupported by any evidence.

8          CDK argues (at 23) that when InDesign provides data integration services to customers

9   switching from the CDK DMS to another DMS, it "compromises CDK's contractual position" with that

10  dealership. But it is the dealership's choice whether to use InDesign for data integration services; CDK

11  does not explain or prove how a dealership's own decision to use InDesign would have any bearing on

12  that dealership's "goodwill" toward CDK. *Goldie's Bookstore, Inc.*, 739 F.2d at 472 (rejecting

13  speculative injury of lost goodwill and lost "untold" customers). Regardless, the dealerships at issue

14  have already decided to stop using the CDK DMS, *see* Dkt. 45 at 23 ("When a Dealership plans to

15  switch DMS providers"), so there is no goodwill left to protect.[9]

16         CDK's argument that InDesign has damaged its goodwill by "disparaging" CDK is wholly

17  unsupported by any evidence. As a legal matter, CDK cites no cases to suggest that disparaging

18  comments between competitors can constitute irreparable harm. Further, CDK has not shown that it has

19  lost customers because of those imagined disparaging remarks. *Am. Passage Media Corp. v. Cass

20  Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding no irreparable harm based on alleged lost

21  goodwill where "none of the advertisers say that they will discontinue business with [plaintiff]")

22  (cleaned up). Regardless, CDK does not point to any disparaging comments by InDesign. CDK cites a

23  lone email—where InDesign offered to be a dealership's "Plan B" if CDK did not transfer that

24

---

25  [9] When dealerships try to switch away from the DMS, CDK holds the dealer's data hostage until the
    dealership pays CDK any outstanding fees—including exorbitant early termination fees that can exceed

26  ███████. Dkt. 45-1, Declaration of David LaGreca ¶ 82; LaGreca Tr. 167:7–20. Amazingly, CDK seems
    to complain (at 23) that InDesign's data integration service allows dealers to switch DMSs without paying

27  CDK's monopolistic data ransoms. That is just further proof of CDK's brazen anticompetitive conduct.
    And in any event, any "financial obligations" of departing dealerships that "remain unfulfilled" is

28  economic loss and does not constitute irreparable injury.

dealership's data to its new DMS provider—that on its face features no disparaging comments about CDK. *See* Dkt. 44-13.

## II. CDK CANNOT SUCCEED ON THE MERITS

Because CDK has not established irreparable harm, the Court can stop there and deny CDK's preliminary injunction on that basis alone. *Qc Mfg., Inc. v. Solatube Int'l, Inc.*, 2021 WL 4963380, at *2 (C.D. Cal. Sept. 10, 2021) (noting that a lack of irreparable harm is grounds to "end the inquiry" and deny the motion for a preliminary injunction). But CDK's motion also must be denied because CDK has not established that it is likely to succeed on the merits of any of its claims (CFAA, DMCA, or tortious interference).

As a threshold matter, and contrary to CDK's argument (at 11), CDK must show that it is likely to succeed on the merits of its claims. In *Starbucks v. McKinney*, 602 U.S. 339 (2024), the Supreme Court recently held that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Id.* at 345. Accordingly, when deciding a motion for a preliminary injunction, "absent a clear command from Congress, courts must adhere to the traditional four-factor test established in *Winter*." *Id.* at 346. And as noted, the four-factor *Winter* test requires a plaintiff to make a "clear showing" that they are "likely to succeed on the merits." *Winter*, 555 U.S. at 20.

CDK cites pre-*Starbucks* caselaw (at 11) and argues it needs to only show "a fair chance of success," rather than likely success, on the merits—but that is no longer the law. Courts applying *Starbucks* have consistently recognized that they "must apply the full four-part test" proscribed in *Winter*, *United States v. Cal. Dep't of Corrections and Rehabilitation.*, 737 F. Supp. 3d 977, 983 (E.D. Cal. 2024), absent a clear command from Congress to the contrary. And because there is no "clear command from Congress to depart from *Winter*," *id.*, with respect to any of CDK's claims, CDK must show likely success on the merits, *see, e.g., fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 132 (S.D.N.Y. 2024) (applying *Starbucks* standard).

CDK cannot make the required showing of likely success on the merits with respect to any of its claims—(**1**) the CFAA, (**2**) the DMCA, or (**3**) tortious interference.

