Vineet Bhatia *(Admitted Pro Hac Vice)*
vbhatia@susmangodfrey.com
Shawn Raymond *(Admitted Pro Hac Vice)*
sraymond@susmangodfrey.com
Daniel Wilson *(Admitted Pro Hac Vice)*
dwilson@susmangodfrey.com
Meredith R. Harrison *(Admitted Pro Hac Vice)*
mharrison@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Jesse-Justin Cuevas (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Amy Gregory *(Admitted Pro Hac Vice)*
agregory@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Stephen Morrissey *(Admitted Pro Hac Vice)*
smorrissey@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union St., Suite 3000
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Rachel L. Schaller *(Admitted Pro Hac Vice)*
rachel.schaller@blankrome.com
Daniel Saeedi *(Admitted Pro Hac Vice)*
daniel.saeedi@blankrome.com
BLANK ROME LLP
444 West Lake Street, Suite 1650
Chicago, Illinois 60606
Telephone: (312) 776-2600
Facsimile: (312) 776-2601

*Attorneys for Plaintiff CDK Global, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CDK GLOBAL, LLC

Plaintiff,

vs.

TEKION CORP. and
INDESIGN DATA, LLC

Defendants.

INDESIGN DATA, LLC,
Counter-Plaintiff,

vs.

CDK GLOBAL, LLC,
Counter-Defendant.

Case No. 3:25-cv-01394-JSC

**PLAINTIFF CDK GLOBAL, LLC'S OPPOSITION TO DEFENDANT TEKION CORP.'S MOTION FOR SUMMARY JUDGMENT**

Date: January 14, 2027
Time: 10:00 a.m.
Court: 8, 19th Floor
Judge: Hon. Jacqueline Scott Corley

**PUBLIC REDACTED**

## TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED ........ 1

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 3

I. CDK Controls and Monitors Unauthorized Access to Its Closed DMS Platform ........ 3

II. CDK Migrates DMS Data for Departing Dealership Customers ........ 5

III. Tekion Infiltrates CDK's DMS Without CDK's Authorization ........ 6

IV. CDK Uncovers Tekion's Hacking Scheme ........ 7

A. In 2019, CDK Sends Tekion a Cease-and-Desist Letter and Tekion Denies Accessing CDK's DMS ........ 7

B. In 2021, CDK Employees with No Responsibility for Controlling Unauthorized Access Become Aware of Some Tekion Methods for Hacking ........ 8

C. In December 2022, CDK Disables Hundreds of User Accounts Used by Tekion and Tekion Agrees to Stop Unauthorized Access by March 2023 ........ 9

D. Tekion Resumes Hacking, and CDK Discovers the Full Scope of Tekion's Methods in November 2024 ........ 9

E. CDK Sends Tekion a Cease-and-Desist Letter in December 2024 and Files this Lawsuit on February 10, 2025 ........ 10

LEGAL STANDARD ........ 11

ARGUMENT ........ 11

I. Under the Separate Accrual Rule, CDK's Claims Are Timely as to Acts Occurring Within the Limitations Period ........ 11

A. The Computer Fraud and Abuse Act and California Comprehensive Computer Data Access and Fraud Act Claims Are Timely ........ 11

B. The Digital Millennium Copyright Act Claim Is Timely ........ 12

C. The Tortious Interference Claim Is Timely ........ 14

D. The UCL Claim Is Timely ........ 15

II. Factual Disputes Preclude Summary Judgment on Statute of Limitations Grounds ........ 15

A. Fact Issues Preclude Finding the Trade Secrets Misappropriation and UCL Claims Are Untimely ........ 16

B. Fact Issues Preclude Finding the DMCA Claim Is Untimely ........ 17

III. Laches Does Not Apply ........ 18

A. CDK Did Not Unreasonably Delay ........ 19

B. The Timing of CDK's Suit Did Not Prejudice Tekion ........ 20

IV. CDK Did Not Acquiesce to or Authorize Tekion's Hacking ........ 21

A. Tekion Lacked Authorization Under the CFAA and CDAFA ........ 21

B. Tekion Circumvented CDK's Technological Control Measures "Without the Authority of the Copyright Owner" in Violation of the DMCA ........ 22

V. CDK Took Reasonable Measures to Protect Its Trade Secrets ........ 23

VI. The Timing of CDK's Suit Does Not Preclude Finding Irreparable Harm ........ 25

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Allstate Ins. Co.*,
630 F.2d 677 (9th Cir. 1980)........................................ 14

*Aryeh v. Canon Bus. Sols., Inc.*,
292 P.3d 871 (Cal. 2013)........................................ *passim*

*Blake v. JP Morgan Chase Bank NA*,
927 F.3d 701 (3d Cir. 2019)........................................ 13

*Blindlight, LLC v. Cubbison*,
2017 WL 4769460 (C.D. Cal. July 3, 2017)........................................ 23

*Bliss v. CoreCivic, Inc.*,
978 F.3d 1144 (9th Cir. 2020)........................................ 2, 12, 13

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020)........................................ 12

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021)........................................ 11, 12

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021)........................................ 12, 13

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
862 F.3d 951 (9th Cir. 2017)........................................ 18

*CDK Glob., LLC v. Tekion Corp.*,
2025 WL 1939951 (N.D. Cal. July 15, 2025)........................................ 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................ 11

*Chegg, Inc. v. Doe*,
2023 WL 7392290 (N.D. Cal. Nov. 7, 2023)........................................ 22

*Couveau v. Am. Airlines, Inc.*,
218 F.3d 1078 (9th Cir. 2000)........................................ 18

*Craigslist Inc. v. 3Taps Inc.*,
942 F. Supp. 2d 962 (N.D. Cal. 2013)........................................ 22

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
880 F.3d 1109 (9th Cir. 2018)........................................ 11, 19, 20

*Facebook, Inc. v. Power Ventures, Inc.*,
252 F. Supp. 3d 765 (N.D. Cal. 2017)........................................ 21, 25

*Facebook, Inc. v. Power Ventures, Inc.*
749 F. App'x 557 (9th Cir. 2019) .... 25

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) .... 21

*Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc.*,
411 F. Supp. 3d 905 (N.D. Cal. 2019) .... 14

*G & G Prods. LLC v. Rusic*,
902 F.3d 940 (9th Cir. 2018) .... 15

*Gemisys Corp. v. Phoenix Am., Inc.*,
186 F.R.D. 551 (N.D. Cal. 1999) .... 25

*Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc.*,
674 F.2d 1336 (9th Cir. 1982) .... 24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
639 F. Supp. 3d 944 (N.D. Cal. 2022) .... 16, 17

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
2019 WL 4166864 (N.D. Ill. Sept. 3, 2019) .... 12

*In re Qualcomm Litig.*,
2018 WL 5840027 (S.D. Cal. Nov. 8, 2018) .... 14

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
2015 WL 13357646 (C.D. Cal. May 6, 2015) .... 23

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) .... 23, 24

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*,
907 P.2d 358 (Cal. 1995) .... 17

*Luke v. Sonoma County*,
256 Cal. Rptr. 3d 489 (Ct. App. 2019) .... 15

*MD Helicopters, Inc. v. Aerometals, Inc.*,
2021 WL 978953 (E.D. Cal. Mar. 16, 2021) .... 15

*Media Rts. Techs., Inc. v. Microsoft Corp.*,
922 F.3d 1014 (9th Cir. 2019) .... 13, 17

*Meyer Tech. Sols., LLC v. Kaegem Corp.*,
2017 WL 4512918 (N.D. Ill. Oct. 10, 2017) .... 12

*Miller v. Glenn Miller Prods., Inc.*,
454 F.3d 975 (9th Cir. 2006) .... 20

*Miniace v. Pac. Mar. Ass'n*,
2006 WL 648732 (N.D. Cal. Mar. 13, 2006) .... 17

*Mountain Copper Co. v. Welcome Growers Gin Co.*,
17 Cal. Rptr. 355 (Ct. App. 1961) ... 16

*Nano-Second Tech. Co., Ltd. v. Dynaflex Int'l*,
2013 WL 1855828 (C.D. Cal. May 1, 2013) ... 14

*Niantic, Inc. v. Global++*,
2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ... 22

*Pearl Invs., LLC v. Standard I/O, Inc.*,
257 F. Supp. 2d 326 (D. Me. 2003) ... 18

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014) ... 13, 19

*Phreesia, Inc. v. Certify Glob., Inc.*,
2022 WL 911207 (D. Md. Mar. 29, 2022) ... 12

*Pitt v. Metro. Tower Life Ins. Co.*,
675 F. Supp. 3d 1073 (S.D. Cal. 2023) ... 25

*PQ Labs, Inc. v. Yang Qi*,
2014 WL 4954161 (N.D. Cal. Sept. 30, 2014) ... 23, 24

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ... 25

*Russell v. Price*,
612 F.2d 1123 (9th Cir. 1979) ... 20

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
627 F. Supp. 2d 1096 (N.D. Cal. 2008) ... 20

*Semegen v. Weidner*,
780 F.2d 727 (9th Cir. 1985) ... 15

*Sewell v. Bernardi*n,
795 F.3d 337 (2d Cir. 2015) ... 12

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,
2008 WL 166950 (N.D. Cal. Jan. 17, 2008) ... 25