### 1.     CDK is not likely to succeed on its CFAA claim

The CFAA is a criminal anti-hacking statute that makes it unlawful to "intentionally access[] a computer without authorization." 18 U.S.C. § 1030(a)(2). "The CFAA was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ Labs*, 31 F.4th at 1196; *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009) (the CFAA was "designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality").

CDK is not likely to succeed on its CFAA claim because: (**A**) CDK has not alleged a plausible CFAA claim in its complaint and therefore cannot establish a likelihood of success on the merits; and (**B**) InDesign was authorized by the dealer to access the dealer's own data.

**A.**     As shown in InDesign's motion to dismiss, CDK has failed to state a claim for relief under the CFAA. Dkt. 52. Because CDK has not plausibly pled a claim, it necessarily has not cleared the far higher hurdle of showing it is likely to succeed on such a well-pled claim. *Weiss v. Perez,* 602 F. Supp. 3d 1279, 1304 (N.D. Cal. 2022) (denying plaintiff's motion for a preliminary injunction because when the plaintiff failed to state a claim, "[s]he accordingly has not shown a likelihood of success on the merits").

CDK's complaint fails to state a claim under the CFAA because CDK could make no plausible allegation that it affirmatively and expressly rescinded InDesign's longstanding dealer permission to access dealer data, which is the minimum prerequisite to CFAA liability. Nor could CDK plausibly plead cognizable loss under the CFAA, as required to state a claim.

The Ninth Circuit "requir[es] affirmative conduct terminating authorization before the defendant can be held accountable on the same terms as a computer 'hacker.'" *Stern v. Weinstein*, 2010 WL 11459791, at *2 (C.D. Cal. Jan. 6, 2010), *aff'd*, 512 F. App'x 701 (9th Cir. 2013); *see also Watters v. Breja*, 2024 WL 201356, at *3 (N.D. Cal. Jan. 18, 2024) (similar); *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027 (W.D. Wash. 2020) (similar).

Here, it is undisputed that CDK never objected to the dealer-authorized access methods that InDesign has used since 2013 before filing its suit. Lampert Decl., ¶¶ 50–51; LaGreca Tr. 121:24–122:2. Notably, in April 2024 and December 2024, CDK sent cease-and-desist letters to Tekion—but not to

InDesign. *See* Compl., ¶¶ 64–71, ¶¶ 90–92; Lampert Decl., ¶ 53; LaGreca Tr. 121:24–122:2. Under controlling Ninth Circuit law, CFAA liability cannot attach until, at minimum, CDK expressly and affirmatively revoked InDesign's dealer authorization to access the DMS. Dkt. 52 at 7–8 (citing and discussing caselaw).

Moreover, CDK also failed to allege in its complaint that it suffered at least $5,000 in damages or loss in a one-year period "by reason of a violation" of the CFAA. *See* 18 U.S.C § 1030(g); *id.* § 1030(c)(4)(A)(i)(I). All CDK's alleged losses occurred *before* CDK sent its cease-and-desist letter to InDesign and are therefore not cognizable under the statute. *Sass v. Roblox Corp.,* 2025 WL 1135092, at *2 (N.D. Cal. Apr. 16, 2025) (dismissing CFAA claim because there was no evidence that Roblox suffered over $5,000 in damages in losses *after* it sent its cease-and-desist letter); *Domain Name***,** 449 F. Supp. 3d at 1030. CDK alleges loss, for example, from its pre-complaint investigation into the purportedly unauthorized access of Tekion and InDesign. *See* Compl., ¶¶ 105–06, 162. But that investigation took place before CDK sent its post-complaint cease-and-desist letter to InDesign. Because "the only potential violations of the CFAA" occurred after CDK expressly revoked InDesign's authorization to access the DMS, CDK's complaint fails to allege the requisite financial loss as a matter of law. *Domain Name*, 449 F. Supp. 3d at 1030.

Because CDK has not pled a CFAA claim sufficient to withstand a motion to dismiss, it necessarily has not established the required likelihood of success on that claim. *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, 2018 WL 4904918, at *5 (N.D. Cal. Oct. 9, 2018); *Doe v. Fed. Dist. Ct.*, 467 F. App'x 725, 728 (9th Cir. 2012).

**B.**     CDK also cannot establish likely success on its CFAA claim based on InDesign's dealer-authorized access subsequent to CDK's Feb. 11 cease-and-desist letter.