*Smartix Int'l Corp. v. MasterCard Int'l LLC*,
2008 WL 4444554 (S.D.N.Y. Sept. 30, 2008) ... 12

*Stern v. Weinstein*,
2010 WL 11459791 (C.D. Cal. Jan. 6, 2010) ... 22

*Stevens v. CoreLogic, Inc*.,
194 F. Supp. 3d 1046 (S.D. Cal. 2016) ... 23

*Tekion Corp. v. CDK Glob., LLC*,
2026 WL 3409085 (N.D. Cal. Nov. 10, 2026) ... 10

*Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164 (C.D. Cal. 2018) .......... 22

*Toyota Motor Sales, U.S.A. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010) .......... 19

*Trembath v. Digardi*, 118 Cal. Rptr. 124 (Ct. App. 1974) .......... 14

*United States v. Chung*, 659 F.3d 815 (9th Cir. 2011) .......... 24

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) .......... 24

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434 (9th Cir. 1984) .......... 16

*Wolf v. Travolta*, 167 F. Supp. 3d 1077 (C.D. Cal. 2016) .......... 14

*Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 2021 WL 4895977 (S.D. Cal. Oct. 20, 2021) .......... 23, 24

*Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995 (9th Cir. 2023) .......... 3, 25

**Statutes**

17 U.S.C. § 507(b) .......... 13

17 U.S.C. § 1201 .......... 18, 22

18 U.S.C. § 1030 .......... 11, 21

18 U.S.C. § 1836(d) .......... 16

18 U.S.C. § 1839(3) .......... 23

CAL. BUS. & PROF. CODE § 17208 .......... 15

CAL. CIV. CODE § 2332 .......... 16

CAL. CIV. CODE § 3426.1(d) .......... 23

CAL. CIV. CODE § 3426.6 .......... 16

CAL. CIV. PROC. CODE § 339 .......... 14

CAL. PEN. CODE § 502(e)(5) .......... 11

**Rules**

FED. R. CIV. P. 56(a) .......... 11

## STATEMENT OF ISSUES TO BE DECIDED

(1) Whether the separate accrual rule and genuine disputes of material fact preclude summary judgment on Tekion's statute-of-limitations defense. (2) Whether established legal doctrine and genuine disputes of material fact preclude summary judgment on Tekion's laches defense. (3) Whether genuine disputes of material fact preclude finding as a matter of law that CDK acquiesced to Tekion's conduct that violates the DMCA, CFAA, and CDAFA. (4) Whether genuine disputes of material fact preclude finding as a matter of law that CDK failed to take reasonable measures to protect its trade secrets. (5) Whether genuine disputes of material fact preclude finding as a matter of law that CDK cannot establish irreparable harm required for a permanent injunction.

## INTRODUCTION

Discovery has established that Tekion Corp. ("Tekion")—a competitor of CDK Global, LLC ("CDK") in the DMS space—repeatedly hacked into CDK's private computer system. Tekion induced CDK's dealership customers to provide Tekion password-protected user accounts and, to cover its tracks, told dealerships not to "include any reference to Tekion or Tekion employee names." Ex. 56 at -594. Tekion used [redacted] to mask its identity. Ex. 57 at -898–899. And, as CDK learned in November 2024, Tekion sent dealerships Meraki devices for Tekion to [redacted] Ex. 58 at -965. Tekion's founder and Chief Operating Officer admits that Tekion [redacted]. Ex. 59 at 103:23–104:3. Tekion's Motion for Summary Judgment ("Mot.") does not seriously dispute that Tekion engaged in unauthorized access during the relevant limitations periods (which date back to February 2021 or February 2023, depending on the claim). Instead, Tekion asks the Court to determine, as a matter of law, that CDK waited too long to object to every instance of Tekion's misconduct.

Tekion is wrong as a matter of law and fact. CDK never authorized Tekion to access its DMS. Ex. 51 (D. LaGreca Decl.) ¶ 47; Ex. 53 (M. Noser Decl.) ¶¶ 22–23. CDK objected every time it learned what Tekion was doing. In May 2019, CDK sent Tekion a cease-and-desist letter warning that using dealer-provided credentials to access CDK's DMS was "without authorization" and violated multiple federal and state laws. Ex. 34. Tekion lied, responding: "it is not Tekion that

accesses the DMS." Ex. 35 at -981. Tekion now blames CDK for believing Tekion's lies.

In late 2022, CDK discovered Tekion's lie and disabled hundreds of Tekion-associated user accounts. Ex. 53 ¶ 17. CDK's in-house counsel then contacted Tekion's General Counsel, Aysswarya Murthi, to discuss using cooperative data conversion protocols. Following these meetings, in February 2023, Tekion agreed to "***stop accessing any CDK systems by 3/15***" and "***get all the data/docs from CDK***." Ex. 60 at -144.[1] CDK's disabling of accounts and Tekion's own agreement to stop hacking—facts that Tekion's Motion conveniently ignores—upend Tekion's contention that CDK somehow "acquiesced" to Tekion's misconduct.

Tekion stayed out of CDK's systems from early 2023 to mid-2024. But then, Tekion reverted to its old ways and began to secretly hack into CDK's proprietary DMS. In November 2024, CDK learned that Tekion had resumed using dealership-provided login credentials. CDK also learned ***for the first time*** that Tekion was using Meraki VPN devices to tunnel into CDK's private network without permission. CDK sent a cease-and-desist letter within weeks and filed this suit two months later. Ex. 41; ECF No. 1. That is not acquiescence. CDK objected, was lied to, objected again, was promised compliance, and sued when the broken promise was uncovered. Tekion cannot break its word and then fault CDK for having believed it.

Each of Tekion's arguments for summary judgment fails on the law, the facts, or both.

*First*, the premise of Tekion's statute-of-limitations defense is that CDK is attempting to recover under a theory of continuing violation or equitable tolling or delayed discovery. That is wrong. CDK does not seek relief for conduct that occurred prior to the two-, three-, or four-year limitations periods for CDK's respective claims. Tekion accessed CDK's DMS at least (1) [redacted] times in the two years pre-suit; (2) [redacted] times in the three years pre-suit; and (3) [redacted] times in the four years pre-suit. Ex. 50 (V. Swaminathan Decl.) ¶¶ 41-43. Tekion's access was prohibited by CDK's dealer contracts and was not authorized by CDK. Ex. 21 § 4; Ex. 51 ¶ 47; Ex. 53 ¶¶ 22–23. Under the separate accrual rule, CDK can recover for each act of unauthorized access that triggers its own limitations period. *See Bliss v. CoreCivic, Inc.*, 978 F.3d 1144, 1148 (9th Cir. 2020); *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 875–76 (Cal. 2013). Tekion's request for summary

[1] All emphasis in this brief is added.

judgment on all claims as time-barred fails for this reason alone. *See* Part I, *infra* at 11–15.

*Second*, genuine factual disputes preclude Tekion's remaining arguments for summary judgment. As to statute of limitations, laches, and acquiescence, what CDK knew, when CDK knew it, and what CDK tolerated are questions of fact that cannot be resolved on a Rule 56 motion. The same is true for whether CDK took reasonable measures to protect its trade secrets. Tekion asks the Court to accept its version of a contested factual record and to draw every inference in its own favor. Rule 56 requires the opposite approach. *See* Parts II–V, *infra* at 15–25.

*Third*, the timing of CDK's suit says nothing about whether CDK will suffer irreparable harm and is entitled to a permanent injunction once Tekion is found liable. *See Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023). *See* Part VI, *infra* at 25.

## STATEMENT OF FACTS

### I. CDK Controls and Monitors Unauthorized Access to Its Closed DMS Platform

CDK is a leading provider of a dealer management system (DMS). Ex. 51 ¶¶ 3-4. A DMS is a suite of software applications for dealerships to manage inventory, service vehicles, close transactions, and handle accounting. *Id.* ¶ 5. In addition to CDK's proprietary data and trade secrets, CDK's DMS stores large amounts of sensitive and/or proprietary data exchanged among dealerships, consumers, and other third parties. *Id.* ¶¶ 8–27. Given the amount of data stored on CDK's DMS, cybersecurity is critical. *Id.* ¶ 28. An essential element of CDK's data security protocol is controlling access to its DMS, which CDK does in three ways.

*First*, CDK uses hardware and software to keep connections to the DMS private. Ex. 51 ¶ 30. To use the DMS, a dealership must have hardware to configure its local network connection to CDK's servers. *Id.* ¶¶ 31-32. CDK deploys a fully encrypted virtual private network (VPN) or other private networking system between the dealership and its data centers. *Id.* ¶ 31. CDK controls both ends of the tunnel, limits access to authorized dealerships' IP addresses, and uses firewalls to ensure only "trusted" internal networks can connect to its DMS. *Id.* ¶¶ 31-34, 42. CDK further restricts access by requiring password-protected login credentials to access its DMS. *Id.* ¶¶ 35-37.