InDesign's access to dealer data on the DMS is always authorized by the dealer. Lampert Decl., ¶ 16; LaGreca Tr. 114:9–15. The authorization of the dealers—who own the data that InDesign accesses—is all the authorization that InDesign needs. CFAA bans access "without authorization" of computer systems to "obtain[] information." *See* 18 U.S.C. § 1030(a)(2)(C). The CFAA does not define "authorization," but the Ninth Circuit has consistently interpreted "authorization" to mean "permission or power granted by an authority." *Brekka*, 581 F.3d at 1133. And critically, the CFAA does not dictate

1   that the "authority" to grant access to the information on a computer system must come from the system

2   owner. As the district court held in dismissing CDK's challenge to the Arizona Dealer Data law under

3   the CFAA, "while the CFAA criminalizes accessing information without authorization in protected

4   computers, *it does not limit how access might be authorized*." *CDK Glob., LLC v. Brnovich*, 461 F.

5   Supp. 3d 906, 915 (D. Ariz. 2020) (emphasis added) (authorization can come from state law, despite

6   CDK's objections); *WalkMe Ltd. v. Whatfix, Inc.*, 2024 WL 1221960, at *5 (N.D. Cal. Mar. 21, 2024)

7   (dismissing CFAA claim where the defendant used legitimate customer-supplied login credentials,

8   despite the objection of the system owner).

9       In most CFAA cases, the owner of the computer also owns the information that the defendant is

10  seeking to obtain. But here, the dealer owns the only data that InDesign accesses. *See supra* 3. And the

11  facts strongly support the conclusion that dealers are an appropriate authority to authorize access to their

12  own data. In the automotive industry, dealers have long been recognized as an authority to grant access

13  to dealer data on the DMS—including by CDK itself and by the various states that have enacted Dealer

14  Data Laws. *See supra* 3. InDesign has relied on the dealer's authority to grant access to dealer data for

15  13 years, without legal action or objection from CDK or any other DMS company. *See* Orin S. Kerr,

16  *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1178 (2016) ("If the agent accesses the account

17  on the account holder's behalf, the agent is acting in the place of the account holder and is authorized.");

18  Lampert Decl., ¶¶ 47–48.

19      None of the Ninth Circuit's CFAA cases support the proposition that CDK can use the CFAA to

20  block the owner of the data from granting access to that data. In *Facebook, Inc. v. Power Ventures*, the

21  information that Power Ventures sought to access included "Facebook's data"—not just the user's data.

22  844 F.3d 1058,1068 (9th Cir. 2016) ("Power continued to access Facebook's data and computers

23  without Facebook's permission."); *see also Facebook, Inc. v. Power Ventures, Inc.*, 2013 WL 5372341,

24  at *1 (N.D. Cal. Sept. 25, 2013) ("Facebook complains that Defendants employ Facebook's proprietary

25  data without its permission by inducing Facebook users to provide their login information and then

26  using that information to 'scrape' Facebook's proprietary material."). *Nosal II* similarly involved a

27  defendant's attempt to steal a former employer's proprietary information for use in a competing venture.

28  *United States v. Nosal*, 844 F.3d 1024, 1031 (9th Cir. 2016).

Further, the Ninth Circuit has held that CFAA violations are limited to conduct that is "analogous to breaking and entering." *hiQ*, 31 F.4th at 1197; *Sandvig v. Barr*, 451 F. Supp. 3d 73, 86 (D.D.C. 2020) ("Congress has consistently analogized violations of § 1030 to physical-world crimes," such as "forced entry" and the "physical-world crime of theft."). Relying on industry-recognized dealer authorization for access to dealer data bears no resemblance to breaking and entering, forced entry, or theft. And given that InDesign has relied on dealer authorization for more than a decade without objection from CDK, CDK's belated CFAA claim squarely implicates the notice concerns underlying the rule of lenity. *Brekka*, 581 F.3d at 1134–35 (holding that the CFAA "is primarily a criminal statute" and its interpretation must be guided by the rule of lenity).