*Second*, CDK requires every dealership customer to enter a Master Services Agreement

(MSA) that imposes contractual access restrictions. Ex. 51 ¶¶ 38-46. Each MSA grants a dealership a license to CDK's software "Products and Services." Ex. 21 § 1. The MSA prohibits dealerships from sharing login credentials with third parties, or creating new accounts for them, or running third-party scripts on CDK's DMS. Ex. 21 §§ 4(b), 4(d).[2] The MSA incorporates the Product Guide, which restricts clients from connecting third-party devices without CDK's authorization. Ex. 51 ¶¶ 40, 46. CDK's MSA requires dealerships to "treat as confidential" and "not disclose or otherwise make available any of the Products and Services . . . or any trade secrets . . . to any person other than employees of [the dealership] with a need-to-know." Ex. 21 § 4(d).

Contractual restrictions on unauthorized third-party access are well-known in the industry. Since at least 2022, Tekion has possessed copies of CDK's MSA and is thus aware of these terms. *See, e.g.*, Ex. 61; Ex. 62. Tekion similarly restricts competitors from accessing Tekion's DMS when a dealership leaves Tekion's platform and instructs each departing dealer that Tekion must handle the data transfer. Ex. 59 at 106:17–107:8; Ex. 63 at -183 ("[redacted]"). Tekion's standard MSA states in all caps: "[redacted]" Ex. 64 at -950; *see also* Ex. 59 at 105:23–106:10.

*Third*, CDK utilizes a "Non-Authorized Access Reduction" ("NAAR") tool that disrupts unauthorized user accounts. Ex. 53 ¶¶ 3, 5. When CDK observes accounts running unauthorized software scripts, CDK can (1) deploy a CAPTCHA prompt; (2) change the password for the account; or (3) disable the user account. Ex. 53 ¶ 6. CDK tracks these disruptions as "Security Events." Ex. 53 ¶¶ 7–8; Ex. 54. Since approximately 2016, CDK's Senior Director Mike Noser has had oversight of the NAAR tool and disrupting nonauthorized access to CDK's DMS. Ex. 53 ¶ 3.

[2] For approximately four years, CDK had a "Data Share Authorization" program through which dealerships could request permission for a dealership employee to run third-party software scripts with a whitelisted account if they executed a Data Share Authorization form that reaffirmed the MSA restrictions. Ex. 53 ¶¶ 10-11; Ex. 55 at -604 (example form); Ex. 65 at 78:1–10. The Data Share Authorization program did not permit third parties to use dealership-provided login credentials to directly access CDK's DMS. Ex. 53 ¶ 12; Ex. 65 at 78:11–21.

## II. CDK Migrates DMS Data for Departing Dealership Customers

Because CDK controls access to its DMS, CDK does not allow its competitors to extract the data for departing DMS customers. Instead, CDK has a dedicated Implementation Data Services ("IDS") team that manages data exports for departing customers. Ex. 52 (B. Rowland Declaration) ¶¶ 2, 11; Ex. 66 at -834. Tekion likewise controls outgoing data migration from its DMS. Ex. 59 at 106:17–107:8; Ex. 63 at -183. In 2020, CDK and Tekion had a "handshake" agreement to cooperate on data conversions, and they entered a formal agreement on April 2, 2021. Ex. 33 at -839 (Tekion confirming "[redacted]"); Ex. 67 (Feb. 2020 "Dealer Switching Guidelines"); Ex. 68 (Apr. 2021 CDK-Tekion Agreement). CDK has data conversion cooperation agreements with other competitors. Ex. 69 (Dealertrack); Ex. 70 (Dominion); Ex. 71 (Pinewood). CDK handles hundreds of DMS migrations each year. Ex. 52 ¶ 6.

The outgoing conversion process follows defined steps. *First*, the competitor submits an "FTP Request Form," identifying the departing dealership and requested dates for data pulls. Ex. 66 at -834; Ex. 72 at 90:17–92:3; *see also, e.g.*, Ex. 75 at -273 (FTP Request Form). *Second*, upon receipt, a CDK team member creates an accounts receivable ("AR") approval request. Ex. 66 at -834; Ex. 72 at 92:15–17. *Third*, AR managers confirm that the departing dealership has satisfied financial obligations. Ex. 66 at -834, -836; Ex. 73 at 51:14–15. *Fourth*, once AR approval is given, CDK exports the data. Ex. 72 at 155:22–156:4 (extraction set up "usually [within] 24 hours" of AR approval). Competitor vendors then can pick up the data through CDK's "conversion extraction program," which does not give the competitor access to CDK's DMS. Ex. 74 at 239:20–240:16.

Data sent too far in advance of a dealership's "Go Live" date (launch date on the new DMS) will be stale. Ex. 73 at 22:19–23:3 (explaining "data changes frequently," so the receiving vendor needs "the most recent data"); Ex. 74 at 250:6–15 (data received more than 90 days out is "problematic"). CDK offers dealerships two to three data pulls in advance of Go Live—and does so free of charge. Ex. 72 at 67:16–68:10, 133:7–11; Ex. 74 at 45:15–21, 252:10–15. And while CDK and its competitors have a preference to receive data 60–90 days before a Go Live, that often does not happen for multiple reasons. Ex. 74 at 250:16–18 ("it's very common that we might get data a week or two at a time or the day before go-live"); Ex. 72 at 273:4–6 ("We do buy/sells with

data the day before."); Ex. 73 at 132:4–20 (describing practices when data given within 90 days).

CDK's goal is for departing DMS customers to have a positive experience with outgoing data migrations because CDK may win back the dealership as a future DMS customer. Ex. 76 at 323:2–13. Most often, CDK achieves that goal. Ex. 73 at 130:8–17 ("95 percent of the times we provide our customers with data on time"). But delays in data conversions can happen for a variety of reasons, such as an incomplete FTP Request Form from the competitor vendor, a dealership's unpaid financial obligations to CDK, or inadvertent miscommunication. Ex. 72 at 320:5–321:16. CDK invests in improving its processes. Ex. 76 at 52:16–19, 72:3–20; Ex. 77 at -638 (two-day workshop to improve data curation process).

Delays are a small percentage of CDK's overall outgoing data migrations. According to Tekion, of the [redacted] dealerships that switched from CDK to Tekion between [redacted] experienced Go Live date changes attributable to CDK. Ex. 78 at 90:25–91:13; Ex. 79 (Tekion Resp. to Interrogatory No. 10) at Exhibit B (identifying alleged delays at [redacted] rooftops). Most delays were only [redacted], and CDK disputes whether even the [redacted] changes in Go Live date are attributable to CDK's conduct. Ex. 79, Exhibit B. Indeed, Tekion's own data conversion specialist, Joey McCollum, who verified Tekion's interrogatory answer, *see* Ex. 79, [redacted] that CDK was at fault for many of the [redacted] so-called delays. *See* Ex. 80 at -352 ([redacted]); *id.* at -355 ([redacted]); *id.* at -361 ([redacted]); *see also* Ex. 78 at 167:23–168:5; *id.* at 213:20–214:12.

## III. Tekion Infiltrates CDK's DMS Without CDK's Authorization

Between February 2021 and February 2025, Tekion accessed CDK's DMS through separate dealerships [redacted] times. Ex. 50 ¶ 41; Ex. 81 at Exhibit A (Tekion Resp. to Interrogatory No. 1 identifying instances of access to CDK's DMS).[3] Tekion admits [redacted]. Ex. 82 at 58:10–18, 86:22–25; Ex. 59 at 103:23–104:3. Rather,

[3] Tekion's records demonstrate the actual number of instances of Tekion's access to CDK's DMS is likely substantially higher. *See* Ex. 50 ¶¶ 65–75. CDK reserves the right to present the complete number of instances of Tekion's access to CDK's DMS in its forthcoming expert disclosures, to be served in accordance with the applicable deadline set by the Court.

Tekion covertly infiltrated CDK's DMS in three steps.

*First*, Tekion uses password-protected login credentials in a way that obscures the true identity of the user. Tekion requests that dealerships create a "MAINT" or admin-level account for Tekion's use, which allows Tekion to create new user accounts and modify existing ones. *See, e.g.*, Ex. 58 at -965–966; Ex. 82 at 31:20–32:4, 51:12–52:4; *see also* Ex. 51 ¶ 59. Tekion instructs dealers to "not include any reference to Tekion or Tekion employee names" when creating those accounts. Ex. 56 at -594. Tekion also obscures its identity by [redacted] Ex. 57 at -898–899; Ex. 84 at 153:6–155:18; *see also* Ex. 85 at -963 (inquiring [redacted]).

*Second*, Tekion mails dealerships Meraki VPN Endpoints so it can "[redacted]" undetected. Ex. 58 at -965; *see also* Ex. 86 at -010; Ex. 87 at -263–264; Ex. 88 at -158–159; Ex. 82 at 40:3–14; Ex. 83 at -812. A Meraki device enables Tekion to connect remotely to the dealership's IP address. Ex. 51 ¶ 57. Tekion instructs dealerships on installation. Ex. 58 at -965–966; Ex. 82 at 53:5–55:20.

*Third*, once connected, Tekion runs "a[redacted]." Ex. 6 ¶¶ 21, 23.