At bottom, CDK's theory would permit and encourage database owners to weaponize the CFAA to control access to data they do not own, which would stretch a statute designed to deter criminal computer hacking far beyond its intended purpose. Indeed, the CFAA's legislative history confirms that, when Congress enacted the original CFAA in 1984, Congress did not want to interfere with "any type or form of computer access that is for a legitimate business purpose." *See* H.R. Rep. No. 98-894, at 21, reprinted in 1984 U.S.C.C.A.N. 3689, 3706–07 (CFAA's predecessor statute). The Court should not countenance CDK's sweeping vision of unfettered power for database owners. *hiQ*, 31 F.4th at 1193–94 (noting that if companies that control servers that "hold vast amounts of public data" can use the CFAA to selectively ban competitors from accessing that data, that "may well be considered unfair competition under California law"); *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62 (1st Cir. 2003) ("public policy" may "limit certain restrictions" on access to information stored on a computer).

### 2.    CDK is not likely to succeed on its DMCA claim

CDK is not likely to succeed on the merits of its DMCA claim. InDesign's access to the DMS through legitimate, dealership-created user accounts is not "circumvention" of a "technological measure" under the DMCA. Moreover, CDK's attempt to use the DMCA to control access to dealer data that it does not own is blatant copyright misuse.

**A.**    To prevail under the DMCA, CDK must prove that InDesign "circumvent[ed]" a technological measure to obtain access to a copyrighted work. 17 U.S.C. § 1201(a)(1)(A). "Circumvention" is "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to

avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A); *iSpot.TV, Inc. v. Teyfukova*, 2023 WL 3602806, at *5 (C.D. Cal. May 22, 2023) (circumvention analysis "must begin with the text of the DMCA").

The record here contains no evidence that InDesign ever took any steps to "avoid, bypass, remove, deactivate, or impair" the DMS password requirements or other technological protection measures. Rather, InDesign has **only** accessed the CDK DMS by entering valid, dealer-created login credentials, Lampert Decl., ¶ 29, as CDK itself acknowledges, Dkt. 45-6, Stroz Declaration, ¶ 74; LaGreca Tr. 113:11–114:2; Stroz Tr. 95:23–96:3.

In light of the DMCA's plain text, courts have held that merely entering a valid username and password—as InDesign has done for more than a decade—is not "circumvention" under the DMCA. *See, e.g., iSpot.Tv., Inc.*, 2023 WL 3602806, at *5; *id.* at *6 ("The wording of the statute indicates that 'circumvention' requires some manipulation of the technological measure at hand and certainly more than that a username and password was simply transferred into the hands of another."); *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 113 (D.D.C. 2005) (similar).[10] Indeed, in the antitrust MDL against CDK—where CDK raised without success these same DMCA claims against Authenticom—the Court explained: "If [using dealer-provided login credentials] is all that CDK alleged, the Court would agree that such an allegation would be insufficient to establish circumvention" under the DMCA. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 571 (N.D. Ill. 2019). Because CDK cannot show that InDesign did anything more than enter a valid username and password, its DMCA claim cannot succeed.

CDK's cited case (at 16)—*Synopsys, Inc. v. InnoGrit Corp.*, 2019 WL 4848387 (N.D. Cal. Oct. 1, 2019)—illustrates why CDK's DMCA claim fails as a matter of law. InnoGrit had "affirmatively manipulated the identifying information of at least 15 InnoGrit computers . . . to bypass" restrictions, *id.* at *2, and "altered identifying information on [Synopsys'] computers and servers located in California." *Id.* at *8. The court distinguished that case from *Egilman* (cited above) because that case, like this one,

---

[10] *Navistar, Inc. v. New Baltimore Garage, Inc.*, 2012 WL 4338816, at *5 (N.D. Ill. Sept. 10, 2012) (same); *Power v. Connectweb Techs., Inc.*, 740 F. Supp. 3d 39, 59 (D. Mass. 2024) (same); *Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, 307 F. Supp. 2d 521, 532 (S.D.N.Y. 2004) (same).