Tekion has stated it only accesses CDK's DMS when CDK delays an outgoing DMS data migration. *See, e.g.*, Ex. 6 ¶ 15. Not true. According to Tekion, CDK allegedly began delaying DMS data migrations in "early 2023." Ex. 42 ¶ 40. But Tekion has been accessing CDK's DMS on and off since 2019. Ex. 81 at Exhibit A (Resp. to ROG No. 1); Ex. 50 ¶¶ 40-64; Ex. 89 at 43:1-7 (confirming [redacted]). Regal Nissan is illustrative. On May 6, 2024 at 6:26 pm, Tekion contacted Regal about "[redacted]" with a Meraki device. Ex. 90 at -197. That outreach occurred before the dealership notified CDK to cancel DMS service. Ex. 75 (FTP Request Form sent May 21); Ex. 91 (request for financial obligations sent May 6 at 9:15pm); Ex. 84 at 104:11–107:4. Tekion never gave CDK a chance to export the data.

## IV. CDK Uncovers Tekion's Hacking Scheme

### A. In 2019, CDK Sends Tekion a Cease-and-Desist Letter and Tekion Denies Accessing CDK's DMS

In 2019, CDK began to suspect that Tekion was using dealership-provided login credentials

to access CDK's DMS. Ex. 53 ¶ 13. The usernames appeared to be associated with dealership employees, but one user description stated "Tekion_Tekion." *Id.*; Ex. 54 at 2. On May 8, 2019, CDK sent Tekion a cease-and-desist letter stating any use of third-party software scripts to access CDK's DMS is "without authorization" and identified statutes Tekion's conduct violated. Ex. 34 at 3. CDK further stated that "inducing CDK dealership customers to create and provide DMS login credentials for Tekion's use" is a "clear violation of those dealers' agreements with CDK." *Id.* CDK demanded that Tekion "immediately cease and desist" its access. *Id.* at 4.

After an exchange of correspondence, on June 12, 2019, Tekion denied accessing CDK's DMS, stating: "***it is not Tekion that accesses the DMS***. Rather, it is the dealer, through its own computer located on its own premises, using its own passwords, and submitting its own service information" who uses Tekion's Digital Service Environment ("DSE") software product. Ex. 35 at -981. Tekion represented the DSE software does not "run on . . . CDK DMSs," but instead runs on "dealers' hardware and operating systems, not CDK's." *Id.* at -982.

In 2019, CDK observed about two dozen user accounts running scripts that bore Tekion's signature. Ex. 53 ¶¶ 13, 15; Ex. 54. CDK ran CAPTCHA prompts to disrupt those credentials. Ex. 53 ¶ 15. CDK did not observe any fingerprints of Tekion's software after September 2019. *Id.*

### B. In 2021, CDK Employees with No Responsibility for Controlling Unauthorized Access Become Aware of Some Tekion Methods for Hacking

In 2021, a handful of CDK employees observed Tekion was accessing CDK's DMS. *See* Ex. 30; Ex. 31; Ex. 38. Loy Johnson, a Support Engineer, began looking into it although "[n]obody asked [him] to." Ex. 92 at 22:18–21; *id.* at 150:20–151:21. Johnson's "primary responsibility with CDK is in the realm of DMS system performance." Ex. 92 at 17:7–13, 18:5–19:4. His role does not directly include cybersecurity, he is not part of CDK's security team, and disrupting nonauthorized access is not part of his regular job. Ex. 92 at 20:20–21:1, 66:4–6, 205:17–206:2. In July 2021, he created a list of separate DMSs that he believed Tekion was accessing, and he shared that list with sales. *See* Ex. 31; Ex. 38. When a dealership appeared on Johnson's list, he "usually [found] out from sales that the client is already known to be a loss." Ex. 31 at -771; *see also* Ex. 93 at 187:18–188:3 ("I don't think it helped" sales); Ex. 94 at 115:3–116:2 (information "probably not" useful).

### C. In December 2022, CDK Disables Hundreds of User Accounts Used by Tekion and Tekion Agrees to Stop Unauthorized Access by March 2023

In late 2022, Loy Johnson first shared his findings on Tekion's activity with CDK's in-house legal department and Mike Noser, who has responsibility for disabling nonauthorized user accounts. Ex. 53 ¶¶ 3, 16-17. Between December 23, 2022, and April 7, 2023, CDK disabled 407 accounts believed to be associated with Tekion. *Id.* ¶¶ 17-19; Ex. 54. Tekion's General Counsel and Founder/CEO, Jay Vijayan, were aware of the disablements. Ex. 85 at -961.

At the same time, CDK's legal department and conversion team engaged Tekion directly. On January 4, 2023, CDK Senior Legal Counsel James Kinzer called Tekion's General Counsel and emailed her to discuss "using the conversion support agreement that [Tekion and CDK] signed last April." Ex. 95 at -978. The lawyers spoke on January 10, 2023, and Tekion's General Counsel then asked to bring together CDK's and Tekion's conversion engineers. *Id.* at -977.

On January 23, 2023, a group of Tekion and CDK lawyers and conversion specialists met to discuss cooperative data transfers. Ex. 97. Through multiple meetings in 2023, CDK explained that it does not allow competitor DMS vendors to directly access its DMS using dealership-provided login credentials. Ex. 52 ¶¶ 8-10; Ex. 96 at -747. Instead, CDK sets up the data pull through its "conversion extraction program" for the competitor to pick up the data. Ex. 52 ¶¶ 10-12; Ex. 74 at 239:20–240:16. Following a January 2023 meeting, Tekion's General Counsel suggested CDK and Tekion "learn from the first conversion" to "standardize a process and protocol that works for all of us" and then update the April 2021 data conversion agreement. Ex. 96 at -744.

Tekion then committed to stop accessing CDK's DMS. On February 22, 2023, a Tekion director informed Tekion's COO, Guru Sankararaman, and others, copying Tekion's General Counsel: "***We are stop [sic] accessing any CDK systems by 3/15 and going to get all the data/docs from CDK per recent discussions/recommendations***." Ex. 60 at -144. Four months later, Tekion confirmed [redacted] Ex. 33 at -839.

### D. Tekion Resumes Hacking, and CDK Discovers the Full Scope of Tekion's Methods in November 2024

Until 2024, Tekion appeared to abide by its promise to stop accessing CDK's DMS. Ex. 81

at Exhibit A (Resp. to Interrogatory No. 1); Ex. 50 ¶ 64; *see also* Ex. 16 at -637 (April 2024 confirmation that Tekion was not pulling data). That changed in mid-2024. CDK experienced a cyber event that forced CDK to take all aspects of its business offline. Ex. 76 at 294:20–295:20. As a result, CDK could not facilitate outgoing DMS data migrations. Ex. 76 at 296:16–20; Ex. 99 at 75:10–17 (Tekion's James Livingstone acknowledging CDK had to "re-onboard their system" and "at the very end was data extract processes"). Around that time, and unbeknownst to CDK, Tekion restarted accessing CDK's DMS to extract data. Ex. 81 at Exhibit A (Resp. to Interrogatory No. 1); Ex. 50 ¶ 64; Ex. 83 at -812 (Tekion asking [redacted]).

In November 2024, CDK learned that Tekion had resumed unauthorized access when a dealership forwarded an email from Tekion to CDK's Judy Tan. Ex. 98 at -387–388. That email instructed the dealership to (1) install the Meraki device; and (2) provide login credentials with "MAINT function enabled." *Id.* at -391–392. The dealership had not submitted an FTP Request Form to give CDK the opportunity to facilitate the outgoing DMS data conversion. *Id.* at -381.

### E. CDK Sends Tekion a Cease-and-Desist Letter in December 2024 and Files this Lawsuit on February 10, 2025

After learning Tekion had resumed unauthorized access, CDK acted promptly. On December 6, 2024, CDK sent Tekion a cease-and-desist letter demanding an end to Tekion's access "without authorization." Ex. 41. Tekion responded by filing a lawsuit in this Court claiming that CDK was engaged in anticompetitive conduct by delaying DMS data migrations. *See* Ex. 42. The Court granted summary judgment dismissing Tekion's antitrust claims on November 10, 2026. *See Tekion Corp. v. CDK Glob., LLC*, 2026 WL 3409085 (N.D. Cal. Nov. 10, 2026).

On February 10, 2025, following an investigation into the scope of Tekion's renewed misconduct, CDK filed this suit. ECF No. 1. CDK's operative First Amended Complaint seeks legal and equitable relief arising out of Tekion's violations of the (1) Computer Fraud and Abuse Act (CFAA); (2) Digital Millennium Copyright Act (DMCA); (3) Defend Trade Secrets Act (DTSA); (4) California Comprehensive Computer Data Access and Fraud Act (CDAFA); (5) California Uniform Trade Secrets Act (CUTSA); (6) common law against tortious interference; and (7) California Unfair Competition Law (UCL). ECF No. 93 ("FAC") ¶¶ 163–313.

## LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether there is a triable issue, "the judge must view the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in favor of that party." *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1118 (9th Cir. 2018).

## ARGUMENT

### I. Under the Separate Accrual Rule, CDK's Claims Are Timely as to Acts Occurring Within the Limitations Period

Tekion's wrongful acts are "separate, recurring invasions of the same right [that] each trigger their own separate statute of limitations." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1069 (N.D. Cal. 2021) (Koh, J.) (citing Ninth Circuit and California Supreme Court law). This principle, known as the "separate accrual" or "continuous accrual" rule, means that "a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period." *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 875–76 (Cal. 2013). CDK's claims are timely as to those acts that occurred within the limitations period for each claim.