"concern[ed] **the mere use or distribution of unauthorized passwords and license keys, without any additional actions taken on the part of the defendants**." *Id.* at *9 (emphasis added).[11]

CDK's remaining DMCA cases (at 15–17) are inapplicable because they all involved defendants that engaged in deliberate technological circumvention, not the use of valid login credentials. In *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010), the DMCA defendant MDY created a bot that allowed users to skip past the early levels of Blizzard's World of Warcraft online role-playing game. *Id.* at 935. Blizzard then implemented technological measures to block third-party bots and, in response, the defendant modified his bot to "avoid detection" by Blizzard. *Id.* at 936; *id.* ("Avoiding detection is rather exciting."). In *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018), the defendants circumvented a technological measure by using bots and dummy accounts to evade CAPTCHA prompts and purchase large quantities of tickets. *Id.* at 1155, 1167. In *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004), the defendant sold software with a feature that bypassed the encoding scheme used to prevent DVDs from being copied. *Id.* at 1094–95. And in *Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 349–50 (D. Me. 2003), the defendant built a "tunnel" into a private network to access copyrighted material.

InDesign has engaged in no similar conduct. InDesign has not used software to circumvent technological blocking measures by CDK—InDesign has never installed software on the CDK DMS at all. Lampert Decl., ¶ 27; LaGreca Tr. 117:5–8. While CDK alleges that Tekion built a VPN tunnel that connected to the CDK DMS, it is undisputed that InDesign did not. Lampert Decl., ¶ 26; LaGreca Tr. 119:3–8. And InDesign has done nothing to "avoid detection" by CDK; on the contrary, InDesign's dealer-created login credentials are plainly labeled with the name of InDesign's software. Lampert Decl., ¶ 39; LaGreca Tr. 125:5–10, 16–19; Swaminathan Tr. 99:25–100:6.

## B. CDK's DMCA claim constitutes copyright misuse

CDK's DCMA claim is unlikely to succeed for the additional reason that CDK's efforts to use

---

[11] *Actuate* and *EEE Business* (CDK Br. at 16) are inapplicable because they both involved DMCA claims against a defendant that *distributed* passwords under Section 1201(a)(2)—a provision not at issue in CDK's motion (*see* CDK Br. at 15, n.3). *Actuate Corp. v. Internat'l Bus. Machines Corp.*, 2010 WL 1340519, at *5-6 (N.D. Cal. Apr. 5, 2010) (defendant posted plaintiff's software and related materials, including license keys, on the internet); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2004) (defendant distributed a code used to unlock media programming).

the DMCA to lock down and control access to data it does not own is blatant copyright misuse. "The defense of copyright misuse forbids a copyright holder from securing an exclusive right or limited monopoly not granted by the Copyright Office." *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (quotation omitted) (cleaned up); *see also Splunk Inc. v. Cribl, Inc.*, 2024 WL 2701628, at *2 (N.D. Cal. May 24, 2024).[12] The Ninth Circuit has held that it is copyright misuse for a copyright holder to leverage its copyright to prevent the licensee from using a competitor. *Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 521 (9th Cir. 1997) (holding that a copyright holder only licensing its software based licensee's "promise not to use competitors' products constituted a misuse of the copyright").

That is precisely what CDK is doing here. Dealers—not CDK—own the data that dealers store on the DMS. *See supra* 3. The Ninth Circuit—in rejecting CDK's challenge to the Arizona Dealer Data Law—already has held that CDK has no copyright in the "raw data in DMS databases" or the arrangement of that data. *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1278–79 (9th Cir. 2021). CDK is using the DMCA—and its alleged proprietary interest in the code and algorithms underlying the DMS—to control access to dealer data that CDK does not own.

CDK, in short, is exerting control over data it does not own and thereby forcing dealers (and their chosen software vendors) to purchase data integration services directly from CDK at greatly inflated prices. That is copyright misuse. *Assessment Tech. of Wisc. v. WIREdata*, 350 F.3d 640, 641 (7th Cir. 2003) (rejecting "the attempt of a copyright owner to use copyright law to block access to data that not only are neither copyrightable nor copyrighted, but were not created or obtained by the copyright owner"); *id.* at 647 (holding that a database owner engaged in copyright misuse and an "abuse of process" by using a copyright suit to "obtain property protection . . . in data, that the copyright law clearly does not confer"); *see also Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 WL 2064201, at *14 (W.D.N.C. Feb. 16, 2023) (recognizing that the DMCA can enable "powerful corporations . . . [to] put[ ] digital locks on their products as a tool to capture and retain a huge market

---

[12] The copyright misuse defense applies to DMCA claims. *See, e.g.*, *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1152 (9th Cir. 2011); *Philips N. Am. LLC v. KPI Healthcare, Inc.*, 2020 WL 2475094, at *3–4 (C.D. Cal. Apr. 15, 2020).

share" over other markets, "reducing consumer choice").