#### A. The Computer Fraud and Abuse Act and California Comprehensive Computer Data Access and Fraud Act Claims Are Timely

The CFAA requires plaintiffs to file suit "within 2 years of the date ***of the act*** complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). The CDAFA likewise has a three-year statute of limitations accruing from "the date ***of the act*** complained of, or the date of the discovery of the damage, whichever is later." CAL. PEN. CODE § 502(e)(5). Tekion argues that "[l]ater instances of Tekion's DMS access do not revive CDK's expired claims" under the CFAA and CDAFA. Mot. at 13. That is a strawman. CDK seeks no relief for "expired claims." CDK's claims are based only on the separate acts within the limitations period. Tekion acknowledges CDK may seek remedies stemming "from acts occurring on or after February 10, 2022 (for purposes of

the CCDAFA) or February 10, 2023 (for purposes of the CFAA)." Mot. at 14. CDK agrees.

If there were any doubt, the statutes' reference to a singular "act" pegs the statute of limitations to each discrete instance of accessing CDK's DMS without authorization. In *Bliss v. CoreCivic, Inc.*, 978 F.3d 1144, 1148 (9th Cir. 2020), the Ninth Circuit held the Wiretap Act's singular "violation" means claims run from "each interception" of a "communication." The court explained that the Wiretap Act's "multiple references to 'communication' in the singular," meant there was "no textual basis for morphing what otherwise would be considered separate violations into a single violation because they flow from a common practice or scheme." *Id.* "The Ninth Circuit's reasoning applies to" the CFAA and CDAFA "which also refer to . . . 'act' in the singular." *Brown*, 525 F. Supp. 3d at 1069 (Koh, J.) (extending *Bliss* to CDAFA); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 625 (N.D. Cal. 2021) (Koh, J.) (extending *Bliss* to CFAA).[4]

The cases Tekion cites do not undermine *Bliss*, *Brown*, and *Calhoun*. Mot. at 13–14. Two of the cases did not have a separate "act" within the limitations period. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 137 (N.D. Cal. 2020) ("gravamen" of suit was that "Apple unlawfully upgraded Plaintiffs' Apple devices to 2FA, which occurs at a discrete point in time"); *Smartix Int'l Corp. v. MasterCard Int'l LLC*, 2008 WL 4444554, at *3 (S.D.N.Y. Sept. 30, 2008) ("final act of unauthorized computer access" occurred outside the limitations period). And in *Meyer Tech. Sols., LLC v. Kaegem Corp.*, 2017 WL 4512918, at *1 (N.D. Ill. Oct. 10, 2017), the court applied the "continuing violation" doctrine[5]—not the separate accrual rule—in dismissing a CFAA claim.

### B. The Digital Millennium Copyright Act Claim Is Timely

A DMCA claim is subject to the three-year statute of limitations for copyright infringement

---

[4] The Second Circuit and multiple district courts agree. *See Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015) (statute of limitations ran separately for unauthorized access to AOL account and Facebook account); *Phreesia, Inc. v. Certify Glob., Inc.*, 2022 WL 911207, at *10 (D. Md. Mar. 29, 2022) (applying the "separate-accrual approach" to CFAA claim "[t]o the extent it is based on acts of unauthorized access that occurred within two years of the date Phreesia filed suit"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2019 WL 4166864, at *9 (N.D. Ill. Sept. 3, 2019) ("[T]o the extent that CDK's CFAA counterclaim is based on more recent conduct [within two years of filing suit], the claim is timely.").

[5] "The continuing violation doctrine aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them." *Aryeh*, 292 P.3d at 875.

set forth in 17 U.S.C. § 507(b). *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1025 (9th Cir. 2019). "It is widely recognized that the separate-accrual rule attends the copyright statute of limitations" under 17 U.S.C. § 507(b). *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). "Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation." *Id.* Through separate dealership networks, Tekion committed successive violations of the DMCA by deploying (1) password-protected credentials and (2) Meraki devices to bypass CDK's private network restrictions. Ex. 50 ¶¶ 10, 17-25; *see also supra* at 6–7. CDK's DMCA claim is timely because it is based only on Tekion's circumvention of technological control measures that occurred in the three years prior to February 10, 2025.

Tekion misreads *Media Rights*, 922 F.3d 1014, as imposing a categorical rule that the separate-accrual rule can never apply to DMCA claims. Mot. at 13. In *Media Rights*, the plaintiff software developer, MRT, alleged that Microsoft (1) violated the Copyright Act because Microsoft's "software 'contains a copy of and/or is a derivative work of' the MRT Software and thus infringes MRT's copyrights"; and (2) "violated the DMCA by circumventing measures in the MRT Software meant to prevent reverse engineering and copying." 922 F.3d at 1019. The reverse engineering occurred between August 2004 and September 2005—well outside the limitations period. *Id.* at 1023. The Ninth Circuit rejected that sales of infringing products within the limitations period could revive the DMCA claim under the separate accrual rule because MRT alleged only ***a single act of circumvention***, reverse engineering, that occurred ***outside the limitations period***. *Id.* at 1025–26. The court did not consider whether MRT could bring a DMCA claim based on successive acts of reverse engineering within the limitations period because none were alleged.

An absolute bar of the separate accrual rule to DMCA claims would mean that a bad actor could violate the DMCA, agree to stop, and then, after the initial limitations period has run, begin new acts of circumvention with impunity. That outcome is antithetical to the rule of law. The separate accrual rule is generally applicable to federal statutes. *See, e.g.*, *Petrella*, 572 U.S. at 671 (Copyright Act); *Bliss*, 978 F.3d at 1148 (Wiretap Act); *Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 706 (3d Cir. 2019) (Real Estate Settlement Procedures Act); *Calhoun*, 526 F. Supp. 3d at 625 (Stored Communications Act). The DMCA is no exception.

### C. The Tortious Interference Claim Is Timely

"A cause of action for tortious interference with business relationships is governed by the two year statute of limitations." *Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 683 (9th Cir. 1980); CAL. CIV. PROC. CODE § 339. "[U]nder the doctrine of continuous accrual, any conduct of tortious interference within the two year statute of limitations period constitute new breaches and separate actionable claims." *In re Qualcomm Litig.*, 2018 WL 5840027, at *1 (S.D. Cal. Nov. 8, 2018); *see also Trembath v. Digardi*, 118 Cal. Rptr. 124, 125 (Ct. App. 1974) ("In general, a cause of action for wrongfully induced breach occurs ***at the date of the wrongful act***."). CDK's tortious interference claim arises from Tekion's inducement of dealerships to breach their MSAs on and after February 10, 2023. FAC ¶¶ 283–298. Each time Tekion induced a dealership to breach its MSA, that constitutes a separate "wrongful act" triggering its own limitations period. It cannot be that Tekion's 2019 inducement of "Dealership A" to breach its MSA immunizes Tekion from a 2024 inducement of "Dealership B" to breach its separate MSA. Rather, CDK's claim is timely as to every inducement and resulting breach occurring within two years of filing this lawsuit.

Tekion argues the separate accrual rule does not extend to tortious interference claims. Mot. at 14–15. But Tekion's cited cases did not involve interference with a business relationship within the limitations period. *Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc.*, 411 F. Supp. 3d 905, 919 (N.D. Cal. 2019) (failure to allege specific transactions affected by defendant's request that Amazon change plaintiff's product listings); *Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1106 (C.D. Cal. 2016) (no allegations "that defendants have interfered with any particular economic relationships in the two years preceding" suit).[6] Here, Tekion induced at least one dealership to breach its MSA in the two years prior to this suit. Ex. 50 ¶¶ 23, 31, 35-36; Ex. 51 ¶¶ 80-84. CDK's tortious interference claim is therefore timely, precluding summary judgment.

---

[6] None of these cases held that the separate accrual rule can never apply to a tortious interference claim. *See, e.g.*, *Factory Direct*, 411 F. Supp. 3d at 919 (declining to decide the issue); *Wolf*, 167 F. Supp. 3d at 1106 (holding "theory of continuous accrual does not appear to apply to this claim" based on the "record before the Court"). And in *Nano-Second Tech. Co., Ltd. v. Dynaflex Int'l*, 2013 WL 1855828, at *3 (C.D. Cal. May 1, 2013), the court denied summary judgment based on a triable issue concerning when plaintiff had the requisite knowledge for accrual.

### D. The UCL Claim Is Timely

UCL claims have a four-year statute of limitations. CAL. BUS. & PROF. CODE § 17208. "To determine whether the continuous accrual doctrine applies" to a UCL claim, courts look "to the nature of the obligation allegedly breached." *Aryeh*, 292 P.3d at 881. CDK's UCL claim is based on (1) Tekion's violations of the CFAA, CDAFA, and DMCA, FAC ¶ 310; and (2) Tekion's unfair business practices, FAC ¶ 306. Because the separate accrual rule applies to violations of the CFAA, CDAFA, and DMCA, *see supra* at 11–14, CDK can sue "for those discrete acts occurring within the four years immediately preceding the filing of [its] suit." *Aryeh*, 292 P.3d at 881.