### 1. Tortious Interference

Finally, CDK is not likely to succeed on its tortious interference claim because: (**A**) CDK cannot show that InDesign knew about the terms of CDK's dealership contracts or (**B**) that InDesign intentionally sought to disrupt CDK's contractual relationship with dealers. Further, (**C**) InDesign's longstanding data integration service serves a valid business purpose.

**A.**     CDK has produced no evidence that InDesign knew the terms of the agreements between CDK and dealer customers. The "defendant's knowledge of the contract" is an essential element of a tortious interference claim. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1133 (9th Cir. 2015); *NCWC Inc. v. CarGuard Admin. Inc.*, 635 F. Supp. 3d 815, 825 (D. Ariz. 2022) ("after-acquired knowledge" not sufficient).

InDesign has never seen a signed contract between CDK and any dealer, Lampert Decl. ¶ 52, because CDK treats its Master Servicers Agreement with dealers as proprietary and confidential. LaGreca Tr. 134:10–15.[13] CDK's argument (at 18) that, because InDesign is an industry member, it "should know that contracts governing access to a DMS are standard" has it backwards: up until recently, CDK's contracts expressly ***allowed*** dealers to authorize their "agents" to access the DMS, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d at 934, and CDK never objected to InDesign's dealer-authorized access, *see supra* 6.

CDK's reference (at 18) to InDesign's indemnification provision in its dealer contracts does not establish knowledge. The indemnification provision is a standard business term that protects against the risk of an unauthorized access claim; it does not show knowledge that dealers in fact lacked the power to authorize InDesign's to access the dealer's own data (which InDesign strongly disputes as a legal matter, *see supra* 15–16). Indeed, InDesign has used the same standard indemnification clause for years, including when CDK's contracts expressly allowed dealers to authorize InDesign's access as their agents. Lampert Decl., ¶ 17. Nor does the December 2024 email chain that CDK cites (at 18) change the

---

[13] When CDK submitted a handful of signed dealer contracts in connection with its motion, it filed those contracts under seal—accompanied by a declaration from Mr. LaGreca representing to the Court that they are highly proprietary. *See* Dkt. 44-2, Declaration of David LaGreca in Support of Administrative Motion to Seal, ¶¶ 5, 8.

analysis. That email reflects one dealership's reading of its contract; that dealership never provided InDesign with the underlying contract, nor did CDK ever reach out to InDesign directly (even after being forwarded the email chain). Ex. 10, Deposition of Denton Bales, at 73:8–21.[14]

**B.**    CDK also has not shown that InDesign "intended or designed to disrupt the plaintiff's contractual relationship," as required for a tortious interference claim. *Williams v. Univ. Med. Ctr. of S. Nev.*, 688 F. Supp. 2d 1134, 1140 (D. Nev. 2010). CDK must prove that InDesign knew "that contractual interference or breach [was] a 'necessary consequence of his action.'" *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *3 (C.D. Cal. Dec. 29, 2020). CDK cites no evidence that InDesign has taken any actions designed to induce a contract breach separate from providing dealers the option to purchase the same data integration services that InDesign has offered since 2013.[15] For example, CDK cites no evidence that InDesign ever told dealerships to terminate or breach their contracts with CDK. *Rosenthal*, 2020 WL 12948055, at *3; *see also Ixchel Pharma, LLC v. Biogen Inc.*, 2018 WL 558781, at *2 (E.D. Cal. Jan. 25, 2018) (dismissing claim where "plaintiff has not identified any evidence that indicates that defendant specifically told [party] to terminate its contract with plaintiff . . . or to breach its contract in any other way"). Indeed, CDK's recitation of purportedly "intentional actions" (at 18–19) amounting to tortious interference focus on the alleged conduct of Tekion, not InDesign. CDK has produced no evidence that InDesign, for example, installed VPN devices at dealerships, sought administrator-level credentials, or suggested dealerships not pay amounts they purportedly owed to CDK.