As to Tekion's unfair business practices, the separate accrual rule applies. Citing *Luke v. Sonoma County*, 256 Cal. Rptr. 3d 489 (Ct. App. 2019), Tekion argues the rule is inapplicable because it "owes no 'recurring obligation' to CDK." Mot. at 15. In *Luke*, there was no "recurring obligation" because the UCL claim was based on breach of a "one-time obligation." 256 Cal. Rptr. 3d at 495. By contrast, a party may have a "recurring obligation" with respect to unfair business practices, which supports application of the separate accrual rule. *Aryeh*, 292 P.3d at 882 (each challenged unfair practice can be a "new unfair act with its own attendant limitations period").

## II. Factual Disputes Preclude Summary Judgment on Statute of Limitations Grounds

Triable issues independently preclude summary judgment on CDK's claims that accrue based on the discovery rule. "[T]he question of when a claim accrues can often be a fact-intensive inquiry." *See G & G Prods. LLC v. Rusic*, 902 F.3d 940, 953 (9th Cir. 2018). "When the facts presented by the parties can be interpreted in more than one way, the question of when the limitations period begins to accrue is a question of fact for the jury." *MD Helicopters, Inc. v. Aerometals, Inc.*, 2021 WL 978953, at *3 (E.D. Cal. Mar. 16, 2021). The Ninth Circuit has repeatedly vacated summary judgment on a statute-of-limitations defense when facts are disputed. *See, e.g.*, *G & G Prods.*, 902 F.3d at 953 (vacating summary judgment because "potentially relevant facts [were] hotly disputed"); *Semegen v. Weidner*, 780 F.2d 727, 733 (9th Cir. 1985) (vacating summary judgment where "there exists a factual issue regarding plaintiffs' discovery of the fraud"). When CDK had the requisite knowledge for accrual of each claim is a disputed material fact.

### A. Fact Issues Preclude Finding the Trade Secrets Misappropriation and UCL Claims Are Untimely

Trade secret misappropriation claims under federal and California law have a three-year statute of limitations running from when the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d); CAL. CIV. CODE § 3426.6. UCL claims similarly have a four-year statute of limitations from when "the plaintiff discovers, or has reason to discover, the cause of action." *Aryeh*, 292 P.3d at 875.

When CDK discovered or should have discovered Tekion's misconduct is a disputed fact that cannot be resolved at summary judgment. Tekion's statute-of-limitations defense depends primarily on the May 2019 cease-and-desist letter. Mot. at 11–12, 15. Drawing all inferences in CDK's favor, that letter reflects only CDK's suspicion Tekion was using password-protected login credentials and a warning that such conduct is unauthorized. Ex. 34. Tekion expressly denied that suspicion with its June 12, 2019 response that "***it is not Tekion that accesses the DMS***." Ex. 35 at -981–982. In *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1437 (9th Cir. 1984), the Ninth Circuit reversed an order granting summary judgment because "whether the reassuring statements of defendant reasonably affected that notice" to trigger statute of limitations on fraud or misrepresentation claims "is a disputed question of fact." The same applies here. Tekion offers no factual or legal explanation for how CDK was on inquiry notice after Tekion's denial.

As for Tekion's alternative argument that CDK knew of Tekion's unauthorized access in 2021 based on Johnson's and other CDK employees' emails, Mot. at 12, genuine factual disputes preclude summary judgment under that limitations theory, too. Whether an employee's knowledge is attributable to the company depends on the law of agency. *See* CAL. CIV. CODE § 2332 (limiting principal's imputed knowledge based on scope of agency). "Knowledge acquired by an agent ***while acting within the course and scope of his employment*** is chargeable to his principal, his employer." *Mountain Copper Co. v. Welcome Growers Gin Co.*, 17 Cal. Rptr. 355, 357 (Ct. App. 1961). The employee must not only possess the knowledge, but also "have a duty to disclose that knowledge." *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 969 (N.D. Cal. 2022). "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question

of fact." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 362 (Cal. 1995).

Johnson testified he was acting outside the scope of his employment when he observed Tekion's access in 2021. Ex. 92 at 16:21–21:1 (defining scope of job); *id.* at 22:18–21 (confirming "[n]obody asked [him] to look into" Tekion's access). None of the people Johnson corresponded with in 2021 had responsibility for monitoring or disabling nonauthorized access. Ex. 53 ¶ 21. It was not until late 2022 that Johnson first reported significant nonauthorized access to CDK's legal department and the head of the CDK team that disrupts nonauthorized user accounts. Ex. 53 ¶ 17.[7] This evidence, construed in CDK's favor, demonstrates that CDK did not discover Tekion's misconduct until 2022, making CDK's trade secret misappropriation and UCL claims timely.[8]

Courts routinely deny summary judgment on limitations defenses when, as here, the scope of an employee's responsibilities and reporting obligations is genuinely disputed. *See, e.g.*, *hiQ*, 639 F. Supp. 3d at 970 (denying summary judgment because "a genuine dispute exists as to the scope of employment of the LinkedIn's employees" and "a factfinder may draw more than one reasonable inference regarding whether LinkedIn knew or should have known about hiQ's scraping"); *Miniace v. Pac. Mar. Ass'n*, 2006 WL 648732, at *3 (N.D. Cal. Mar. 13, 2006) (denying summary judgment on limitations grounds based on fact question of HR Director's reporting obligations). No matter what Johnson and his colleagues knew in 2021, a genuine dispute of material fact remains regarding whether their knowledge is attributable to CDK.

**B. Fact Issues Preclude Finding the DMCA Claim Is Untimely**

For a DMCA claim, the three-year statute of limitations accrues from when the plaintiff "learned, or reasonably should have learned, of [defendant's] alleged violation of the DMCA." *Media Rights*, 922 F.3d at 1025. The DMCA prohibits circumvention of a technological measure

[7] Tekion says that "[b]etween 2019 and 2021," Johnson "discussed his findings about Tekion's access to CDK's DMS with key CDK personnel," including David Hiers, Mike Noser, and David LaGreca. Mot. at 8 (citing Ex. 17 at 26:10–27:18). Nothing in the record supports that. Johnson testified he did not know when his conversation with Hiers took place, Ex. 17 at 26:19–21, and gave no date of other discussions. *See* Ex. 17 at 26:10–27:18.

[8] Citing deposition testimony, Tekion claims Johnson began monitoring Tekion in 2019. Mot. at 12. Johnson suffers from chronic illness affecting his memory and cognitive ability, which discounts his deposition testimony that he began monitoring Tekion "between 2019 and 2021." Ex. 92 at 12:3–7, 22:14–17. Tekion has introduced no emails evidencing Johnson knew of Tekion's conduct in 2019. The earliest email is February 2021. *See* Ex. 30.

in order to access the copyrighted work. 17 U.S.C. § 1201(a)(1). Circumvention under the DMCA means, *inter alia*, "to avoid [or] bypass" "a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). Tekion "avoided" or "bypassed" CDK's technological measures by (1) inducing dealerships to provide it with password-protected login credentials; and (2) deploying Meraki devices to tunnel into CDK's private network. Both methods of circumvention are independent DMCA violations. *See, e.g.*, *Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 350 (D. Me. 2003) (denying summary judgment because jury could find defendant's "configur[ing] his server and router to tunnel into [plaintiff's private] network" violated the DMCA); *CDK Glob., LLC v. Tekion Corp.*, 2025 WL 1939951, at *9 (N.D. Cal. July 15, 2025) (denying motion to dismiss because "using the dealers' credentials . . . to access CDK's system 'avoided' or 'bypassed' CDK's technological measures to ensure dealer-only access").

As to the first method of circumvention, there is a dispute when CDK learned or should have learned that Tekion was using password-protected login credentials. *See supra* at 16–17.

As to the second method of circumvention, it is undisputed CDK first learned Tekion was using Meraki devices to bypass CDK's firewalls and private network restrictions on November 1, 2024—a mere ***three months*** before CDK filed suit. *See supra* at 10; Mot. at 4 (discussing Tekion's use of VPN devices). Tekion does not argue that CDK should have learned about the Meraki devices before 2024. Mot. at 12–13. CDK's DMCA claim is timely for the independent reason that CDK could not have learned Tekion was tunneling into CDK's network until November 2024.

**III. Laches Does Not Apply**

Tekion seeks summary judgment on laches. Mot. at 15–18. "To establish laches a defendant must prove both [1] an unreasonable delay by the plaintiff and [2] prejudice to itself." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). Tekion proves neither element as a matter of law. "Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." *Id.*; *see also Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 976 (9th Cir. 2017) ("dispute of material fact as to whether any delay was unreasonable" precluded summary judgment on laches).