CDK's citation to *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006 (C.D. Cal. 2013) is misplaced because, in that case, the defendant designed and sold "botting software" that had "no other purpose" apart from automating the playing of World of Warcraft (which was

---

[14] *Axia Fin., LLC v. Mason McDuffie Mortg. Co.*, 2023 WL 7280443 (N.D. Cal. Sept. 20, 2023), which CDK cites, is inapposite. In that case, at least 40 of the defendant's employees had worked for the plaintiff and knew about the confidentiality agreements at issue from their time there. *Id.* at *11. InDesign has no such firsthand knowledge of CDK's contract terms.

[15] CDK submitted a declaration implying that InDesign misrepresented itself to a dealership in North Carolina as being affiliated with CDK. Dkt. 45-4, Kiser Decl., ¶ 9. That allegation is flatly untrue. InDesign never told that dealership (or any other dealership) that it is affiliated with CDK. Lampert Decl., ¶ 32. When questioned about this incident, the CDK declarant could offer no personal knowledge to substantiate CDK's false insinuation. Ex. 11, Deposition of Mark Kiser, at 84:3–9.

1  undisputedly proprietary to Blizzard). *Id.* at 1010–11, 1016. InDesign, by contrast, plainly has a

2  legitimate business purpose, as described further below: it has provided its data integration services to

3  dealerships across the country for a decade-plus without complaint or incident.  Nor does InDesign

4  inform its users how to "avoid detection" of its software, like the defendant in *Blizzard*. *Id.* at 1016.

5      **C.**       Finally, InDesign has a "legitimate business purpose" that will prevent CDK from

6  prevailing on its tortious interference claim. "Under California law, a legitimate business purpose" is a

7  defense to a tortious interference claim. *hiQ Labs, Inc.*, 31 F.4th at 1192 (citing cases). Courts consider

8  whether (1) "the means of interference involve no more than recognized trade practices;" (2) "whether

9  the conduct is within the realm of fair competition"; and (3) "whether the business interest is pretextual

10 or asserted in good faith." *Id.* (cleaned up) (citations omitted). InDesign's data integration services meet

11 all three criteria.

12     ***First***, InDesign's data integration service is a recognized trade practice. Dealer-authorized data

13 integration services have been widely used at automotive dealerships for decades. *See supra* 3–4. CDK

14 itself—before it saw greater profit in monopolizing access to dealer data—recognized, supported, and

15 employed that trade practice. *Id.* 4–5. Indeed, no other DMS provider (apart from CDK and Reynolds)

16 has interfered with or objected to InDesign's use of dealer-authorized access methods. Lampert Decl., ¶¶

17 49, 51; *Buxbom v. Smith*, 23 Cal. 2d 535, 546 (1944) (defense applies where "the means of interference

18 involve no more than recognized trade practices").

19     ***Second***, InDesign's conduct is squarely within the realm of fair competition. InDesign's very

20 existence ***promotes*** competition: it offers one of the few remaining independent data integration

21 services, providing a high-quality, low-cost service to dealerships and automotive software vendors.

22 Lampert Decl., ¶¶ 11, 30–31. Indeed, the desire to protect dealers' ability to use independent integrators

23 is what prompted state legislatures to enact the Dealer Data Laws that CDK unsuccessfully sued to

24 block. *See supra* 5, 20; *Buxbom*, 23 Cal. 2d at 546 ("The justification advanced is generally the right to

25 conduct a business in competition with that of the plaintiff."); *D & R Distrib. Co. v. Chambers Corp.*,

26 *Inc.,* 608 F. Supp. 1290, 1297 (E.D. Cal. 1984) ("The critical deficiency in plaintiff's case… is its lack

27 of any evidence that the defendants committed any acts which were not justified under the general

28 principles of competition.").

***Third***, InDesign asserts its business interests in good faith. InDesign serves dealers that want independent data integration services not to harm CDK, but rather because it wants to offer an innovative and affordably priced service that can help dealerships succeed. Lampert Decl., ¶ 33. CDK does not even allege that InDesign somehow provides its services—which it has offered in this same manner to automotive dealerships since 2013—in bad faith. Moreover, InDesign has its own contractual obligations to dealerships that it must fulfill. *Id.* ¶ 34; *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 80 (1979) (finding defendant acted in good faith and thus was not liable for tortious interference because its conduct "was not done solely to damage plaintiffs").