### A. CDK Did Not Unreasonably Delay

Tekion's argument that laches warrants summary judgment on CDK's legal claims fails at the threshold. "[I]n face of a statute of limitations . . . laches cannot be invoked to bar legal relief." *Petrella*, 572 U.S. at 679. CDK's filing within the applicable statute of limitations creates a "strong presumption" against finding unreasonable delay. *Eat Right*, 880 F.3d at 1115. At a minimum, CDK's claims are timely under the separate-accrual rule. *See supra* at 11–15.[9]

Regardless, Tekion's account of "delay" omits what CDK did and what Tekion promised in return. *See* Mot. at 15–16. The complete timeline shows no delay:

- **2019 objection and denial.** On May 8, 2019, CDK sent Tekion a cease-and-desist letter. Ex. 34. Tekion responded that "it is not Tekion that accesses the DMS." Ex. 35 at -981.
- **2022 disablement and meetings.** Beginning in December 2022, CDK disabled hundreds of accounts. Ex. 53 ¶¶ 17-19; Ex. 54. CDK then met with Tekion's General Counsel and data conversion team, and the parties renewed cooperative data migration protocols. Ex. 52 ¶¶ 8-14; Ex. 95 at -977–978; Ex. 96 at -744–747.
- **2023 promise and cooperative agreement.** Tekion agreed to stop access and abided by that promise until 2024. Ex. 60 at -144; Ex. 50 ¶ 64; Ex. 81 at Exhibit A.
- **2024 discovery and prompt action.** In November 2024, CDK discovered that Tekion had resumed its unauthorized access, and learned for the first time that Tekion was using Meraki devices. Ex. 52 ¶ 15; Ex. 98 at -387–388. CDK sent a cease-and-desist letter on December 6, 2024, Ex. 41, and filed this suit on February 10, 2025. ECF No. 1.

Delay attributable to efforts to resolve a dispute without litigation is not unreasonable for purposes of laches. *See Toyota Motor Sales, U.S.A. v. Tabari*, 610 F.3d 1171, 1183 (9th Cir. 2010) (two years was not unreasonable delay because "during that period the parties were actively seeking to resolve [the] matter out of court"); *Eat Right*, 880 F.3d at 1119 (triable issue whether plaintiff "was trying to settle its claims with Whole Foods" precluded summary judgment on laches). Here, Tekion agreed to stop hacking, and CDK relied on that agreement to forgo litigation in 2023. Tekion

[9] Even when laches does apply, it ordinarily limits only pre-suit relief and does not license future wrongdoing or prevent a permanent injunction. *See Petrella*, 572 U.S. at 685–87.

cannot break its promise and then accuse CDK of unreasonable delay for having believed it.[10]

**B. The Timing of CDK's Suit Did Not Prejudice Tekion**

Even if Tekion could show unreasonable delay, it also must show prejudice, such as "[taking] actions or suffer[ing] consequences that it would not have, had the plaintiff brought suit promptly." *Eat Right*, 880 F.3d at 1119. Tekion's laches defense flounders on this element as well.

*First*, Tekion cites [redacted] spent between 2019–2024 [redacted] Mot. at 17. [redacted] Ex. 49 ¶ 5. [redacted]. *Id.* Tekion's CFO suggests Tekion would not have made this investment if CDK sued sooner, *id.*, but Tekion offers no specifics how its investment for its DMS (launched in 2020) and other products would have changed based on the timing of this lawsuit. Spending Tekion would have made regardless is not prejudice. *See Russell v. Price*, 612 F.2d 1123, 1126 (9th Cir. 1979) (affirming no laches where "Defendants at no time changed their film distribution activities in reliance on [plaintiff's] conduct").

*Second*, Tekion says the timing of CDK's suit is "more prejudicial given how CDK began introducing artificial barriers" to the outgoing DMS data migration process. Mot. at 17. Those barriers are nonexistent. The "artificial barriers" affected only [redacted] of CDK-to-Tekion migrations. Ex. 78 at 90:25–91:13; Ex. 79 at Exhibit B; *see also* Ex. 52 ¶¶ 6, 14 (CDK has cooperatively provided data to Tekion for hundreds of dealerships). An equally plausible inference is that CDK's conduct had no effect on dealerships' ability to launch on Tekion's platform. *See supra* at 6.

*Third*, Tekion overstates the "valuable, hidden insight into Tekion's business" that CDK supposedly gained to Tekion's detriment. Mot. at 18. When Tekion accessed CDK's DMS, CDK's sales team often already knew the customer was leaving CDK. *See, e.g.*, Ex. 31 at -711 ("client is already known to be a loss"). Tekion does not cite a single example of CDK winning back a customer or otherwise disrupting Tekion's relationship with that dealership.

---

[10] Neither of Tekion's cases involved a party who "delayed" by attempting pre-suit resolution. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 999 (9th Cir. 2006) (plaintiff aware of infringement years before filing suit, sent eight cease-and-desist letters, but no letter to defendant); *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1114 (N.D. Cal. 2008) (plaintiff ignored trademark infringement for 18 years).

*Finally*, Tekion's claimed belief that "it could continue helping dealers extract their data from CDK's DMS using dealer-provided credentials" lacks credibility. Mot. at 18. Tekion does not allow competitors to access its own DMS. Ex. 63 at -183; Ex. 64 at -950; Ex. 59 at 105:23–106:10. Before launching its DMS, Tekion received CDK's 2019 cease-and-desist letter. Ex. 34. If any doubt remained, in 2023 Tekion agreed to use CDK-controlled data conversions. Ex. 60 at -144. If Tekion believed CDK had no objection to Tekion's access, the fault lies with Tekion—not CDK.

## IV. CDK Did Not Acquiesce to or Authorize Tekion's Hacking

Tekion argues that CDK acquiesced to or impliedly authorized Tekion's access, defeating elements of the CFAA, CDAFA, and DMCA claims. Mot. at 19–21. Tekion is wrong.

### A. Tekion Lacked Authorization Under the CFAA and CDAFA

The CFAA requires CDK to show that Tekion accessed CDK's DMS "without authorization." 18 U.S.C. § 1030(a)(4). A defendant acts "without authorization" when "he or she has no permission to access a computer or when such permission has been revoked explicitly." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). Tekion never had CDK's permission to access CDK's DMS, and CDK's MSAs prohibit Tekion's access. Ex. 21 §§ 4(b), 4(d); Ex. 51 ¶ 47; Ex. 53 ¶ 22–23. Tekion's COO admitted that [redacted] Ex. 59 at 103:23–104:3.

Yet Tekion argues it had "authorization" to access CDK's DMS from dealerships. Mot. at 19. This narrative is undermined by Tekion's own prohibitions against dealerships authorizing competitors' access to Tekion's DMS. Ex. 59 at 105:23–107:8; Ex. 63 at -183; Ex. 64 at -950. And CDK expressly revoked any inferred permission in 2019 and again in 2023. CDK's May 8, 2019 letter told Tekion that "inducing CDK dealership customers to create and provide DMS login credentials for Tekion's use" is "unauthorized" and violates the CFAA. Ex. 34 at 3.[11]

That 2019 letter sufficed to revoke whatever permission Tekion wrongly thought it had. In *Power Ventures*, the Ninth Circuit held plaintiff Facebook "expressly rescinded" permission provided by Facebook users to access Facebook's website "when Facebook issued its written cease and desist letter to [defendant] Power." 844 F.3d at 1067. District courts agree a cease-and-desist

[11] Tekion's James Fox agreed this letter conveyed lack of permission. Ex. 89 at 40:6-41:6.

letter constitutes an express revocation of permission. *See, e.g.*, *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *6 (N.D. Cal. Nov. 7, 2023) ("Defendants surely accessed the site without authorization once Chegg revoked any and all access to its website in the letter." (emphasis in original)); *Niantic, Inc. v. Global++*, 2019 WL 8333451, at *6 (N.D. Cal. Sept. 26, 2019) (letter "revoke[d] Defendants' access altogether"); *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 969–70 (N.D. Cal. 2013) (continued use of website after receipt of cease-and-desist letter constitutes unauthorized access). Tekion offers no explanation why the 2019 letter was inadequate. *See* Mot. at 19–20.[12]

If any doubt remained, in 2023, CDK again revoked any permission Tekion thought it had through account disablements and meetings between the parties' legal departments and data conversion specialists. Ex. 52 ¶¶ 8-13; Ex. 95 at -977–978; Ex. 96 at -744; Ex. 97. Tekion then agreed to "stop accessing any CDK systems by 3/15." Ex. 60 at -144; *see also* Ex. 33 at -839 (telling [redacted] Tekion's assertion that CDK "[s]ilently disable[ed] accounts, without explanation" is, at best, contested and, at worst, false. Mot. at 20.[13]

**B. Tekion Circumvented CDK's Technological Control Measures "Without the Authority of the Copyright Owner" in Violation of the DMCA**

A DMCA claim requires circumvention of "a technological measure, ***without the authority of the copyright owner***." 17 U.S.C. §§ 1201(a)(1), 1201(a)(3)(A). Faced with its own undisputed use of Meraki devices and login credentials, *see supra* at 6–7, Tekion argues that "[b]ecause CDK knew of and indeed tolerated dealers sharing access credentials with Tekion, Tekion did not act 'without the authority of the copyright owner.'" Mot. at 20. The record does not support that.

---

[12] At most, Tekion cites *Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1175 (C.D. Cal. 2018) for the proposition that "admonish[ing] Defendants for violating the [terms of use]" of a website "does not 'actually revoke access authority.'" Mot. at 19. In *Ticketmaster*, the cease-and-desist letter "appear[ed] to imply that Defendants could continue to use Ticketmaster's website so long as they abide by the TOU." 306 F. Supp. 3d at 1176. Tekion does not suggest (because it cannot) that CDK's 2019 letter indicated Tekion could continue using dealership-provided login credentials to access CDK's DMS so long as Tekion abided by certain conditions.