## III.    THE PUBLIC INTEREST AND EQUITIES FAVOR INDESIGN

Finally, CDK cannot demonstrate that the (1) "balance of equities tips in its favor" or (2) that the injunction would serve the public interest. *Winter*, 555 U.S. at 20.[16]

**1.**    CDK cannot show that the balance of equities tip in its favor. The district court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Bird-B-Gone, Inc. v. Bird Barrier Am., Inc.*, 2013 WL 11730662, at *7 (C.D. Cal. Mar. 20, 2013).

The balance of equities strongly favors denial of CDK's motion. If granted, CDK's motion would place InDesign's survival in serious jeopardy. Lampert Decl., ¶ 58. CDK's long course of anticompetitive conduct has already eliminated virtually every independent integrator and pushed InDesign (one of only two remaining competitors) to the brink. *See supra* 1, 4–5. Because CDK is the dominant DMS provider, more than half of InDesign's data integration business comes from serving CDK dealers. Lampert Decl., ¶ 57. While InDesign is a scrappy competitor and would do everything it can to survive and adapt, losing more than half of its customer base would pose an existential threat. *See, e.g., Admor HVAC Prods., Inc. v. Lessary*, 2019 WL 2518105, at *15 (D. Haw. June 18, 2019) ("[T]he balance of harms tips in favor of defendant when granting the injunction would close

---

[16] As a threshold matter, CDK again erroneously relies upon cases using the pre-*Starbucks* sliding scale to argue that because "CDK is likely to prevail on the merits, the public interest would be served by entering the injunction." Dkt. 45 at 25. But that is not correct: as discussed, *Starbucks* held that plaintiffs must separately make a "clear showing" on all four *Winter* elements, including on the balance of the equities and the public interest. *Starbucks*, 602 U.S. at 346.

defendant's business.").

On the other side of the ledger, CDK has identified no concrete harm if InDesign is allowed to continue conducting its business as it has since 2013. CDK's security claims are entirely speculative and its intellectual property arguments have no basis in fact, because InDesign only extracts dealer data, not CDK's proprietary information. *See supra* 5; *Wensel v. Gonzales*, 2009 WL 347628, at *3 (E.D. Cal. Feb. 11, 2009) ("In the absence of a threatened injury that is more than speculative, the court cannot find that the balance of hardships tips sharply in plaintiff's favor.").

**2.**    CDK's proposed preliminary injunction also does not serve the public interest, as it would harm consumers and competition by allowing CDK to finish its decade-long campaign to wipe out competition from independent data integrators.

Courts have repeatedly recognized the public's strong interest in preserving competition. *Elko, Inc. v. Peters*, 2022 WL 256975, at *6 (D. Nev. Jan. 27, 2022) (denying plaintiff's motion where "preliminary injunction would hinder natural competition and normal business activities in a specialized market"); *Qualcomm Inc. v. Compal Elecs., Inc.*, 283 F. Supp. 3d 905, 924 (S.D. Cal. 2017) (rejecting the argument that "protecting intellectual property rights trumps the public interest in market competition"). If CDK can wipe out or further hobble InDesign's business, dealerships and automotive software vendors (including those that rely on InDesign's services) will suffer, because they will be deprived of one of the few competitive options left. Lampert Decl., ¶ 58.

### CONCLUSION

The Court should deny CDK's motion for a preliminary injunction.

Dated:  May 1, 2025                           **WINSTON & STRAWN LLP**


By: _/s/ Joshua Hafenbrack_
    Joshua Hafenbrack (pro hac vice)
    jhafenbrack@winston.com
    Jade Briana Baker (pro hac vice)
    jbbaker@winston.com
    Sydney Hartman (pro hac vice)
    shartman@winston.com
    1901 L Street NW
    Washington, DC 20036
    Telephone: (202) 282-5017
    Fax: (202) 282-5100

    Jeanifer E. Parsigian (SBN: 289001)
    jparsigian@winston.com
    101 California Street, 35th Floor
    San Francisco, CA 94111
    Telephone: (415) 591-1000
    Facsimile: (415) 591-1400

    Bethany Ao (pro hac vice)
    bao@winston.com
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601
    Telephone: (312) 558-5600
    Fax: (312) 558-5700

    *Counsel for Defendant INDESIGN DATA,*
    *LLC*

**CERTIFICATE OF SERVICE**

I certify that on May 1, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: May 1, 2025                    _/s/ Joshua Hafenbrack_
                                      Joshua Hafenbrack

                                      Counsel for InDesign Data, LLC