[13] Tekion cites *Stern v. Weinstein*, 2010 WL 11459791, at *2 (C.D. Cal. Jan. 6, 2010) for the proposition that permission must be "affirmatively rescinded." Mot. at 20. In *Stern*, the court did not consider what conduct amounts to an affirmative rescission and instead accepted as true on a motion to dismiss that defendant "had authorization to access the [Consumer Attorneys Association of Los Angeles] listserv at all relevant times." 2010 WL 11459791, at *2.

*First*, Tekion presents no evidence that CDK knew of or tolerated Tekion's use of Meraki devices. CDK discovered Tekion's use of Meraki devices in November 2024 and sent a cease-and-desist letter on December 6, 2024. Ex. 52 ¶ 15; Ex. 98 at -387–388; Ex. 41.

*Second*, whether CDK knew of and tolerated Tekion's use of login credentials is disputed. *See supra* at 16–17. These facts distinguish Tekion's sole cited authority. *See* Mot. at 21. In *Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046, 1054 (S.D. Cal. 2016), through license agreements, plaintiff photographers "impliedly gave authority to the [defendant real estate] agents to upload these photographs even though the result was the removal of [copyright management information]." By contrast, CDK never licensed the DMS to Tekion and Tekion agreed to stop accessing CDK's DMS. Ex. 60 at -144. There was no implied consent.

## V. CDK Took Reasonable Measures to Protect Its Trade Secrets

Under both DTSA and CUTSA, "a required element of a trade secret is that the owner 'has taken reasonable measures to keep such information secret.'" *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020) (citing 18 U.S.C. § 1839(3); CAL. CIV. CODE § 3426.1(d)). "Whether a party's efforts are 'reasonable' is ordinarily an issue for the trier of fact." *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 2021 WL 4895977, at *22 (S.D. Cal. Oct. 20, 2021); *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 2015 WL 13357646, at *3 (C.D. Cal. May 6, 2015) ("The reasonable efforts analysis is a 'fact intensive' one."). Drawing all inferences in CDK's favor, CDK has taken three "reasonable measures" to ensure secrecy of its trade secrets.[14]

*First*, CDK uses technological measures. CDK (1) encrypts its private network, Ex. 51 ¶ 31; (2) limits access to devices tied to authorized IP addresses and uses firewalls to regulate access, *id.* ¶¶ 33-34; and (3) requires password-protected login credentials to access CDK's DMS, *id.* ¶ 35. Courts hold such controls are reasonable measures to protect trade secrets. *See InteliClear*, 978 F.3d at 660 (encryption); *PQ Labs, Inc. v. Yang Qi*, 2014 WL 4954161, at *6 (N.D. Cal. Sept. 30, 2014) (secure servers); *Blindlight, LLC v. Cubbison*, 2017 WL 4769460, at *11 (C.D. Cal. July 3, 2017) (passwords).

---

[14] Tekion contends CDK's trade secrets are "unidentified." Mot. at 21. Tekion ignores that CDK identified its trade secrets in response to Tekion's Interrogatory No. 7. *See* Ex. 4 at 11–12.

*Second*, CDK's MSAs contain confidentiality clauses and related terms. "Confidentiality provisions constitute reasonable steps to maintain secrecy." *InteliClear*, 978 F.3d at 660. CDK's MSA requires dealerships to "treat as confidential" and "not disclose" CDK's products or trade secrets "to any person other than employees of [the dealership] with a need-to-know." Ex. 21 (MSA) § 4(d). It also restricts dealerships from granting third-party software access to CDK's DMS or copying or reverse engineering CDK products. *Id.* §§ 4(b)–(c). These contractual restrictions satisfy the reasonable measures to ensure secrecy requirement. *See, e.g.*, *United States v. Chung*, 659 F.3d 815, 825 (9th Cir. 2011) ("limiting access to a trade secret on [a] 'need to know basis' is a 'reasonable measure[] for maintaining secrecy'"); *Workplace Techs.*, 2021 WL 4895977, at *22 (disclosure of trade secrets "on an as-needed basis" and requiring confidentiality agreements could constitute a "reasonable effort to maintain the secrecy of [plaintiff's] alleged trade secrets").

*Third*, CDK has data share agreements with competitor DMS vendors, including Tekion. Ex. 67 (Tekion 2020 Agrmt.); Ex. 68 (Tekion 2021 Agrmt.); Ex. 69 (Dealertrack); Ex. 70 (Dominion); Ex. 71 (Pinewood). Under these agreements, CDK pulls the dealership's DMS data and provides CDK's competitors with login credentials to a "conversion extraction program"—not the DMS that dealership employees can access with their accounts. Ex. 74 at 239:20–240:16.

Tekion fails to establish an absence of reasonable secrecy measures as a matter of law.

*First*, Tekion asserts that CDK "does not track or monitor authorized users' access to its DMS." Mot. at 21. That is disputed. For years, CDK has monitored nonauthorized access. Ex. 53 ¶¶ 3, 16. Although consistent fingerprints for unauthorized users can be difficult to identify, Ex. 53 ¶ 4, the law does not require perfection. *See, e.g.*, *Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1340 (9th Cir. 1982) ("Secrecy need not be absolute."); *PQ Labs,* 2014 WL 4954161, at *6 ("Plaintiffs need not employ every conceivable method of protecting their trade secrets in order to show . . . 'reasonable' efforts ….").

*Second*, Tekion points out CDK's trade secrets are available to dealership employees. Mot. at 21. It is "well established that 'confidential disclosures to employees, licensees, or others will not destroy the information's status as a trade secret.'" *United States v. Nosal*, 844 F.3d 1024, 1043–44 (9th Cir. 2016). No dealerships are exempt from confidentiality provisions. Ex. 51 ¶ 39.

*Third*, Tekion argues that CDK disclosed its trade secrets to Tekion "*for years*, without consequence" and in 2022 "merely disabled accounts and then assumed, without verifying, that its 'imperfect' countermeasures had worked." Mot. at 22. Again, Tekion's own documents refute this. CDK disabled accounts and then had multiple meetings with Tekion. *See supra* at 9. Once Tekion resumed misconduct, CDK sent a cease-and-desist letter. Ex. 41. Unlike Tekion's cited cases, CDK did not inconsistently enforce its protective measures. *See Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 561 (N.D. Cal. 1999) (plaintiff "was inconsistent in designating [software product] as confidential" in license agreements); *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2008 WL 166950, at *17 (N.D. Cal. Jan. 17, 2008) (plaintiff "disregarded" confidentiality provisions).[15]

## VI. The Timing of CDK's Suit Does Not Preclude Finding Irreparable Harm

A permanent injunction requires "irreparable injury." *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 773 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019). Tekion's violations of the CFAA support a finding of irreparable injury. *Id.* at 782 (violations of CFAA "constitute irreparable harm"). Tekion argues "CDK's yearslong acquiescence" forecloses finding irreparable harm. Mot. at 22. Once again, Tekion's argument hinges on an inaccurate recitation of the facts that, regardless, cannot be resolved at summary judgment. *See supra* at 16–19.

Even if CDK had delayed, permanent injunctive relief would remain available. Tekion cites cases denying ***preliminary injunctions*** based on delay. *See* Mot. at 22–23 (citing cases). Delay does not have "equal bearing in the permanent injunction context (where the injunction protects established rights that a jury found were violated) rather than the preliminary injunction context (where the injunction preserves the status quo pending litigation)." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023). The key question is whether, after Tekion is found liable, CDK is entitled to protection against future harms. The timing of CDK's suit is irrelevant.[16]

## CONCLUSION

CDK respectfully requests the Court deny Tekion's motion for summary judgment.

---

[15] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), cited by Tekion, considered the constitutionality of a federal statute not at issue in this case and is inapposite for that reason.

[16] In Tekion's only case involving a permanent injunction, the court denied relief based on "no ongoing violation." *Pitt v. Metro. Tower Life Ins. Co.*, 675 F. Supp. 3d 1073, 1087 (S.D. Cal. 2023).

Dated: November 16, 2026

**SUSMAN GODFREY L.L.P.**

By: */s/ Vineet Bhatia*

VINEET BHATIA *(Admitted Pro Hac Vice)*
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*Admitted Pro Hac Vice*)
sraymond@susmangodfrey.com
DANIEL WILSON *(Admitted Pro Hac Vice*)
dwilson@susmangodfrey.com
MEREDITH R. HARRISON *(Admitted Pro Hac Vice*)
mharrison@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

AMY GREGORY *(Admitted Pro Hac Vice*)
agregory@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

STEPHEN MORRISSEY *(Admitted Pro Hac Vice)*
smorrissey@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union St., Suite 3000
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

RACHEL SCHALLER (*Admitted Pro Hac Vice*)
DANIEL SAEEDI (*Admitted Pro Hac Vice*)
rachel.schaller@blankrome.com
daniel.saeedi@blankrome.com

BLANK ROME LLP
444 West Lake Street, Suite 1650
Chicago, Illinois 60606
Telephone: (312) 776-2600
Facsimile: (312) 776-2601

*Attorneys for Plaintiff CDK Global, LLC*